IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**JUDGE WOODS**



14 CV 1757

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR AMCORE BANK, N.A.; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR AMTRUST BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR BANKUNITED, F.S.B.; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR CALIFORNIA NATIONAL BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COLONIAL BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COMMUNITY BANKS OF COLORADO; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR CORUS BANK, N.A.; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR DOWNEY SAVINGS AND LOAN ASSOCIATION, F.A.; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR EUROBANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST COMMUNITY BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST FEDERAL BANK OF CALIFORNIA, F.S.B.; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST NATIONAL BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST REGIONAL BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FRONTIER BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR GEORGIAN BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR GUARANTY BANK; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **COMPLAINT** <br><br> **CASE NO.:** <br><br> **JURY TRIAL DEMANDED** |

RECEIVED
MAR 1 4 2014
U.S.D.C. S.D. N.Y.

FEDERAL DEPOSIT INSURANCE                )
CORPORATION AS RECEIVER FOR              )
HILLCREST BANK; FEDERAL DEPOSIT          )
INSURANCE CORPORATION AS RECEIVER        )
FOR IMPERIAL CAPITAL BANK; FEDERAL       )
DEPOSIT INSURANCE CORPORATION AS         )
RECEIVER FOR INDYMAC BANK, F.S.B.;       )
FEDERAL DEPOSIT INSURANCE                )
CORPORATION AS RECEIVER FOR INTEGRA      )
BANK, N.A.; FEDERAL DEPOSIT INSURANCE    )
CORPORATION AS RECEIVER FOR IRWIN        )
UNION BANK AND TRUST COMPANY;            )
FEDERAL DEPOSIT INSURANCE                )
CORPORATION AS RECEIVER FOR LA JOLLA     )
BANK, F.S.B.; FEDERAL DEPOSIT INSURANCE  )
CORPORATION AS RECEIVER FOR LYDIAN       )
PRIVATE BANK; FEDERAL DEPOSIT            )
INSURANCE CORPORATION AS RECEIVER        )
FOR MIDWEST BANK AND TRUST COMPANY;      )
FEDERAL DEPOSIT INSURANCE                )
CORPORATION AS RECEIVER FOR ORION        )
BANK; FEDERAL DEPOSIT INSURANCE          )
CORPORATION AS RECEIVER FOR PACIFIC      )
NATIONAL BANK; FEDERAL DEPOSIT           )
INSURANCE CORPORATION AS RECEIVER        )
FOR PARK NATIONAL BANK; FEDERAL          )
DEPOSIT INSURANCE CORPORATION AS         )
RECEIVER FOR PFF BANK & TRUST; FEDERAL   )
DEPOSIT INSURANCE CORPORATION AS         )
RECEIVER FOR R-G PREMIER BANK OF         )
PUERTO RICO; FEDERAL DEPOSIT             )
INSURANCE CORPORATION AS RECEIVER        )
FOR RIVERSIDE NATIONAL BANK OF           )
FLORIDA; FEDERAL DEPOSIT INSURANCE       )
CORPORATION AS RECEIVER FOR SAN DIEGO    )
NATIONAL BANK; FEDERAL DEPOSIT           )
INSURANCE CORPORATION AS RECEIVER        )
FOR SILVERTON BANK, N.A.; FEDERAL        )
DEPOSIT INSURANCE CORPORATION AS         )
RECEIVER FOR SUPERIOR BANK; FEDERAL      )
DEPOSIT INSURANCE CORPORATION AS         )
RECEIVER FOR TIERONE BANK; FEDERAL       )
DEPOSIT INSURANCE CORPORATION AS         )
RECEIVER FOR UNITED COMMERCIAL BANK;     )

FEDERAL DEPOSIT INSURANCE                )
CORPORATION AS RECEIVER FOR UNITED       )
WESTERN BANK; FEDERAL DEPOSIT            )
INSURANCE CORPORATION AS RECEIVER        )
FOR WASHINGTON MUTUAL BANK; and          )
FEDERAL DEPOSIT INSURANCE                )
CORPORATION AS RECEIVER FOR              )
WESTERNBANK PUERTO RICO                  )
                Plaintiffs,       )
                                       )
                                       )
      v.                          )
                                       )
BANK OF AMERICA CORPORATION; BANK OF     )
AMERICA, N.A.; MERRILL LYNCH & CO.;      )
MERRILL LYNCH CAPITAL SERVICES, INC.;    )
MERRILL LYNCH INTERNATIONAL BANK         )
LTD.; BARCLAYS BANK PLC; BRITISH         )
BANKERS' ASSOCIATION; BBA ENTERPRISES    )
LTD.; BBA LIBOR LTD.; CITIGROUP, INC.;   )
CITIBANK, N.A.; CITIGROUP FINANCIAL      )
PRODUCTS, INC.; COÖPERATIEVE CENTRALE    )
RAIFFEISEN-BOERENLEENBANK, B.A.;         )
CREDIT SUISSE GROUP AG; CREDIT SUISSE    )
INTERNATIONAL; DEUTSCHE BANK AG;         )
HSBC HOLDINGS PLC; HSBC BANK USA, N.A.;  )
THE HONGKONG AND SHANGHAI BANKING        )
CORPORATION LTD.; JPMORGAN CHASE &       )
CO.; JPMORGAN CHASE BANK, N.A.; BEAR     )
STERNS CAPITAL MARKETS, INC.; J.P.       )
MORGAN MARKETS LTD. (F.K.A. BEAR         )
STEARNS INTERNATIONAL LTD.); J.P.        )
MORGAN BANK DUBLIN PLC (F.K.A. BEAR      )
STEARNS BANK PLC); LLOYDS BANKING        )
GROUP PLC; LLOYDS TSB BANK PLC; HBOS     )
PLC; SOCIÉTÉ GÉNÉRALE; THE               )
NORINCHUKIN BANK; ROYAL BANK OF          )
CANADA; THE ROYAL BANK OF SCOTLAND       )
PLC; THE BANK OF TOKYO-MITSUBISHI UFJ    )
LTD.; UBS AG; and PORTIGON AG (F.K.A.    )
WESTLB),                                 )
               Defendants.       )

# TABLE OF CONTENTS

Page

NATURE OF THE CASE ................................................................................................... 1

JURISDICTION AND VENUE ......................................................................................... 2

PARTIES ............................................................................................................................ 4

BACKGROUND ................................................................................................................ 16

I.      INTERBANK LENDING ......................................................................................... 17

II.     CREATION OF LIBOR ............................................................................................ 18

III.    CALCULATION OF LIBOR .................................................................................... 18

IV.     LIBOR GOVERNANCE ........................................................................................... 21

V.      DEFENDANTS' KNOWLEDGE OF LIBOR'S IMPORTANCE ............................. 24

FRAUDULENT AND COLLUSIVE CONDUCT RELATING TO LIBOR .................... 26

I.      SYSTEMATIC LIBOR SUPPRESSION .................................................................. 26

II.     CONDUCT TO BENEFIT INDIVIDUAL TRADER POSITIONS ........................... 38

III.    HARMFUL EFFECTS OF THE FRAUDULENT AND COLLUSIVE CONDUCT ....... 39

DISCLOSURE OF THE FRAUDULENT AND COLLUSIVE CONDUCT ..................... 43

I.      BARCLAYS ADMISSIONS .................................................................................... 45

II.     UBS ADMISSIONS ................................................................................................. 47

III.    RBS ADMISSIONS ................................................................................................. 48

IV.     RABOBANK ADMISSIONS ................................................................................... 49

COUNT I:       BREACH OF CONTRACT WITH AMCORE ....................................... 53

COUNT II:      BREACH OF CONTRACTS WITH AMTRUST .................................... 54

COUNT III:     BREACH OF CONTRACTS WITH CORUS .......................................... 56

COUNT IV:      BREACH OF CONTRACTS WITH INDYMAC ................................... 58

COUNT V:       BREACH OF CONTRACT WITH INTEGRA ....................................... 63

COUNT VI:      BREACH OF CONTRACT WITH SILVERTON ................................... 64

COUNT VII:     BREACH OF CONTRACT WITH SUPERIOR ..................................... 66

COUNT VIII:    BREACH OF CONTRACTS WITH UCB .............................................. 68

COUNT IX:      BREACH OF CONTRACTS WITH WAMU .......................................... 71

COUNT X:       BREACH OF CONTRACTS WITH WESTERNBANK .......................... 75

COUNT XI:      BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND
FAIR DEALING ................................................................................................................ 78

COUNT XII:       UNJUST ENRICHMENT/RESTITUTION ...................................................... 79

COUNT XIII:      FRAUD ....................................................................................... 81

COUNT XIV:       AIDING AND ABETTING FRAUD ................................................ 86

COUNT XV:        CIVIL CONSPIRACY TO COMMIT FRAUD ............................... 87

COUNT XVI:       NEGLIGENT MISREPRESENTATION ......................................... 88

COUNT XVII:      TORTIOUS INTERFERENCE WITH CONTRACT ...................... 94

COUNT XVIII:     AIDING & ABETTING TORTIOUS INTERFERENCE WITH
CONTRACT       ...................................................................................... 94

COUNT XIX:       CIVIL CONSPIRACY TO COMMIT TORTIOUS INTERFERENCE
WITH CONTRACT ......................................................................................... 95

COUNT XX:        TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC
ADVANTAGE       ..................................................................................... 96

COUNT XXI:       AIDING & ABETTING TORTIOUS INTERFERENCE WITH
PROSPECTIVE ECONOMIC ADVANTAGE ..................................................... 97

COUNT XXII:      CIVIL CONSPIRACY TO COMMIT TORTIOUS INTERFERENCE
WITH PROSPECTIVE ECONOMIC ADVANTAGE ......................................... 98

COUNT XXIII:     VIOLATIONS OF SHERMAN ACT SECTION 1 .......................... 99

COUNT XXIV:      VIOLATIONS OF THE DONNELLY ACT ................................. 106

PRAYER FOR RELIEF ............................................................................... 107

JURY DEMAND ........................................................................................ 108

## NATURE OF THE CASE

1.      This Complaint arises from the manipulation and suppression of the London Interbank Offered Rate ("LIBOR"), a benchmark rate indexed to trillions of dollars in interest-rate swaps and loans that plays a fundamentally important role in financial systems throughout the world.  As set forth more fully below, Defendants on the United States Dollar ("USD") LIBOR panel ("Panel Bank Defendants") and Defendant British Bankers' Association ("BBA") touted LIBOR as a simple, transparent benchmark[1] calculated from competitive interest rates in the market for unsecured interbank loans.  In truth, however, the Panel Bank Defendants fraudulently and collusively suppressed USD LIBOR, and they did so to their advantage.  The Panel Bank Defendants engaged in this fraudulent and collusive conduct from August 2007 through at least mid-2011.

2.      Defendant BBA participated in the alleged scheme to protect the revenue stream it generated from selling LIBOR licenses and to appease the Panel Bank Defendants that were members of the BBA.  While some Defendants have admitted the fact of their wrongful conduct, most of the facts remain known only to Defendants and the regulatory agencies investigating the manipulation of LIBOR.

3.      The Federal Deposit Insurance Corporation ("FDIC") is a corporation organized and existing under the laws of the United States of America.  Under the Federal Deposit Insurance ("FDI") Act, the FDIC is authorized to be appointed as receiver for failed insured depository institutions, 12 U.S.C. § 1821(c), including the 38 failed institutions listed in paragraph 9 (the "Closed Banks").  The FDIC succeeds to, and is empowered to sue and

---

[1] British Bankers' Association Annual Report (2010), attached as Exhibit 1 and incorporated into this Complaint by reference.

complain in any court of law to pursue, all claims held by banks for which it is the receiver. 12 U.S.C. §§ 1819, 1821(d)(2)(A)(i), including the Closed Banks.

4. Defendants' wrongful conduct as described in this Complaint caused substantial losses to the Closed Banks. The Closed Banks reasonably expected that accurate representations of competitive market forces, and not fraudulent conduct or collusion among the Panel Bank Defendants, would determine USD LIBOR and, consequently, the value of financial instruments tied to USD LIBOR. The Closed Banks' losses flowed directly from, among other things, the harms to competition caused by the fraud and collusion alleged in this Complaint. The FDIC as Receiver for the Closed Banks ("FDIC-R") seeks to recover for the losses the Closed Banks sustained as a result of this wrongful conduct.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), as well as 28 U.S.C. §§ 1331 and 1337. This Court has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1367 because all of the claims arise from the same facts and circumstances and form part of the same case or controversy.

6. This Court also has subject matter jurisdiction under 12 U.S.C. § 1819(b)(2)(A), which provides that all suits to which the FDIC, in any capacity, is a party shall be deemed to arise under the laws of the United States.

7. This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and N.Y. C.P.L.R. §§ 301 and 302. All Defendants transacted business and derived substantial revenue from that business within New York. Most, if not all, Defendants have offices located in New York and/or have engaged in a regular and continuous

course of business in New York.  Some Defendants[2] are resident corporations of New York, with

their headquarters or primary place of business located within the state.  Furthermore, all

Defendants acted as co-conspirators with each other.  As explained below, certain Defendants

also entered into interest-rate swap contracts with certain of the Closed Banks, which recite that

disputes arising under those contracts will be governed by New York law and which

incorporated USD LIBOR as the interest rate term.  Certain of the contracts also include

jurisdiction and forum selection clauses naming courts in New York, including the United States

District Court for the Southern District of New York, as the fora in which claims arising out of

those contracts shall be brought.  Defendants therefore purposefully availed themselves of the

privilege of conducting activities in the United States and the Southern District of New York in

connection with the wrongful activities described in this Complaint.

       8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Sections 4

and 12 of the Clayton Act (15 U.S.C. §§ 15, 22).  All Defendants maintain offices or agents,

transact business, and/or are found within the Southern District of New York.  A substantial part

of the interstate commerce giving rise to the claims described in this Complaint was carried out,

in part, within the Southern District of New York.  Defendants performed acts in furtherance of

their conspiracy within the Southern District of New York and elsewhere that were intended to

affect, and did affect, the Closed Banks and others located within the Southern District of New

York.

---

[2] The following Defendants are headquartered in New York: Merrill Lynch Capital Services,
Inc.; Citigroup, Inc.; Citibank, N.A.; Citigroup Financial Products, Inc.; JPMorgan Chase & Co.;
and Bear Stearns Capital Markets, Inc.  Defendant HSBC Bank USA, N.A. has its principal place
of business in New York and Defendant Deutsche Bank AG maintains a "regional head office"
in New York.

## PARTIES

9.      The Plaintiff is the FDIC-R, which comprises the 38 separate and distinct receiverships for the Closed Banks identified in sub-paragraphs a-ll below.  The FDIC-R is empowered to pursue claims held by the Closed Banks, including the claims against the Defendants in this action.

a.      On April 23, 2010, the FDIC was duly appointed as receiver for Amcore Bank, N.A. ("Amcore"), Rockford, Illinois.

b.      On December 4, 2009, the FDIC was duly appointed as receiver for AmTrust Bank ("AmTrust"), Cleveland, Ohio.

c.      On May 21, 2009, the FDIC was duly appointed as receiver for BankUnited, F.S.B. ("BankUnited"), Coral Gables, Florida.

d.      On October 30, 2009, the FDIC was duly appointed as receiver for California National Bank ("Cal. National"), Los Angeles, California.

e.      On August 14, 2009, the FDIC was duly appointed as receiver for Colonial Bank ("Colonial"), Montgomery, Alabama.

f.      On October 21, 2011, the FDIC was duly appointed as receiver for Community Banks of Colorado ("Cmty. of Co."), Greenwood Village, Colorado.

g.      On September 11, 2009, the FDIC was duly appointed as receiver for Corus Bank, N.A. ("Corus"), Chicago, Illinois.

h.      On November 21, 2008, the FDIC was duly appointed as receiver for Downey Savings and Loan Association, F.A. ("Downey"), Newport Beach, California.

- 4 -

i.      On April 30, 2010, the FDIC was duly appointed as receiver for Eurobank ("Eurobank"), San Juan, Puerto Rico.

j.      On January 28, 2011, the FDIC was duly appointed as receiver for First Community Bank ("First Cmty."), Taos, New Mexico.

k.      On December 18, 2009, the FDIC was duly appointed as receiver for First Federal Bank of California, F.S.B. ("First Fed."), Santa Monica, California.

l.      On September 13, 2013, the FDIC was duly appointed as receiver for First National Bank ("First National"), Edinburg, Texas.

m.      On January 29, 2010, the FDIC was duly appointed as receiver for First Regional Bank ("First Regional"), Los Angeles, California.

n.      On April 30, 2010, the FDIC was duly appointed as receiver for Frontier Bank ("Frontier"), Everett, Washington.

o.      On September 25, 2009, the FDIC was duly appointed as receiver for Georgian Bank ("Georgian"), Atlanta, Georgia.

p.      On August 21, 2009, the FDIC was duly appointed as receiver for Guaranty Bank ("Guaranty"), Austin, Texas.

q.      On October 22, 2010, the FDIC was duly appointed as receiver for Hillcrest Bank ("Hillcrest"), Overland Park, Kansas.

r.      On December 18, 2009, the FDIC was duly appointed as receiver for Imperial Capital Bank ("Imperial"), La Jolla, California.

s.      On July 11, 2008, the FDIC was duly appointed as receiver for IndyMac Bank, F.S.B. ("IndyMac"), Pasadena, California.

t.  On July 29, 2011, the FDIC was duly appointed as receiver for Integra Bank, N.A. ("Integra"), Evansville, Indiana.

u.  On September 18, 2009, the FDIC was duly appointed as receiver for Irwin Union Bank and Trust Company ("Irwin"), Columbus, Indiana.

v.  On February 19, 2010, the FDIC was duly appointed as receiver for La Jolla Bank, F.S.B. ("La Jolla"), La Jolla, California.

w.  On August 19, 2011, the FDIC was duly appointed as receiver for Lydian Private Bank ("Lydian"), Palm Beach, Florida.

x.  On May 14, 2010, the FDIC was duly appointed as receiver for Midwest Bank and Trust Company ("Midwest"), Elmwood Park, Illinois.

y.  On November 13, 2009, the FDIC was duly appointed as receiver for Orion Bank ("Orion"), Naples, Florida.

z.  On October 30, 2009, the FDIC was duly appointed as receiver for Pacific National Bank ("Pacific National"), San Francisco, California.

aa.  On October 30, 2009, the FDIC was duly appointed as receiver for Park National Bank ("Park National"), Chicago, Illinois.

bb.  On November 21, 2008, the FDIC was duly appointed as receiver for PFF Bank & Trust ("PFF"), Pomona, California.

cc.  On April 30, 2010, the FDIC was duly appointed as receiver for R-G Premier Bank of Puerto Rico ("Premier"), Hato Rey, Puerto Rico.

dd.  On April 16, 2010, the FDIC was duly appointed as receiver for Riverside National Bank of Florida ("Riverside"), Fort Pierce, Florida.

ee.     On October 30, 2009, the FDIC was duly appointed as receiver for San Diego National Bank ("San Diego National"), San Diego, California.

ff.     On May 1, 2009, the FDIC was duly appointed as receiver for Silverton Bank, N.A. ("Silverton"), Atlanta, Georgia.

gg.     On April 15, 2011, the FDIC was duly appointed as receiver for Superior Bank ("Superior"), Birmingham, Alabama.

hh.     On June 4, 2010, the FDIC was duly appointed as receiver for TierOne Bank ("TierOne"), Lincoln, Nebraska.

ii.     On November 6, 2009, the FDIC was duly appointed as receiver for United Commercial Bank ("UCB"), San Francisco, California.

jj.     On January 21, 2011, the FDIC was duly appointed as receiver for United Western Bank ("United Western"), Denver, Colorado.

kk.     On September 25, 2008, the FDIC was duly appointed as receiver for Washington Mutual Bank ("WaMu"), Henderson, Nevada.

ll.     On April 30, 2010, the FDIC was duly appointed as receiver for Westernbank Puerto Rico ("Westernbank"), Mayaguez, Puerto Rico.

10.     Defendant Bank of America Corporation is a Delaware corporation headquartered in Charlotte, North Carolina.  Bank of America Corporation was at all relevant times a member of the USD LIBOR panel.  Several subsidiaries of Bank of America Corporation engaged in financial transactions relating to USD LIBOR with Closed Banks, including: Defendant Bank of America, N.A. (the successor-in-interest to Bank of America National Trust & Savings Association), a Delaware corporation with offices in New York; Merrill Lynch & Co., a Delaware corporation with offices in New York; Merrill Lynch Capital Services, Inc., a

Delaware corporation headquartered in New York; and Merrill Lynch International Bank Ltd., a corporation based in Ireland.  Defendants Bank of America Corporation, Bank of America, N.A., Merrill Lynch & Co., Merrill Lynch Capital Services, Inc., and Merrill Lynch International Ltd. are referenced collectively in this Complaint as "Bank of America."  Bank of America operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.   Bank of America participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

11.    Defendant Barclays Bank plc ("Barclays") is a United Kingdom public limited company headquartered in London, England, with two offices in New York.  Barclays was at all relevant times a member of the USD LIBOR panel.  Barclays operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[3]  Barclays also engaged in financial transactions relating to USD LIBOR with certain of the Closed Banks.  Barclays participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

12.    The BBA is a trade association based in the United Kingdom.  Throughout the 2000s, the BBA owned LIBOR.  The BBA is governed by a Board, which officially meets four times per year, comprised of the BBA Chief Executive and Chief Executives of other Defendants.  Defendant BBA Enterprises Ltd. is a wholly owned subsidiary of the BBA located in London.  In late 2009, the BBA incorporated a new legal subsidiary, Defendant BBA LIBOR

---

[3] Barclays, *Barclays in the United States*, http://group.barclays.com/about-barclays/about-us/usa (last visited Mar. 11, 2014).

Ltd., to govern LIBOR.[4]

13. As set forth more fully below, the BBA advertised LIBOR and solicited business in the United States, including in the Southern District of New York. In 2007, the BBA sought and obtained a trademark for bbaLIBOR™ from the United States Patent and Trademark Office (Registration No. 3212218). At all times relevant to the claims asserted herein, the BBA electronically communicated news and information through internet websites (bba.org, bbalibor.org), the Thomson Reuters website (reuters.com), the Wall Street Journal, and through other data vendor websites including International Data Corp. ("IDC"), which maintains an office in New York.[5] At all times relevant to the claims asserted herein, the BBA also published LIBOR data to more than one-million computer screens around the world, including in the United States and the Southern District of New York.[6] In 2009, the BBA launched a Twitter social media service news feed to bypass the print media[7] because interest in LIBOR had soared "since so many loans are linked to it."[8]

14. Defendant Citigroup, Inc. is a Delaware corporation headquartered in New York, New York. Citigroup, Inc. or its wholly owned subsidiary, Defendant Citibank, N.A., which is headquartered in New York, was at all relevant times a member of the USD LIBOR

---

[4] David Enrich & Max Colchester, *Before Scandal, Clash over Control of Libor*, Wall St. J., Sept. 11, 2012, http://online.wsj.com/article/SB10000872396390443847404577631404235329424.html.

[5] BBA, *Welcome to bbalibor, Frequently Asked Questions (FAQs)*, http://www.bbalibor.com/explained/faqs (last visited Mar. 11, 2014); IDC Worldwide Offices, http://www.idc.com/about/wwoffices.jsp (last visited Mar. 11, 2014).

[6] BBA, *bbalibor Explained, Frequently Asked Questions (FAQs)*, *supra* note 5.

[7] BBA, *Capital Markets Bulletin*, 5 (June 2009), attached as Exhibit 2 and incorporated into this Complaint by reference.

[8] BBA, *BBA LIBOR: The World's Most Important Number Now Tweets Daily*, May 21, 2009, attached as Exhibit 3 and incorporated into this Complaint by reference.

panel.  Several wholly owned subsidiaries of Citigroup, Inc. engaged in financial transactions relating to LIBOR with the Closed Banks, including Defendant Citibank, N.A. and Defendant Citigroup Financial Products, Inc., which is headquartered in New York.  Defendants Citigroup, Inc., Citibank, N.A., and Citigroup Financial Products, Inc. are referenced collectively in this Complaint as "Citigroup."  Citigroup operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.  Citigroup participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

15.     Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A. ("Rabobank") is a financial services provider with its headquarters in Utrecht, the Netherlands, and an office in New York.  Rabobank was at all relevant times a member of the USD LIBOR panel.  Rabobank operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[9]  Rabobank participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

16.     Defendant Credit Suisse Group AG is a Swiss company headquartered in Zurich, Switzerland.  Credit Suisse Group AG was at all relevant times a member of the USD LIBOR panel.  Several subsidiaries of Credit Suisse Group AG engaged in financial transactions relating to USD LIBOR with the Closed Banks, including Defendant Credit Suisse International (f.k.a Credit Suisse First Boston International and Credit Suisse Financial Products), which has an office in New York.  Defendants Credit Suisse Group AG and Credit Suisse International are

---

[9] Rabobank Group, *Are We Somewhere Near You?*, https://www.rabobank.com/en/locateus/index.html (last visited Mar. 11, 2014).

referenced collectively in this Complaint as "Credit Suisse."  Credit Suisse operated in the

United States directly or through its wholly owned and/or controlled subsidiaries, affiliates,

agents, and predecessors.[10]  Credit Suisse participated in the wrongful conduct alleged in this

Complaint both directly and through its subsidiaries and affiliates.

       17.    Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial

services company headquartered in Frankfurt, Germany, with numerous offices including a

regional head office in New York.  Deutsche Bank was at all relevant times a member of the

USD LIBOR panel.  Deutsche Bank engaged in financial transactions relating to USD LIBOR

with the Closed Banks.  Deutsche Bank operated in the United States directly or through its

wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[11]  Deutsche

Bank participated in the wrongful conduct alleged in this Complaint both directly and through its

subsidiaries and affiliates.

       18.    Defendant HSBC Holdings plc is a United Kingdom public limited company

headquartered in London, England.  HSBC Holdings plc was at all relevant times a member of

the USD LIBOR panel.  Several subsidiaries of HSBC Holdings plc engaged in financial

transactions relating to USD LIBOR with the Closed Banks, including Defendant HSBC Bank

USA, N.A., a national banking association with its principal office located in New York,[12] and

Defendant The Hongkong and Shanghai Banking Corporation Ltd., a Hong Kong limited

---

[10] Credit Suisse, *Office Locator*, https://www.credit-suisse.com/who_we_are/en/office_locator.jsp (last visited Mar. 11, 2014).

[11] Deutsche Bank, *Welcome to Deutsche Bank USA*, https://www.db.com/us/ (locations) (last visited Mar. 11, 2014).

[12]  HSBC Bank USA, National Association, Fact Sheet, http://www.us.hsbc.com/1/PA_1_083Q9FJ08A002FBP5S00000000/content/new_usshared/shared_fragments/pdf/hbus_factsheet_0912.pdf.

liability corporation.[13]  Defendants HSBC Holdings plc, HSBC Bank USA, N.A., and The

Hongkong and Shanghai Banking Corporation Ltd. are referenced collectively in this Complaint

as "HSBC."  HSBC operated in the United States directly, or through its wholly owned and/or

controlled subsidiaries, affiliates, agents, and predecessors.[14]  HSBC participated in the wrongful

conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

       19.    Defendant JPMorgan Chase & Co. is a Delaware corporation headquartered in

New York.  JPMorgan Chase & Co. was at all relevant times a member of the USD LIBOR

panel.  Several subsidiaries of JPMorgan Chase & Co. engaged in financial transactions relating

to USD LIBOR with the Closed Banks, including: Defendant JPMorgan Chase Bank, N.A., a

national banking association principally located in Columbus, Ohio with numerous locations in

New York; Defendant Bear Stearns Capital Markets, Inc., a Delaware corporation headquartered

in New York; Defendant J.P. Morgan Markets Ltd. (f.k.a. Bear Stearns International Ltd.), a

company based in London, UK; and Defendant J.P. Morgan Bank Dublin plc (f.k.a. Bear Stearns

Bank plc), a company based in Dublin, Ireland.  Defendants JPMorgan Chase & Co., JPMorgan

Chase Bank, N.A., Bear Stearns Capital Markets, Inc., J.P. Morgan Markets Ltd., and J.P.

Morgan Bank Dublin plc are referenced collectively in this Complaint as "JPMorgan."

JPMorgan operated in the United States directly or through its wholly owned and/or controlled

subsidiaries, affiliates, agents, and predecessors.  JPMorgan participated in the wrongful conduct

alleged in this Complaint both directly and through its subsidiaries and affiliates.

---

[13] The Hongkong and Shanghai Banking Corporation Limited, Annual Report and Accounts 2012, http://vpr.hkma.gov.hk/pdf/100002/ar_12/ar_12_pt01.pdf.

[14] HSBC, *Customer Service*: *Find HSBC Branches and ATMs*, http://www.us.hsbc.com/1/2/home/customer-service/hsbc-locations/branch (last visited Mar. 11, 2014).

20.     Defendant Lloyds Banking Group plc is a United Kingdom public limited company headquartered in London, England, with an office in New York.  Lloyds Banking Group plc was formed in 2009 through the acquisition of Defendant HBOS plc ("HBOS") by Defendant Lloyds TSB Bank plc.  Prior to 2009, HBOS and Lloyds TSB Bank plc were members of the USD LIBOR panel.  Lloyds Banking Group plc joined the USD LIBOR panel upon its formation in 2009.  Defendants Lloyds Banking Group plc, HBOS plc, and Lloyds TSB Bank plc are referenced collectively in this Complaint as "Lloyds."  Lloyds operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[15]  Lloyds participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

21.     Defendant Société Générale is a French banking corporation, headquartered in Paris, France, with an office in New York.  Société Générale replaced HBOS on the USD LIBOR panel on February 9, 2009.  Société Générale operated in the United States directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[16]  Société Générale participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

22.     Defendant The Norinchukin Bank ("Norinchukin") is a Japanese cooperative bank headquartered in Tokyo, Japan, with an office in New York.  Norinchukin was at all relevant times a member of the USD LIBOR panel.   Norinchukin is one of Japan's largest institutional investors and has a reputation as Japan's largest hedge fund.  Norinchukin operated

---

[15] Lloyds Banking Group, *Life with Us: Locations – International locations*, http://www.lloydsbankinggroup-careers.com/view/213/international-locations.html (last visited Mar. 11, 2014).

[16] Société Générale, *Our Businesses – Our locations*, http://www.societegenerale.com/en/about-us/our-businesses/our-locations (last visited Mar. 11, 2014).

in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[17]  Norinchukin participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

23.    Defendant Royal Bank of Canada ("RBC") is the largest financial institution in Canada and is headquartered in Toronto, Canada, with affiliates in New York.  RBC was at all relevant times a member of the USD LIBOR panel.  RBC operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[18]  RBC engaged in financial transactions related to USD LIBOR with Closed Banks.  RBC participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

24.    Defendant The Royal Bank of Scotland plc ("RBS") is a United Kingdom public limited company headquartered in Edinburgh, Scotland, with an office in New York.  RBS was at all relevant times a member of the USD LIBOR panel.  RBS engaged in financial transactions relating to USD LIBOR with Closed Banks.  RBS operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[19]  RBS participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

25.    Defendant The Bank of Tokyo-Mitsubishi UFJ Ltd. ("BTMU") is a Japanese subsidiary of Mitsubishi UFJ Financial Group, Inc. and is headquartered in Tokyo, Japan, with

---

[17] Norinchukin Bank, *About The Norinchukin Bank – Global Network*, http://www.nochubank.or.jp/en/about/globalnetwork.html (last visited Mar. 11, 2014).

[18] RBC Bank, *About RBC Bank*, http://www.rbcbank.com/about-us/cid-296623.html (last visited Mar. 11, 2014).

[19] RBS, *About RBS Group*, http://www.rbsbank.co.jp/en/about-us/about-rbs-group (last visited Mar. 11, 2014).

an office in New York.  BTMU was at all relevant times a member of the USD LIBOR panel.

BTMU operated in the United States directly or through its wholly owned and/or controlled

subsidiaries, affiliates, agents, and predecessors.[20]  BTMU participated in the wrongful conduct

alleged in this Complaint both directly and through its subsidiaries and affiliates.

26.     Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich,

Switzerland, with offices in New York.  UBS was at all relevant times a member of the USD

LIBOR panel.  UBS was formed in 1998 through the merger of Swiss Bank Corporation and the

Union Bank of Switzerland.  UBS engaged in financial transactions relating to USD LIBOR with

Closed Banks.  UBS operated in the United States directly or through its wholly owned and/or

controlled subsidiaries, affiliates, agents, and predecessors.[21]  UBS participated in the wrongful

conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

27.     WestLB AG was a German joint stock company headquartered in Dusseldorf,

Germany.  Defendant Portigon AG is a German company headquartered in Dusseldorf,

Germany, with an office in New York, that acquired WestLB AG in 2009.  Prior to 2009,

WestLB AG was a member of the USD LIBOR panel.  Portigon joined the USD LIBOR panel

after acquiring WestLB AG.  WestLB AG and Defendant Portigon AG are referenced

collectively in this Complaint as "Portigon."  Portigon engaged in financial transactions related

to USD LIBOR with the Closed Banks.  Portigon operated in the United States directly or

---

[20] Bank of Tokyo-Mitsubishi UFJ, *Global Network – The Americas*,
http://www.bk.mufg.jp/english/ourcompany/globalnetwork/americas.html#USA (last visited
Mar. 11, 2014).

[21] UBS, *UBS Location Finder*,
http://apps1.ubs.com/locationfinder/searchForm.do?GeoEntityId=3&GeoEntityType=3 (last
visited Mar. 11, 2014).

through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[22] Portigon participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

28.    The acts charged in this Complaint as having been done by Defendants were authorized, ordered, or done by their officers, directors, agents, employees, or representatives, while actively engaged in the management of Defendants' businesses or affairs.

29.    Various other individuals, companies, corporations, partnerships, associations, and other entities, the identities of which are unknown to the FDIC-R and were unknown to the Closed Banks, and which cannot presently be named as defendants in this action, may have participated as co-conspirators with Defendants in the violations alleged in this Complaint, and/or performed substantial acts and made statements in the Southern District of New York in furtherance of the alleged violations.

30.    At all relevant times, Defendants were acting as the agents, employees, co-conspirators, and/or representatives of their respective "affiliates" and were acting within the course and scope of their agency, employment, and/or conspiracy with the full knowledge, consent, permission, authorization, and ratification, either express or implied, of each of their respective affiliates in performing the acts alleged in this Complaint.

## BACKGROUND

31.    Banks compete in a number of markets.  In the markets for money, banks compete to attract funds through deposits, interbank loans, and other arrangements in which the banks can generally be thought of as "the borrower."  A bank's "liquidity" is determined by the

---

[22] Portigon Financial Services, *Group Information – Our Locations*, http://www.portigon.com/cm/content/portigon/i/en/portigon-ag/konzerninformationen/standorte.html (last visited Mar. 11, 2014).

amount of cash that it has, or can raise quickly, to pay off its debts.[23]  Banks also compete in the

capital markets for assets.

## I.       INTERBANK LENDING

32.   The basic principles of supply and demand apply to money.  When investment

options are risky, people have an incentive to hold cash.[24]  As part of their operations, banks

obtain cash from other banks in "money markets," primarily through short-term loans.  In a

competitive market, banks with superior credit risk and liquidity profiles will, all else equal, be

able to obtain more attractive interbank interest rates.  As a result, the interest that banks charge

each other reflects the cost of cash in a competitive market.[25]

33.   For more than 30 years, the London interbank market has been a major source

of cash for banks seeking to fund USD denominated loans.  The London interbank market has

enabled banks in need of cash to obtain deposits of U.S. dollars ("Eurodollar deposits"), either on

an overnight basis or for fixed terms (typically, one, two, three or six months), from banks with

excess cash.

---

[23] An asset is liquid if the market in which it is traded has many buyers and sellers and is bought and sold frequently with low transaction costs.  All else equal, the more liquid an asset is relative to alternative assets, the greater the demand will be for that asset and, consequently, it will be priced higher.  Frederic S. Mishkin, *The Economics of Money, Banking, and Financial Markets* (3d. ed. 2013), 90.

[24] *Id*.

[25] *See, e.g.,* Financial Times, *Lexicon – Definition of LIBOR*, *available at* http://lexicon.ft.com/Term?term=LIBOR; The Wheatley Review of LIBOR: Final Report, 75-77 (Sept. 12. 2012) ("Wheatley II"), *available at* http://cdn.hm-treasury.gov.uk/wheatley_review_libor_finalreport_280912.pdf; *see also* BBA, *Frequently Asked Questions*, *supra* note 5 (noting that LIBOR is "extremely market sensitive and affected by a number of factors").

## II.        CREATION OF LIBOR

34.    The fundamental principle underlying floating interest rates is to let the market determine the cost of money.[26]  The BBA created LIBOR in 1986 as a tool to help its members set interest rates on large corporate loans issued collectively by multiple banks.  Over time, LIBOR increased in importance as banks began incorporating it into financial contracts. Based on the BBA's representations regarding LIBOR's asserted "objectivity and accuracy," LIBOR developed into the primary benchmark for short-term interest rates globally and is now indexed to trillions of dollars' worth of financial instruments, including interest-rate swap contracts, mortgages, and other loans.[27]  Financial institutions around the world, including the Closed Banks, reasonably relied on LIBOR as an honest and accurate benchmark of a competitively determined interbank lending rate.

## III.        CALCULATION OF LIBOR

35.    During the relevant time period, the BBA calculated and disseminated LIBOR for 15 maturities, from overnight to 12 months, and for 10 currencies (Australian Dollar, Canadian Dollar, Swiss Franc, Danish Krone, Euro, Sterling, Japanese Yen, New Zealand Dollar, Swedish Krona and USD).  The BBA's licensees included companies located in the United States.

36.    The BBA calculated LIBOR based on submissions of borrowing costs in a competitive interbank market made by a panel of banks selected for each currency ("Contributor

---

[26] *See, e.g.*, Jonathan Macey, *LIBOR: Three Scandals in One – A Commentary by Jonathan Macey '82*, July 20, 2012, http://www.law.yale.edu/news/15826.htm.

[27] BBA, *bbalibor Explained, The Basics*, http://www.bbalibor.com/explained/the-basics (last visited Mar. 11, 2014); BBA, *Understanding The Construction And Operation Of BBA LIBOR – Strengthening For The Future* (June 10, 2008), *available at* http://www.aciforex.org/docs/markettopics/20080610__BBA_comments_on_Libor_fixing.pdf.

Banks"). The BBA represented that Contributor Banks were chosen based on their scale of market activity, credit rating, and perceived expertise in the currency concerned.[28] These selection criteria were intended to show that Contributor Banks would have the best and most accurate knowledge of interbank borrowing costs for each currency.

37.     The BBA published rules governing the way that Contributor Banks determined their submissions and Contributor Banks agreed to abide by those rules to remain on the LIBOR panel. The BBA's rules stated that Contributor Banks must provide rates for each tenor (*i.e.*, maturities) in response to the question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?"[29] The Panel Bank Defendants represented that they abided by the BBA's published rules and definitions and based their submissions on their cost of funds in the London interbank market. The published rules require each Contributor Bank to: (a) submit rates without reference to rates contributed by other Contributor Banks; (b) submit rates determined by the Contributor Bank's staff primarily responsible for management of that bank's cash, rather than its derivative trading book; (c) submit rates without reference to the pricing of any derivative financial instrument; and (d) submit rates that represent the rates it "would be offered funds."[30] These rules require that the inputs to LIBOR be an honest reflection of competitive interbank

---

[28] BBA, *bbalibor Explained, The Basics*, *supra* note 27.

[29] *Id.*

[30] Letter from Denis J. McInerney, Chief, Fraud Section, Criminal Division, United States Department of Justice, Appendix A (Dec. 18, 2012) ("UBS SOF") ¶ 7, attached as Exhibit 4 and incorporated into this Complaint by reference; BBA, *bbalibor Explained, The Basics*, *supra* note 27; BBA, *Technical Aspects, Setting bbalibor*, http://www.bbalibor.com/technical-aspects/setting-bbalibor (last visited Mar. 11, 2014); BBA, *bbalibor Explained*, *Definitions*, http://www.bbalibor.com/explained/definitions (last visited Mar. 11, 2014).

interest rates.[31]

38.     Every London business day, Contributor Banks electronically communicated their LIBOR submissions to the BBA's agent, Thomson Reuters, by 11:10 a.m. London Time. The BBA's published rules stated that Contributor Banks were not to know the LIBOR rates submitted by other Contributor Banks during this submission window.[32]

39.     During the relevant period, USD LIBOR was calculated by excluding the four highest and four lowest submissions, and then averaging the remaining eight submissions for each tenor.  This average constituted the LIBOR "fixing."[33]  Thomson Reuters, as an agent for the BBA, then electronically communicated the LIBOR fixings to licensees, including the Wall Street Journal and Bloomberg News, by midday, London Time.[34]  The Wall Street Journal and Bloomberg News published LIBOR 24 hours after the BBA published it to its licensees.  The individual LIBOR submissions for each Panel Bank Defendant were also transmitted through the BBA's licensed data vendors.  Figure 1 below presents the BBA's graphic depiction of the LIBOR process.

---

[31] Wheatley II, *supra* note 25, at 55.  One of the key characteristics for a credible benchmark rate is that the benchmark should "clearly convey the economic realities of the underlying interest it seeks to measure to its users."  Financial Benchmarks Consultation Report*,* the Board of the International Organization of Securities Commissions (Jan. 2013), 10, *available at* http://www.g20ys.org/upload/files/IOSCO_Financial_Benchmark_Progress_Report.pdf.

[32] BBA, *bbalibor Explained, The Basics*, *supra* note 27.

[33] In the parlance of commercial banks, a rate submission for LIBOR was referred to as a "submission" and the LIBOR rate that the BBA publishes was known as the "fixing."

[34] BBA, *bbalibor Explained, Frequently Asked Questions (FAQs)*, *supra* note 5.

**Figure 1:  LIBOR Processes**[35]



## IV.        LIBOR GOVERNANCE

40.    Through 2010, the Foreign Exchange and Money Markets ("FX & MM")

Committee of the BBA had sole responsibility for all aspects of the functioning and development

of LIBOR.[36]  Thirteen "active market practitioners" comprised the FX & MM Committee.[37]  The

BBA does not disclose the names of the members of the FX & MM Committee,[38] but UBS and

---

[35] BBA, *bbalibor Explained, The Basics*, *supra* note 27.

[36] *See, e.g.,* Landon Thomas Jr., *Trade Group for Bankers Regulates a Key Rate*, N.Y. Times, July 5, 2012, http://www.nytimes.com/2012/07/06/business/global/the-gentlemens-club-that-sets-libor-is-called-into-question.html?pagewanted=all; Fixing LIBOR: Some Preliminary Findings, Second Report of Session 2012-13, Vol. I, 5 (Aug. 18, 2012) ("Wheatley Report I"), *available at* http://www.parliament.uk/documents/commons-committees/treasury/Fixing%20LIBOR_%20some%20preliminary%20findings%20-%20VOL%20I.pdf.

[37] BBA, *Understanding BBA LIBOR*, attached as Exhibit 5 and incorporated into this Complaint by reference.

[38] Enrich & Colchester, *Before Scandal, Clash over Control of Libor*, *supra* note 4.

RBS admit that they had representatives on the FX & MM Committee.[39]  On information and belief, other Panel Bank Defendants also served on the FX & MM Committee.  The chair and two deputy chairs of the FX & MM Committee were representatives from Contributor Banks.[40]  FX & MM Committee members met at least every two months at undisclosed locations to discuss LIBOR.[41]  The FX & MM Committee did not publish official minutes.[42]  According to its admissions to the United States Department of Justice ("DOJ"), UBS's representative on the FX & MM Committee in 2009 knew of fraudulent and collusive conduct relating to LIBOR and directed employees to "be careful" not to expose the wrongful conduct.[43]

41.     The BBA employed a full-time manager to supervise on a day-to-day basis all aspects of LIBOR calculation and dissemination to the marketplace.  The LIBOR manager was purportedly responsible for ensuring that all LIBOR processes operated to the highest standards.  The LIBOR manager acted as secretariat to the FX & MM Committee and was responsible for informing the FX & MM Committee about issues pertaining to LIBOR.

---

[39] UBS SOF ¶ 85; Financial Services Authority, Final Notice to UBS AG ¶ 122 (Dec. 19, 2012) ("UBS Final Notice"), attached as Exhibit 6 and incorporated into this Complaint by reference; Financial Services Authority, Final Notice to the Royal Bank of Scotland ¶ 89 (Feb. 6, 2013) ("RBS Final Notice"), attached as Exhibit 7 and incorporated into this Complaint by reference.

[40] BBA, *LIBOR Governance and Scrutiny: Proposals Agreed by the FX & MM Committee*, Appendix I, 12 ¶ 3 (Nov. 17, 2008), *available at* www.bbalibor.com/download/4025.

[41] Liam Vaughan, *Secret Libor Committee Clings to Anonymity Following Scandal*, Bloomberg, Aug. 21, 2012, http://www.bloomberg.com/news/2012-08-20/secret-libor-committee-clings-to-anonymity-after-rigging-scandal.html.

[42] *Id.*

[43] UBS SOF ¶¶ 85-86.

42.     In April 2005, the BBA hired John Ewan to serve as the LIBOR manager and to put LIBOR on secure commercial footing.[44]  Mr. Ewan, dubbed by one publication as "Mr. LIBOR," has claimed that during his tenure he increased revenue from LIBOR more than tenfold, introduced new products, and obtained European Union, United States and Japanese trademarks for LIBOR.[45]  Mr. Ewan claims that he was responsible for developing and maintaining relationships with all stakeholders in LIBOR, keeping them apprised of changes to the benchmark and the markets it tracks.[46]  Mr. Ewan also claims to have cultivated "excellent relationships at a senior level" with most major central banks and market participants (principally banks, brokers, trade associations, hedge funds, and exchanges).[47]

43.     On January 1, 2010, more than a year after learning that regulators were investigating LIBOR, the BBA modified its structure by creating a new entity, BBA LIBOR Ltd., to assume responsibility for the day-to-day running of the benchmark.  The FX & MM Committee continued to oversee LIBOR.  Despite this change in structure, the processes and procedures followed by Contributor Banks and the BBA in calculating and publishing LIBOR remained the same.  On September 12, 2012, an independent panel recommended that the BBA be stripped of its role in LIBOR rate setting.  Martin Wheatley, head of the United Kingdom's

---

[44] John Ewan, LinkedIn profile, http://www.linkedin.com/profile/view?id=16112767&authType=NAME_SEARCH&authToken=w1s3&locale=en_US&srchid=9e589557-4afa-4690-a3a2-1fa98b5f7578-0&srchindex=2&srchtotal=14&goback=.fps_PBCK_*1_John_Ewan_*1_*1_*1_*1_*2_*1_Y_*1_*1_*1_false_1_R_*1_*51_*1_*51_true_*2_*2_*2_*2_*2_*2_*2_*2_*2_*2_*2_*2_*2_*2_*2_*2_*2_*2_*2_*2&pvs=ps&trk=pp_profile_name_link (last visited Mar. 11, 2014).  Mr. Ewan left the BBA in the summer of 2012.

[45] Steve Hawkes, *Mr. Libor Quits*, The Sun, July 21, 2012. http://www.thesun.co.uk/sol/homepage/news/money/4441913/Mr-Libor-quits.html.

[46] John Ewan, LinkedIn profile, *supra* note 44.

[47] *Id*.

Financial Services Authority ("FSA"), noted at the time, "the BBA acts as the lobby organization for the same submitting banks that they nominally oversee, creating a conflict of interest that precludes strong and credible governance."[48]  In February 2013, the BBA agreed to cede control of LIBOR to a new operator.

## V.    DEFENDANTS' KNOWLEDGE OF LIBOR'S IMPORTANCE

44.    The BBA actively promoted LIBOR as a key benchmark rate:

> BBA LIBOR is by far the most widely referenced interest rate index in the world.  Its importance goes beyond that of inter bank lending and touches everyone from large international conglomerates to small borrowers.  It is central in interest rate swaps and the great majority of floating rate securities and loans relate to LIBOR. Independent research indicates that around $350 trillion of swaps and $10 trillion of loans are indexed to BBA LIBOR.  It is the basis for settlement of interest rate contracts on the world's major futures and options exchanges.  It is written into standard derivative and loan documentation such as the ISDA terms and is also used for an increasing range of retail products.[49]

45.    Financial instruments that incorporated USD LIBOR were priced based on the understanding that free market forces, and not collusion, would determine the stream of income generated by those financial instruments.  USD LIBOR, and expectations that it would be determined based on competitive market forces, cabined price negotiations for financial instruments that incorporated USD LIBOR.  Market participants, including the Closed Banks, reasonably relied on Defendants' representations that LIBOR was, and would be, honestly set at competitive rates and that the Panel Bank Defendants submitted LIBOR rates that were accurate and consistent with the published LIBOR rules.  Indeed, the BBA acknowledged in 2008 that

---

[48] Wheatley II, *supra* note 25, at 21.

[49] BBA, *Understanding the Construction and Operation of BBA LIBOR – Strengthening For The Future*, § 1.1, *supra* note 27.

LIBOR "has always been relied on by the market as a reliable benchmark" of borrowing costs.[50]

46.     Defendant Barclays has admitted that each Contributor Bank's LIBOR submissions contained market information concerning the costs of borrowing unsecured funds in particular currencies and tenors, the liquidity conditions and stress in the money markets, and Contributor Banks' ability to borrow funds in the particular markets.[51]  Defendant Barclays further admitted that the market information conveyed by LIBOR submissions "affect[ed], or tend[ed] to affect, the prices of commodities in interstate commerce, including the daily rates at which BBA U.S. Dollar . . . LIBOR . . . [was] fixed" and the financial products that expressly incorporated LIBOR.[52]

47.     Because a Contributor Bank's LIBOR submissions should correspond to the cost of money for that Contributor Bank, a Contributor Bank's LIBOR submission may be perceived as an indicator of a Contributor Bank's financial health and liquidity.  For example, if a Contributor Bank's LIBOR submission is relatively high as compared to other Contributor Banks, that submission would suggest that Contributor Bank presents a credit risk and has potential liquidity problems.

---

[50] BBA, *Libor Gets Enhanced Governance and Scrutiny Procedures* (Dec. 18, 2008), http://www.bbalibor.com/%20news-releases/libor-gets-enhanced-governance-and-scrutiny-procedures (last visited Mar. 11, 2014).

[51] *See, e.g.*, *In the Matter of: Barclays PLC, Barclays Bank PLC, and Barclays Capital, Inc.*, CFTC Docket No. 12-25, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions (June 27, 2012) ("Barclays CFTC Order"), at 26, attached as Exhibit 8 and incorporated into this Complaint by reference.

[52] *Id.*

## FRAUDULENT AND COLLUSIVE CONDUCT RELATING TO LIBOR

**I.    SYSTEMATIC LIBOR SUPPRESSION**

48.    Many of the Panel Bank Defendants' portfolios in at least 2007 and 2008 were weighted such that the Panel Bank Defendants financially benefited from reductions in floating interest rates.  For example, Deutsche Bank reportedly earned more than $650 million in profit during 2008 from trades tied to LIBOR because LIBOR was lower than predicted by competitive market forces.[53]  Similarly, Bank of America reported that it was "liability sensitive to LIBOR" and net interest income would increase substantially if short-term interest rates fell by 100 basis points while long-term rates remained the same.[54]  Bank of America further stated that it held a notional amount of more than $50 billion in receive fixed/pay floating interest rate swaps that would mature in 2008 or 2009 with no offsetting pay fixed/receive floating[55] interest rate swaps.[56]

49.    On Thursday, August 9, 2007, the Panel Bank Defendants submitted overnight USD LIBOR rates that were significantly higher than the prior day.  Overnight USD LIBOR rose from 5.35% on August 8, 2007, to 5.86% on August 9, 2007, which put USD LIBOR at its highest level since 2001.  Because these increases were not coincidental with changes in the rates charged by central banks, the media expressed concern that the increase in

---

[53] Jean Eaglesham, *Bank Made Huge Bet, and Profit, on Libor*, Wall St. J., Jan. 10, 2013, http://online.wsj.com/article/SB10001424127887324442304578231721272636626.html.

[54] Bank of America, 2008 Annual Report, 88-90, *available at* http://media.corporate-ir.net/media_files/irol/71/71595/reports/2008_AR.pdf.

[55] An interest rate swap is a contract in which two parties agree to exchange cash flows for a fixed period of time based on a defined principal amount (known as its notional value).  In its simplest form, one counterparty agrees to pay a fixed rate on the notional amount and, in exchange, receives a floating rate on the notional amount.

[56] Bank of America, 2008 Annual Report, *supra* note 54, at Table 42.

USD LIBOR indicated that the Panel Bank Defendants were afraid to lend to each other and that major losses for the Panel Bank Defendants and others were on the horizon.

50.   On August 9, 2007, after the LIBOR submissions were electronically published for that day, a UBS executive sent an internal email to a senior manager, a manager, and others stating that "it is highly advisable to err on the low side with fixings for the time being to protect our franchise in these sensitive markets.  Fixing risk and [profit and loss] thereof is secondary priority for now."[57]  UBS employees understood this secret directive to apply to all LIBOR currencies.[58]

51.   By August 16, 2007, all of the Panel Bank Defendants made significantly lower USD LIBOR submissions than the prior week.  UBS, for example, lowered its USD overnight LIBOR submission by 90 basis points.  Figure 2 below plots the USD overnight LIBOR submissions for the Panel Bank Defendants from August 7, 2007 through August 28, 2007.  As can be seen in Figure 2, the Panel Bank Defendants' LIBOR submissions showed significant dispersion in early August but then showed significant uniformity by the end of the month.  This pattern corroborates allegations that the Panel Bank Defendants began colluding on USD LIBOR in August 2007.

---

[57] UBS SOF ¶ 105.

[58] UBS SOF ¶ 108.

**Figure 2: Overnight USD LIBOR Submissions**



52.     During this same time period, the BBA issued a press release titled "Key Facts about LIBOR" in which the BBA falsely stated that LIBOR "closely reflects the real rates of interest being used by the world's big financial institutions" and that it "reflects the actual rate at which banks borrow money from each other."[59]

53.     On August 20, 2007, RBS's London-based head of money markets trading and the person responsible for USD LIBOR submissions, Paul Walker, reportedly telephoned RBS's head of short-term markets for Asia, Scott Nygaard, in Tokyo, to discuss how banks were using LIBOR to profit on its movements rather than submitting rates that honestly reflected their perceived costs of borrowing.  Mr. Walker is quoted as telling Mr. Nygaard: "People are setting to where it suits their book. . . .  LIBOR is what you say it is."[60]  Senior RBS managers

---

[59] BBA, *Key Facts About BBA LIBOR* (Aug. 10, 2007), attached as Exhibit 9 and incorporated into this Complaint by reference.

[60] Liam Vaughan & Gavin Finch, *Secret Libor Transcripts Expose Trader Rate-Manipulation*, Bloomberg, Dec. 13, 2012, http://www.bloomberg.com/news/print/2012-12-13/rigged-libor-with-police-nearby-shows-flaw-of-light-touch.html.

reportedly knew, that at least as of August 2007, the Panel Bank Defendants were "systematically rigging LIBOR."[61]

54.     Also in August 2007, senior managers at Barclays instructed their USD LIBOR submitters to lower their USD LIBOR submissions so that they would stay "within the pack" and be nearer to the suppressed rates of other Panel Bank Defendants rather than rates that were consistent with the BBA's definition of LIBOR.[62]  In one internal Barclays email dated August 28, 2007, a Barclays employee noted that Lloyds's USD LIBOR submission was artificially low.[63]  Similarly, in October 2007, a Barclays employee noted internally that an unidentified Contributor Bank submitted a LIBOR rate that was lower than the rate it actually paid.[64]

55.     Barclays's directive to stay "within the pack" with other Panel Bank Defendants remained in place, and was repeated, through at least January 2009.  Barclays has admitted that its USD LIBOR submissions were false because they were lower than Barclays would otherwise have submitted and contrary to the definition of LIBOR.[65]

56.     On November 29, 2007, a Barclays manager contacted a representative of BBA to advise that USD "LIBORs are being set lower than where they ought to be" and

---

[61] *Id.*

[62] Letter from Denis J. McInerney, Chief, Criminal Division, Fraud Section, United States Department of Justice, Appendix A (June 26, 2012) ("Barclays SOF") ¶ 37, attached as Exhibit 10 and incorporated into this Complaint by reference.

[63] Email to Pat Leising (Aug. 28, 2007), BCI-H0000071-72, attached as Exhibit 11 and incorporated into this Complaint by reference.

[64] Email to Jason Miu (Oct. 3, 2007), BARC-MAY6000086-87, attached as Exhibit 12 and incorporated into this Complaint by reference.

[65] Barclays SOF ¶ 36.

informed the BBA that this issue applied to all of the Panel Bank Defendants.[66]   The Barclays

manager explained that the Panel Bank Defendants were submitting rates that were too low

because "banks are afraid to stick their heads above the parapet and post higher numbers because

of what happened to [Barclays] when [Barclays] did.   You get shot at."[67]   The Barclays manager

specifically stated that certain other Panel Bank Defendants were submitting LIBOR rates lower

than where those banks could actually get funds.[68]

      57.     On November 30, 2007, a private discussion occurred between an employee

of Barclays and the FSA.   An internal Barclays memorandum reveals that Barclays "didn't say

anything along the lines of, you know, we're not posting where we think we should."[69]   On

December 4, 2007, a Barclays LIBOR submitter sent an internal email stating that the Panel

Bank Defendants, including Barclays, were submitting false and dishonest submissions.[70]

      58.     On March 5, 2008, the FSA asked Barclays what it was paying for funding in

certain tenors and currencies.[71]   A Barclays manager stated internally that s/he did not want to

disclose that Barclays was borrowing USD "way over LIBOR" and would rather indicate that it

was paying a rate equal to LIBOR.[72]   A Barclays LIBOR submitter agreed that if s/he responded

with "the honest truth" it might open a "can of worms."[73]   Barclays responded to the FSA that it

---

[66] *Id*. ¶ 43.

[67] *Id*.

[68] *Id*.

[69] *Id*. ¶ 45.

[70] *Id*.

[71] *Id*. ¶ 46.

[72] *Id*.

[73] *Id*.

was paying for one-year USD at LIBOR "flat," which was untrue.[74]

59.   On April 11, 2008, a Barclays employee told an employee of the New York Federal Reserve that he was aware of Panel Bank Defendants putting in USD LIBOR submissions that were lower than what they were actually paying and that "the ones that need the cash most put in the lowest, lowest rates."[75]   The Barclays employee said that Barclays could not borrow money at the rates submitted by other Panel Bank Defendants and that "if we can't borrow money at that rate . . . [t]hen no one else could really. . . .  I mean we, you-you know we speak to everyone that everyone else does so, um, yeah, it's a quite, quite an uncomfortable feeling and . . . I don't know if at some stage LIBORs will correct themselves."[76]

60.   On Wednesday, April 16, 2008, the Wall Street Journal published an article questioning the accuracy of LIBOR.[77]   The article quotes Mr. Ewan as saying that the BBA is "closely watching the rates banks contribute" and that "[i]f it is deemed necessary, we will take action to preserve the reputation and standing in the market of our rates."[78]   The article states that LIBOR was to be on the agenda of an upcoming BBA board meeting.[79]

---

[74] *Id.*

[75] New York Federal Reserve Bank, Unofficial Transcript, ID09274211 (Apr. 11, 2008), at 7, *available at* http://www.newyorkfed.org/newsevents/news/markets/2012/libor/April_11_2008_transcript.pdf.

[76] *Id.* at 16.

[77] Carrick Mollenkamp, *Bankers Cast Doubt On Key Rate Amid Crisis*, Wall St. J., Apr. 16, 2008, http://online.wsj.com/article/SB120831164167818299.html.  However, in the article, the *WSJ*, acknowledged that "[n]o specific evidence has emerged that banks have provided false information about borrowing rates."  *Id.*

[78] *Id.*

[79] *Id.*

61.     Over the next week, the BBA launched what its executives described as a "charm offensive,"[80] reaching out to investors and journalists to dispel concerns about LIBOR. For example, on April 17, 2008 the BBA publicly announced that it would expel any Contributor Bank that made deliberately inaccurate LIBOR submissions to create the false impression that the BBA did, and would, exercise meaningful oversight to ensure accurate and honest LIBOR submissions.[81]  The BBA stated that it would fast-track an "intensive review" of its LIBOR process, but that it did not believe that Contributor Banks had submitted false quotes.[82]

62.     The true purpose of this "charm offensive" was not to address the fraud and collusion causing USD LIBOR suppression but rather to create the false impression that the Panel Bank Defendants provided accurate and honest USD LIBOR submissions.  Consistent with this "charm offensive," a number of Panel Bank Defendants publicly provided pretextual explanations for the so-called dislocations in USD LIBOR.  For example,

- On April 21, 2008, Jeffrey Rosenberg, head of credit strategy at Bank of America Securities, argued that the variations in LIBOR were simply a function of the way the BBA calculates LIBOR.  He said the BBA approach "works when both overall bank risk is low and the dispersion of risks across banks is small . . . [which] is clearly not the case currently."[83]

- On April 28, 2008, Dominic Konstam of Credit Suisse publicly defended LIBOR, stating that it "has been a barometer of the need for banks to raise

---

[80] Enrich & Colchester, *Before Scandal, Clash Over Control of Libor*, *supra* note 4.

[81] UBS SOF ¶ 114.

[82] Carrick Mollenkamp & Laurence Norman, *British Bankers Group Steps Up Review of Widely Used Libor*, Wall St. J., Apr. 17, 2008, http://online.wsj.com/article/SB120838284713820833.html.

[83] Gillian Tett & Michael Mackenzie, *Doubts Over Libor Widen*, Fin. Times, Apr. 21, 2008, http://www.ft.com/intl/cms/s/0/d1d9a792-0fbd-11dd-8871-0000779fd2ac.html#axzz2vhJk8xIz. That same article quotes unidentified "bankers" as saying it was "unlikely that this discrepancy has arisen because banks have deliberately been colluding to keep Libor rates down."

capital.  The main problem with LIBOR is the capital strains facing banks."[84]

- On May 16, 2008, JPMorgan stated that LIBOR was "not broken" but that recent volatility could be attributed to reluctance among banks to lend to each other amid the current credit crunch.[85]

These pretextual explanations and/or denials were false and intended to conceal the fact that the Panel Bank Defendants were fraudulently and collusively suppressing USD LIBOR.[86]

63.    During a six-month period in 2008, Thomson Reuters reportedly alerted Mr. Ewan on a weekly basis that the LIBOR process was being distorted.[87]  Mr. Ewan reportedly

---

[84] Michael Mackenzie, *Talk of Quick Fix Recedes As Libor Gap Fails To Close*, Fin. Times, July 29, 2008, http://www.ft.com/intl/cms/s/0/3da27a46-5d05-11dd-8d38-000077b07658.html#axzz1szdS58jE.

[85] Kirsten Donovan, Jamie McGeever, Jennifer Ablan, Richard Leong & John Parry, *UPDATE 2-European, U.S. Bankers Work On Libor Problems*, Reuters, May 16, 2008, http://in.reuters.com/article/2008/05/16/markets-rates-bba-idINL162110020080516.

[86] As the FSA recently noted, the evidence of "dislocation did not in itself . . . carry any implication that 'lowballing' was occurring."  Financial Services Authority Internal Audit Report ("FSA Internal Audit"), *A Review Of The Extent Of Awareness Within The FSA Of Inappropriate LIBOR Submissions*, *Management Response*, ¶ 1.5 (Mar. 2013), *available at* www.fsa.gov.uk/static/pubs/other/ia-libor-management-response.pdf.  Indeed, the *Wall Street Journal* article warned, "no specific evidence has emerged that banks have provided false information about borrowing rates."  Mollenkamp, *Bankers Cast Doubt On Key Rate Amid Crisis*, *supra* note 77.  *See also* Samuel Cuhen and Matt Raskin, Recent Concerns Regarding LIBOR's Credibility, New York Federal Reserve, May 20, 2008, http://www.newyorkfed.org/newsevents/news/markets/2012/libor/MarketSource_Report_May20 2008.pdf (the "Fed Report") (New York Fed report stated in May 2008 "it is difficult to find convincing evidence of actual misreporting."); Brenda González-Hermosillo et al., Global Financial Stability Report, International Monetary Fund, Oct. 2008, http://www.imf.org/External/Pubs/FT/GFSR/2008/02/pdf/chap2.pdf ("U.S. dollar LIBOR remains an accurate measure of a typical creditworthy bank's marginal cost of unsecured U.S. dollar term funding."); Joellen Perry et al., Central Banks Ponder Dollar-Debt Rate, Wall St. J., May 2, 2008, http://online.wsj.com/news/articles/SB120967584946260607 (reporting that LIBOR remained "unusually high.").

[87] Ian Pollock, *Libor: BBA 'Warned Weekly' Says Former Rate-Compiler*, BBC News, July 25, 2012, http://www.bbc.co.uk/news/business-18930191.

told Thomson Reuters that he would investigate its concerns.[88]

64.     On May 19, 2008, the FX & MM Committee met to discuss questions raised about LIBOR.  The meeting was "confidential" and the BBA refused to confirm the fact of the meeting.[89]  Senior bank executives described this gathering as a "working level pre meeting" to determine what should happen at the BBA's formal meeting scheduled for May 30, 2008.[90] Contributor Bank executives reportedly decided that they would make no substantive changes to the way LIBOR was calculated, but would instead embark on a campaign to alter perceptions that LIBOR was flawed.[91]

65.     On May 29, 2008, the Wall Street Journal published another article questioning USD LIBOR submissions made by Citigroup, Portigon, HBOS, JPMorgan, UBS, and other Panel Bank Defendants.[92]  Numerous Panel Bank Defendants disclaimed the Wall Street Journal's analysis.  The head of global fixed-income strategy at JPMorgan, for example, asserted that the Wall Street Journal's methodology was flawed because it was "based on too high a risk-free rate which produces a large upward bias in the Journal's measure of bank

---

[88] *Id.*

[89] Email from Angela Knight to Paul Tucker (May 21, 2008), attached as Exhibit 13 and incorporated into this Complaint by reference.  Barclays publicly disclosed the cover email but, apparently, not the attachment, which is said to provide the "blow-by-blow" account of what transpired at the May 19, 2008 meeting.

[90] Email from Paul Tucker (May 28, 2008), attached as Exhibit 14 and incorporated into this Complaint by reference.

[91] *Id.*

[92] Carrick Mollenkamp & Mark Whitehouse, *Study Casts Doubt on Key Rate*, Wall St. J., May 29, 2008, http://online.wsj.com/article/SB121200703762027135.html.  As with its April 2008 article, the *Wall Street Journal* cautioned that its analysis "doesn't prove that banks are lying or manipulating Libor."  *Id.*

borrowing costs."[93]  A Citigroup spokesman said, "We continue to submit our LIBOR rates at levels that accurately reflect our perception of the market."[94]  An HBOS spokesman said, "We believe our Libor fixings are a genuine and realistic indication of our average cost of funding. Our postings are on the whole in line with the market."[95]  Portigon (then WestLB) insisted that it provided accurate data.[96]  These pretextual explanations and/or denials were false and intended to conceal the fact that the Panel Bank Defendants were fraudulently and collusively suppressing USD LIBOR.

66.    In another article published that same day, the BBA insisted: "We have every confidence in the integrity of the BBA LIBOR-setting process and the accuracy of the figures it produces."[97]  The BBA's statement was false.

67.    After its formal meeting on May 30, 2008, the BBA announced that it would be strengthening the oversight of LIBOR and that "it would give more details in due course."[98] The unidentified attendees at the May 30, 2008 BBA meeting signed confidentiality agreements limiting their ability to disclose what was discussed.[99]  In fact, the Panel Bank Defendants and

---

[93] *Id.*

[94] John Parry, Dan Wilchins & Ed Tobin, *Banks May Be Understating Key Lending Rate: Report*, Reuters, May 29, 2008, http://www.reuters.com/article/2008/05/29/us-banks-libor-idUSN2930208320080529.

[95] *Id.*

[96] *Id.*

[97] Gavin Finch & Elliot Gotkine, *Libor Banks Misstated Rates, Bond at Barclays Says*, Bloomberg, May 29, 2008, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aMSoLbYpbHWk.

[98] *INTERNATIONAL: Libor Process*, N.Y. Times, May 30, 2008, http://www.nytimes.com/2008/06/06/news/06iht-6oxan-LIBOR.13532018.html (last visited Mar. 11, 2014).

[99] Email from Angela Knight to Paul Tucker (May 31, 2008), attached as Exhibit 15 and incorporated into this Complaint by reference.

the BBA intended only to make minor cosmetic changes to the LIBOR process.  The BBA

shared its proposed changes with the Bank of England, which internally concluded that the

BBA's proposal was "wholly inadequate."[100]  The FSA directed the BBA not to suggest that

regulatory authorities endorsed the proposals.[101]

68.     On June 10, 2008, the BBA issued a press statement asserting that Contributor

Banks "are invariably those with the best credit ratings and in the current diminished credit

capacity of the market it is therefore not surprising that some institutions will not be able to

access funds at the LIBOR rate."[102]  The BBA's statement represented that the BBA was

incorporating a tight scrutiny mechanism that would require any contribution discrepancies to be

reviewed and justified.  In fact, the BBA's statement was false and the Panel Bank Defendants

and the BBA did not intend to employ a tight scrutiny mechanism but, rather, intended to allow

the Panel Bank Defendants to continue to fraudulently and collusively suppress USD LIBOR.

69.     On August 5, 2008, the BBA publicly represented on its website that

Contributor Banks which had responded to the BBA's request for consultation were "confident"

that their submitted rates were "truly reflective of their perceived borrowing costs" and that

LIBOR was a "fundamentally robust and accurate benchmark, with contributors inputting rates

---

[100]  Transcript of Governor's written comments on email for Friday 30 May 2008 entitled Result
of BBA review: just "strengthening the oversight of LIBOR," attached as Exhibit 16 and
incorporated into this Complaint by reference.

[101]  Email from Michael Cross (June 5, 2008), attached as Exhibit 17 and incorporated into this
Complaint by reference.

[102]  BBA, *Understanding the Construction and Operation Of BBA LIBOR – Strengthening for the
Future*, *supra* note 27.

that they believe reflect their future funding costs."[103]  According to a statement from the BBA published on its website, the FX & MM Committee concluded that, based on its review of investigation, it "believes that current submissions are accurate."[104]

70.     BBA officials later internally discussed the possibility of selling LIBOR or spinning it off into a wholly independent entity, but when BBA staffers pitched the idea to the Panel Bank Defendant executives, they reportedly understood that the Panel Bank Defendants— which paid much of the BBA's bills through their membership fees—wanted LIBOR kept in-house so that they could continue to influence it.[105]  As a result, the idea ultimately was abandoned.

71.     According to UBS's admissions, an internal discussion took place among UBS employees in September 2008 that confirmed that the Panel Bank Defendants were continuing to make artificially low LIBOR submissions.  In a documented discussion, a UBS employee stated, "LIBORs currently are even more fictitious than usual."[106]  On October 10, 2008, a Barclays employee privately reported to the New York Federal Reserve Bank ("NY Fed") that Barclays's USD LIBOR submissions were "unrealistic."[107]  An October 17, 2008 email from a Rabobank LIBOR submitter stated, "We are now setting all libors [sic]

---

[103] BBA, *BBA LIBOR CONSULTATION FEEDBACK STATEMENT*, at ¶¶ 1.5, 3.14, 3.19 (Aug. 5, 2008), attached as Exhibit 18 and incorporated into this Complaint by reference.  The metadata for this document identifies Mr. Ewan as the author of the document.

[104] *Id.* at ¶ 4.8.

[105] Enrich & Colchester, *Before Scandal, Clash Over Control of Libor*, *supra* note 4.

[106] UBS SOF ¶ 101.

[107] Unofficial Transcript of telephone call (Oct. 10, 2008), BARC-MAY6-000091-97, at 95, *available at* http://s3.documentcloud.org/documents/399152/new-york-fed-documents-on-barclays.pdf.

significantly under the market levels."[108]  On October 24, 2008, another Barclays employee privately reported to the NY Fed that USD LIBOR rates were "absolute rubbish,"[109] citing submissions by Portigon and Deutsche Bank as being too low.  The employee told the NY Fed that he was aware of banks that were making LIBOR submissions that were below what they actually paid in comparable transactions.[110]  Publicly, however, Barclays and other Panel Bank Defendants continued to falsely represent that LIBOR was based on accurate and honest submissions.

72.    The conspiracy to suppress LIBOR superseded the prior and ongoing efforts of individual traders to manipulate LIBOR to benefit their trading positions.[111]  For example, UBS management on several occasions received requests made by individual traders to deviate slightly from the systematic suppression to manipulate a particular submission for Japanese Yen LIBOR on a given day.[112]  On information and belief, those requests were rejected and/or did not prevent USD LIBOR suppression.

## II.    CONDUCT TO BENEFIT INDIVIDUAL TRADER POSITIONS

73.    Recent public disclosures reveal that certain derivatives traders employed by the Panel Bank Defendants routinely asked their LIBOR submitters to provide false and

---

[108] *United States v. Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A.,* Deferred Prosecution Agreement, Attachment A (Oct. 29, 2013) ("Rabobank SOF"), ¶ 40, attached as Exhibit 19 and incorporated into this Complaint by reference.

[109] Transcript of telephone call (Oct. 24, 2008), BARC-MAY6-000098-100, at 000098, 000100, *available at* http://s3.documentcloud.org/documents/399152/new-york-fed-documents-on-barclays.pdf.

[110] *Id.* at 000100.

[111] UBS SOF ¶ ¶ 132-133.

[112] *Id.*

dishonest LIBOR submissions to the BBA.[113]  The LIBOR submitters for these Panel Bank Defendants agreed to accommodate, and did accommodate, the traders' requests for favorable LIBOR submissions on numerous occasions.[114]

74.    Over a period of years, a culture of collusion developed that ultimately enabled the systematic LIBOR suppression discussed above.[115]

## III.    HARMFUL EFFECTS OF THE FRAUDULENT AND COLLUSIVE CONDUCT

75.    By submitting and publishing interbank lending rates that were determined by collusion rather than by competition, the Panel Bank Defendants interfered with the competitive process in the markets for money and LIBOR-based financial instruments and artificially increased the prices they charged, and margins they earned, in those markets including the markets for interest-rate swaps.

76.    Absent collusion, banks compete for cash based on the interest rates that they pay.  As noted above, the interest rate that a borrower is willing to pay, and a lender is willing to accept, is determined in large part by the borrower's credit standing and liquidity.  In a competitive environment, less creditworthy banks are incentivized to become more efficient and shed risk to compete more effectively.[116]  This competitive behavior is precisely what the antitrust laws are designed to encourage.

---

[113] *Id*. ¶ 20; Barclays SOF ¶ 11; *United States v. Royal Bank of Scotland plc,* Deferred Prosecution Agreement, Attachment A (Feb. 5, 2013) ("RBS SOF"), ¶ 14, attached as Exhibit 20 and incorporated into this Complaint by reference.

[114] Barclays SOF ¶ 11; UBS SOF ¶ 20; RBS SOF ¶¶ 14-15, 19.

[115] *See, e.g.*, Bloomberg, *Libor Gives Prosecutors Chance to Change Banking Culture*, Sept. 24, 2012, http://www.bloomberg.com/news/2012-09-24/libor-gives-prosecutors-chance-to-change-banking-culture.html.

[116]  Xavier Freixas, Antoine Martin, David Skeie, *Bank Liquidity, Interbank Markets, and Monetary Policy,* Federal Reserve Bank of New York Staff Reports, May 2009 (revised Sep. 2009), http://www.newyorkfed.org/research/staff_reports/sr371.pdf.

77.     In addition, the Panel Bank Defendants' fraudulent and collusive conduct artificially biased the competitive process for financial products that paid cash flows determined by USD LIBOR ("LIBOR-based financial products") in favor of the Panel Bank Defendants.  As shown above, prices for LIBOR-based interest-rate swaps were set based on the expectation that competitive market forces would determine USD LIBOR in the future.  By secretly agreeing to suppress USD LIBOR, the Panel Bank Defendants obtained a competitive advantage over their counterparties that expanded and effectively fixed the margins that the Panel Bank Defendants would earn in transactions for LIBOR-based financial products.

78.     As shown in Figure 3 below, USD LIBOR was consistently a few basis points above the Eurodollar Bid Rate published by the Federal Reserve Board from 2002-2006.  In fact, this close relationship existed from at least 1992 through July 2007.[117]  Eurodollars are time deposits in USD held in commercial banks outside the United States, primarily London.  Eurodollar futures contracts, based on a notional $1 million three-month deposit, are traded on the Chicago Mercantile Exchange.[118]  Prior to the contract settlement date, the price of a three-month Eurodollar futures contract is an indication of the market's prediction of the three-month USD LIBOR on its settlement date.[119]  In other words, prior to Defendants' fraud and collusion, a Eurodollar futures contract provided an estimate of USD LIBOR in the future for the given maturity.  The Eurodollar bid rate can be seen to represent the interest rate at which a bank would lend money to another bank and the corollary of LIBOR, which can be seen as the

---

[117] Federal Reserve Bank of San Francisco, *Ask Dr. Econ* (July 2006), http://www.frbsf.org/education/activities/drecon/2006/0607.html.

[118] Barclays SOF ¶ 9.

[119] *Id*.

"ask" rate.[120]   As a result, an economist would expect to see a small bid (Eurodollar)/ask (LIBOR) spread as reflected in the relationship that existed from 1992 through 2006.[121] According to a statistical study conducted by economics professors, the Eurodollar Bid Rate predicted the following day's LIBOR rates better than did the prior day's LIBOR rates from 1992 through 2007.[122]

79.     The relationship between the Eurodollar Bid Rate and LIBOR fundamentally changed in the summer of 2007, with LIBOR rates falling below the Eurodollar Bid Rate, sometimes dramatically, through late 2011.   These data confirm that the Panel Bank Defendants' behavior changed in 2007 with regard to USD LIBOR submissions at the same time that UBS and Barclays secretly adopted policies to suppress LIBOR and maintain submitted rates within a narrow range.   From at least 2007 through at least mid-2011, every one of the Panel Bank Defendants submitted USD LIBOR submissions that were significantly lower than the Eurodollar Bid Rate.

---

[120] Connan Snider & Thomas Youle, *Does the LIBOR Reflect Banks' Borrowing Costs?*, at 3, 7 (Apr. 2, 2010), *available at* http://www.econ.umn.edu/~youle001/libor_4_01_10.pdf.

[121] *Id.*

[122] *Id.* at 8.

**FIGURE 3: Difference between 3M USD LIBOR and 3M Eurodollar Bid Rate**



80.     On a Defendant-by-Defendant basis, the average USD LIBOR/Eurodollar Bid Rate spread during that time ranged from 25 basis points (BTMU, Barclays, Norinchukin) to 35 basis points (JPMorgan, WestLB).[123]  Similarly, during the last two weeks of September 2008, the average USD LIBOR/Eurodollar Bid Rate spread ranged from 110 basis points (HBOS) to 153 basis points (JPMorgan), with the exception of Barclays (87 bp).[124]

81.     The individual participants in the fraudulent and collusive conduct described in this Complaint would not have engaged in the conduct, which carries the potential for criminal penalties, absent a reasonable belief that the conduct actually influenced the USD LIBOR fixings published by, and through, the BBA.

---

[123] The remaining Panel Bank Defendants are: Bank of America (30 bp), Citigroup (32 bp), Credit Suisse (27 bp), Deutsche Bank (31 bp), HBOS (29 bp), HSBC (32 bp), Lloyds (30 bp), Rabobank (32 bp), RBC (26 bp), RBS (26 bp), and UBS (29 bp).

[124] The remaining Panel Bank Defendants are: BTMU (120 bp), Bank of America (144 bp), Citigroup (142 bp), Credit Suisse (122 bp), Deutsche Bank (129 bp), HSBC (141 bp), Lloyds (146), Norinchukin (126 bp), Rabobank (143 bp), RBC and RBS (140 bp), UBS (141 bp), and WestLB (138 bp).

82.     By suppressing USD LIBOR, the Panel Bank Defendants distorted the price of financial products tied to USD LIBOR, limited consumer choice, and diminished the quality of financial products tied to USD LIBOR.  The Panel Bank Defendants purport to compete in these financial product markets.  Further, to the extent that the Panel Bank Defendants used false and dishonest USD LIBOR submissions to bolster their respective reputations, they artificially increased their ability to charge higher underwriting fees and obtain higher offering prices for financial products to the detriment of the Closed Banks and other consumers.

83.     The Closed Banks engaged in numerous financial transactions with Panel Bank Defendants and others involving products that incorporated USD LIBOR.  The Closed Banks reasonably relied on the honesty of the affected benchmark rates in undertaking these transactions and holding LIBOR-based financial products.  As a direct and proximate result of Defendants' wrongful conduct as described in this Complaint, the Closed Banks have been injured in their business and property and have suffered damages in an amount presently undetermined.

## DISCLOSURE OF THE FRAUDULENT AND COLLUSIVE CONDUCT

84.     On March 15, 2011, UBS disclosed in a note to its Annual Report that it had received subpoenas from the United States Commodity Futures Trading Commission ("CFTC") and the DOJ in connection with investigations into LIBOR.  This note marked the first public acknowledgment by any Defendant of the non-public CFTC investigation, which began in late 2008.[125]  The Annual Report stated that the investigations focused on whether there were improper attempts by UBS, either acting on its own behalf or together with others, to manipulate LIBOR rates.

---

[125] FSA Internal Audit, ¶ 1.1, *supra* note 86.

85.     Over the next months, the Panel Bank Defendants, regulators, and media reports gradually revealed the scope of the expanding global investigations of manipulation of LIBOR and other benchmark rates.

- On March 16, 2011, the *Financial Times* reported that the CFTC and/or the DOJ subpoenaed UBS, Bank of America, Citigroup, and Barclays regarding USD LIBOR.  *Bloomberg* reported that regulators had also contacted Portigon, Lloyds, and Deutsche Bank.[126]

- A Competition Law Officer from the Canadian Competition Bureau submitted an affidavit in May 2011 in support of an ex parte application asking the Canadian courts to compel HSBC, RBS, Deutsche Bank, JPMorgan, and Citigroup to produce documents.  The Canadian investigation relates to whether those banks conspired to "enhance unreasonably the price of interest rate derivatives from 2007 to March 11, 2010 . . . to prevent or lessen, unduly, competition in the purchase, sale, or supply of interest rate derivatives from 2007 to March 11, 2010, . . . to restrain or injure competition unduly from 2007 to March 11, 2010 . . . [and] to fix, maintain, increase or control the price for the supply of interest rate derivatives from March 12, 2010 to June 25, 2010."[127]

- In 2011, UBS secured conditional leniency from the DOJ for antitrust infringements related to Yen LIBOR and the Euroyen Tokyo Interbank Offered Rate ("TIBOR").[128]

- On February 3, 2012, Credit Suisse disclosed that the Swiss Competition Commission had commenced an investigation involving 12 banks including Credit Suisse, and certain other financial intermediaries,

---

[126] Brooke Masters, Patrick Jenkins & Justin Baer, *Banks Served Subpoenas in Libor Case*, Fin. Times, Mar. 16, 2011, http://www.ft.com/intl/cms/s/0/52958d66-501f-11e0-9ad1-00144feab49a.html#axzz2vhJk8xIz; Joshua Gallu and Donald Griffin, Bloomberg, *Libor Probe Spurs Witness Call-Up at Citigroup, Deutsche Bank*, Mar. 23, 2011, http://www.bloomberg.com/news/2011-03-24/libor-manipulation-probe-spurs-witness-call-up-at-citigroup-deutsche-bank.html.

[127] Affidavit of Brian Elliott (May 2011 Court of Ontario), ¶ 15, *available at* http://wallstreetonparade.com/wp-content/uploads/2012/07/AffidavitofBrianElliott-May182011.pdf.

[128] UBS AG, Form 6-K, July 26, 2011, at Note 15, *available at* http://www.ubs.com/global/en/about_ubs/investor_relations/other_filings/sec.html.

concerning potential collusion among traders to affect and influence the bid-ask spread for derivatives tied to LIBOR.[129]

- On February 14, 2012, *Bloomberg* reported that European Union antitrust regulators were investigating whether banks formed a cartel to manipulate interest rates.[130]

- In September 2012, sources reported that a former trader for RBS, Tan Chi Min, filed a 231-page affidavit with the Singapore High Court, which included contemporaneous messages authored during his tenure at RBS that reveal LIBOR fraud and collusion.  In one message dated August 19, 2007, Mr. Tan wrote in an electronic discussion with traders at other banks, including Deutsche Bank's Mark Wong: "It's just amazing how Libor fixing can make you that much money or lose if opposite.  It's a cartel now in London."[131]

## I.    BARCLAYS ADMISSIONS

86.    On June 26, 2012, Barclays entered into a non-prosecution agreement with the Criminal Fraud Division of the DOJ relating to, among other things, USD LIBOR.  As part of that agreement, Barclays agreed to a Statement of Facts that explains the basis of the non-prosecution agreement.  Barclays further received conditional leniency from the DOJ's Antitrust Division for potential Sherman Act violations involving financial instruments that reference Euribor.  Barclays also entered into a settlement with the CFTC to resolve charges related to LIBOR that it violated Sections 6(c), 6(d), and 9(a)(2) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 9, 13b, and 13(a)(2).[132]

---

[129] Haig Simonian, *Swiss Probe 12 Banks Over Libor Allegations*, Fin. Times, Feb. 3, 2012, http://www.ft.com/intl/cms/s/0/9ba2396e-4e7f-11e1-aa0b-00144feabdc0.html#axzz2vhoucPDG.

[130] Lindsay Fortado & Joshua Gallu, *Libor Probe Said to Expose Collusion, Lack of Internal Controls*, Bloomberg, Feb. 14, 2012, http://www.bloomberg.com/news/2012-02-15/libor-investigation-said-to-expose-collusion-lack-of-internal-controls.html.

[131] Andrea Tan, Gavin Finch, & Liam Vaughan, *RBS Instant Messages Show Libor Rates Skewed for Traders*, Bloomberg, Sept. 26, 2012, http://www.bloomberg.com/news/2012-09-25/rbs-instant-messages-show-libor-rates-skewed-for-traders.html.

[132] Barclays CFTC Order.

87.     According to these filings, Barclays through its agents, officers, and employees repeatedly made false, misleading, or knowingly inaccurate submissions concerning USD LIBOR and other currencies.  More specifically, Barclays admitted that by falsely representing that its USD LIBOR submissions were based on its perceived costs of borrowing unsecured funds in the relevant interbank markets, it engaged in a deceptive course of conduct in an effort to gain an advantage over its counterparties and that Barclays's USD LIBOR submissions were false or misleading.[133]  Barclays admitted that it lacked specific internal controls and procedures concerning its submission processes for LIBOR and that its inadequate supervision allowed the fraudulent and collusive conduct to occur.  Barclays further admitted that it knew that the fraudulent and collusive suppression of affected interest rate derivatives tied to LIBOR benefited Barclays at the expense of its counterparties.[134]

88.     The BBA, which in fact had known of the investigation since late 2008, publicly claimed to be "shocked" by Barclays's disclosures.[135]  Just a few months earlier, however, the BBA had deleted links on its website that detailed its involvement with setting LIBOR, including a statement that it "calculates and produces BBA LIBOR at the request of our members for the good of the market."[136]

---

[133] Barclays SOF ¶ 33.

[134] Barclays SOF ¶ ¶ 30-32.

[135] BBA, *Libor Statement – Thursday 28, June*, Jun. 28, 2012, *available at* http://www.mondovisione.com/media-and-resources/news/british-bankers-association-libor-statement-thursday-28-june/.

[136] Liam Vaughan & Jesse Westbrook, *Libor Links Deleted as U.K. Bank Group Backs Away from Rate*, Bloomberg, Mar. 7, 2012, http://www.businessweek.com/news/2012-03-06/libor-links-deleted-as-bank-group-backs-away-from-tarnished-rate#p2.

## II.     UBS ADMISSIONS

89.     On December 18, 2012, UBS entered into a non-prosecution agreement with the Criminal Fraud Division of DOJ related to LIBOR.  UBS also obtained conditional leniency for potential Sherman Act violations involving financial instruments that reference Yen LIBOR and Euroyen TIBOR.

90.     On December 19, 2012, the Swiss Financial Market Supervisory Authority ("FINMA") issued a Summary Report regarding its investigation of UBS.[137]  The Final Notice summarizes UBS's misconduct and notes that UBS's "substantial failings in the system and control processes for LIBOR submissions" prevented those responsible at UBS from detecting and acting on the misconduct.[138]

91.     In December 2012, UBS Securities Japan Co. Ltd. ("UBSSJ") agreed to plead guilty to one count of wire fraud (18 U.S.C. § 1343)[139] for secretly manipulating Yen LIBOR and TIBOR.  UBSSJ admitted in its plea that false and misleading LIBOR submissions were "material" from the perspective of counterparties to financial transactions.[140]

92.     In December 2012, the DOJ charged two former UBS traders – Tom Alexander William Hayes and Roger Darin (collectively, the "UBS traders") – with wire fraud and conspiracy to commit wire fraud for secretly manipulating LIBOR and other benchmark

---

[137] *FINMA Investigation into the Submission of Interest Rates for the Calculation of Interest Reference Rates such as LIBOR by UBS AG*, at 2 (Dec. 19, 2012), attached as Exhibit 21 and incorporated into this Complaint by reference.

[138] *Id.*

[139] Letter from Denis J. McInerney, *supra*, note 30, at Appendix B.

[140] UBS SOF ¶¶ 9-10, 75.

rates.[141]  In addition, the DOJ charged the UBS traders with a violation of Section 1 of the

Sherman Act for conspiring with an unidentified employee at a major financial institution and

others to fix Yen LIBOR, a key price component of Yen LIBOR-based derivative products.[142]

93.    On December 19, 2012, UBS and UBSSJ entered into a settlement with the

CFTC to resolve allegations that UBS violated Sections 6(c), 6(d), and 9(a)(2) of the CFTC, 7

U.S.C. §§ 9, 13b, and 13(a)(2) related to LIBOR.[143]  According to the CFTC's findings, from at

least January 2005 through 2011, UBS by and through acts of dozens of employees, officers, and

agents located around the world, engaged in systematic misconduct that undermined the integrity

of certain global benchmarks, including USD LIBOR.  UBS admitted that its false submissions

contained market information that affected or tended to affect USD LIBOR, and USD LIBOR

was a commodity in interstate commerce.[144]  Further, UBS continued its "rampant misconduct,"

including collusive conduct, long after it was on notice (in October 2008) of an investigation into

its USD LIBOR practices.[145]

## III.    RBS ADMISSIONS

94.    On February 5, 2013, RBS executed a Deferred Prosecution Agreement with

the Criminal Fraud Section of the DOJ related to LIBOR.  Under the terms of that agreement,

RBS admitted various facts relating to its involvement in fraudulent and collusive practices

---

[141] *United States of America v. Alexander, et al*., Complaint, 12 MAG 3229 (Dec. 12, 2012),
attached as Exhibit 22 and incorporated into this Complaint by reference.

[142] *Id.* (Count 3).

[143] *In the Matter of UBS AG and UBS Securities Japan Co. Ltd*., CFTC Docket No. 13-09, Order
Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as
Amended, Making Findings and Imposing Remedial Sanctions (Dec. 19, 2012), attached as
Exhibit 23 and incorporated into this Complaint by reference.

[144] *Id.* at 4, 41, 52-53.

[145] *Id.* at 5.

relating to LIBOR submissions.  The United States filed a two-count criminal information

charging RBS with wire fraud and price fixing in connection with RBS's conduct and agreed to

defer prosecution of that case pursuant to its agreement with RBS.[146]  In addition, RBS Securities

Japan Ltd. pleaded guilty to one count of wire fraud for its participation in fraudulent and

collusive practices relating primarily to BBA Yen LIBOR.[147]

94. 95.      The agreements reached between (a) the United States and Barclays, (b) the

United States and UBS, and (c) the United States and RBS all refer to an ongoing investigation

into misconduct related to additional, unidentified benchmark rates.  On information and belief,

USD LIBOR is among the interest rates under investigation by the United States.

## IV.    RABOBANK ADMISSIONS

96.      On October 29, 2013, Rabobank settled LIBOR investigations by the DOJ,

CFTC, FSA and Dutch PPS.  Rabobank admitted to the CFTC that its manipulation of USD

LIBOR, Pound Sterling LIBOR, Yen LIBOR and EURIBOR violated the CEA and it paid a

$475 million fine.[148]  Rabobank also entered into a deferred prosecution agreement with the

Criminal Fraud Section of the DOJ to resolve charges of wire fraud based on the manipulation of

LIBOR and EURIBOR and paid a $235 million fine.  As part of the settlements, Rabobank

admitted that more than two dozen of its traders, including its Global Head of Liquidity and

Finance, participated in ongoing and pervasive manipulation of USD and Yen LIBOR to favor

---

[146] RBS Deferred Prosecution Agreement, *supra* note 113.

[147] *Id.*

[148] *In the Matter of Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A.,* CFTC Docket No. 14-02, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions (Oct. 29, 2013) ("Rabobank CFTC Order"), attached as Exhibit 24 and incorporated into this Complaint by reference.

its day-to-day trading positions.[149]

97.     According to these filings, Rabobank, through its agents, officers, and employees repeatedly made false, misleading, or knowingly inaccurate submissions concerning USD LIBOR and other currencies.  More specifically, Rabobank admitted that by falsely representing that its LIBOR submissions were based on its perceived costs of borrowing unsecured funds in the relevant interbank markets, it engaged in a deceptive course of conduct in an effort to gain an advantage over its counterparties and that Rabobank's LIBOR submissions were false or misleading.[150]

98.     The Closed Banks, and after they failed, the FDIC as Receiver for the Closed Banks, could not discover the fraud and collusion described in this Complaint until June 2012 at the earliest when Barclays admitted that it knowingly and intentionally submitted false and dishonest LIBOR submissions to the BBA.  Prior to that time, the only information available was that other government regulators had initiated an investigation into LIBOR, and that LIBOR "dislocations" were unusual and deviated from patterns predating the financial crisis.  As explained above, however, Defendants offered facially plausible pretextual explanations for these "dislocations" and repeatedly denied the existence of any fraudulent or collusive conduct relating to LIBOR submissions.  In particular, the BBA held itself out as an independent entity that exercised meaningful oversight of LIBOR and on several occasions falsely represented that it had confirmed that LIBOR submissions were honest and accurate.  The FDIC-R and the Closed Banks therefore did not know that USD LIBOR was false, made intentionally and knowingly, with intent to mislead, and/or pursuant to an agreement among Defendants.

---

[149] Rabobank Deferred Prosecution Agreement, *supra* note 108.

[150] Rabobank SOF ¶ 97.

99.     The FDIC-R and the Closed Banks did not have access to the information that could have revealed the fraud and collusion.  For example, the FDIC-R and the Closed Banks did not have access to, among other things, (a) internal communications at the Panel Bank Defendants regarding fraud and collusion, (b) communications between and among the Panel Defendant Banks regarding LIBOR, (c) communications between the Panel Defendant Banks and government regulators regarding the LIBOR investigation, (d) documents produced in connection with the confidential investigations, (e) meetings of the FX & MM Committee, or (f) communications within the BBA or between Panel Bank Defendants and the BBA.

100.    The admissions by Barclays, UBS, and RBS reveal some of the efforts that the Panel Bank Defendants undertook to conceal their fraudulent and collusive conduct.  For example, (a) a UBS trader scolded a manager for internally transmitting in writing a request to manipulate a LIBOR submission,[151] (b) a Barclays trader consciously sought to move LIBOR submissions in small increments over time to avoid detection,[152] (c) a UBS derivatives desk manager instructed a LIBOR submitter to lie when interviewed by UBS attorneys investigating LIBOR manipulation,[153] and (d) in 2010, long after learning of the investigation into LIBOR, RBS traders continued their conduct but sought to avoid communicating in writing because "at the moment the FED are all over us about libors [sic]."[154] On information and belief, the other Panel Bank Defendants engaged in similar conduct to cover up their fraudulent and collusive activities involving USD LIBOR.  The evidence of such conduct is solely within the custody and control of the Panel Bank Defendants and/or government regulators other than the FDIC.

---

[151] UBS SOF ¶ 38.

[152] Barclays SOF ¶ 44.

[153] UBS SOF ¶ 39.

[154] RBS Final Notice ¶ 52.

101.    Several Defendants have asserted that they were unaware of the fraud and

collusion, or of any reason to suspect fraud and collusion, relating to USD LIBOR until shortly

before the Barclays disclosures in June 2012:

- The former CEO of Barclays, Bob Diamond, testified before the United Kingdom's Treasury Select Committee that he had no knowledge of any fraudulent or collusive conduct relating to LIBOR until shortly before he was presented with the FSA findings.[155]

- Four former UBS executives testified before Parliament that they had no knowledge of the alleged conduct or any reason at the time to suspect that Defendants were engaged in fraud and/or collusion with respect to LIBOR.[156]

- RBS claimed that it was unaware of the fraud and collusion until 2011, and continues to insist that there is no evidence of deliberate suppression of LIBOR.[157]

- The BBA claimed it was shocked by Barclay's admissions.[158]

Consistent with these statements, the former head of the FSA, Adair Turner, told

Parliament on February 27, 2013, that regulators could not have spotted the fraudulent and

collusive conduct even with "intensive supervision."[159]  Similarly, Former Chairman of the

United States Federal Reserve Board, Alan Greenspan, was recently quoted as saying: "Through

all of my experience, what I never contemplated was that there were bankers who would

---

[155] *Bob Diamond questioned by MPs on Barclays Libor scandal: as it happened*, The Telegraph (video) http://www.telegraph.co.uk/finance/newsbysector/banksandfinance/9374516/Bob-Diamond-questioned-by-MPs-on-Barclays-Libor-scandal-as-it-happened.html.

[156] *See, e.g.*, Mark Scott, *British Panel Castigates Ex-UBS Officials at Hearing*, N.Y. Times Dealbook, Jan.10, 2013, http://dealbook.nytimes.com/2013/01/10/former-ubs-executives-are-grilled-over-libor/.

[157] *RBS Reaches LIBOR Settlements* (Feb. 6, 2013), http://markets.rbs.com/MediaLibrary/LIBOR_RNS_FEB_2013.pdf.

[158] BBA, *Libor Statement – Thursday* 28, *supra* note 135.

[159] Huw Jones, *It Was Impossible To Spot Libor Rigging: UK Watchdog*, Feb. 27, 2013, http://www.reuters.com/article/2013/02/27/us-libor-britain-fsa-idUSBRE91Q0NX20130227.

purposely misrepresent facts to banking authorities.  You were honor bound to report accurately, and it never entered my mind that, aside from a fringe element, it would be otherwise."[160] Indeed, the CFTC did not begin its investigation until May 2009 and, even with the benefit of government subpoenas, "It took 20 months before we had actionable evidence," according to former CFTC Chair Gary Gensler.[161]

### COUNT I: BREACH OF CONTRACT WITH AMCORE
### (MERRILL LYNCH CAPITAL SERVICES, INC.)

102.    FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

103.    On September 3, 1996, Amcore entered into an ISDA Master Agreement with Defendant Merrill Lynch Capital Services, Inc., under which Amcore entered into pay-fixed swaps with Merrill Lynch Capital Services, Inc. ("Amcore-ML Master Agreement").[162]

104.    In the Amcore-ML Master Agreement, the parties represented that the execution, delivery, and performance of the Amcore-ML Master Agreement did not violate or conflict with any law applicable to it.  ¶ 3(a)(iii).  The Amcore-ML Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, and complete in every material respect."  ¶ 3(d).  The Amcore-ML Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Amcore-ML Master Agreement or any Credit

---

[160] Liam Vaughn & Gavin Finch, *Libor Lies Revealed in Rigging of $300 Trillion Benchmark*, Bloomberg, Jan. 28, 2013, http://www.bloomberg.com/news/2013-01-28/libor-lies-revealed-in-rigging-of-300-trillion-benchmark.html.

[161] Joe Nocera, *The Little Agency That Could*, N.Y. Times, Nov. 15, 2013, http://www.nytimes.com/2013/11/16/opinion/the-little-agency-that-could.html.

[162] The Amcore-ML Master Agreement is attached as Exhibit 25 and incorporated into this Complaint by reference.

Support Document to which it is a party.  ¶ 4(c).

105.    The Amcore-ML Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.  ¶ 5(a)(iv).  The Amcore-ML Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Amcore-ML Master Agreement.  ¶ 11.

106.    The Amcore-ML Master Agreement states that all transactions between Amcore and Bank of America are entered into in reliance on the fact that the Amcore-ML Master Agreement and all confirmations form a single agreement between the parties.  ¶ 1(c).  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

107.    During the relevant period, Amcore entered into pay-fixed swaps governed by the Amcore-ML Master Agreement.

108.    Merrill Lynch Capital Services, Inc. knowingly breached and defaulted on the Amcore-ML Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, and its underpayments to Amcore tied to the artificially suppressed USD LIBOR.

109.    As a result of Merrill Lynch Capital Services, Inc.'s breach of the Amcore-ML Master Agreement, Amcore and the FDIC as Receiver for Amcore haves suffered damages under the Amcore-ML Master Agreement.

### COUNT II: BREACH OF CONTRACTS WITH AMTRUST
### (CITIBANK, N.A. AND RBS)

110.    FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

111.    On, September 11, 2006, Ohio Savings Bank, predecessor-in-interest to AmTrust, entered into an ISDA Master Agreement with Defendant Citibank, N.A., under which AmTrust entered into pay-fixed swaps with Citibank ("AmTrust-Citibank Master Agreement").[163]

112.    On October 12, 2006, Ohio Savings Bank, predecessor-in-interest to AmTrust, entered into an ISDA Master Agreement with Defendant the Royal Bank of Scotland plc, under which AmTrust entered into pay-fixed swaps with RBS ("AmTrust-RBS Master Agreement").[164] The AmTrust-Citibank Master Agreement and the AmTrust-RBS Master Agreement are referenced collectively in this Complaint as the AmTrust Master Agreements.

113.    In the AmTrust Master Agreements, the parties each represented that the execution, delivery, and performance of the AmTrust Master Agreements did not violate or conflict with any law applicable to them.  ¶ 3(a)(iii).  The AmTrust Master Agreements further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."  ¶ (d).  The AmTrust Master Agreements require that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the AmTrust Master Agreements or any Credit Support Document to which it is a party.  ¶ 4(c).

114.    The AmTrust Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material

---

[163] The AmTrust-Citibank Master Agreement is attached as Exhibit 26 and incorporated into this Complaint by reference.

[164] The AmTrust-RBS Master Agreement is attached as Exhibit 27 and incorporated into this Complaint by reference.

respect when made or repeated.  ¶ 5(a)(iv).  The AmTrust Master Agreements provide that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the AmTrust Master Agreements.  ¶ 11.

115.     The AmTrust Master Agreements state that all transactions between AmTrust and Citibank or RBS are entered into in reliance on the fact that the AmTrust Master Agreements and all confirmations form a single agreement between the parties.  ¶ 1(c).  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

116.     During the relevant period, AmTrust entered into pay-fixed swaps governed by the AmTrust Master Agreements.

117.     Citibank and RBS knowingly breached and defaulted on the AmTrust Master Agreements through their fraudulent and collusive conduct, their failure to disclose fraudulent and collusive conduct, their intentional misrepresentation and manipulation of USD LIBOR, and their underpayments to AmTrust tied to the artificially suppressed USD LIBOR.

118.     As a result of the Citibank's and RBS's breach of the AmTrust Master Agreements, AmTrust and the FDIC as Receiver for AmTrust have suffered damages under the AmTrust Master Agreements.

## COUNT III: BREACH OF CONTRACTS WITH CORUS
### (BANK OF AMERICA, N.A. AND JPMORGAN CHASE BANK, N.A.)

119.     FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

120.     On April 26, 2002, Corus entered into an ISDA Master Agreement with Defendant Bank of America, N.A., under which Corus entered into pay-fixed swaps with Bank

of America, N.A. ("Corus-BOA Master Agreement").[165]

121.    On February 21, 1995, Corus entered into an ISDA Master Agreement with Defendant JPMorgan Chase Bank, N.A. under which Corus entered into pay-fixed swaps with JPMorgan Chase Bank, N.A. ("Corus-JP Master Agreement").[166]  The Corus-BOA Master Agreement and the Corus-JP Master Agreement are referenced collectively in this Complaint as the Corus Master Agreements.

122.    In the Corus Master Agreements, the parties represented that the execution, delivery, and performance of the Corus Master Agreements did not violate or conflict with any law applicable to them.  ¶ 3(a)(iii).  The Corus Master Agreements further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, and complete in every material respect."  ¶ 3(d).  The Corus Master Agreements require that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Corus Master Agreements or any Credit Support Document to which it is a party.  ¶ 4(c).

123.    The Corus Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.  ¶ 5(a)(iv).  The Corus Master Agreements provide that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason

---

[165] The Corus-BOA Master Agreement is attached as Exhibit 28 and incorporated into this Complaint by reference.

[166] The Corus-JP Master Agreement is attached as Exhibit 29 and incorporated into this Complaint by reference.

of the enforcement and protection of its rights under the Corus Master Agreements.  ¶ 11.

124.    The Corus Master Agreements state that all transactions between Corus and Bank of America, N.A. or JPMorgan Chase Bank, N.A. are entered into in reliance on the fact that the Corus Master Agreements and all confirmations form a single agreement between the parties.  ¶ 1(c).  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

125.    During the relevant period, Corus entered into pay-fixed swaps governed by the Corus Master Agreements.

126.    Bank of America, N.A. and JPMorgan Chase Bank, N.A. knowingly breached and defaulted on the Corus Master Agreements through their fraudulent and collusive conduct, their failure to disclose fraudulent and collusive conduct, and their underpayments to Corus tied to the artificially suppressed USD LIBOR.

127.    As a result of Bank of America, N.A.'s and JPMorgan Chase Bank, N.A.'s breach of the Corus Master Agreements, Corus and the FDIC as Receiver for Corus have suffered damages under the Corus Master Agreements.

### COUNT IV: BREACH OF CONTRACTS WITH INDYMAC
**(BANK OF AMERICA, N.A., MERRILL LYNCH CAPITAL SERVICES, INC., BARCLAYS, CITIBANK, N.A., CITIGROUP FINANCIAL PRODUCTS, INC., CREDIT SUISSE INTERNATIONAL, DEUTSCHE BANK, J.P. MORGAN BANK DUBLIN PLC, JPMORGAN CHASE BANK, N.A., J.P. MORGAN MARKETS LTD., RBC, RBS, AND UBS )**

128.    FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

129.    On May 15, 2000, as amended on April 2, 2003 and June 10, 2005, IndyMac entered into an ISDA Master Agreement with Defendant Bank of America, N.A., under which IndyMac entered into pay-fixed swaps with Bank of America, N.A.  On March 16, 2000 and January 23, 2001, IndyMac entered into ISDA Master Agreements with Fleet National Bank,

predecessor-in-interest to Defendant Bank of America, N.A., under which IndyMac entered into pay-fixed swaps with Bank of America, N.A.  The Master Agreements between IndyMac and Bank of America, N.A. are referenced collectively in this complaint as the "IndyMac-BOA Master Agreements".[167]

130.    On July 3, 2000, IndyMac entered into an ISDA Master Agreement with Defendant Merrill Lynch Capital Services, Inc., under which IndyMac entered into pay-fixed swaps with Merrill Lynch Capital Services, Inc. ("IndyMac-ML Master Agreement").[168]

131.    On April 26, 2005, IndyMac entered into an ISDA Master Agreement with Defendant Barclays Bank plc, under which IndyMac entered into pay-fixed swaps with Barclays ("IndyMac-Barclays Master Agreement").[169]

132.    On October 30, 2001, IndyMac entered into an ISDA Master Agreement with Defendant Citibank, N.A., under which IndyMac entered into pay-fixed swaps with Citibank, N.A. ("IndyMac-Citibank Master Agreement").[170]

133.    On March 15, 2005, IndyMac entered into an ISDA Master Agreement with Defendant Citigroup Financial Products, Inc., under which IndyMac entered into pay-fixed swaps with Citigroup Financial Products, Inc. ("IndyMac-CFP Master Agreement").[171]

---

[167] The IndyMac-BOA Master Agreements are attached as Exhibits 30-32 and incorporated into this Complaint by reference.

[168] The IndyMac-ML Master Agreement, as amended on October 7, 2005, is attached as Exhibit 33 and incorporated into this Complaint by reference.

[169] The IndyMac-Barclays Master Agreement is attached as Exhibit 34 and incorporated into this Complaint by reference.

[170] The IndyMac-Citibank Master Agreement, as amended on March 28, 2003, is attached as Exhibit 35 and incorporated into this Complaint by reference.

[171] The IndyMac-CFP Master Agreement is attached as Exhibit 36 and incorporated into this Complaint by reference.

134.    On February 16, 2001, IndyMac entered into an ISDA Master Agreement with Credit Suisse First Boston International, predecessor-in-interest to Credit Suisse International, under which IndyMac entered into pay-fixed swaps with Defendant Credit Suisse International ("IndyMac-Credit Suisse Master Agreement").[172]

135.    On May 18, 2007, IndyMac entered into an ISDA Master Agreement with Defendant Deutsche Bank, under which IndyMac entered into pay-fixed swaps with Deutsche Bank ("IndyMac-Deutsche Master Agreement").[173]

136.    On September 5, 2002, IndyMac entered into an ISDA Master Agreement with Defendant J.P. Morgan Bank Dublin plc (f.k.a. Bear Stearns Bank plc), under which IndyMac entered into pay-fixed swaps with J.P. Morgan Bank Dublin plc ("IndyMac-Bear Bank Master Agreement").[174]

137.    On January 29, 2004, IndyMac entered into an ISDA Master Agreement with Defendant JPMorgan Chase Bank, N.A., under which IndyMac entered into pay-fixed swaps with JPMorgan Chase Bank, N.A. ("IndyMac-JP Master Agreement").[175]

138.    On March 7, 2006, IndyMac entered into an ISDA Master Agreement with Defendant J.P. Morgan Markets Ltd. (f.k.a. Bear Stearns International Ltd.), under which IndyMac entered into pay-fixed swaps with J.P. Morgan Markets Ltd. ("IndyMac-Bear Int'l

---

[172] The IndyMac-Credit Suisse Master Agreement is attached as Exhibit 37 and incorporated into this Complaint by reference.

[173] The IndyMac-Deutsche Master Agreement is attached as Exhibit 38 and incorporated into this Complaint by reference.

[174] The IndyMac-Bear Bank Master Agreement is attached as Exhibit 39 and incorporated into this Complaint by reference.

[175] The IndyMac-JP Master Agreement, as amended on March 14, 2008, is attached as Exhibit 40 and incorporated into this Complaint by reference.

Master Agreement").[176]

139.    On July 14, 2004, IndyMac entered into an ISDA Master Agreement with Defendant Royal Bank of Canada, under which IndyMac entered into pay-fixed swaps with RBC ("IndyMac-RBC Master Agreement").[177]

140.    On November 18, 2005, IndyMac entered into an ISDA Master Agreement with Defendant the Royal Bank of Scotland plc, under which IndyMac entered into pay-fixed swaps with RBS ("IndyMac-RBS Master Agreement").[178]

141.    On June 2, 2004, IndyMac entered into two ISDA Master Agreements with Defendant UBS AG, under which IndyMac entered into pay-fixed swaps with UBS ("IndyMac-UBS Master Agreements").[179]  The Master Agreements involving IndyMac are referenced collectively in this Complaint as the IndyMac Master Agreements and the Counterparties to the IndyMac Master Agreements are referenced collectively in this Complaint as the IndyMac Contracting Defendants.

142.    In the IndyMac Master Agreements, the parties represented that the execution, delivery, and performance of the IndyMac Master Agreements did not violate or conflict with any law applicable to them.  ¶ 3(a)(iii).  The IndyMac Master Agreements further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, and complete in every material respect."  ¶ 3(d).  The IndyMac Master Agreements

[176] The IndyMac-Bear Int'l Master Agreement is attached as Exhibit 41 and incorporated into this Complaint by reference.

[177] The IndyMac-RBC Master Agreement is attached as Exhibit 42 and incorporated into this Complaint by reference.

[178] The IndyMac-RBS Master Agreement, as amended on December 7, 2007, is attached as Exhibit 43 and incorporated into this Complaint by reference.

[179] The IndyMac-UBS Master Agreements are attached as Exhibits 44 and 45 and incorporated into this Complaint by reference.

require that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the IndyMac Master Agreements or any Credit Support Document to which it is a party.  ¶ 4(c).

143.    The IndyMac Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.  ¶ 5(a)(iv).  The IndyMac Master Agreements provide that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the IndyMac Master Agreements.  ¶ 11.

144.    The IndyMac Master Agreements state that all transactions between IndyMac and the IndyMac Contracting Defendants are entered into in reliance on the fact that the IndyMac Master Agreements and all confirmations form a single agreement between the parties.  ¶ 1(c).  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

145.    During the relevant period, IndyMac entered into pay-fixed swaps governed by the IndyMac Master Agreements.

146.    The IndyMac Contracting Defendants knowingly breached and defaulted on the IndyMac Master Agreements through their fraudulent and collusive conduct, their failure to disclose fraudulent and collusive conduct, their intentional misrepresentation and manipulation of USD LIBOR, and their underpayments to IndyMac tied to the artificially suppressed USD LIBOR.

147.    As a result of the IndyMac Contracting Defendants' breach of the IndyMac

Master Agreements, IndyMac and the FDIC as Receiver for IndyMac have suffered damages

under the IndyMac Master Agreements.

### COUNT V: BREACH OF CONTRACT WITH INTEGRA
### (CITIGROUP FINANCIAL PRODUCTS, INC.)

148.    FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

149.    On February 4, 2003, Integra entered into an ISDA Master Agreement with

Defendant Citigroup Financial Products, Inc., under which Integra entered into pay-fixed swaps

with Citigroup Financial Products, Inc. ("Integra-CFP Master Agreement").[180]

150.    In the Integra-CFP Master Agreement, the parties each represented that the

execution, delivery, and performance of the Integra-CFP Master Agreement did not violate or

conflict with any law applicable to it.  ¶ 3(a)(iii).  The Integra-CFP Master Agreement further

states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to

the other party [is] true, accurate and complete in every material respect."  ¶ 3(d).  The

Integra-CFP Master Agreement requires that the parties comply in all material respects with all

applicable laws and orders to which a party may be subject if failure so to comply would

materially impair its ability to perform its obligations under the Integra-CFP Master Agreement

or any Credit Support Document to which it is a party.  ¶ 4(c).

151.    The Integra-CFP Master Agreement provides that a party defaults any time

that it makes or repeats a representation that proves to be incorrect or misleading in any material

respect when made or repeated.  ¶ 5(a)(iv).  The Integra-CFP Master Agreement provides that a

defaulting party will, on demand, indemnify and hold harmless the other party for and against all

---

[180] The Integra-CFP Master Agreement, as amended on September 20, 2006, is attached as
Exhibit 46 and incorporated into this Complaint by reference.

reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Integra-CFP Master Agreement.  ¶ 11.

152.     The Integra-CFP Master Agreement states that all transactions between Integra and Citigroup Financial Products are entered into in reliance on the fact that the Integra-CFP Master Agreement and all confirmations form a single agreement between the parties.  ¶ 1(c).  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

153.     During the relevant period, Integra entered into pay-fixed swaps governed by the Integra-CFP Master Agreement.

154.     Citigroup Financial Products knowingly breached and defaulted on the Integra-CFP Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, and its underpayments to Integra tied to the artificially suppressed USD LIBOR.

155.     As a result of the Citigroup Financial Products's breach of the Integra-CFP Master Agreement, Integra and the FDIC as Receiver for Integra have suffered damages under the Integra-CFP Master Agreement.

## COUNT VI: BREACH OF CONTRACT WITH SILVERTON
### (CITIGROUP FINANCIAL PRODUCTS, INC.)

156.     FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

157.     On May 8, 2008, Silverton entered into an ISDA Master Agreement with Defendant Citigroup Financial Products, Inc., under which Silverton entered into pay-fixed swaps with Citigroup Financial Products ("Silverton-CFP Master Agreement.").[181]

---

[181] The Silverton-CFP Master Agreement is attached as Exhibit 47 and incorporated into this Complaint by reference.

158.     In the Silverton-CFP Master Agreement, the parties each represented that the execution, delivery, and performance of the Silverton-CFP Master Agreement did not violate or conflict with any law applicable to it.  ¶ 3(a)(iii).  The Silverton-CFP Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."  ¶ 3(d).  The Silverton-CFP Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Agreement or any Credit Support Document to which it is a party.  ¶ 4(c).

159.     The Silverton-CFP Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.  ¶ 5(a)(iv).  The Silverton-CFP Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Silverton-CFP Master Agreement.  ¶ 11.

160.     The Silverton-CFP Master Agreement states that all transactions between Silverton and Citigroup Financial Products are entered into in reliance on the fact that the Silverton-CFP Master Agreement and all confirmations form a single agreement between the parties.  ¶ 1(c).  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

161.     During the relevant period, Silverton entered into pay-fixed swaps governed by the Silverton-CFP Master Agreement.

162.     Citigroup Financial Products breached and defaulted on the Silverton-CFP Master Agreement through its fraudulent and collusive conduct, its failure to disclose the fraudulent and collusive conduct, and its underpayments to Silverton tied to the artificially suppressed USD LIBOR.

163.     As a result of the Citigroup Financial Products's breach of the Silverton-Citigroup Master Agreement, Silverton and the FDIC as Receiver for Silverton have suffered damages under the Silverton-Citigroup Master Agreement.

## COUNT VII: BREACH OF CONTRACT WITH SUPERIOR
### (CREDIT SUISSE INTERNATIONAL)

164.     FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

165.     On June 25, 2002, Superior entered into an ISDA Master Agreement with Credit Suisse First Boston International, predecessor-in-interest to Defendant Credit Suisse International, under which Superior entered into pay-fixed swaps with Credit Suisse International ("Superior-Credit Suisse Master Agreement").[182]

166.     In the Superior-Credit Suisse Master Agreement, the parties represented that the execution, delivery, and performance of the Superior-Credit Suisse Master Agreement did not violate or conflict with any law applicable to it.  ¶ 3(a)(iii).  The Superior-Credit Suisse Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."  ¶ 3(d).  The Superior-Credit Suisse Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the

---

[182] The Superior-Credit Suisse Master Agreement is attached as Exhibit 48 and incorporated into this Complaint by reference.

Superior-Credit Suisse Master Agreement or any Credit Support Document to which it is a party. ¶ 4(c).

167.    The Superior-Credit Suisse Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.  ¶ 5(a)(iv).  The Superior-Credit Suisse Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Superior-Credit Suisse Master Agreement.  ¶ 11.

168.    The Superior-Credit Suisse Master Agreement states that all transactions between Superior and Credit Suisse International are entered into in reliance on the fact that the Superior-Credit Suisse Master Agreement and all confirmations form a single agreement between the parties.  ¶ 1(c).  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

169.    During the relevant period, Superior entered into pay-fixed swaps governed by the Superior-Credit Suisse Master Agreement.

170.    Credit Suisse International breached and defaulted on the Superior-Credit Suisse Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, and its underpayments to Superior tied to the artificially suppressed USD LIBOR.

171.    As a result of the Credit Suisse International's breach of the Superior-Credit Suisse Master Agreements, Superior and the FDIC as Receiver for Superior have suffered damages under the Superior-Credit Suisse Master Agreement.

## COUNT VIII: BREACH OF CONTRACTS WITH UCB
### (BANK OF AMERICA, N.A., MERRILL LYNCH INTERNATIONAL BANK LTD., MERRILL LYNCH & CO., BARCLAYS, CITIBANK, N.A., THE HONGKONG AND SHANGHAI BANKING CORP. LTD., JPMORGAN CHASE BANK, N.A., AND UBS)

172.    FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

173.    On February 9, 2005, UCB entered into an ISDA Master Agreement with Defendant Bank of America, N.A., under which UCB entered into pay-fixed swaps with Bank of America, N.A. ("UCB-BOA Master Agreement").[183]

174.    On May 19, 2004, UCB entered into an ISDA Master Agreement with Defendant Merrill Lynch International Bank Ltd. and Merrill Lynch & Co., under which UCB entered into pay-fixed swaps with Merrill Lynch International Bank Ltd. and Merrill Lynch & Co. ("UCB-ML Master Agreement").[184]

175.    On May 19, 2009, UCB entered into an ISDA Master Agreement with Defendant Barclays Bank plc, under which UCB entered into pay-fixed swaps with Barclays ("UCB-Barclays Master Agreement").[185]

176.    On February 3, 2004, UCB entered into an ISDA Master Agreement with Defendant Citibank, N.A., under which UCB entered into pay-fixed swaps with Citibank, N.A. ("UCB-Citibank Master Agreement").[186]

---

[183] The UCB-BOA Master Agreement, as amended on October 28, 2008, is attached as Exhibit 49 and incorporated into this Complaint by reference.

[184] The UCB-ML Master Agreement is attached as Exhibit 50 and incorporated into this Complaint by reference.

[185] The UCB-Barclays Master Agreement is attached as Exhibit 51 and incorporated into this Complaint by reference.

[186] The UCB-Citibank Master Agreement is attached as Exhibit 52 and incorporated into this Complaint by reference.

177.     On January 28, 2005, UCB entered into an ISDA Master Agreement with Defendant The Hongkong and Shanghai Banking Corporation Ltd. under which UCB entered into pay-fixed swaps with The Hongkong and Shanghai Banking Corporation Ltd. ("UCB-HSBC Master Agreement").[187]

178.     On March 24, 2004, UCB entered into an ISDA Master Agreement with Defendant JPMorgan Chase Bank, N.A., under which UCB entered into pay-fixed swaps with JPMorgan Chase Bank, N.A. ("UCB-JP Master Agreement").[188]

179.     On February 12, 2004, UCB entered into an ISDA Master Agreement with Defendant UBS AG, under which UCB entered into pay-fixed swaps with UBS ("UCB-UBS Master Agreement").[189]  The Master Agreements involving UCB are referenced collectively in this Complaint as the UCB Master Agreements and the Counterparties to the UCB Master Agreements are referenced collectively in this Complaint as the UCB Contracting Defendants.

180.     In the UCB Master Agreements, the parties represented that the execution, delivery, and performance of the UCB Master Agreements did not violate or conflict with any law applicable to them.  ¶ 3(a)(iii).  The UCB Master Agreements further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, and complete in every material respect."  ¶ 3(d).  The UCB Master Agreements require that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its

---

[187] The UCB-HSBC Master Agreement is attached as Exhibit 53 and incorporated into this Complaint by reference.

[188] The UCB-JP Master Agreement is attached as Exhibit 54 and incorporated into this Complaint by reference.

[189] The UCB-UBS Master Agreement is attached as Exhibit 55 and incorporated into this Complaint by reference.

obligations under the UCB Master Agreements or any Credit Support Document to which it is a party.  ¶ 4(c).

181.    The UCB Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.  ¶ 5(a)(iv).  The UCB Master Agreements provide that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the UCB Master Agreements.  ¶ 11.

182.    The UCB Master Agreements state that all transactions between UCB and the UCB Contracting Defendants are entered into in reliance on the fact that the UCB Master Agreements and all confirmations form a single agreement between the parties.  ¶ 1(c).  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

183.    During the relevant period, UCB entered into pay-fixed swaps governed by the UCB Master Agreements.

184.    The UCB Contracting Defendants breached and defaulted on the UCB Master Agreements through their fraudulent and collusive conduct, their failure to disclose fraudulent and collusive conduct, their intentional misrepresentation and manipulation of USD LIBOR, and their underpayments to UCB tied to the artificially suppressed USD LIBOR.

185.    As a result of the UCB Contracting Defendants' breach of the UCB Master Agreements, UCB and the FDIC as Receiver for UCB have suffered damages under the UCB Master Agreements.

**COUNT IX: BREACH OF CONTRACTS WITH WAMU**
**(BANK OF AMERICA, N.A., MERRILL LYNCH CAPITAL SERVICES, INC.,**
**MERRILL LYNCH INTERNATIONAL BANK LTD., BARCLAYS, CITIBANK, N.A.,**
**CREDIT SUISSE INTERNATIONAL, HSBC BANK USA, N.A., BEAR STEARNS**
**CAPITAL MARKETS, INC., JPMORGAN CHASE**
**BANK, N.A., RBC, UBS, AND PORTIGON)**

186.     FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

187.     On March 3, 1998 and April 23, 1998, WaMu entered into ISDA Master

Agreements with Bank of America National Trust & Savings Association,

predecessor-in-interest to Defendant Bank of America, N.A., under which WaMu entered into

pay-fixed swaps with Bank of America, N.A. ("WaMu-BOA Master Agreements").[190]

188.     On June 1, 1989, WaMu entered into an ISDA Master Agreement with

Defendant Merrill Lynch Capital Services, Inc., under which WaMu entered into pay-fixed

swaps with Merrill Lynch Capital Services, Inc. ("WaMu-ML Cap. Master Agreement").[191]

189.     On October 31, 2001, WaMu entered into an ISDA Master Agreement with

Defendant Merrill Lynch International Bank Ltd., under which WaMu entered into pay-fixed

swaps with Merrill Lynch International Bank Ltd.  ("WaMu-ML Int'l Master Agreement").[192]

190.     On January 10, 2002, WaMu entered into an ISDA Master Agreement with

Defendant Barclays Bank plc, under which WaMu entered into pay-fixed swaps with Barclays

("WaMu-Barclays Master Agreements").[193]

---

[190] The WaMu-BOA Master Agreements are attached as Exhibits 56 and 57 and incorporated into this Complaint by reference.

[191] The WaMu-ML Cap. Master Agreement is attached as Exhibit 58 and incorporated into this Complaint by reference.

[192] The WaMu-ML Int'l Master Agreement is attached as Exhibit 59 and incorporated into this Complaint by reference.

[193] The WaMu-Barclays Master Agreement is attached as Exhibit 60 and incorporated into this Complaint by reference.

191.     On July 28, 1995, American Savings Bank, F.A., predecessor-in-interest to WaMu, entered into an ISDA Master Agreement with Defendant Citibank, N.A., under which WaMu entered into pay-fixed swaps with Citibank, N.A. ("WaMu-Citibank Master Agreement").[194]

192.     On March 26, 1998, WaMu entered into an ISDA Master Agreement with Credit Suisse Financial Products, predecessor-in-interest to Defendant Credit Suisse International, under which WaMu entered into pay-fixed swaps with Credit Suisse International ("WaMu-Credit Suisse Master Agreement").[195]

193.     On April 11, 2002, WaMu entered into an ISDA Master Agreement with Defendant HSBC Bank USA, N.A., under which WaMu entered into pay-fixed swaps with HSBC Bank USA, N.A. ("WaMu-HSBC Master Agreement").[196]

194.     On December 19, 1997 and May 21, 1998, WaMu entered into ISDA Master Agreements with Defendant Bear Stearns Capital Markets, Inc., under which WaMu entered into pay-fixed swaps with Bear Stearns Capital Markets, Inc. ("WaMu-Bear Master Agreements").[197]

195.     On February 23, 1996, WaMu entered into an ISDA Master Agreement with The Chase Manhattan Bank, predecessor-in-interest to Defendant JPMorgan Chase Bank, N.A., under which WaMu entered into pay-fixed swaps with JPMorgan Chase Bank, N.A.

---

[194] The WaMu-Citibank Master Agreement is attached as Exhibit 61 and incorporated into this Complaint by reference.

[195] The WaMu-Credit Suisse Master Agreement is attached as Exhibit 62 and incorporated into this Complaint by reference.

[196] The WaMu-HSBC Master Agreement is attached as Exhibit 63 and incorporated into this Complaint by reference.

[197] The WaMu-Bear Master Agreements are attached as Exhibits 64 and 65 and incorporated into this Complaint by reference.

("WaMu-Chase Master Agreement").[198]

196.    On February 2, 1998, WaMu entered into an ISDA Master Agreement with Morgan Guaranty Trust Co. of New York, predecessor-in-interest to Defendant JPMorgan Chase Bank, N.A. under which WaMu entered into pay-fixed swaps with JPMorgan Chase Bank, N.A. ("WaMu-Morgan Master Agreement.").[199]

197.    On November 21, 2002, WaMu entered into an ISDA Master Agreement with Bank One, N.A., predecessor-in-interest to Defendant JPMorgan Chase Bank, N.A. under which WaMu entered into pay-fixed swaps with JPMorgan Chase Bank, N.A. ("WaMu-Bank1 Master Agreement.").[200]

198.    On February 2, 1998, Homeside Lending, Inc., predecessor-in-interest to WaMu entered into an ISDA Master Agreement with Defendant Royal Bank of Canada, under which WaMu entered into pay-fixed swaps with RBC ("WaMu-RBC Master Agreement.").[201]

199.    On June 17, 1998, WaMu entered into an ISDA Master Agreement with Defendant UBS AG, under which WaMu entered into pay-fixed swaps with UBS ("WaMu-UBS Master Agreement").[202]

---

[198] The WaMu-Chase Master Agreement is attached as Exhibit 66 and incorporated into this Complaint by reference.

[199] The WaMu-Morgan Master Agreement is attached as Exhibit 67 and incorporated into this Complaint by reference.

[200] The WaMu-Bank1 Master Agreement is attached as Exhibit 68 and incorporated into this Complaint by reference.

[201] The WaMu-RBC Master Agreement is attached as Exhibit 69 and incorporated into this Complaint by reference.

[202] The WaMu-UBS Master Agreement is attached as Exhibit 70 and incorporated into this Complaint by reference.

200.     On June 24, 1998, WaMu entered into an ISDA Master Agreement with WestLB, predecessor-in-interest to Defendant Portigon AG, under which WaMu entered into pay-fixed swaps with Portigon ("WaMu-Portigon Master Agreement").[203]   The Master Agreements involving WaMu are referenced collectively in this Complaint as the WaMu Master Agreements and the Counterparties to the WaMu Master Agreements are referenced collectively in this Complaint as the WaMu Contracting Defendants.

201.     In the WaMu Master Agreements, the parties represented that the execution, delivery, and performance of the WaMu Master Agreements did not violate or conflict with any law applicable to then.  ¶ 3(a)(iii).  The WaMu Master Agreements further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, and complete in every material respect."  ¶ 3(d).  The WaMu Master Agreements require that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the WaMu Master Agreements or any Credit Support Document to which it is a party.  ¶ 4(c).

202.     The WaMu Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.  ¶ 5(a)(iv).  The WaMu Master Agreements provide that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the WaMu Master Agreements.  ¶ 11.

---

[203] The WaMu-Portigon Master Agreement is attached as Exhibit 71 and incorporated into this Complaint by reference.

203.    The WaMu Master Agreements state that all transactions between WaMu and the WaMu Contracting Defendants are entered into in reliance on the fact that the WaMu Master Agreements and all confirmations form a single agreement between the parties. ¶ 1(c).  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

204.    During the relevant period, WaMu entered into pay-fixed swaps governed by the WaMu Master Agreements.

205.    The WaMu Contracting Defendants breached and defaulted on the WaMu Master Agreements through their fraudulent and collusive conduct, their failure to disclose fraudulent and collusive conduct, their intentional misrepresentation and manipulation of USD LIBOR, and their underpayments to WaMu tied to the artificially suppressed USD LIBOR.

206.    As a result of the WaMu Contracting Defendants' breach of the WaMu Master Agreements, WaMu and the FDIC as Receiver for WaMu have suffered damages under the WaMu Master Agreements.

### COUNT X: BREACH OF CONTRACTS WITH WESTERNBANK
### (MERRILL LYNCH CAPITAL SERVICES, INC., CITIBANK, N.A., CITIGROUP, INC., CREDIT SUISSE INTERNATIONAL, JPMORGAN CHASE BANK, N.A.)

207.    FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

208.    On May 19, 2004, Westernbank entered into an ISDA Master Agreement with Defendant Merrill Lynch Capital Services, Inc., under which Westernbank entered into pay-fixed swaps with Merrill Lynch Capital Services, Inc. ("Westernbank-ML Master Agreement").[204]

---

[204] The Westernbank-ML Master Agreement is attached as Exhibit 72 and incorporated into this Complaint by reference.

209.    On February 25, 1993, Western Federal Savings Bank, predecessor-in-interest to Westernbank entered into an ISDA Master Agreement with Defendant Citibank, N.A., under which Westernbank entered into pay-fixed swaps with Citibank, N.A. ("Westernbank-Citibank Master Agreement").[205]

210.    On December 2, 1996, Westernbank entered into an ISDA Master Agreement with Smith Barney Capital Services, Inc., a joint venture between Defendant Citigroup and Morgan Stanley, under which Westernbank entered into pay-fixed swaps with Citigroup ("Westernbank-SB Master Agreement").[206]  The Westernbank0SB Master Agreement was guaranteed by Citigroup on April 4, 2006.

211.    On October 9, 2001, Westernbank entered into an ISDA Master Agreement with Credit Suisse First Boston International, predecessor-in-interest to Defendant Credit Suisse International, under which Westernbank entered into pay-fixed swaps with Credit Suisse International ("Westernbank-Credit Suisse Master Agreement").[207]

212.    On February 2, 1996, Westernbank, entered into an ISDA Master Agreement with The Chase Manhattan Bank, predecessor-in-interest to Defendant JPMorgan Chase Bank, N.A. under which Westernbank entered into pay-fixed swaps with JPMorgan Chase Bank, N.A. ("Westernbank-Chase Master Agreement.").[208]  The Master Agreements involving Westernbank are referenced collectively in this Complaint as the Westernbank Master Agreements and the

---

[205] The Westernbank-Citibank Master Agreement is attached as Exhibit 73 and incorporated into this Complaint by reference.

[206] The Westernbank-SB Master Agreement, and Citigroup Guarantee, is attached as Exhibit 74 and incorporated into this Complaint by reference.

[207] The Westernbank-Credit Suisse Master Agreement is attached as Exhibit 75 and incorporated into this Complaint by reference.

[208] The Westernbank-Chase Master Agreement is attached as Exhibit 76 and incorporated into this Complaint by reference.

Counterparties to the Westernbank Master Agreements are referenced collectively in this Complaint as the Westernbank Contracting Defendants.

213.     In the Westernbank Master Agreements, the parties represented that the execution, delivery, and performance of the Westernbank Master Agreements did not violate or conflict with any law applicable to them.  ¶ 3(a)(iii).  The Westernbank Master Agreements further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, and complete in every material respect."  ¶ 3(d).  The Westernbank Master Agreements require that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Westernbank Master Agreements or any Credit Support Document to which it is a party.  ¶ 4(c).

214.     The Westernbank Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.  ¶ 5(a)(iv).  The Westernbank Master Agreements provide that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Westernbank Master Agreements.  ¶ 11.

215.     The Westernbank Master Agreements state that all transactions between Westernbank and the Westernbank Contracting Defendants are entered into in reliance on the fact that the Westernbank Master Agreements and all confirmations form a single agreement between the parties.  ¶ 1(c).  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

216.     During the relevant period, Westernbank entered into pay-fixed swaps governed by the Westernbank Master Agreements.

217.     The Westernbank Contracting Defendants breached and defaulted on the Westernbank Master Agreements through their fraudulent and collusive conduct, their failure to disclose fraudulent and collusive conduct, their intentional misrepresentation and manipulation of USD LIBOR, and their underpayments to Westernbank tied to the artificially suppressed USD LIBOR.

218.     As a result of the Westernbank Contracting Defendants' breach of the Westernbank Master Agreements, Westernbank and the FDIC as Receiver for Westernbank has suffered damages under the Westernbank Master Agreements.

## COUNT XI: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (CONTRACTING DEFENDANTS)

219.     FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically Paragraph Nos. 102-218.

220.     As alleged above, certain Defendants (collectively the "Contracting Defendants")[209] entered into contracts with certain Closed Banks (collectively the "Contracting Closed Banks")[210] for LIBOR-based financial products.  These contracts are referenced collectively in this Complaint as the Master Agreements.

---

[209] The Contracting Defendants include at least: Bank of America, N.A.; Merrill Lynch & Co.; Merrill Lynch International Bank Ltd.; Merrill Lynch Capital Services, Inc.; Barclays Bank plc; Citigroup, Inc.; Citibank, N.A.; Citigroup Financial Products, Inc.; Credit Suisse International; Deutsche Bank; The Hongkong and Shanghai Bank Corp. Ltd.; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; J.P. Morgan Bank Dublin plc; J.P. Morgan Markets Ltd.; Bear Stearns Capital Markets, Inc.; the Royal Bank of Canada; the Royal Bank of Scotland plc; UBS AG; and Portigon.

[210] The Contracting Closed Banks include at least: Amcore; AmTrust; Corus; IndyMac; Integra; Silverton; Superior; UCB; WaMu; and Westernbank.

221.    Within each Master Agreement there is an implied duty of good faith and fair dealing, whereby each Contracting Defendant had a duty to act in good faith and not engage in any conduct that would destroy or injure its Contracting Closed Bank counterparty's rights to the benefits of their contracts.

222.    During the relevant period, the Contracting Closed Banks entered into pay-fixed swaps governed by the Master Agreements.

223.    The Contracting Defendants violated the duty of good faith and fair dealing through their fraudulent and collusive conduct, their failure to disclose fraudulent and collusive conduct, their intentional misrepresentation and manipulations of USD LIBOR, and their underpayments to the Contracting Closed Banks tied to the artificially suppressed USD LIBOR.

224.    These actions which were intended to, and did, impair the Contracting Closed Banks' rights to the benefits of their contracts, increase the Contracting Defendants' revenues related to LIBOR-based financial products, and lower interest rate payments to the Contracting Closed Banks.

225.    As a result of the Contracting Defendants' breach of the duty of good faith and fair dealing, the Contracting Closed Banks and the FDIC as Receiver for the Contracting Closed Banks have suffered damages under the Master Agreements.

## <u>COUNT XII: UNJUST ENRICHMENT/RESTITUTION</u><br>(CONTRACTING DEFENDANTS)

226.    FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically Paragraph Nos. 102-218.

227.    The Contracting Defendants entered into contracts with the Contracting Closed Banks for LIBOR-based financial products.

228.    The Contracting Defendants engaged in wrongful acts and omissions, as described above, whereby the Contracting Defendants were unjustly enriched at the expense of and to the detriment of the Contracting Closed Banks and have interfered with the Contracting Closed Banks' protected interests.

229.    As described throughout this Complaint, the Contracting Defendants knowingly acted in an unfair, unconscionable, and oppressive manner towards the Contracting Closed Banks and acted in conscious disregard for the Contracting Closed Banks' rights by manipulating LIBOR and making numerous misrepresentations and/or omissions regarding LIBOR's accuracy.

230.    Through their wrongful conduct, the Contracting Defendants have knowingly received and retained wrongful financial and other benefits at the Contracting Closed Banks' expense and have received windfall profits.

231.    As a direct and proximate result of the Contracting Defendants' wrongful and inequitable conduct, as set forth above, the Contracting Defendants have been unjustly enriched and the Contracting Closed Banks have suffered damages in the form of, among other things, higher prices for LIBOR-based financial products and lower interest rate payments from Defendants and others from LIBOR-based financial products.  The Contracting Defendants' retention of funds under these circumstances constitutes unjust enrichment as the Contracting Defendants have no right to the benefits that were obtained through their wrongful conduct.

232.    The financial benefits that the Contracting Defendants derived from their wrongful manipulation of LIBOR belong to the Contracting Closed Banks and the FDIC as Receiver for the Contracting Closed Banks.  The Contracting Closed Banks and the FDIC as Receiver for the Contracting Closed Banks may have no adequate remedy at law for the

Contracting Defendants' misappropriated gains.  The Court should compel the Contracting

Defendants to disgorge to the Contracting Closed Banks and the FDIC as Receiver for the

Contracting Closed Banks all wrongful or inequitable proceeds that the Contracting Defendants

received.

## COUNT XIII: FRAUD
### (ALL DEFENDANTS)

233.    FDIC-R incorporates by reference the preceding paragraphs in this Complaint.

234.    Each Defendant owed a duty to the Closed Banks to honestly and accurately

report USD LIBOR and not to intentionally mislead the Closed Banks and others by secretly and

collectively manipulating USD LIBOR for their gain and to the detriment of others in the

financial markets.  The Panel Bank Defendants' and the BBA's duty arises from representations

that they made, individually and/or through the BBA, that LIBOR was a reliable indicator of the

state of the money markets, that it was a reliable barometer of risk, that it reflected competitive

rates in the London interbank lending market, that submissions were made in accord with

published rules, and other such public representations.  The Contracting Defendants duty arises

from the contractual relationships they entered into with the Contracting Closed Banks, under

which the Contracting Defendants owed a duty of good faith and fair dealing to the Contracting

Closed Banks.

### Fraudulent USD LIBOR Submissions (Panel Bank Defendants)

235.    As described above, beginning in August 2007 and continuing through at least

mid-2011, each Panel Bank Defendant falsely represented on a daily basis the following:

- Its USD LIBOR submissions were consistent with the published definition
  of LIBOR.

- It based its USD LIBOR submissions on its honest perception of its cost of funds in the London interbank market without reference to rates submitted by other Panel Bank Defendants.

- Its USD LIBOR submissions represented the actual competitive rates at which it honestly believed another bank would offer it funds in the London interbank market.

236.     The Panel Bank Defendants made these representations knowing that they were false, or with reckless disregard for their truth.

237.     These representations were material because they formed the basis for USD LIBOR published by and through the BBA and affected the price of LIBOR-based financial products.  In addition, each Panel Bank Defendant's published submission provided information regarding its creditworthiness and liquidity.  When a Panel Bank Defendant with high credit risk and liquidity problems submitted LIBOR rates that were artificially low in relation to other Panel Bank Defendants that Panel Bank Defendant's submission was material because it led market participants to believe that the Panel Bank Defendant presented the same credit standing as the other Panel Bank Defendants.  Had market participants and purchasers of LIBOR-based financial products known the true credit risk and liquidity issues facing those Panel Bank Defendants, some market participants would have declined to do business with them or would have demanded more favorable terms.

238.     The Panel Bank Defendants intended for the Closed Banks and others to rely on these false representations of material fact.  The Closed Banks reasonably relied on these false representations of material fact.

239.     As a result of the Closed Banks' reasonable reliance on these false representations of material fact, the Closed Banks and the FDIC-R have suffered damages in the form of, among other things, higher prices for LIBOR-based financial products and lower interest rate payments from Defendants and others from LIBOR-based financial products.

**Fraudulent Representations Regarding USD LIBOR (Panel Bank Defendants and BBA)**

240.    As described above, beginning in August 2007 and continuing through at least mid-2011, the Panel Bank Defendants and the BBA falsely represented on a daily basis that USD LIBOR rates electronically communicated by, and through, the BBA were based on honest submissions by the Panel Bank Defendants of competitively set London interbank lending rates that were consistent with the published definition of LIBOR.

241.    The Panel Bank Defendants and the BBA made these misrepresentations knowing that they were false, or with reckless disregard for their truth.  These misrepresentations were material because they (a) formed the basis for pricing LIBOR-based financial products and (b) helped to sustain LIBOR as the dominant benchmark for competitive interbank lending rates. The Panel Bank Defendants and the BBA intended for the Closed Banks and others to rely on these false representations of material fact.

242.    The Closed Banks reasonably relied on these false representations of material fact in deciding whether to enter into transactions indexed to USD LIBOR and whether to continue holding LIBOR-based financial products.  The Closed Banks specifically relied on Defendants' false representations in calculating the expected future cash flows from financial products with interest rates based on USD LIBOR.

243.    As a result of the Closed Banks' reasonable reliance on these false representations of material fact, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for LIBOR-based financial products and lower interest rate payments from Defendants and others from LIBOR-based financial products.

**The BBA's Fraud**

244.     Beginning in mid-2008, as described in this Complaint, the BBA falsely represented to the Closed Banks and others that it actively and independently monitored the Panel Bank Defendants' USD LIBOR submissions to ensure that they were consistent with the published definition of LIBOR.  From 2007 through at least 2011, the BBA represented that LIBOR was a "transparent" benchmark and that LIBOR provided a "reliable indicator" of the state of the money markets and risk in the global economy.

245.     In April 2008, the BBA falsely represented that (a) it was closely watching USD LIBOR submissions, (b) it would expel any Contributor Bank that made deliberately inaccurate LIBOR submissions, (c) it would fast-track an "intensive review" of its LIBOR process, and (d) it did not believe that Panel Bank Defendant had submitted false rates.

246.     In June 2008, the BBA falsely represented that (a) the Panel Bank Defendants' USD LIBOR submissions were honest and accurate, and (b) it was incorporating a tight scrutiny mechanism that would require any contribution discrepancies to be reviewed and justified.

247.     On August 5, 2008, the BBA falsely represented that rates submitted by Contributor Banks were "truly reflective of their perceived borrowing costs" and that LIBOR was a "fundamentally robust and accurate benchmark."[211]

248.     The BBA made these misrepresentations knowing that they were false, or with reckless disregard for their truth.  These misrepresentations were material because the BBA held itself out as an independent entity that would exercise strong oversight of LIBOR to ensure that LIBOR submissions by individual Panel Bank Defendants would be honest and consistent with

---

[211] BBA, *BBA LIBOR CONSULTATION FEEDBACK STATEMENT*, *supra* note 103.

the published definition of LIBOR.  Had market participants known that USD LIBOR was set by collusion, and not competitive market forces, market participants would have turned to other, more accurate, benchmarks to incorporate into their financial contracts.

249.    The BBA intended for the Closed Banks and others to rely on these false representations of material fact.  The Closed Banks reasonably relied on these false representations in deciding whether to enter into transactions tied to USD LIBOR and whether to continue holding LIBOR-based financial products.

250.    As a result of the Closed Banks' reasonable reliance on these false representations of material fact, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for LIBOR-based financial products and lower interest rate payments from Defendants and others from LIBOR-based financial products.

### Contracting Defendants' Fraud

251.    As discussed above, the Contracting Closed Banks entered into contracts with the Contracting Defendants for LIBOR-based financial products.  By virtue of these contractual relationships, the Contracting Defendants owed a duty of good faith and fair dealing to the Contracting Closed Banks.

252.    Contrary to their duty, Contracting Defendants knowingly provided the Contracting Closed Banks information regarding settling positions based on false submissions used to calculate USD LIBOR, thereby affirmatively misrepresenting that USD LIBOR accurately captured the competitive market forces that influence London interbank lending rates. Further, the Contracting Defendants failed to disclose the fraud and collusion relating to USD LIBOR.  The Contracting Defendants made these false representations and material omissions knowing that they were false, or with reckless disregard for their truth. The Contracting

Defendants made these misrepresentations and omissions during negotiations for each pay-fixed swap and each time that payments were made and/or exchanged with the Contracting Closed Banks under the pay-fixed swaps in order to induce the Contracting Closed Banks to enter into these transactions.  The Contracting Closed Banks would not have entered into the pay-fixed swaps at the same prices if the Contracting Closed Banks had known the Contracting Defendants intended to substitute collusion for competition in the setting of USD LIBOR.

253.    The Contracting Closed Banks reasonably relied on the Contracting Defendants' misrepresentations and nondisclosures in deciding whether to enter into financial transactions incorporating USD LIBOR and, if so, on what terms, and whether to continue holding LIBOR-based financial products.

254.    As a result of the Contracting Closed Banks' reasonable reliance on these Defendants' fraudulent misrepresentations and omissions, the Contracting Closed Banks and the FDIC as Receiver for the Contracting Closed Banks suffered damages in the form of, among other things, higher prices for LIBOR-based financial products and lower interest rate payments from Defendants and others from LIBOR-based financial products.

## COUNT XIV: AIDING AND ABETTING FRAUD
### (ALL DEFENDANTS)

255.    FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically 233-254.

256.    As explained above, the Defendants committed acts of fraud through their manipulation of LIBOR and their misrepresentations regarding LIBOR, which the Closed Banks reasonably relied upon.

257.    Defendants had actual knowledge of the fraudulent acts of the other Defendants.

258.     Each Defendant aided and abetted the fraud committed by the other Defendants by providing substantial assistance and/or participating in the fraudulent acts committed by the other Defendants, as explained in the paragraphs above.

259.     As a result of Defendants' aiding and abetting, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for LIBOR-based financial products and lower interest rate payments from Defendants and others from LIBOR-based financial products.

### COUNT XV: CIVIL CONSPIRACY TO COMMIT FRAUD
### (ALL DEFENDANTS)

260.     FDIC-R incorporates the preceding paragraphs in this Complaint, including specifically Paragraph Nos. 233-254.

261.     As explained above, Defendants committed acts of fraud through their manipulation of LIBOR and their misrepresentations and/or omissions regarding LIBOR, which the Closed Banks reasonably relied upon.

262.     Defendants formed a conspiracy or agreement to commit fraud by manipulating LIBOR and submitting false USD LIBOR rates that were inconsistent with the public definition of LIBOR, below their actual borrowing costs, and within a narrow range among the Panel Bank Defendants, as well as by engaging in a course of material misrepresentations and/or omissions to conceal the fraudulent acts.

263.     As explained throughout this Complaint, Defendants conspired together to commit fraud by manipulating LIBOR through false and fraudulent LIBOR submissions, as well as engaging in a course of material misrepresentations and/or omissions to conceal the fraudulent acts.

264.     Defendants intentionally and knowingly committed acts in furtherance of this conspiracy, as explained above, by manipulating LIBOR and making false and fraudulent LIBOR submissions, as well as making repeated misrepresentations and omissions regarding LIBOR's accuracy.

265.     As a result of Defendants' conduct, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for LIBOR-based financial products and lower interest rate payments from Defendants and others from LIBOR-based financial products.

## COUNT XVI: NEGLIGENT MISREPRESENTATION
### (ALL DEFENDANTS)

266.     FDIC-R incorporates by reference the preceding paragraphs in this Complaint.

267.     As discussed above, the Contracting Closed Banks entered into contracts with the Contracting Defendants for LIBOR-based financial products.  By virtue of these contractual relationships, the Contracting Closed Banks had a special relationship with the Contracting Defendants and the Contracting Defendants owed a duty of good faith and fair dealing to the Contracting Closed Banks.  As a result of this special relationship, the Contracting Defendants had a duty to impart correct information to the Contracting Closed Banks.

268.     The Panel Bank Defendants and the BBA also owed a duty to the Closed Banks to honestly and accurately report USD LIBOR and not to intentionally mislead the Closed Banks and others by secretly and collectively manipulating USD LIBOR for their gain and to the detriment of others in the financial markets.  Defendants' duty arises from representations that they made, individually and/or through the BBA, that LIBOR was "a reliable indicator of the state of the money markets," that it was a "reliable barometer of risk," that it reflected competitive rates in the London interbank lending market, and other public representations

regarding the nature and reliability of LIBOR.

**Misrepresentations in USD LIBOR Submissions (Panel Bank Defendants)**

269.     As described above, beginning in August 2007 and continuing through at least

mid-2011, each Panel Bank Defendant falsely represented on a daily basis the following:

- Its USD LIBOR submissions were consistent with the published definition of LIBOR;

- It based its USD LIBOR submissions on its honest perception of its cost of funds in the London interbank market without reference to rates submitted by other Panel Bank Defendants; and

- Its USD LIBOR submissions represented the actual competitive rates at which it honestly believed another bank would offer it funds in the London interbank market.

270.     The Panel Bank Defendants made these representations, at a minimum,

negligently and without reasonable justification.

271.     These representations were material because they formed the basis for USD

LIBOR published by and through the BBA and affected the price of LIBOR-based financial

products.  In addition, an individual bank's published submission provided information regarding

its creditworthiness and liquidity.  When a Panel Bank Defendant with high credit risk and

liquidity problems submitted LIBOR rates that were artificially low in relation to other Panel

Bank Defendants that Panel Bank Defendant's submission was material because it led market

participants to believe that the Panel Bank Defendant presented the same credit standing as the

other Panel Bank Defendants.  Had market participants and purchasers of LIBOR-based financial

products known the true credit risk and liquidity issues facing those Panel Bank Defendants, they

would have declined to do business with them.

272.     The Panel Bank Defendants intended for the Closed Banks and others to rely

on these false representations of material fact.  The Closed Banks reasonably relied on these false

representations of material fact in deciding whether to do business with a particular Panel Bank Defendant.

273.     As a result of the Closed Banks' reasonable reliance on these false representations of material fact, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for LIBOR-based financial products and lower interest rate payments from Defendants and others from LIBOR-based financial products.

### Misrepresentations Regarding USD LIBOR (Panel Bank Defendants and BBA)

274.     As described above, beginning in August 2007 and continuing through at least mid-2011, the Panel Bank Defendants and the BBA falsely represented on a daily basis that USD LIBOR rates electronically communicated by, and through, the BBA were based on honest submissions by the Panel Bank Defendants of competitively set London interbank lending rates that were consistent with the published definition of LIBOR.

275.     The Panel Bank Defendants and the BBA made these misrepresentations, at a minimum, negligently and without reasonable care.  These misrepresentations were material because they (a) formed the basis for pricing LIBOR-based financial products and (b) helped to sustain LIBOR as the dominant benchmark for competitive interbank lending rates.  The Panel Bank Defendants and the BBA intended for the Closed Banks and others to rely on these false representations of material fact.

276.     The Closed Banks reasonably relied on these false representations of material fact in deciding whether to enter into transactions indexed to USD LIBOR and whether to continue holding LIBOR-based financial products.  The Closed Banks specifically relied on Defendants' false representations in calculating the expected future cash flows from USD LIBOR and, consequently, the prices the Closed Banks were willing to pay for pay-fixed swaps.

277.     As a result of the Closed Banks' reasonable reliance on these false misrepresentations of material fact, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for LIBOR-based financial products and lower interest rate payments from Defendants and others from LIBOR-based financial products.

### The BBA's Misrepresentations

278.     Beginning in mid-2008, as described in this Complaint, the BBA falsely represented to the Closed Banks and others that it actively and independently monitored the Panel Bank Defendants' USD LIBOR submissions to ensure that they were consistent with the published definition of LIBOR.  From 2007 through at least mid- 2011, the BBA represented that LIBOR was a "transparent" benchmark and that LIBOR provided a "reliable indicator" of the state of the money markets and risk in the global economy.

279.     In April 2008, the BBA falsely represented that (a) it was closely watching USD LIBOR submissions, (b) it would expel any Contributor Bank that made deliberately inaccurate LIBOR submissions, (c) it would fast-track an "intensive review" of its LIBOR process, and (d) it did not believe that Panel Bank Defendant had submitted false rates.

280.     In June 2008, the BBA falsely represented that (a) the Panel Bank Defendants' USD LIBOR submissions were honest and accurate, and (b) it was incorporating a tight scrutiny mechanism that would require any contribution discrepancies to be reviewed and justified.

281.     On August 5, 2008, the BBA falsely represented that rates submitted by Contributor Banks were "truly reflective of their perceived borrowing costs" and that LIBOR

was a "fundamentally robust and accurate benchmark."[212]

282.    The BBA made these misrepresentations, at a minimum, negligently and without reasonable care.  These misrepresentations were material because the BBA held itself out as an independent entity that would exercise strong oversight of LIBOR to ensure that LIBOR submissions by individual Panel Bank Defendants would be honest and consistent with the published definition of LIBOR.  Had market participants known that USD LIBOR was set by collusion, and not competitive market forces, market participants would have turned to other, more accurate, benchmarks to incorporate into their financial contracts.

283.    The BBA intended for the Closed Banks and others to rely on these false representations of material fact.  The Closed Banks reasonably relied on these false representations in deciding whether to enter into transactions tied to USD LIBOR and whether to continue holding LIBOR-based financial products.

284.    As a result of the Closed Banks' reasonable reliance on these false representations, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for LIBOR-based financial products and lower interest rate payments from Defendants and others from LIBOR-based financial products.

### Contracting Defendants' Misrepresentations

285.    As discussed above, the Contracting Closed Banks entered into contracts with the Contracting Defendants for LIBOR-based financial products.  By virtue of these contractual relationships, the Contracting Defendants owed a duty of good faith and fair dealing to the Contracting Closed Banks.

---

[212] BBA, *BBA LIBOR CONSULTATION FEEDBACK STATEMENT*, *supra* note 103.

286.     Contrary to its duty, the Contracting Defendants affirmatively misrepresented their credit risk and liquidity through fraudulent and collusive USD LIBOR submissions.  In addition, the Contracting Defendants affirmatively misrepresented that USD LIBOR accurately captured the competitive market forces that influence London interbank lending rates.  Further, the Contracting Defendants failed to disclose the fraud and collusion relating to USD LIBOR. The Contracting Defendants made these false representations and material omissions, at a minimum, negligently and without reasonable care.  The Contracting Defendants made these misrepresentations and omissions during negotiations for each pay-fixed swap and each time that payments were made and/or exchanged with the Contracting Closed Banks under the pay-fixed swaps in order to induce the Contracting Closed Banks to enter into these transactions.  The Contracting Closed Banks would not have entered into the pay-fixed swaps at the same prices if the Contracting Closed Banks had known the Contracting Defendants intended to substitute collusion for competition with respect to USD LIBOR.

287.     The Contracting Closed Banks reasonably relied on the Contracting Defendants' misrepresentations and nondisclosures in deciding whether to enter into financial transactions incorporating USD LIBOR and, if so, on what terms, and whether to continue holding LIBOR-based financial products.

288.     As a result of the Contracting Closed Banks' reasonable reliance on these Defendants' fraudulent misrepresentations and omissions, the Contracting Closed Banks and the FDIC as Receiver for the Contracting Closed Banks suffered damages in the form of, among other things, higher prices for LIBOR-based financial products and lower interest rate payments from Defendants and others from LIBOR-based financial products.

## COUNT XVII: TORTIOUS INTERFERENCE WITH CONTRACT
### (PANEL BANK DEFENDANTS AND BBA)

289.    FDIC-R incorporates by reference the preceding paragraphs in this Complaint.

290.    The Closed Banks entered into pay-fixed swaps and other financial contracts tied to USD LIBOR with the Contracting Defendants and counterparties other than Defendants.

291.    The Panel Bank Defendants and the BBA knew, or should have known, that the Closed Banks had entered into financial instruments that incorporated USD LIBOR.   In fact, certain Panel Bank Defendants were counterparties to similar contracts with the Closed Banks.

292.    The Panel Bank Defendants and the BBA intentionally interfered with these contracts and agreements, as described above, including by their collusive manipulation of USD LIBOR and fraudulent misrepresentations and/or omissions about LIBOR's accuracy.  The Panel Bank Defendants' and BBA's tortious acts caused those contracts to be breached and the Closed Banks to receive reduced payments from those contracts and/or a decrease in value.

293.    As a result of the Panel Bank Defendants' and the BBA's intentional interference with the Closed Banks' contracts and agreements, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, receiving lower interest rate payments from the Contracting Defendants and others.

## COUNT XVIII: AIDING & ABETTING TORTIOUS INTERFERENCE WITH CONTRACT
### (PANEL BANK DEFENDANTS AND BBA)

294.    FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically Paragraph Nos. 289-293.

295.    As explained above, the Panel Bank Defendants and the BBA tortiously interfered with the Closed Banks' contracts and agreements with the Contracting Defendants and counterparties other than the Contracting Defendants.

296.     The Panel Bank Defendants and the BBA had actual knowledge of the acts of tortious interference of each other.

297.     Each Panel Bank Defendant and the BBA aided and abetted the tortious interference committed by the other Panel Bank Defendants and the BBA by providing substantial assistance and/or participating in the tortious acts committed by the other Panel Bank Defendants and the BBA, including through their collusive manipulation of USD LIBOR and fraudulent misrepresentations and/or omissions about LIBOR's accuracy.  The Panel Bank Defendants' and the BBA's acts of aiding and abetting caused those contracts to be breached and the Closed Banks to receive reduced payments from those contracts and/or a decrease in value.

298.     As a result of the Panel Bank Defendants' and the BBA's aiding and abetting, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for LIBOR-based financial products and lower interest rate payments from the Contracting Defendants and others from LIBOR-based financial products.

## COUNT XIX: CIVIL CONSPIRACY TO COMMIT TORTIOUS INTERFERENCE WITH CONTRACT
### (PANEL BANK DEFENDANTS AND BBA)

299.     FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically Paragraph Nos. 289-293.

300.     As explained above, the Panel Bank Defendants and the BBA tortiously interfered with the Closed Banks' contracts with the Contracting Defendants and counterparties other than Defendants.

301.     As explained throughout this Complaint, the Panel Bank Defendants and the BBA conspired together to tortiously interfere with the Closed Banks' contracts by manipulating LIBOR through false and fraudulent LIBOR submissions, as well as engaging in a course of

material misrepresentations and/or omissions to conceal their tortious acts.

302.   The Panel Bank Defendants and the BBA intentionally and knowingly committed acts in furtherance of this conspiracy, as explained above, by manipulating LIBOR and making false and fraudulent LIBOR submissions, as well as making repeated misrepresentations and omissions regarding LIBOR's accuracy.

303.   As a result of the Panel Bank Defendants' and the BBA's conduct, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for LIBOR-based financial products and lower interest rate payments from the Contracting Defendants and others from LIBOR-based financial products.

## COUNT XX: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (PANEL BANK DEFENDANTS AND BBA)

304.   FDIC-R incorporates by reference the preceding paragraphs in this Complaint.

305.   The Closed Banks had valid business expectancies in that the Closed Banks were engaged in interest-rate swap contracts and other LIBOR-based financial instruments with certain Defendants and counterparties other than Defendants.  The Closed Banks' contractual relationships at that time expressly incorporated USD LIBOR and provided that the Closed Banks would receive payments based on the level of USD LIBOR.

306.   The Panel Bank Defendants and the BBA knew of the Closed Banks' contractual relationships and business expectancies and understood that USD LIBOR, as the "world's most important number," was incorporated into many contracts similar to the ones to which the Closed Banks were parties.  In fact, certain Defendants were counterparties to similar contracts with the Closed Banks.  The Panel Bank Defendants and the BBA further knew, or should have known, that the Closed Banks expected payments from these contracts based on the

level of USD LIBOR.

307.     The Panel Bank Defendants and the BBA intentionally interfered with the Closed Banks' business expectancies by means of improper, fraudulent, wrongful methods, as described throughout this Complaint, and caused the Closed Banks to receive reduced payments from these contracts and/or a decrease in value over what the Closed Banks would have realized, absent the Panel Bank Defendants' and the BBA's conduct.

308.     As a result of the Panel Bank Defendants' and the BBA's intentional interference with the Closed Banks' business expectancies, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, lower interest rate payments from the Contracting Defendants and others, and paying artificially high prices for financial products tied to USD LIBOR.

## COUNT XXI: AIDING & ABETTING TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (PANEL BANK DEFENDANTS AND BBA)

309.     FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically Paragraph Nos. 304-308.

310.     As explained above, the Panel Bank Defendants and the BBA tortiously interfered with the Closed Banks' valid business expectancies with certain Defendants and counterparties other than the Defendants.

311.     The Panel Bank Defendants and the BBA had actual knowledge of the acts of tortious interference of the other Panel Bank Defendants and the BBA.

312.     Each Panel Bank Defendants and the BBA, through improper and fraudulent means, aided and abetted the tortious interference committed by the other Panel Bank Defendants and the BBA by providing substantial assistance and/or participating in the tortious

acts committed by the other Panel Bank Defendants and the BBA, including through their collusive manipulation of USD LIBOR and fraudulent misrepresentations and/or omissions about LIBOR's accuracy. The Panel Bank Defendants' and the BBA's acts of aiding and abetting caused the Closed Banks to receive reduced payments from their contracts and/or a decrease in value over what the Closed Banks would have realized, absent the Panel Bank Defendants' and the BBA's conduct.

313. As a result of the Panel Bank Defendants' and the BBA's aiding and abetting, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for LIBOR-based financial products and lower interest rate payments from the Contracting Defendants and others from LIBOR-based financial products.

## COUNT XXII: CIVIL CONSPIRACY TO COMMIT TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (PANEL BANK DEFENDANTS AND BBA)

314. FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically Paragraph Nos. 304-308.

315. As explained above, the Panel Bank Defendants and the BBA tortiously interfered with the Closed Banks' valid business expectancies with certain Defendants and counterparties other than Defendants.

316. As explained throughout this Complaint, the Panel Bank Defendants and the BBA conspired together to tortiously interfere with the Closed Banks' valid business expectancies by manipulating LIBOR through false and fraudulent LIBOR submissions, as well as by engaging in a course of material misrepresentations and/or omissions to conceal their tortious acts.

317.    The Panel Bank Defendants and the BBA intentionally and knowingly committed acts in furtherance of this conspiracy, as explained above, by manipulating LIBOR and making false and fraudulent LIBOR submissions, as well as by making repeated misrepresentations and omissions regarding LIBOR's accuracy.

318.    As a result of the Panel Bank Defendants' and the BBA's conduct, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for LIBOR-based financial products and lower interest rate payments from the Contracting Defendants and others from LIBOR-based financial products.

## COUNT XXIII: VIOLATIONS OF SHERMAN ACT SECTION 1
### (PANEL BANK DEFENDANTS AND BBA)

319.    FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

### Agreement

320.    In or about August 2007 and lasting through at least mid-2011, the Panel Bank Defendants formed a combination, conspiracy, or agreement to submit false USD LIBOR rates that were inconsistent with the public definition of LIBOR, below the Panel Bank Defendants' actual borrowing costs, and within a narrow range among the Panel Bank Defendants.  The Panel Bank Defendants had a conscious commitment to common objectives, namely suppressing USD LIBOR for the Panel Bank Defendants' short-term profit on transactions involving LIBOR-based financial products, artificially maintaining the Panel Bank Defendants' long-term viability, and preserving LIBOR as the dominant benchmark for the competitively determined cost of money.

321.    As set forth more fully below, by substituting collusion for competition in the setting of USD LIBOR, the Panel Bank Defendants manipulated the price and quality of financial products indexed to USD LIBOR and fundamentally harmed the competitive process in a number of ways.  First, the Panel Bank Defendants' collusive conduct reduced competition

among the Panel Bank Defendants for money.  By agreeing to create the false impression that

they all presented similar credit risks, the Panel Bank Defendants effectively agreed not to

compete for money on the basis of creditworthiness.  In the absence of collusion, banks with

higher credit risk would have competed on the merits by, among other things, paying higher

interest rates than their competitors,[213] attempting to provide better services and products,

improving efficiency, and shedding risk.  In some instances, banks with unacceptably high credit

risk would be unable to attract money at any interest rate from certain companies.

322.     Second, by agreeing to artificially suppress USD LIBOR into the future, the

Panel Bank Defendants reduced price competition among them in the markets for LIBOR-based

financial products.  Prices for these financial products were set based on the expectation that

competitive market forces, and not a secret agreement, would determine interbank interest rates.

By colluding to suppress LIBOR, the Panel Bank Defendants reduced transparency[214] and

obtained supracompetitive profit margins on transactions involving LIBOR-based financial

products.  In short, the Panel Bank Defendants colluded to directly manipulate the price of

certain LIBOR-based financial products.  These supracompetitive profits reduced the Panel Bank

Defendants' incentive to improve their financial products, optimize their operations, and/or

compete more aggressively on price.  Relatedly, the collusion reduced competition between the

Panel Bank Defendants and non-conspirator banks because the Panel Bank Defendants could

offer prices and interest rates that appeared more attractive but that, in fact, contained a built-in

supracompetitive profit margin.

---

[213] *See, e.g.*, BBA, *Small business lending bankfacts*, Aug. 10, 2011 ("Price reflects the probability – in the banks' experience and according to its data – of the borrower not being able to repay the debt.").

[214] The DOJ has commented that "transparency is often more important in financial markets than in some others."  *Competition and Financial Markets*, DAF/COMP/WD(2009)11.

323.     Third, Panel Bank Defendants and the BBA harmed competition in the market for floating interest rate benchmarks by collusively creating the false appearance that USD LIBOR accurately captured the market forces that determine interbank lending rates in a competitive market.  During the conspiracy period, LIBOR was the dominant interest rate benchmark used in financial instruments sold in the United States.  But for the collusion, there would have been higher demand for alternative, more reliable, benchmarks.

324.     Finally, Panel Bank Defendants' and the BBA's collusion interfered with the supply/demand balance for money.  In general, lower interest rates encourage borrowing, which increases the demand for, and restricts the supply of, money.  In a competitive environment, market forces determine interest rates and efficiently allocate money.

325.     As set forth above, the Panel Bank Defendants and the BBA had strong motives to conspire.  Because of the way that USD LIBOR is mathematically calculated, the number of participants in the unlawful agreement can directly affect the USD LIBOR fixing published by and through the BBA.  In addition, the unlawful scheme required collective action to avoid detection.  If any number of Panel Bank Defendants deviated from the agreement by submitting true and accurate USD LIBOR rates on a sustained basis, that Panel Bank Defendant would have risked exposing the unlawful scheme.

326.     Moreover, Panel Bank Defendants with good credit had a competitive advantage over less creditworthy Panel Bank Defendants.  Absent a conspiracy, it also was not in the economic self-interest of those Panel Bank Defendants with good credit to tolerate artificially low USD LIBOR submissions by the less credit-worthy banks.  As a result, the Panel Bank Defendants and the BBA could not have systematically suppressed USD LIBOR without collusion.  Even if all Panel Bank Defendants shared the same independent interest in

suppressing USD LIBOR on a given day, the agreement assured the Panel Bank Defendants that (a) USD LIBOR would remain suppressed into the future and (b) the Panel Bank Defendants would submit suppressed LIBOR rates that were within a narrow range of each other.  On information and belief, by virtue of their participation in the London interbank market, the Panel Bank Defendants knew the actual rates at which other Panel Bank Defendants could borrow funds and were in a position to know that the other Panel Bank Defendants' USD LIBOR submissions were lower than the rates at which those other Panel Bank Defendants believed they could borrow on the same terms.  Similarly, because the BBA published each Panel Bank Defendants' LIBOR submissions, the Panel Bank Defendants could not cheat on their agreement to suppress USD LIBOR.

327.    The Panel Bank Defendants and the BBA had ample opportunity to conspire through, among other things, their FX & MM Committee meetings and numerous interbank communications.  As set forth herein, on information and belief, the BBA joined in the unlawful agreement at the request of its most important members and, to forestall the development of alternative benchmarks that could compete with LIBOR.

328.    The Panel Bank Defendants cannot credibly claim that they all unilaterally and simultaneously began systematically providing fraudulent and artificially low USD LIBOR submissions at or around the same time in August 2007.  This is apparent, in light of the evidence publicly disclosed by Barclays and UBS revealing that each implemented similar internal directives to suppress LIBOR at that time, and RBS's reported internal admission in August 2007 that it knew Panel Banks were systematically manipulating USD LIBOR.  Because the BBA's instructions prohibit Contributor Banks from basing their USD LIBOR submissions on submissions by other Contributor Banks, the Panel Bank Defendants cannot claim that their

conduct was merely the result of conscious parallelism.  The Panel Bank Defendants' pretextual

explanations for the artificially low USD LIBOR submissions further expose the fact of the Panel

Bank Defendants' and the BBA's unlawful agreement.

### Restraint of Trade

329.    The purpose and/or effect of the Panel Bank Defendants' and the BBA's

unlawful agreement was to suppress USD LIBOR, an element of price in numerous financial

products including, but not limited to, interest rate swaps, to the benefit of the Panel Bank

Defendants and to the detriment of the Closed Banks and other counterparties.  The Panel Bank

Defendants and the BBA knew, or should have known, that their agreement to suppress USD

LIBOR would affect the prices and returns on financial products tied to USD LIBOR.  By

agreeing to systematically and secretly suppress LIBOR, the Panel Bank Defendants and the

BBA harmed the competitive process in at least a number of ways.

330.    First, the Panel Bank Defendants substituted collusion for competition in

determining USD LIBOR.  As set forth above, market participants included USD LIBOR in

financial products to capture competitive interbank lending rates and, by proxy, the market

forces that (absent collusion) influence interbank lending rates.  By secretly agreeing to suppress

USD LIBOR on a systematic basis, the Panel Bank Defendants disrupted the competitive process

by which parties "discover" the price of LIBOR-based financial products.[215]  As the U.S. District

Court for the Northern District of California observed: "Fraud and deceit are not legitimate

---

[215] For example, assume a monopolist offers a product for $30 when its internal cost to produce
and sell the product is just $10.  Absent competition, buyers will not know that $30 represents a
three-fold increase over the seller's costs.  Now, assume instead that there are multiple sellers of
the same product, all with similar costs.  Rather than lose a sale, the second seller will offer a
price below $30, which should trigger a price reaction from the seller's rivals.  Eventually,
through the competitive process, buyers will "discover" that the market price for the product is
just above $10.  *See* Marshall and Marx, Economics of Collusion (2012), 83-84.

market forces.  Fundamentally, markets are information processing systems.  The market price is only as 'real' as the data that inform the process of price discovery.  By the same token, the market price is 'artificial' when the market is misinformed."[216]  By providing a benchmark supposedly tied to competitively determined interbank lending rates, LIBOR served the price-discovery purpose in LIBOR-based financial products.  Through their collusive agreement, the Panel Bank Defendants artificially increased the profit margins that they earned in LIBOR-based financial product transactions.

331.    Second, the Panel Bank Defendants interfered with the ability of non-conspirator banks to compete against Panel Bank Defendants in the markets for LIBOR-based financial instruments.  Like the Closed Banks, non-conspirator banks were unaware of the alleged fraud and collusion and therefore priced LIBOR-based financial products based on the reasonable expectation that USD LIBOR would be determined by competitive market forces.  As a result, the Panel Bank Defendants' knowledge of the collusive suppression provided the Panel Bank Defendants with a competitive advantage over non-conspirator banks.  The Panel Bank Defendants could negotiate prices that appeared to be below fair market value, but were, in fact, still well above the collusively suppressed market value.

332.    Third, each artificially suppressed LIBOR submission by an individual Panel Bank increased that Panel Bank's reputation and public perception of its credit risk and liquidity.[217]  In the absence of collusion, banks with superior credit and liquidity profiles would have used their reputation as a competitive advantage and banks with lower reputations would have been forced to compete on the merits by providing better prices, improving efficiency, and

---

[216] *U.S. v. Reliant Energy Services, Inc.*, 420 F. Supp. 2d 1043, 1058 (N.D. Cal. 2006).

[217] Business reputation is an "as asset of significant value" in the banking sector.  Metz, Kraten, Metz, Seow, Libor manipulation? 36 Jnl. Banking & Fin. 136-50.

shedding risk. Barclays and UBS, in fact, admit that each individual LIBOR submission contained market information that affected or tended to affect prices.[218]

333.   Fourth, the Panel Bank Defendants stifled innovation and limited demand for alternative (competing) benchmarks. Through their agreement to submit rates that appeared to be fair and honest reflections of interbank lending, the Panel Bank Defendants maintained the façade that market forces determined LIBOR and that a more reliable benchmark was unnecessary. But for the collusion, the Panel Bank Defendants would have been forced to compete on the merits by showing that LIBOR served its intended purpose as a proxy for competition or by incorporating other floating interest rate benchmarks into financial products they sold. Indeed, now that the fraud and collusion infecting LIBOR is coming to light, the markets are seeing a shift away from LIBOR toward alternative benchmarks.[219]

334.   Finally, the Panel Defendants interfered with the supply/demand balance for money. In general, lower interest rates encourage borrowing, which increases the demand for, and restricts the supply of, money. In a competitive environment, market forces determine interest rates and efficiently allocate money.

335.   The antitrust charges filed against subsidiaries of UBS and RBS confirm that agreements to manipulate LIBOR constitute per se restraints of trade that harmed competition in the markets for LIBOR-based financial products in violation of Sherman Act Section 1. *Per se* treatment of the horizontal conspiracy is appropriate because the Panel Bank Defendants and the BBA can offer no pro-competitive justification for the conduct alleged in this Complaint.

---

[218] *See, e.g.*, Barclays SOF ¶ 97.

[219] *See, e.g.* Tom Brathwaite and Brooke Masters, *US regulators urge quick LIBOR replacement*, Financial Times (Apr. 25, 2013), available at http://www.ft.com/intl/cms/s/0/6e79e7bc-addc-11e2-82b8-00144feabdc0.html#axzz2RsLxEDQq.

**Antitrust Injury and Damages**

336.     As a result of the Panel Bank Defendants' and the BBA's fraudulent and collusive conduct, the Closed Banks and the FDIC-R suffered damages from the artificial suppression of LIBOR in the form of, among other things, paying artificially high prices for LIBOR-based financial instruments and receiving artificially low interest payments on LIBOR-based financial products.  These damages flow directly from the agreement's interference with competitive market forces.

337.     In the absence of collusion, the Panel Bank Defendants could not have achieved the supracompetitive prices that they were able to charge (and increased profit margins that they were able to earn) in transactions for certain LIBOR-based financial instruments.

**COUNT XXIV: VIOLATIONS OF THE DONNELLY ACT**
**(PANEL BANK DEFENDANTS AND BBA)**

338.     FDIC-R incorporates by reference the preceding paragraphs of this Complaint, including specifically paragraphs 319-337.

339.     As explained in detail above, the Panel Bank Defendants and the BBA unlawfully interfered with competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in violation of N.Y. Gen. Bus. Law § 340.

340.     As a result of the Panel Bank Defendants' and the BBA's fraudulent and collusive conduct, the Closed Banks and the FDIC-R have suffered damages from the artificial suppression of LIBOR in the form of, among other things, paying artificially high prices for LIBOR-based financial instruments and receiving artificially low interest payments on LIBOR-based financial products.  These damages flow directly from the agreement's interference with competition and the free exercise of any activity in the conduct of any business,

trade or commerce.

341.    In the absence of collusion, the Panel Bank Defendants could not have

achieved the supracompetitive prices that they were able to charge (and increased profit margins

that they were able to earn) in transactions for certain LIBOR-based financial instruments.

**PRAYER FOR RELIEF**

WHEREFORE, FDIC as Receiver for the Closed Banks requests the Court to:

a.    Enter judgment for the FDIC-R awarding full damages for all
economic, monetary, actual, consequential, and compensatory
damages that the Closed Banks suffered as a result of Defendants'
wrongful and/or inequitable conduct.

b.    Award punitive damages to the extent allowable by law.

c.    Award treble damages for violations of the Sherman Act and/or
Donnelly Act.

d.    Award attorneys' fees and costs of suit.

e.    Award pre- and post-judgment interest to the extent allowable by law.

f.    Grant such other further relief as allowed by law.

## <u>JURY DEMAND</u>

The FDIC-R demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated:  March 14, 2014

Respectfully submitted,

DICKSTEIN SHAPIRO LLP

By: _____
Richard J. Leveridge
James R. Martin
Jennifer D. Hackett
Bethany Gorlin
1825 I Street, NW
Washington, DC  20006
202-420-2200

*Attorneys for the FDIC-R*