**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR AMCORE BANK, N.A.; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR AMTRUST BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR BANKUNITED, F.S.B.; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR CALIFORNIA NATIONAL BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COLONIAL BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COMMUNITY BANKS OF COLORADO; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR CORUS BANK, N.A.; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR DOWNEY SAVINGS AND LOAN ASSOCIATION, F.A.; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR EUROBANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST COMMUNITY BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST FEDERAL BANK OF CALIFORNIA, F.S.B.; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST NATIONAL BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST REGIONAL BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FRONTIER BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR GEORGIAN BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR GUARANTY BANK; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>**AMENDED COMPLAINT**<br><br>**CASE NO.:  1:14-cv-01757-NRB**<br><br>**MDL No. 2262**<br><br>**ECF CASE**<br><br>**JURY TRIAL DEMANDED** |

FEDERAL DEPOSIT INSURANCE                    )
CORPORATION AS RECEIVER FOR                  )
HILLCREST BANK; FEDERAL DEPOSIT              )
INSURANCE CORPORATION AS RECEIVER            )
FOR IMPERIAL CAPITAL BANK; FEDERAL           )
DEPOSIT INSURANCE CORPORATION AS             )
RECEIVER FOR INDYMAC BANK, F.S.B.;           )
FEDERAL DEPOSIT INSURANCE                    )
CORPORATION AS RECEIVER FOR INTEGRA          )
BANK, N.A.; FEDERAL DEPOSIT INSURANCE        )
CORPORATION AS RECEIVER FOR IRWIN            )
UNION BANK AND TRUST COMPANY;                )
FEDERAL DEPOSIT INSURANCE                    )
CORPORATION AS RECEIVER FOR LA JOLLA         )
BANK, F.S.B.; FEDERAL DEPOSIT INSURANCE      )
CORPORATION AS RECEIVER FOR LYDIAN           )
PRIVATE BANK; FEDERAL DEPOSIT                )
INSURANCE CORPORATION AS RECEIVER            )
FOR MIDWEST BANK AND TRUST COMPANY;          )
FEDERAL DEPOSIT INSURANCE                    )
CORPORATION AS RECEIVER FOR ORION            )
BANK; FEDERAL DEPOSIT INSURANCE              )
CORPORATION AS RECEIVER FOR PACIFIC          )
NATIONAL BANK; FEDERAL DEPOSIT               )
INSURANCE CORPORATION AS RECEIVER            )
FOR PARK NATIONAL BANK; FEDERAL              )
DEPOSIT INSURANCE CORPORATION AS             )
RECEIVER FOR PFF BANK & TRUST; FEDERAL       )
DEPOSIT INSURANCE CORPORATION AS             )
RECEIVER FOR R-G PREMIER BANK OF             )
PUERTO RICO; FEDERAL DEPOSIT                 )
INSURANCE CORPORATION AS RECEIVER            )
FOR RIVERSIDE NATIONAL BANK OF               )
FLORIDA; FEDERAL DEPOSIT INSURANCE           )
CORPORATION AS RECEIVER FOR SAN DIEGO        )
NATIONAL BANK; FEDERAL DEPOSIT               )
INSURANCE CORPORATION AS RECEIVER            )
FOR SILVERTON BANK, N.A.; FEDERAL            )
DEPOSIT INSURANCE CORPORATION AS             )
RECEIVER FOR SUPERIOR BANK; FEDERAL          )
DEPOSIT INSURANCE CORPORATION AS             )
RECEIVER FOR TIERONE BANK; FEDERAL           )
DEPOSIT INSURANCE CORPORATION AS             )
RECEIVER FOR UNITED COMMERCIAL BANK;         )

FEDERAL DEPOSIT INSURANCE )
CORPORATION AS RECEIVER FOR UNITED )
WESTERN BANK; FEDERAL DEPOSIT )
INSURANCE CORPORATION AS RECEIVER )
FOR WASHINGTON MUTUAL BANK; and )
FEDERAL DEPOSIT INSURANCE )
CORPORATION AS RECEIVER FOR )
WESTERNBANK PUERTO RICO )
                Plaintiffs, )
  )
            v. )
  )
BANK OF AMERICA CORPORATION; BANK OF )
AMERICA, N.A.; MERRILL LYNCH & CO.; )
MERRILL LYNCH CAPITAL SERVICES, INC.; )
MERRILL LYNCH INTERNATIONAL BANK )
LTD.; BARCLAYS BANK PLC; BRITISH )
BANKERS' ASSOCIATION; BBA ENTERPRISES )
LTD.; BBA LIBOR LTD.; CITIGROUP, INC.; )
CITIBANK, N.A.; CITIGROUP FINANCIAL )
PRODUCTS, INC.; COÖPERATIEVE CENTRALE )
RAIFFEISEN-BOERENLEENBANK, B.A.; )
CREDIT SUISSE GROUP AG; CREDIT SUISSE )
INTERNATIONAL; DEUTSCHE BANK AG; )
HSBC HOLDINGS PLC; HSBC BANK USA, N.A.; )
THE HONGKONG AND SHANGHAI BANKING )
CORPORATION LTD.; JPMORGAN CHASE & )
CO.; JPMORGAN CHASE BANK, N.A.; BEAR )
STERNS CAPITAL MARKETS, INC.; J.P. )
MORGAN MARKETS LTD. (F.K.A. BEAR )
STEARNS INTERNATIONAL LTD.); J.P. )
MORGAN BANK DUBLIN PLC (F.K.A. BEAR )
STEARNS BANK PLC); LLOYDS BANKING )
GROUP PLC; LLOYDS TSB BANK PLC; HBOS )
PLC; SOCIÉTÉ GÉNÉRALE; THE )
NORINCHUKIN BANK; ROYAL BANK OF )
CANADA; THE ROYAL BANK OF SCOTLAND )
PLC; THE BANK OF TOKYO-MITSUBISHI UFJ )
LTD.; UBS AG; and PORTIGON AG (F.K.A. )
WESTLB), )
                Defendants. )

**TABLE OF CONTENTS**

**Page**

NATURE OF THE CASE ...................................................................................... 1

JURISDICTION AND VENUE ........................................................................... 2

PARTIES ............................................................................................................. 4

BACKGROUND ................................................................................................ 18

A.  Interest Rate Fundamentals ....................................................................... 18

B.  The Role of Indices and Benchmarks in Financial Markets ..................... 20

C.  The Role of Interest-Rate Benchmarks in Lending .................................. 24

D.  The Role of Interest-Rate Benchmarks in Derivatives ............................ 25

E.  Development of bbaLIBOR™ .................................................................... 30

F.  Calculation of bbaLIBOR™ ...................................................................... 31

G.  bbaLIBOR™ Governance ......................................................................... 34

H.  Defendants' Knowledge of bbaLIBOR™'s Importance .......................... 37

FRAUDULENT AND COLLUSIVE CONDUCT RELATING TO bbaLIBOR™ ................... 40

A.  Systematic bbaLIBOR™ Depression ....................................................... 40

B.  Conduct to Benefit Individual Trader Positions ...................................... 55

C.  Harmful Effects of the Unlawful Conduct ............................................... 56

DISCLOSURE OF THE FRAUDULENT AND COLLUSIVE CONDUCT ........................... 61

A.  Barclays's Admissions .............................................................................. 61

B.  UBS Admissions ....................................................................................... 63

C.  RBS Admissions ....................................................................................... 65

D.  Rabobank Admissions ............................................................................... 65

E.  Lloyds and HBOS Admissions ................................................................. 66

COUNT I:  BREACH OF CONTRACT WITH AMCORE ............................................ 72

COUNT II:  BREACH OF CONTRACTS WITH AMTRUST ........................................ 74

COUNT III:  BREACH OF CONTRACTS WITH CORUS ............................................ 76

COUNT IV:  BREACH OF CONTRACTS WITH INDYMAC ....................................... 79

COUNT V:  BREACH OF CONTRACT WITH INTEGRA .......................................... 83

COUNT VI:  BREACH OF CONTRACT WITH SILVERTON ...................................... 85

COUNT VII:  BREACH OF CONTRACT WITH SUPERIOR ....................................... 87

COUNT VIII:  BREACH OF CONTRACTS WITH UCB ........................................................ 89

COUNT IX:  BREACH OF CONTRACTS WITH WAMU ........................................................ 92

COUNT X:  BREACH OF CONTRACTS WITH WESTERNBANK ........................................ 97

COUNT XI:  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH  AND
FAIR DEALING ............................................................................................................. 100

COUNT XII:  UNJUST ENRICHMENT/RESTITUTION ...................................................... 101

COUNT XIII:  FRAUD ....................................................................................................... 103

COUNT XIV:  AIDING AND ABETTING FRAUD ................................................................ 108

COUNT XV:  CIVIL CONSPIRACY TO COMMIT FRAUD ................................................. 109

COUNT XVI:  NEGLIGENT MISREPRESENTATION ........................................................ 110

COUNT XVII:  TORTIOUS INTERFERENCE WITH CONTRACT ...................................... 116

COUNT XVIII:  AIDING AND ABETTING TORTIOUS INTERFERENCE WITH
CONTRACT .................................................................................................................... 117

COUNT XIX:  CIVIL CONSPIRACY TO COMMIT TORTIOUS INTERFERENCE
WITH CONTRACT .......................................................................................................... 118

COUNT XX:  TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC
ADVANTAGE .................................................................................................................. 119

COUNT XXI:  AIDING AND ABETTING TORTIOUS INTERFERENCE WITH
PROSPECTIVE ECONOMIC ADVANTAGE .................................................................... 120

COUNT XXII:  CIVIL CONSPIRACY TO COMMIT TORTIOUS INTERFERENCE
WITH PROSPECTIVE ECONOMIC ADVANTAGE .......................................................... 121

COUNT XXIII:  VIOLATIONS OF SHERMAN ACT SECTION 1 ....................................... 122

A.      Relevant Market:  USD Short-Term Interest-Rate Benchmarks ................................... 137

B.      Relevant Market:  OTC USD Interest-Rate Derivatives............................................... 142

C.      Relevant Market:  USD Floating-Rate Retail Loans ..................................................... 144

D.      Relevant Market:  USD Floating-Rate MBS .................................................................. 146

COUNT XXIV:  VIOLATIONS OF THE DONNELLY ACT ................................................. 147

PRAYER FOR RELIEF .................................................................................................... 148

JURY DEMAND ............................................................................................................... 148

## NATURE OF THE CASE

1.    This Complaint arises from the manipulation and depression of bbaLIBOR™, a series of interest-rate benchmarks incorporated in trillions of dollars in interest-rate derivatives and floating-rate loans that played a fundamentally important role in financial systems throughout the world.  According to the Defendant British Bankers Association ("BBA"), bbaLIBOR™ represented the average interest rate paid in the London interbank-loan market by a panel of banks, which during the relevant time period was comprised of many of the largest and most reputable commercial banks in the world.  During the relevant period, 16 banks comprised the panel of banks for bbaLIBOR™ for U.S. dollar ("USD") interbank loans ("Panel Bank Defendants").  Each working day that they were on the panel,[1] the Panel Bank Defendants submitted to the BBA the interest rates that purportedly represented the rates at which the Panel Bank Defendants would be offered USD interbank loans in a competitive market.

2.    The Panel Bank Defendants were not only contributors to USD bbaLIBOR™, they also were among the most important members of the Defendant BBA, active participants in the committees that oversaw bbaLIBOR™, and the most important users of the benchmark in downstream financial markets, such as the markets for USD interest-rate derivatives, floating-rate loans, and floating-rate mortgage-backed securities ("MBS").  While some Defendants have admitted wrongful conduct, most of the facts remain known only to Defendants and the regulatory agencies investigating the manipulation of bbaLIBOR™.

3.    The Federal Deposit Insurance Corporation ("FDIC") is a corporation organized and existing under the laws of the United States of America.  Under the Federal Deposit

---

[1] Most Panel Bank Defendants were on the USD bbaLIBOR™ panel throughout the entire relevant time period. Defendant Société Générale replaced Defendant HBOS on the USD bbaLIBOR™ panel in 2009.  Defendant Portigon joined the USD bbaLIBOR™ panel after acquiring Defendant WestLB AG in 2009.

Insurance Act, the FDIC is authorized to be appointed as receiver for failed insured depository institutions, 12 U.S.C. § 1821(c), including the 38 institutions listed in paragraph 9 (the "Closed Banks"). The FDIC succeeds to, and is empowered to sue and complain in any court of law to pursue, all claims held by banks for which it is the receiver, 12 U.S.C. §§ 1819, 1821(d)(2)(A)(i), including the Closed Banks.

4.     Defendants' wrongful conduct as described in this Complaint caused substantial losses to the Closed Banks. The Closed Banks reasonably expected that accurate representations of competitive market forces, and not fraudulent conduct or collusion among the Defendants, would determine USD bbaLIBOR™ and, consequently, the value of financial instruments tied to USD bbaLIBOR™. The Closed Banks' losses flowed directly from, among other things, the harms to competition caused by the fraud and collusion alleged in this Complaint. The FDIC as Receiver for the Closed Banks ("FDIC-R") seeks to recover for losses that the Closed Banks sustained as a result of this wrongful conduct.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over the claims under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), as well as 28 U.S.C. §§ 1331 and 1337. This Court has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1367 because all of the claims arise from the same facts and circumstances and form part of the same case or controversy.

6.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 pursuant to 12 U.S.C. § 1819(b)(2)(A), which provides that all suits to which the FDIC is a party, in any capacity, shall be deemed to arise under the laws of the United States.

7.     This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and N.Y. C.P.L.R. §§ 301 and 302.  Defendants have deliberately and purposefully conducted business in the United States and in New York.  Defendants are either incorporated in and maintain their principal places of business in the United States, or maintain significant ongoing operations in the United States.  All Defendants transacted business and derived substantial revenue from that business within New York.  Most, if not all, Defendants have offices located in New York and/or have engaged in a regular and continuous course of business in New York.  Some Defendants[2] are resident corporations of New York, with their headquarters or primary places of business located within the state.  Furthermore, all Defendants acted as co-conspirators with each other and performed acts in furtherance of their unlawful conspiracy within New York, and elsewhere in the United States.  As explained below, certain Defendants also entered into interest-rate swap contracts with certain of the Closed Banks, which provide that disputes arising under those contracts will be governed by New York law and which incorporate USD bbaLIBOR™ as the interest-rate benchmark.  Certain of the contracts also include jurisdiction and forum-selection clauses naming courts in New York, including the United States District Court for the Southern District of New York, as the fora in which claims arising out of those contracts shall be brought.  Defendants therefore purposefully availed themselves of the privilege of conducting activities in the United States and New York in connection with the wrongful activities described in this Complaint.

8.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 and Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15, 22).  All Defendants maintain

---

[2] The following Defendants are headquartered in New York:  Merrill Lynch Capital Services, Inc.; Citigroup, Inc.; Citibank, N.A.; Citigroup Financial Products, Inc.; JPMorgan Chase & Co.; and Bear Stearns Capital Markets, Inc. Defendant HSBC Bank USA, N.A. has its principal place of business in New York and Defendant Deutsche Bank AG maintains a "regional head office" in New York.

offices or agents, transact business, or are found within the Southern District of New York.  The

interstate commerce giving rise to the claims described in this Complaint was carried out, in part,

within the Southern District of New York.  Defendants performed acts in furtherance of their

conspiracy within the Southern District of New York and elsewhere that were intended to affect,

and did affect, the Closed Banks and others located within the Southern District of New York.

## PARTIES

9.     The Plaintiff is the FDIC-R, which comprises the 38 separate and distinct

receiverships for the Closed Banks identified in subparagraphs (a)-(ll) below.  The FDIC-R is

empowered to pursue claims held by the Closed Banks, including the claims against the

Defendants in this action.

>  a.     On April 23, 2010, the FDIC was duly appointed as receiver for Amcore
>         Bank, N.A. ("Amcore"), Rockford, Illinois.
>
>  b.     On December 4, 2009, the FDIC was duly appointed as receiver for AmTrust
>         Bank ("AmTrust"), Cleveland, Ohio.
>
>  c.     On May 21, 2009, the FDIC was duly appointed as receiver for BankUnited,
>         F.S.B. ("BankUnited"), Coral Gables, Florida.
>
>  d.     On October 30, 2009, the FDIC was duly appointed as receiver for California
>         National Bank ("Cal. National"), Los Angeles, California.
>
>  e.     On August 14, 2009, the FDIC was duly appointed as receiver for Colonial
>         Bank ("Colonial"), Montgomery, Alabama.
>
>  f.     On October 21, 2011, the FDIC was duly appointed as receiver for
>         Community Banks of Colorado ("Cmty. of Co."), Greenwood Village,
>         Colorado.

g.  On September 11, 2009, the FDIC was duly appointed as receiver for Corus Bank, N.A. ("Corus"), Chicago, Illinois.

h.  On November 21, 2008, the FDIC was duly appointed as receiver for Downey Savings and Loan Association, F.A. ("Downey"), Newport Beach, California.

i.  On April 30, 2010, the FDIC was duly appointed as receiver for Eurobank ("Eurobank"), San Juan, Puerto Rico.

j.  On January 28, 2011, the FDIC was duly appointed as receiver for First Community Bank ("First Cmty."), Taos, New Mexico.

k.  On December 18, 2009, the FDIC was duly appointed as receiver for First Federal Bank of California, F.S.B. ("First Fed."), Santa Monica, California.

l.  On September 13, 2013, the FDIC was duly appointed as receiver for First National Bank ("First National"), Edinburg, Texas.

m.  On January 29, 2010, the FDIC was duly appointed as receiver for First Regional Bank ("First Regional"), Los Angeles, California.

n.  On April 30, 2010, the FDIC was duly appointed as receiver for Frontier Bank ("Frontier"), Everett, Washington.

o.  On September 25, 2009, the FDIC was duly appointed as receiver for Georgian Bank ("Georgian"), Atlanta, Georgia.

p.  On August 21, 2009, the FDIC was duly appointed as receiver for Guaranty Bank ("Guaranty"), Austin, Texas.

q.  On October 22, 2010, the FDIC was duly appointed as receiver for Hillcrest Bank ("Hillcrest"), Overland Park, Kansas.

r.     On December 18, 2009, the FDIC was duly appointed as receiver for Imperial Capital Bank ("Imperial"), La Jolla, California.

s.     On July 11, 2008, the FDIC was duly appointed as receiver for IndyMac Bank, F.S.B. ("IndyMac"), Pasadena, California.

t.     On July 29, 2011, the FDIC was duly appointed as receiver for Integra Bank, N.A. ("Integra"), Evansville, Indiana.

u.     On September 18, 2009, the FDIC was duly appointed as receiver for Irwin Union Bank and Trust Company ("Irwin"), Columbus, Indiana.

v.     On February 19, 2010, the FDIC was duly appointed as receiver for La Jolla Bank, F.S.B. ("La Jolla"), La Jolla, California.

w.     On August 19, 2011, the FDIC was duly appointed as receiver for Lydian Private Bank ("Lydian"), Palm Beach, Florida.

x.     On May 14, 2010, the FDIC was duly appointed as receiver for Midwest Bank and Trust Company ("Midwest"), Elmwood Park, Illinois.

y.     On November 13, 2009, the FDIC was duly appointed as receiver for Orion Bank ("Orion"), Naples, Florida.

z.     On October 30, 2009, the FDIC was duly appointed as receiver for Pacific National Bank ("Pacific National"), San Francisco, California.

aa.     On October 30, 2009, the FDIC was duly appointed as receiver for Park National Bank ("Park National"), Chicago, Illinois.

bb.     On November 21, 2008, the FDIC was duly appointed as receiver for PFF Bank & Trust ("PFF"), Pomona, California.

cc.   On April 30, 2010, the FDIC was duly appointed as receiver for R-G Premier Bank of Puerto Rico ("Premier"), Hato Rey, Puerto Rico.

dd.   On April 16, 2010, the FDIC was duly appointed as receiver for Riverside National Bank of Florida ("Riverside"), Fort Pierce, Florida.

ee.   On October 30, 2009, the FDIC was duly appointed as receiver for San Diego National Bank ("San Diego National"), San Diego, California.

ff.   On May 1, 2009, the FDIC was duly appointed as receiver for Silverton Bank, N.A. ("Silverton"), Atlanta, Georgia.

gg.   On April 15, 2011, the FDIC was duly appointed as receiver for Superior Bank ("Superior"), Birmingham, Alabama.

hh.   On June 4, 2010, the FDIC was duly appointed as receiver for TierOne Bank ("TierOne"), Lincoln, Nebraska.

ii.   On November 6, 2009, the FDIC was duly appointed as receiver for United Commercial Bank ("UCB"), San Francisco, California.

jj.   On January 21, 2011, the FDIC was duly appointed as receiver for United Western Bank ("United Western"), Denver, Colorado.

kk.   On September 25, 2008, the FDIC was duly appointed as receiver for Washington Mutual Bank ("WaMu"), Henderson, Nevada.

ll.   On April 30, 2010, the FDIC was duly appointed as receiver for Westernbank Puerto Rico ("Westernbank"), Mayaguez, Puerto Rico.

10.     Defendant Bank of America Corporation is a Delaware corporation headquartered in Charlotte, North Carolina.  Bank of America Corporation was at all relevant times a member of the USD bbaLIBOR™ panel.  Several subsidiaries of Bank of America Corporation engaged in financial transactions incorporating USD bbaLIBOR™ with the Closed Banks, including: Defendant Bank of America, N.A. (the successor-in-interest to Bank of America National Trust & Savings Association), a Delaware corporation with offices in New York; Merrill Lynch & Co., a Delaware corporation with offices in New York; Merrill Lynch Capital Services, Inc., a Delaware corporation headquartered in New York; and Merrill Lynch International Bank Ltd., a corporation based in Ireland.  Defendants Bank of America Corporation, Bank of America, N.A., Merrill Lynch & Co., Merrill Lynch Capital Services, Inc., and Merrill Lynch International Ltd. are referenced collectively in this Complaint as "Bank of America."  Bank of America operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.  Bank of America participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

11.     Defendant Barclays Bank plc ("Barclays") is a United Kingdom public limited company headquartered in London, England, with two offices in New York.  Barclays was at all relevant times a member of the USD bbaLIBOR™ panel.  Barclays operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[3]  Barclays also engaged in financial transactions incorporating USD bbaLIBOR™ with certain of the Closed Banks.  Barclays participated in the wrongful conduct alleged in this

---

[3] *See Barclays in the USA*, Barclays, http://www.barclays.com/about-barclays/around-the-world/usa.html (last visited Oct. 1, 2014).

Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

12.    The BBA is a trade association based in the United Kingdom.  Throughout the 2000s, the BBA owned bbaLIBOR™.  The BBA was governed by a Board, which officially met four times per year, comprised of the BBA Chief Executive and Chief Executives of other Panel Bank Defendants.  Through 2010, the Foreign Exchange and Money Markets ("FX & MM") Committee of the BBA—whose members included representatives of at least several Panel Bank Defendants—had sole responsibility for all aspects of the functioning and development of bbaLIBOR™.  Defendant BBA Enterprises Ltd. is a wholly owned subsidiary of the BBA located in London.  In late 2009, the BBA incorporated a new legal subsidiary, Defendant BBA LIBOR Ltd., to govern bbaLIBOR™.[4]

13.    As set forth more fully below, the BBA advertised bbaLIBOR™ and solicited business in the United States, including in the Southern District of New York.  In 2007, the BBA sought and obtained a trademark for bbaLIBOR™ from the United States Patent and Trademark Office (Registration No. 3212218).  At all times relevant to the claims asserted herein, the BBA electronically communicated news and information through its Internet websites (www.bba.org, www.bbalibor.org), the Thomson Reuters website (reuters.com), the Wall Street Journal, and through other data vendor websites including International Data Corp. ("IDC"), which maintains an office in New York.[5]  At all times relevant to the claims asserted herein, the BBA also published bbaLIBOR™ data to more than one million computer screens around the world,

---

[4] David Enrich & Max Colchester, *Before Scandal, Clash over Control of Libor*, Wall St. J., Sept. 11, 2012, http://online.wsj.com/article/SB10000872396390443847404577631404235329424.html.

[5] *See, e.g.*, *Frequently Asked Questions (FAQs)*, BBA Libor, https://web.archive.org/web/20110303121338/ http://www.bbalibor.com/bbalibor-explained/faqs (last visited Oct. 1, 2014); *Worldwide Offices*, IDC, http://www. idc.com/about/wwoffices.jsp#.UTkzDo6BBMY (last visited Oct. 1, 2014).

including in the United States and the Southern District of New York.[6]   In 2009, the BBA

launched a Twitter social media news feed to bypass the print media[7] because interest in LIBOR

had soared "since so many loans are linked to it."[8]   The BBA maintained a Facebook page

accessible from the Southern District of New York (https://www.facebook.com/BritishBankers).

The BBA also demanded that any entity that sought to use bbaLIBOR™ for a commercial

purpose first obtain a license from the BBA.[9]   On information and belief, the BBA participated in

the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and

affiliates in the Southern District of New York and elsewhere in the United States.

      14.     Defendant Citigroup, Inc. is a Delaware corporation headquartered in New York,

New York.  Citigroup, Inc., or its wholly owned subsidiary, Defendant Citibank, N.A., which is

headquartered in New York, was at all relevant times a member of the USD bbaLIBOR™ panel.

Several wholly owned subsidiaries of Citigroup, Inc. engaged in financial transactions

incorporating bbaLIBOR™ with the Closed Banks, including Defendant Citibank, N.A. and

Defendant Citigroup Financial Products, Inc., which also is headquartered in New York.

Defendants Citigroup, Inc., Citibank, N.A., and Citigroup Financial Products, Inc. are referenced

collectively in this Complaint as "Citigroup."  Citigroup operated in the United States directly or

through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.

Citigroup participated in the wrongful conduct alleged in this Complaint both directly and

---

[6] *See Frequently Asked Questions (FAQs)*, *supra* note 5.

[7] *See BBA LIBOR*, Capital Markets Bull., June 2009, at 5, attached as Exhibit 1 and incorporated into this Complaint by reference.

[8] Press Release, BBA, BBA LIBOR:  The World's Most Important Number Now Tweets Daily (May 21, 2009), attached as Exhibit 2 and incorporated into this Complaint by reference.

[9] *Licensing*, BBA Libor, http://web.archive.org/web/20111210044943/http://www.bbalibor.com/licencing (last visited Oct. 1, 2014).  The BBA's licensing records do not appear to be publicly available.

through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

15.     Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A. ("Rabobank") is a financial services provider with its headquarters in Utrecht, the Netherlands, and an office in New York.  Rabobank was at all relevant times a member of the USD bbaLIBOR™ panel. Rabobank operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[10]  Rabobank participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

16.     Defendant Credit Suisse Group AG is a Swiss company headquartered in Zurich, Switzerland.  Credit Suisse Group AG was at all relevant times a member of the USD bbaLIBOR™ panel.  Several subsidiaries of Credit Suisse Group AG engaged in financial transactions incorporating USD bbaLIBOR™ with the Closed Banks, including Defendant Credit Suisse International (f.k.a Credit Suisse First Boston International and Credit Suisse Financial Products), which has an office in New York.  Defendants Credit Suisse Group AG and Credit Suisse International are referenced collectively in this Complaint as "Credit Suisse." Credit Suisse operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[11]  Credit Suisse participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

---

[10] *See, e.g.*, *Rabobank Group United States of America*, Rabobank Grp., https://www.rabobank.com/en/locate-us/americas/usa.html (last visited Oct. 1, 2014).

[11] *See, e.g.*, *Office Locator*, Credit Suisse, https://www.credit-suisse.com/who_we_are/en/office_locator.jsp (last visited Oct. 1, 2014).

17.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany, with numerous offices including a regional head office in New York.  Deutsche Bank was at all relevant times a member of the USD bbaLIBOR™ panel.  Deutsche Bank engaged in financial transactions incorporating USD bbaLIBOR™ with the Closed Banks.  Deutsche Bank operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[12] Deutsche Bank participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

18.     Defendant HSBC Holdings plc is a United Kingdom public limited company headquartered in London, England.  HSBC Holdings plc was at all relevant times a member of the USD bbaLIBOR™ panel.  Several subsidiaries of HSBC Holdings plc engaged in financial transactions incorporating USD bbaLIBOR™ with the Closed Banks, including Defendant HSBC Bank USA, N.A., a national banking association with its principal office located in New York,[13] and Defendant The Hongkong and Shanghai Banking Corporation Ltd., a Hong Kong limited liability corporation.[14]  Defendants HSBC Holdings plc, HSBC Bank USA, N.A., and The Hongkong and Shanghai Banking Corporation Ltd. are referenced collectively in this Complaint as "HSBC."  HSBC operated in the United States directly, or through its wholly

---

[12] *See, e.g.*, *Location Finder*, Deutsche Bank, https://secure.deutsche-bank.de/cc/locationsfinder/en/welcome2.do?country=USA (last visited Oct. 1, 2014).

[13] *See, e.g.*, *Fact Sheet*, HSBC Bank USA, Nat'l Ass'n, http://www.us.hsbc.com/1/PA_1_083Q9FJ08A002FBP5S00000000/content/new_usshared/shared_fragments/pdf/hbus_factsheet_0912.pdf (last visited Oct. 1, 2014).

[14] *See, e.g.*, The Hongkong & Shanghai Banking Corp. Ltd., Annual Report and Accounts 2012, at 1 (2012), *available at* http://vpr.hkma.gov.hk/pdf/100002/ar_12/ar_12_pt01.pdf.

owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[15]  HSBC participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

19.  Defendant JPMorgan Chase & Co. is a Delaware corporation headquartered in New York.  JPMorgan Chase & Co. was at all relevant times a member of the USD bbaLIBOR™ panel.  Several subsidiaries of JPMorgan Chase & Co. engaged in financial transactions incorporating USD bbaLIBOR™ with the Closed Banks, including:  Defendant JPMorgan Chase Bank, N.A., a national banking association principally located in Columbus, Ohio with numerous locations in New York; Defendant Bear Stearns Capital Markets, Inc., a Delaware corporation headquartered in New York; Defendant J.P. Morgan Markets Ltd. (f.k.a. Bear Stearns International Ltd.), a company based in London, United Kingdom; and Defendant J.P. Morgan Bank Dublin plc (f.k.a. Bear Stearns Bank plc), a company based in Dublin, Ireland. Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., Bear Stearns Capital Markets, Inc., J.P. Morgan Markets Ltd., and J.P. Morgan Bank Dublin plc are referenced collectively in this Complaint as "JPMorgan."  JPMorgan operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.  JPMorgan participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

---

[15] *See, e.g.*, *Country Contacts*, HSBC Holdings plc, http://www.hsbc.com/about-hsbc/structure-and-network/ country-contacts#USA (last visited Oct. 1, 2014).

20.     Defendant Lloyds Banking Group plc is a United Kingdom public limited company headquartered in London, England, with an office in New York.  Lloyds Banking Group plc was formed in 2009 through the acquisition of Defendant HBOS plc ("HBOS") by Defendant Lloyds TSB Bank plc.  Prior to 2009, HBOS and Lloyds TSB Bank plc were members of the USD bbaLIBOR™ panel.  Lloyds Banking Group plc joined the USD bbaLIBOR™ panel upon its formation in 2009.  Defendants Lloyds Banking Group plc, HBOS plc, and Lloyds TSB Bank plc are referenced collectively in this Complaint as "Lloyds."  Lloyds operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[16]  Lloyds participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

21.     Defendant Société Générale is a French banking corporation, headquartered in Paris, France, with an office in New York.  Société Générale replaced HBOS on the USD bbaLIBOR™ panel on February 9, 2009.  Société Générale operated in the United States directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[17]  Société Générale participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

22.     Defendant The Norinchukin Bank ("Norinchukin") is a Japanese cooperative bank headquartered in Tokyo, Japan, with an office in New York.  Norinchukin was at all

---

[16] *See, e.g.*, *International Locations*, Lloyds Banking Grp., http://www.lloydsbank-careers.com/view/263/international-locations.html (last visited Oct. 1, 2014).

[17] *See, e.g.*, *Our Locations*, Société Générale Grp., http://www.societegenerale.com/en/about-us/our-businesses/our-locations (last visited Oct. 1, 2014).

relevant times a member of the USD bbaLIBOR™ panel.  Norinchukin is one of Japan's largest

institutional investors and has a reputation as Japan's largest hedge fund.  Norinchukin operated

in the United States directly or through its wholly owned and/or controlled subsidiaries,

affiliates, agents, and predecessors.[18]  Norinchukin participated in the wrongful conduct alleged

in this Complaint both directly and through its subsidiaries and affiliates in the Southern District

of New York and elsewhere in the United States.

    23.    Defendant Royal Bank of Canada ("RBC") is the largest financial institution in

Canada and is headquartered in Toronto, Canada, with affiliates in New York.  RBC was at all

relevant times a member of the USD bbaLIBOR™ panel.  RBC operated in the United States

directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and

predecessors.[19]  RBC engaged in financial transactions incorporating USD bbaLIBOR™ with the

Closed Banks.  RBC participated in the wrongful conduct alleged in this Complaint both directly

and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in

the United States.

    24.    Defendant The Royal Bank of Scotland plc ("RBS") is a United Kingdom public

limited company headquartered in Edinburgh, Scotland, with an office in New York.  RBS was

at all relevant times a member of the USD bbaLIBOR™ panel.  RBS engaged in financial

transactions incorporating USD bbaLIBOR™ with the Closed Banks.  RBS operated in the

United States directly or through its wholly owned and/or controlled subsidiaries, affiliates,

---

[18] *See, e.g.*, *Global Network*, The Norinchukin Bank, http://www.nochubank.or.jp/en/about/globalnetwork.html (last visited Oct. 1, 2014).

[19] *See, e.g.*, *RBC Companies*, RBC Bank, http://www.rbcbank.com/about-rbc-bank/rbc-companies/index.html (last visited Oct. 1, 2014).

agents, and predecessors.[20] RBS participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

25. Defendant The Bank of Tokyo-Mitsubishi UFJ Ltd. ("BTMU") is a Japanese subsidiary of Mitsubishi UFJ Financial Group, Inc. and is headquartered in Tokyo, Japan, with an office in New York. BTMU was at all relevant times a member of the USD bbaLIBOR™ panel. BTMU operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[21] BTMU participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

26. Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland, with offices in New York. UBS was at all relevant times a member of the USD bbaLIBOR™ panel. UBS was formed in 1998 through the merger of Swiss Bank Corporation and the Union Bank of Switzerland. UBS engaged in financial transactions incorporating USD LIBOR with the Closed Banks. UBS operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[22] UBS participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

---

[20] *See, e.g.*, *Where We Do Business*, RBS, http://www.rbs.com/about/worldwide-locations.html (last visited Oct. 1, 2014).

[21] *See, e.g.*, *Global Network—The Americas*, Bank of Tokyo-Mitsubishi UFJ, http://www.bk.mufg.jp/global/globalnetwork/americas/index.html (last visited Oct. 1, 2014).

[22] *See, e.g.*, *UBS Location Finder*, UBS, http://apps1.ubs.com/locationfinder/searchForm.do?GeoEntityId=3&GeoEntityType=3 (last visited Oct. 1, 2014).

27.     WestLB AG was a German joint stock company headquartered in Dusseldorf, Germany.  Defendant Portigon AG is a German company headquartered in Dusseldorf, Germany, with an office in New York, which acquired WestLB AG in 2009.  Prior to 2009, WestLB AG was a member of the USD bbaLIBOR™ panel.  Portigon joined the USD bbaLIBOR™ panel after acquiring WestLB AG.  WestLB AG and Defendant Portigon AG are referenced collectively in this Complaint as "Portigon."  Portigon engaged in financial transactions incorporating USD bbaLIBOR™ with the Closed Banks.  Portigon operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[23]  Portigon participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

28.     The acts charged in this Complaint as having been done by Defendants were authorized, ordered, or done by their officers, directors, agents, employees, or representatives, while actively engaged in the management of Defendants' businesses or affairs.

29.     Various other individuals, companies, corporations, partnerships, associations, and other entities, the identities of which are unknown to the FDIC-R and were unknown to the Closed Banks, and which cannot at present be named as defendants in this action, may have participated as co-conspirators with Defendants in the unlawful conduct alleged in this Complaint, and/or performed substantial acts and made statements in the Southern District of New York in furtherance of the alleged violations.

---

[23] *See, e.g.*, *Our Locations*, Portigon Fin. Servs., http://www.portigon.com/cm/content/portigon/i/en/ueber-portigon/standorte.html (last visited Oct. 1, 2014).

30.     At all relevant times, Defendants were acting as the agents, employees, co-conspirators, and/or representatives of their respective "affiliates" and of each other, and were acting within the course and scope of their agency, employment, and/or conspiracy with the full knowledge, consent, permission, authorization, and ratification, either express or implied, of each of their respective affiliates and of each other, in performing the acts alleged in this Complaint.

## BACKGROUND

31.     Banks compete in a number of markets.  Among other markets, they compete in the markets for cash in specific currencies.  For example, there is a market for U.S. dollars. Banks compete to obtain U.S. dollars principally through customer deposits and short-term wholesale funds.  To obtain U.S. dollars through those means, banks must agree to pay an interest rate.[24]  Banks compete to obtain short-term wholesale funds from, among other sources, major financial institutions, including each other.[25]  Banks also compete in the markets for interest-rate derivatives, loans to businesses and consumers ("retail loans"), and the purchase and sale of MBS.

### A.     Interest Rate Fundamentals

32.     Absent collusion, interest rates are set in arms-length negotiations between a lender with cash and a borrower in need of cash.  The interest rate charged by the lender is the price the lender charges to let the borrower use the cash for a period of time.  An interest rate has two basic components:  the "risk-free rate," which represents the return that a lender will expect

---

[24] *See, e.g.*, Bank of Am., 2008 Annual Report, at 56 (2008), *available at* http://media.corporate-ir.net/media_files/irol/71/71595/reports/2008_AR.pdf.

[25] *See, e.g.*, Barclays PLC, Annual Report 2009, at 131 (2009), *available at* http://www.barclays.com/content/dam/barclayspublic/docs/InvestorRelations/AnnualReports/AR2009/barclays-plc-annual-report-2009.pdf ("Important factors in assuring liquidity are competitive rates and the maintenance of depositors' confidence.").

for losing access to its funds for a period of time (i.e., the time-value of money), and a "risk premium," which compensates the lender for the risk that the borrower will not fully repay the loan on time.  Absent collusion, and all else being equal, lenders will charge a higher risk premium to borrowers with lower relative creditworthiness.  In fact, a financial entity's ability to access short-term wholesale funds at all will depend on its creditworthiness.

33.     In a competitive market, the interest rate that banks pay for short-term wholesale funds is negotiated at arm's length and accounts for the factors described above.  For example, all else being equal, a bank that receives a credit downgrade will have to pay higher interest rates for short-term wholesale funds than it would have to pay absent the downgrade.[26]  Short-term wholesale loans can be secured or unsecured.  Unsecured wholesale loans are backed only by the borrowing bank's creditworthiness.  During the relevant period, Defendants held out bbaLIBOR™ as a reliable index that measured competitive interest rates for unsecured interbank loans, which market participants referred to as the bank's "cost of funds."[27]

34.     By the mid-2000s, the London interbank market had been a major source of cash for banks seeking to fund USD loans for more than 30 years.  The London interbank market enabled banks in need of cash to obtain deposits of U.S. dollars ("Eurodollar deposits"), either on an overnight basis or for fixed terms (typically, one, two, three, or six months), from banks with excess cash.

---

[26] *See, e.g.*, *id.* at 130-32.

[27] *See, e.g.*, Martin Wheatley, *The Wheatley Review of LIBOR:  Final Report* 82 (2012), *available at* https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/191762/wheatley_review_libor_finalreport_280912.pdf (hereinafter "Wheatley Final Report").

35.     A bank's "liquidity" is determined by the amount of cash that it has, or can raise quickly, to pay off its debts.[28]  Banks also compete in the capital markets for longer-term assets. Longer-term assets, such as residential mortgages, tend to pay higher rates of return[29] but are less "liquid" than cash.  A bank's profitability rests on its ability to attract money through customer deposits and short-term assets and to invest (lend) that money in longer-term assets that pay higher interest rates.

**B.     The Role of Indices and Benchmarks in Financial Markets**

36.     An index is a statistical measure, typically of price or quantity, calculated from a representative set of underlying data.[30]  Index providers invest significant amounts of time and money to develop and market financial indices.  The market for financial indices is competitive, with providers differentiating their indices through incremental improvements and innovation.[31] As stated by an association representing the benchmark industry:  "A well-functioning benchmark industry is one in which index administrators have an incentive to invest continuously in innovation . . . .  Without this incentive, innovation and competition in the industry is likely to decrease."[32]

---

[28] An asset is liquid if the market in which it is traded has many buyers and sellers and the asset is bought and sold frequently with low transaction costs.  All else equal, the more liquid an asset is relative to alternative assets, the greater the demand will be for that asset and, consequently, it will be priced higher.  Frederic S. Mishkin, The Economics of Money, Banking, and Financial Markets 90 (3d. ed. 2013).

[29] For example, mortgage lenders sometimes charge a premium over bbaLIBOR™, usually in the form of a set rate on top of bbaLIBOR™.

[30] *Commission Staff Working Document, Impact Assessment Accompanying the Document Proposal for a Regulation of the European Parliament and of the Council on Indices Used as Benchmarks in Financial Instruments and Financial Contracts*, at 1, SWD (2013) 336 final (Sep. 18, 2013).

[31] *See, e.g.*, BlackRock, *Response to Consultation Document on the Regulation of Indices* 17 (Nov. 29, 2012), *available at* https://www2.blackrock.com/webcore/litService/search/getDocument.seam?source=LITLIST &contentId=1111178048&venue=pub_ind (hereinafter "BlackRock Resp.").

[32] Deutsche Börse Group, *White Paper on the Benchmark Industry* 16-17 (Dec. 2013), *available at* https://deutsche-boerse.com/dbg/dispatch/en/binary/gdb_content_pool/imported_files/public_files/10_downloads/11_about_us/ Public_Affairs/The_benchmark_industry_1213.pdf (hereinafter "*The Benchmark Industry*"); *see also* BlackRock Resp., *supra* note 31, at 17 ("We note that significant investment and research is involved in creating and calculating

37.     By providing reliable information to market participants, financial indices promote what economists refer to as "price discovery"—the process by which parties to a transaction come to an agreement on a price for a given product.  In economics, "perfect competition" involves a market in which, among other things, buyers and sellers equally have all relevant information about the market.  All else being equal, when consumers have more information about a product, they will receive higher quality and lower prices than when they are deprived of information or given false information.

38.     If an index is used as a reference price for a financial instrument or a financial contract, it becomes a benchmark.[33]  There are four main types of players in benchmark markets: (1) those that contribute the data ("contributors"); (2) administrators who provide the benchmark ("providers"); (3) institutions that issue products that incorporate the benchmark ("issuers"); and (4) end users.

39.     Absent collusion, the forces of competition choose financial benchmarks.[34]  Thus, providers in a competitive market will only succeed in creating commercially viable benchmarks

---

indices and it is a competitive market place with providers differentiating through incremental improvements and innovation.").

[33] *Proposal for a Regulation of the European Parliament and of the Council on Indices Used as Benchmarks in Financial Instruments and Financial Contracts*, at 2, COM (2013) 641 final (Sept. 18, 2013) (hereinafter "EC Proposal"); Wheatley Final Report, *supra* note 27, at 54.

[34] *See, e.g.*, Argus Media, *Response to Consultation Document on the Regulation of Indices* 15, *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/argus_en.pdf  (last visited Oct. 1, 2014) (hereinafter "Argus Resp.") ("[T]he choice of benchmarks for financial contract must be largely market driven."); BDEW, *Position Paper on European Commission's Consultation Document on the Regulation of Indices* 2 (Nov. 15, 2012), *available at* http://ec.europa.eu/internal_market/consultations/—2012/ benchmarks/registered-organisations/bdew-en_en.pdf ("[M]arket participants know best, which index is efficient and fits best for their needs."); Blackrock Resp., *supra* note 31, at 15 (competition gives end-users options "and the recourse to change providers if governance and transparency are deemed to be insufficient"); Euribor-EBF, *Response to the European Commission Consultation Document on the Regulation of Indices* 21 (Nov. 28, 2012), *available at* http://www.emmi-benchmarks.eu/assets/files/D2161C-2012-Euribor-EBF%20response%20to%20 the%20EC%20Consultation%20on%20the%20Regulation%20of%20Indices_clean.pdf; Federation Bancaire Francaise, *Response to the European Commission Consultation Document for the Regulation of the Production and Use of Indices* 3, *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/fbf_en.pdf  (last visited Oct. 1, 2014) ("[T]he choice of alternative benchmarks should be market-led,

if they provide accurate and reliable data, establish appropriate governance structures, and provide sufficient transparency around their methodology and data inputs.[35]  If a benchmark does not command the confidence of all participants in the market, parties will cease to use it.  As one index provider recently wrote:  "Absent fraud and collusion . . . financial markets, investors, consumers and government agencies will efficiently rout poorly constructed benchmarks and condemn . . . illogical/ill-conceived uses of benchmarks."[36]

40.     Because the actual market or economic reality is likely to change over time, benchmark providers in a competitive market regularly reassess key terms of, and inputs to, a financial benchmark to ensure that the benchmark still provides a reliable representation of the actual market or economic reality that the benchmark is intended to measure.[37]  For example, absent collusion, Defendants would have re-evaluated the reliance of bbaLIBOR™ on unsecured interbank loan interest rates as the sole source of input data.  Recent proposals to improve bbaLIBOR™ include provisions to corroborate unsecured interbank loan interest rates with actual transaction data and by referencing other forms of wholesale funding.

with users choosing the best alternatives for their needs."); Finance Watch, *Response to Consultation Document on the Regulation of Indices* 16 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/finance-watch_en.pdf ("A self-regulation principle will state that competition will let the 'best' benchmarks impose themselves.").  Even the BBA has advocated for choice in the market for interest-rate benchmarks.  *See* BBA, LIBOR—Update (Mar. 5, 2012) , *available at* http://www.betterregulation.com/doc/2/128582 (quoting Ian Mair, then Chairman of the London Money Market Ass'n, as saying that "It is important that all market participants have a choice of benchmarks.").

[35] *See* Markit, *Response to Consultation Document on the Regulation of Indices* 11 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/markit_en.pdf (hereinafter "Markit Resp."); *The Benchmark Industry*, *supra* note 32, at 15 ("Indices are only beneficial if users can trust them fully.").

[36] Russell Indexes, *Response to Consultation Document on the Regulation of Indices* 9 (July 2012), *available at* https://www.russell.com/documents/indexes/eu-commission-consultation-response.pdf (hereinafter "Russell Resp."); *see also* BlackRock Resp., *supra* note 31, at 3 ("[B]ecause of competition and innovation in the marketplace, index providers will be incentivised through market forces to ensure their products are of a certain quality and viable indices for the end investor.").

[37] Bd. Int'l Org. Sec. Comm'ns [IOSCO], *Financial Benchmarks Consultation Report*, at 25, IOSCO Doc. CR01/13 (Jan. 2013), *available at* http://www.iosco.org/library/pubdocs/pdf/IOSCOPD399.pdf (hereinafter "IOSCO Consultation Report"); EC Proposal, *supra* note 33, at 8.

41.     In a competitive market, issuers and end users choose financial benchmarks based on how they weigh various quality factors.[38] First, will the benchmark serve its intended purpose?[39] If not, issuers and end users will not use it.

42.     Second, is the benchmark anchored in observable transactions or high-quality data? Absent collusion, issuers and users demand input data that is sufficient to represent the actual market or economic reality that the benchmark is intended to measure.[40] For interest-rate benchmarks in particular, users want input data that is formed by competitive supply and demand conditions.[41]

43.     Third, does the benchmark provide a clearly defined calculation methodology that users can replicate and predict? Transparency as to what benchmarks measure and their most relevant characteristics is critical because it allows issuers and end users to make correct assessments about whether to choose a particular benchmark.[42] Market transparency is a "core principle" because "the market demands it."[43]

---

[38] *See* ICAP, *Response to the European Commission Consultation on the Regulation of Indices* 4 (Nov. 27, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/icap_en.pdf (hereinafter "ICAP Resp.").

[39] EC Proposal, *supra* note 33, at 2.

[40] *Id.* at 15-16; Wheatley Final Report, *supra* note 27, at 55-56.

[41] IOSCO, *Principles for Financial Benchmarks: Final Report*, at 10, 20, 33, IOSCO Doc. FR07/13 (July 2013), *available at* http://www.iosco.org/library/pubdocs/pdf/IOSCOPD415.pdf (hereinafter "IOSCO Principles"); Market Participants Grp. on Reforming Interest Rate Benchmarks, Final Report 28 (Mar. 2014) ("Rates should be based on prices formed by competitive supply and demand and anchored in observable transactions.").

[42] *See, e.g.*, *The Benchmark Industry*, *supra* note 32, at 5-6 (index should be fully replicable and completely transparent); AFG, *Response to the European Commission's Consultation on the Regulation of Indices* 3 (Nov. 29, 2012); Amundi, *Answer to E.C.'s Consultation Document on the Regulation of Indices* 2 (Nov. 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/amundi_en.pdf; Wheatley Final Report, *supra* note 27, at 55-56.

[43] S&P Dow Jones Indices, *Response to Consultation Document on the Regulation of Indices* ¶ 6 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/individual-others/s-p-dow-jones-indices_en.pdf ; Markit Resp., *supra* note 35, at 11 ("[C]ommercial benchmark providers will only succeed in creating commercially viable products if they manage to provide accurate and reliable data, establish appropriate governance structures, and provide sufficient transparency around their methodology and data inputs."); *The Benchmark Industry*, *supra* note 32, at 15 ("End customers . . . need transparency about the index methodology to

44.     Fourth, will the benchmark be published by a provider with high professional standards and proven experience and does the benchmark have controls in place to deter manipulation and ensure that rates are properly calculated in accordance with the published methodology?  If not, issuers and end users will avoid the benchmark as insufficiently trustworthy.[44]

45.     Absent collusion, "if benchmarks are found wanting, the market will migrate towards an alternative through choice."[45]  As a result, absent a conspiracy, providers seek to provide the most reliable and accurate indices "in order to retain a competitive advantage in the marketplace."[46]

### C.    The Role of Interest-Rate Benchmarks in Lending

46.     Lenders can offer loans at fixed or floating rates.  In a fixed-rate loan, the interest rate stays the same through the term of the loan.  As the term increases, however, so does the risk that market-wide interest rates will go up, leaving the lender with an asset paying below market rates.  In a competitive market, the price of a fixed-rate loan reflects these risks.

47.     In a floating-rate loan, the interest rate can change over time as determined by an agreed-upon benchmark.  This allows the lender to transfer the risk of market-wide changes in

---

understand what the index is measuring."); Barclays, *Response to the Wheatley Review of Libor:  Initial Discussion Paper* 2 (Sept. 6, 2012) ("It is essential that the market has access to benchmarks that are well-constructed, transparent, and that inspire the confidence of both market participants and regulators.")  Transparency enhances investor protection.  EC Proposal, *supra* note 33, at 9.

[44] *See, e.g.*, Wheatley Final Report, *supra* note 27, at 55-56; Argus Resp., *supra* note 34, at 2 ("Continued commercial success in this competitive marketplace is directly related to the integrity of an organisation's services.").

[45] ICAP Resp., *supra* note 38, at 9.

[46] Index Indus. Ass'n, *Response to Consultation Document—Regulation of Indices* 6 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/index-industry-association_en.PDF.

interest rates to the borrower.  This in turn allows the lender to charge a lower interest rate at the outset of the floating-rate loan.

48.     Lenders in a competitive market should gravitate toward interest-rate benchmarks that reliably represent a bank's actual cost of funds because that enables them to pass those costs on to borrowers and lock in a profit.  For example, a lender may offer a 20-year loan at its cost-of-funds plus a margin.[47]

### D.     The Role of Interest-Rate Benchmarks in Derivatives

49.     A floating-rate loan reduces a lender's risk that interest rates will increase (and increases the risk that rates will decrease), but it transfers that same risk to borrowers.  The market for interest-rate derivatives provides a way for borrowers to transfer interest-rate risk to third parties for a price.  An interest-rate derivative is a derivative where the underlying asset is the right to pay or receive a principal amount of money at a given interest rate.  For example, a borrower may accept a floating-rate loan tied to an interest-rate benchmark and contemporaneously enter into a contract with a third party where the borrower agrees to make fixed-rate payments in exchange for floating interest rates tied to the same benchmark—an interest-rate swap.  Through this "hedging" strategy, the borrower has effectively converted its floating-rate loan into a fixed-rate one.  The ability to hedge is increased if the same interest-rate benchmark is incorporated into the swap and the floating-rate loan because it synchronizes changes in the interest rates.

---

[47] *See, e.g.*, Wheatley Final Report, *supra* note 27, at 44 ("The use of a benchmark such as LIBOR allows lenders to use it as a barometer of the inter-bank funding market to base the margin to be applied to its customers.").

50.     This synchronization creates a "network effect" in which a product tends towards dominance because its utility increases with the number of people that use it.[48]  For example, a consumer's demand for a telephone network increases with the number of other users on the network whom she can call or from whom she can receive calls.  In industries characterized by network effects, competing networks can "tip" so that if one network overtakes the other, the other becomes insignificant.[49]

51.     The vast majority of interest-rate swaps were traded over-the-counter ("OTC").  In addition, interest-rate swaps are traded on exchanges, such as the Chicago Mercantile Exchange ("CME") and Intercontinental Exchange ("ICE").  Exchange-traded swaps are standardized financial instruments, with pre-defined notional values, repayment dates, benchmarks, and length.

**Figure 1:  Vanilla Interest-Rate Swap**



52.     The advantage of OTC swaps was that they can be adjusted to meet a user's needs, for example by synchronizing the payment dates and duration within a loan.  OTC swaps are typically negotiated pursuant to a standardized Master Agreement that was developed by the International Securities and Derivatives Association ("ISDA").  Many of the Panel Bank Defendants served on ISDA's Board of Directors and had other prominent roles in that trade

---

[48] *See, e.g.*, *id.* at 46, 76; European Comm'n, *Consultation Document on the Regulation of Indices:  A Possible Framework for the Regulation of the Production and Use of Indices Serving as Benchmarks in Financial and Other Contracts*, at 19 (Sept. 5, 2012), *available at* http://ec.europa.eu/internal_market/consultations/docs/2012/benchmarks/consultation-document_en.pdf.

[49] *See* Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization 393 (4th ed. 2005).

association.[50]  A swap contract is negotiated for an agreed-upon term—10 years, for example—with pre-defined dates on which the interest rates are calculated and payments made (known as "payment dates").  On each payment date, the interest payments are "netted" out and the "loser" pays its counterparty the difference between the fixed- and floating-rate payments.  For example, if on the first payment date, application of the fixed interest rate to the notional results in a payment due of $10,000 and application of the predefined benchmark interest rate to the notional results in a payment due of $9,000, then the fixed-rate payer must pay the difference ($1,000) to its counterparty.

53.     In the OTC interest-rate swap market, broker/dealers functioned as market makers.  A small set of dealers dominated the market for OTC USD interest-rate derivatives during the conspiracy period.  According to a July 2010 ISDA market survey, the largest 14 broker/dealers held 82% of all interest-rate derivatives by notional amount.[51]  Of these 14 largest dealers, 10 were Panel Bank Defendants: Bank of America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, HSBC, JPMorgan, RBS, Société Générale, and UBS.[52]  Similarly, the top five bank holding companies in the United States—Defendants Bank of America, JP Morgan, Citigroup, and HSBC, and non-Defendant Goldman-Sachs—accounted for more than 95% of all OTC swaps and derivatives transactions in the United States in 2009.[53]

---

[50] See, e.g., 2011 Board of Directors, International Swaps & Derivatives Ass'n, Inc., http://www.isda.org/wwa/bod.html (last visited on Oct. 1, 2014).

[51] David Mengle, Concentration of OTC Derivatives Among Major Dealers, ISDA Research Notes, July 2010, available at www.isda.org/researchnotes/pdf/ConcentrationRN_4-10.pdf.

[52] See id.

[53] See Office of the Comptroller of the Currency, OCC's Quarterly Report on Bank Trading and Derivatives Activities:  First Quarter 2009, available at http://www.occ.gov/news-issuances/news-releases/2009/nr-occ-2009-72a.pdf.  In the first quarter of 2009, Panel Bank Defendants JP Morgan, Bank of America, and Citigroup collectively earned more than $6 billion in trading revenue from interest-rate derivative positions.  See id.

54.     As Defendant UBS has acknowledged, in interest-rate swap transactions, "the benchmark is a price, not an index."[54]  OTC dealers quote prices for interest-rate swaps in two parts:  (1) an interest-rate benchmark and (2) a fixed interest rate.  In the absence of collusion, the fixed rate is calculated to provide the same value today (net present value or "NPV") of the expected cash flows from the quoted benchmark over the life of the swap.  The fixed-rate payer calculates the expected cash flows by applying the published rules of the quoted benchmark to the predicted market conditions over the length of the swap.  For example, for a three-year swap, the counterparty would use bbaLIBOR™'s published rules to predict competitive interbank interest rates over the three-year period and use those predictions to determine the NPV of those interest-rate payments.[55]

55.     For example, assume that on January 1, 2014, an OTC dealer offers a three-year swap where the floating rate is indexed to 3-month USD bbaLIBOR™ on a notional $10 million with payment dates at the end of each year.  Applying the USD bbaLIBOR™ methodology, a potential counterparty will predict the floating-rate payments on each payment date and then calculate the NPV of those payments.  If the NPV of the quoted fixed rate exceeds the NPV of the quoted benchmark, then the swap would be over-priced.  In other words, the price of the swap is expressly predicated on the USD bbaLIBOR™ published rules and application of those rules to expected market conditions.

56.     Thus, the markets for interest-rate benchmarks, interest-rate derivatives, and floating-rate loans are inextricably intertwined in that: (a) interest-rate benchmarks serve as a component of the prices of interest-rate derivatives and floating-rate loans; (b) interest-rate

---

[54] UBS, *Re:  Consultation Document on the Regulation of Indices* 3 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/individual-others/ubs_en.pdf.

[55] *See* Wheatley Final Report, *supra* note 27, at 45.

derivatives and floating-rate loans require a reliable interest-rate benchmark; (c) network effects support adoption of a single standard interest-rate benchmark for interest-rate derivatives and floating-rate loans; and (d) the value of an interest-rate benchmark is fundamentally determined by its suitability as a pricing component in interest-rate derivatives and floating-rate loans. Similarly, holders of floating-rate MBS (whose prices incorporate interest-rate benchamrks) seek to hedge their risks through interest-rate derivatives (whose prices likewise incorporate interest-rate benchmars), which further reinforce the network-effect nature of the market for interest-rate benchmarks. The relationship among these product markets is graphically depicted in Figure 2 below.

**Figure 2: Relationship Between Product Markets**



E.    **Development of bbaLIBOR™**

57.    The origin of bbaLIBOR™ can be traced to 1969, when a Greek banker arranged an $80 million syndicated loan to the Shah of Iran.[56]  At the time, lenders in global markets did not have access to a uniform benchmark that would reflect their cost of funds.  Instead, lending syndicates offered loans with interest rates that were renegotiated every three or six months to reflect changing market conditions.

58.    The banker, who worked for the London branch of Manufacturer's Hanover (now part of JP Morgan), devised a formula whereby a group of major reference banks within each syndicate agreed to report their funding costs shortly before a loan rollover date.  The weighted average of these rates, rounded to the nearest 1/8th percent plus a spread for profit, became the price of the loan for the next period.  The banker named this rate the London interbank offer rate.  Within a few years, this version of "Libor" evolved from a measure used to price individual loans to a much broader benchmark for deals worth hundreds of billions of dollars a year.  As demand for loans surged, demand for interest-rate derivatives followed.

59.    In the mid-1980s, the banks using the informal "Libor" asked the BBA to devise a benchmark to act as a reference point for pricing derivatives and interest-rate swaps, and to make benchmarking more transparent and objective.[57]  The BBA agreed and, working with other parties such as the Bank of England, renamed the benchmark bbaLIBOR.

---

[56] Kirstin Ridley & Huw Jones, *Insight:  A Greek Banker, the Shah and the Birth of Libor*, Reuters (Aug. 7, 2012), http://www.reuters.com/article/2012/08/08/us-banking-libor-change-idUSBRE87702320120808.

[57] Michael R. Koblenz, et al., *LIBOR:  Everything You Ever Wanted to Know But Were Afraid to Ask*, 6 J. Bus., Entrepreneurship & L. 281, 283 (2013), *available at* http://digitalcommons.pepperdine.edu/cgi/viewcontent. cgi?article=1094&context=jbel.

### F.    Calculation of bbaLIBOR™

60.    During the 2000s, the BBA licensed bbaLIBOR™ for 15 maturities (from overnight to 12 months) and for 10 currencies (Australian Dollar, Canadian Dollar, Swiss Franc, Danish Krone, Euro, Pound Sterling, Japanese Yen, New Zealand Dollar, Swedish Krona and USD).  The BBA's licensees included companies located in the United States.[58]

61.    The BBA represented that it chose the banks that would contribute submissions ("Contributor Banks") based on their scale of market activity, credit rating, and perceived expertise in the currency concerned.[59]  The BBA stated that it intended the selection criteria to show that Contributor Banks would have the best and most accurate knowledge of interbank borrowing costs for each currency.  Only the Contributor Banks knew what the rates really were in the opaque interbank loan market.[60]

62.    The BBA's published rules (its methodology) governed the way that Contributor Banks were required to determine their submissions, and Contributor Banks purported to agree to abide by those rules in order to remain on the bbaLIBOR™ panel of banks.  In 1998, the FX & MM Committee decided that a universal definition of a prime bank could no longer be given and, in response to user demand, changed the definition to the one that was used through the

---

[58] The BBA has access to this license information.  The FDIC as Receiver for the Closed Banks does not.

[59] *The Basics*, BBA Libor, https://web.archive.org/web/20130130191334/http://www.bbalibor-explained/the-basics (last visited Oct. 1, 2014).  Many, if not all of the Panel Bank Defendants were, during the relevant time period, contributors to other bbaLIBOR™ panels as well as the USD bbaLIBOR™ panel.

[60] The term "opaque" is often used in financial markets as an antonym for "transparent."  Transparent financial markets are those in which much is publicly known about prices and volumes of financial transactions.  *See Transparency and Over-the-counter Derivatives*, ISDA, Research Notes, 2009, *available at* http://www.isda.org/researchnotes/pdf/isda-research-notes1.pdf.  Transparent financial markets promote price discovery and are therefore considered to be more efficient than opaque markets.  Commercial banks have superior access to information in the financial markets and use that information for profit through their activity in OTC derivative markets.  *See, e.g.*, U.S. C.F.T.C. Chairman Gary Gensler, Remarks at the OTC Derivatives Reform, Consumer Federation of America Financial Services Conference (Dec. 3, 2009), *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opagensler-22.

2000s and continues to exist today:  "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?"[61]

63.  The published rules required each Contributor Bank to submit rates:  (a) without reference to rates contributed by other Contributor Banks; (b) determined by the Contributor Bank's staff primarily responsible for management of a bank's cash, rather than its derivative trading book; (c) without reference to the pricing of any derivative financial instrument; and (d)  that represent the rates it "would be offered funds."[62]  The BBA intended for these rules to show that the inputs to bbaLIBOR™ reflected competitive interest rates in the market for unsecured interbank loans.[63]  In its 2010 Annual Report, the BBA identified bbaLIBOR™'s three main strengths as:  (1) its simplicity; (2) its transparency (because it purportedly published all of the information needed to understand bbaLIBOR™ including the instructions given to contributing banks); and (3) it was "market led."[64]

64.  In addition, the BBA claimed that it was independent of the Contributor Banks and that it would aggressively monitor compliance with the published rules.  For example, in

---

[61] Until 1998, banks submitted quotes to the BBA answering the question:  "At what rate do you think interbank term deposits will be offered by one prime bank to another prime bank for a reasonable market size today at 11 am?"

[62] Letter from Denis J. McInerney, Chief, Fraud Section, Criminal Division, U.S. Dep't Justice, Appendix A, Statement of Facts ¶ 7 (Dec. 18, 2012) (hereinafter "UBS SOF"), attached as Exhibit 3 and incorporated into this Complaint by reference; *The Basics*, *supra* note 59; *Setting bbalibor*, BBA Libor, https://web.archive.org/web/20120902014345/http://www.bbalibor.com/technical-aspects/setting-bbalibor (last visited Oct. 1, 2014); *Definitions*, BBA Libor, https://web.archive.org/web/20130205220303/http://www.bbalibor.com/bbalibor-explained/definitions (last visited Oct. 1, 2014).

[63] Wheatley Final Report, *supra* note 27, at 55.  One of the key characteristics for a credible benchmark rate is that the benchmark should "clearly convey the economic realities of the underlying interest it seeks to measure to its users."  IOSCO Consultation Report, *supra* note 37, at 10.

[64] BBA, 2010 Annual Report, at 25 (2010).

2008, the BBA stated that the bbaLIBOR™ process is overseen by an "independent committee of market participants."[65]

65.    Contributor Banks electronically communicated their bbaLIBOR™ submissions every London business day to the BBA's agent, Thomson Reuters, by 11:10 a.m. London Time. The BBA's published rules stated that Contributor Banks were not to know the bbaLIBOR™ rates submitted by other Contributor Banks during this submission window.[66]

66.    USD bbaLIBOR™ was calculated by throwing out the four highest and four lowest submissions, and then averaging the remaining eight submissions.  This average constituted the bbaLIBOR™ "fixing."[67]  Thomson Reuters, as an agent for the BBA, then electronically communicated the bbaLIBOR™ fixings to licensees, including the Wall Street Journal, and Bloomberg News by midday, London Time.[68]  The Wall Street Journal and Bloomberg News published bbaLIBOR™ 24 hours after the BBA first published it.  The individual bbaLIBOR™ submissions for each Panel Bank Defendant were also transmitted through the BBA's licensed data vendors.  Figure 3 below presents the BBA's graphic depiction of the bbaLIBOR™ process.[69]

---

[65] BBA, *Understanding the Construction and Operation of BBA LIBOR*, at 1 (June 10, 2008), *available at* http://www.aciforex.org/docs/markettopics/20080610__BBA_comments_on_Libor_fixing.pdf.

[66] *The Basics*, *supra* note 59.

[67] In the parlance of commercial banks, a rate submission for LIBOR was referred to as a "submission" and the LIBOR rate that the BBA published was known as the "fixing."

[68] *See Frequently Asked Questions (FAQs)*, *supra* note 5.

[69] *The Basics*, *supra* note 59.

**Figure 3:  bbaLIBOR™ Processes**



G.   **bbaLIBOR™ Governance**

67.     Through 2010, the FX & MM Committee had sole responsibility for all aspects of

the functioning and development of bbaLIBOR™.[70]  Thirteen "active market practitioners"

comprised the FX & MM Committee.[71]  The BBA represented that the FX & MM Committee

was an "independent body."[72]  The BBA did not disclose the names of the members of the FX &

---

[70] *See, e.g.*, Landon Thomas Jr., *Trade Group for Bankers Regulates a Key Rate*, N.Y. Times, July 5, 2012, http://www.nytimes.com/2012/07/06/business/global/the-gentlemens-club-that-sets-libor-is-called-into-question.html?pagewanted=all; U.K. House of Commons Treasury Committee, *Fixing LIBOR:  Some Preliminary Findings*, Second Report of Session 2012-13, Vol. I, at 5 (Aug. 18, 2012), *available at* http://www.publications. parliament.uk/pa/cm201213/cmselect/cmtreasy/481/481.pdf.

[71] *Understanding BBA LIBOR*, BBA, https://web.archive.org/web/20130511195637/http://www.bba.org.uk/media/article/understanding-bba-libor (last visited Oct. 1, 2014).

[72] *See, e.g.*, BBA Libor, LIBOR Governance and Scrutiny:  Proposals Agreed by the FX & MM Committee § 1.6 (Nov. 17, 2008), *available at* www.bbalibor.com/download/4025.

MM Committee,[73] but UBS and RBS have both admitted in connection with their settlements with government regulators that they had representatives on the FX & MM Committee.[74] On information and belief, other Panel Bank Defendants also served on the FX & MM Committee. The chair and two deputy chairs of the FX & MM Committee were representatives from Contributor Banks.[75] FX & MM Committee members met at least every two months at undisclosed locations to discuss bbaLIBOR™.[76] The FX & MM Committee did not publish official minutes.[77]

68.     The BBA employed a full-time manager to supervise on a day-to-day basis all aspects of the calculation of bbaLIBOR™ and the dissemination of bbaLIBOR™ to the marketplace. The BBA represented that the manager was responsible for ensuring that all bbaLIBOR™ processes met the "highest standards."[78] The bbaLIBOR™ manager acted as an executive on the FX & MM Committee and was responsible for informing the FX & MM Committee about issues pertaining to bbaLIBOR™. The BBA and its agents monitored the Contributor Banks' individual submissions in real-time. When one Contributor Bank submitted rates that seemed out of line with other submissions, the BBA or its agents would contact the

---

[73] Enrich & Colchester, *supra* note 4.

[74] UBS SOF, *supra* note 62, ¶ 85; Fin. Servs. Auth., Final Notice to UBS AG ¶ 122 (Dec. 19, 2012), attached as Exhibit 4 and incorporated into this Complaint by reference; Fin. Servs. Auth., Final Notice to the Royal Bank of Scotland ¶ 89 (Feb. 6, 2013) (hereinafter "RBS Final Notice"), attached as Exhibit 5 and incorporated into this Complaint by reference.

[75] LIBOR Governance and Scrutiny, *supra* note 72, § 1.11.

[76] Liam Vaughan, *Secret Libor Committee Clings to Anonymity Following Scandal*, Bloomberg (Aug. 21, 2012), http://www.bloomberg.com/news/2012-08-20/secret-libor-committee-clings-to-anonymity-after-rigging-scandal.html.

[77] *Id.*

[78] *See, e.g.*, LIBOR Governance and Scrutiny, *supra* note 72, § 1.7.

outlier Contributor Bank to "confirm" the submission—for example, "Everyone else is coming in a good bit under that."[79]

69.     In April 2005, the BBA hired John Ewan, a 29-year-old financial researcher with a biology degree and no apparent prior experience managing a financial benchmark, to serve as the bbaLIBOR™ manager.[80]  Mr. Ewan, dubbed by one publication as "Mr. LIBOR," has claimed that he was hired to put bbaLIBOR™ on a secure commercial footing and that in his first two years he increased revenue more than tenfold, introduced new products, and obtained European Union, United States and Japanese trademarks for bbaLIBOR™, and successfully negotiated contracts with the derivatives exchanges, all of the major data vendors, and hundreds of other users.[81]

70.     At least by 2007, the BBA required entities that sought to redistribute bbaLIBOR™ or use it for any commercial purpose to first obtain a license from the BBA.[82]  Mr. Ewan claims that he was responsible for developing and maintaining relationships with all stakeholders in bbaLIBOR™, including keeping them apprised of changes to the benchmark and the markets it tracks.[83]  Mr. Ewan also claims to have cultivated "excellent relationships at a senior level" with most major central banks and market participants (principally banks, brokers, trade associations, hedge funds, and exchanges).[84]

---

[79] Donald MacKenzie, *What's in a Number?*, London Rev. Books, Sep. 25, 2008, at 11-12, *available at* http://www.lrb.co.uk/v30/n18/donald-mackenzie/whats-in-a-number.

[80] *John Ewan Public Profile*, LinkedIn, https://www.linkedin.com/pub/john-ewan/5/490/627 (last visited Oct. 1, 2014).  Mr. Ewan left the BBA in the summer of 2012.

[81] Steve Hawkes, *Mr. Libor Quits*, The Sun, July 21, 2012, http://www.thesun.co.uk/sol/homepage/news/money/4441913/Mr-Libor-quits.html.

[82] *Licensing*, *supra* note 9 ("Please note that without the express permission of the BBA, no company is allowed to display bbalibor on their website or use the data for commercial purposes.").

[83] *John Ewan Public Profile*, *supra* note 80.

[84] *Id*.

71.     On January 1, 2010, more than a year after learning that regulators were investigating bbaLIBOR™, the BBA modified its structure.  It created a new entity, BBA LIBOR, Ltd., to assume responsibility for the day-to-day running of the benchmark.  One report suggested that the BBA created BBA LIBOR, Ltd. to limit the BBA's liability for expected claims relating to bbaLIBOR™.[85]  Despite this change in structure, the processes and procedures followed by Contributor Banks and the BBA in calculating and publishing bbaLIBOR™ remained the same.  The FX & MM Committee also continued to oversee bbaLIBOR™.

72.     On September 12, 2012, an independent panel recommended that the BBA be stripped of its role in bbaLIBOR™ rate setting.  As Martin Wheatley, head of the United Kingdom's FSA, explained at the time, "the BBA acts as the lobby organisation for the same submitting banks that they nominally oversee, creating a conflict of interest that precludes strong and credible governance."[86]  In February 2013, the BBA agreed to cede control of bbaLIBOR™ to a new operator.  On January 31, 2014, the BBA handed over responsibility for the administration of bbaLIBOR™ to Intercontinental Exchange Benchmark Administration, Ltd.[87]

## H.     Defendants' Knowledge of bbaLIBOR™'s Importance

73.     Defendants understood the importance of bbaLIBOR™ to the global economy and actively promoted bbaLIBOR™ as a key benchmark rate.  For example, the BBA described the importance of that benchmark as follows:

> BBA LIBOR is by far the most widely referenced interest rate index in the world.  Its importance goes beyond that of interbank lending and touches everyone from large international conglomerates to small borrowers.  It is central in interest rate swaps and the great majority of floating rate securities and loans

---

[85] Enrich & Colchester, *supra* note 4.

[86] Wheatley Final Report, *supra* note 27, at 21.

[87] *Disclaimer*, BBA Libor, http://www.bbalibor.com/disclaimer (last visited Oct. 1, 2014).

> relate to LIBOR. Independent research indicates that around $350 trillion of swaps and $10 trillion of loans are indexed to BBA LIBOR. It is the basis for settlement of interest rate contracts on the world's major futures and options exchanges. It is written into standard derivative and loan documentation such as the ISDA terms and is also used for an increasing range of retail products.[88]

74.     Financial instruments that incorporated USD bbaLIBOR™ were priced based on the express understanding that Defendants would adhere to the benchmark's published methodology. Market participants, including the Closed Banks, reasonably relied on Defendants' representations that bbaLIBOR™ was, and would be, honestly and reliably calculated according to the published rules. Indeed, the BBA acknowledged in 2008 that bbaLIBOR™ "has always been relied on by the market as a reliable benchmark" of borrowing costs.[89]

75.     Defendant Barclays has admitted that individual bbaLIBOR™ submissions conveyed information to market participants about each Contributor Bank's costs of borrowing unsecured funds, the liquidity conditions and stress in the money markets, and each Contributor Bank's ability to borrow funds in particular markets.[90] Defendant Barclays further admitted that the market information conveyed by bbaLIBOR™ submissions "affect[ed], or tend[ed] to affect the prices" of financial products that incorporated bbaLIBOR™ as the interest-rate benchmark.[91]

76.     Because a Contributor Bank's bbaLIBOR™ submissions should correspond to the cost of money for that Contributor Bank, market participants could perceive a Contributor

---

[88] *Understanding the Construction and Operation of LIBOR*, *supra* note 65, at 3.

[89] Press Release, BBA, Libor Gets Enhanced Governance and Scrutiny Procedures (Dec. 17, 2008), *available at* http://www.mondovisione.com/media-and-resources/news/british-bankers-association-libor-gets-enhanced-governance-and-scrutiny-procedur.

[90] *See In re Barclays plc*, No. 12-25, 2012 WL 2500330, at *22 (C.F.T.C. June 27, 2012) (hereinafter "Barclays CFTC Order").

[91] *Id.*

Bank's bbaLIBOR™ submission as an indicator of that Contributor Bank's financial health and liquidity.  For example, if a Contributor Bank's bbaLIBOR™ submission was relatively high as compared to other Contributor Banks, that submission would have suggested that the Contributor Bank presented a credit risk and had potential liquidity problems.  Commercial banks with liquidity problems have trouble attracting business and could find themselves prohibited from working with financial institutions.

77.    Because the Contributor Banks were purportedly among the world's largest and most financially sound commercial banks, market participants valued bbaLIBOR™ as a floor for the borrowing rate of other, less creditworthy, institutions and individuals.[92]  Though bbaLIBOR™ developed into the industry standard, other reference rates existed throughout the relevant period.  For example, brokers such as Tullet Prebon and Tradition Financial Services and data providers Bloomberg and Depository Trust & Clearing Corp. ("DTCC") provided data on various interest-rate benchmarks.

78.    In March 2012, the BBA responded to published reports about an investigation into bbaLIBOR™ by insisting that it and the Contributor Banks were "committed to the continuing evolution of Libor so that it adapts to meet the changing market and user requirements and general expectations."[93]  The BBA has quoted Ian Mair, then Chairman of the London Money Market Association, as saying "It is important that all market participants *have a choice* of benchmarks."[94]  Following Barclays's admission of bbaLIBOR™ manipulation, the

---

[92] David Hou & David Skeie, Fed. Reserve Bank of N.Y., LIBOR:  Origins, Economic Crisis, Scandal, and Reform 3 (March 2014), *available at* http://www.ny.frb.org/research/staff_reports/sr667.pdf.

[93] LIBOR—Update, *supra* note 34.

[94] *Id.* (emphasis added).

BBA again stated that it was committed to providing a benchmark that had the support of all users.[95]

79.    In 2014, the BBA transferred control of bbaLIBOR™ to a commercial benchmark provider, ICE Benchmark Administration ("IBA").  IBA announced that it would implement additional controls to deter misconduct and ensure that LIBOR serves its intended purpose.[96]

80.    Following Barclays's disclosure, multiple providers have sought to enter the market for interest-rate benchmarks, such as the DTCC, which offers the General Collateral Finance Repo Index (which has gained the support of numerous market participants).  This restored competition in the market for interest-rate benchmarks has also led to the introduction of new financial products, such as futures and options contracts linked to repo rate indices and overnight indexed swap rates.

## FRAUDULENT AND COLLUSIVE CONDUCT RELATING TO bbaLIBOR™

### A.    Systematic bbaLIBOR™ Depression

81.    Many of the Panel Bank Defendants' portfolios in at least 2007 and 2008 were weighted such that the Panel Bank Defendants financially benefited from reductions in short-term floating interest rates.  For example, Deutsche Bank reportedly earned more than $650 million in profit during 2008 from trades tied to bbaLIBOR™ because bbaLIBOR™ was lower than predicted by competitive market forces.[97]  Similarly, Bank of America reported that it was "liability sensitive to LIBOR" and net interest income would increase substantially if short-term

---

[95] Press Release, BBA, British Bankers' Association Statement Regarding the Treasury Committee's Preliminary Findings on Libor (Aug. 18, 2012), *available at* http://www.mondovisione.com/media-and-resources/news/british-bankers-association-statement-regarding-the-treasury-committees-prelim.

[96] Iris Dorbian, *Will Banks Pay Up for a New, Improved Libor?*, CFO (Aug. 19, 2014), http://ww2.cfo.com/credit/2014/08/will-banks-pay-new-improved-libor.

[97] Jean Eaglesham, *Bank Made Huge Bet, and Profit, on Libor*, Wall St. J., Jan. 10, 2013, http://online.wsj.com/article/SB10001424127887324442304578231721272636626.html.

interest rates fell by 100 basis points while long-term rates remained the same.[98]  Bank of America further stated that it held a notional amount of more than $50 billion in receive fixed/pay floating interest rate swaps that would mature in 2008 or 2009 with no offsetting pay fixed/receive floating[99] interest-rate swaps.[100]

82.     On Thursday, August 9, 2007, the Panel Bank Defendants submitted overnight USD bbaLIBOR™ rates that were significantly higher than the prior day.  Overnight USD bbaLIBOR™ rose from 5.35% on August 8, 2007, to 5.86% on August 9, 2007, which put USD bbaLIBOR™ at its highest level since 2001.  Because these increases were not coincidental with changes in the rates charged by central banks, the media expressed concern that the increase in USD bbaLIBOR™ indicated that the Panel Bank Defendants were afraid to lend to each other and that major losses for the Panel Bank Defendants and others were on the horizon.

83.     On August 9, 2007, after the bbaLIBOR™ submissions were electronically published for that, a UBS executive sent an internal email to a senior manager, a manager, and others stating that "it is highly advisable to err on the low side with fixings for the time being to protect our franchise in these sensitive markets.  Fixing risk and [profit and loss] thereof is secondary priority for now."[101]  UBS employees understood this secret directive to apply to all bbaLIBOR™ currencies.[102]

---

[98] Bank of Am., 2008 Annual Report, *supra* note 24, at 88-90.

[99] An interest rate swap is a contract in which two parties agree to exchange cash flows for a fixed period of time based on a defined principal amount (known as its notional value).  In its simplest form, one counterparty agrees to pay a fixed rate on the notional amount and, in exchange, receives a floating rate on the notional amount.

[100] Bank of Am., 2008 Annual Report, *supra* note 24, at 91 tbl.42.

[101] UBS SOF, *supra* note 62, ¶ 105.

[102] *Id.* ¶ 108.

84.     By August 16, 2007, all of the Panel Bank Defendants dropped their submissions significantly.  UBS, for example, lowered its USD overnight bbaLIBOR™ submission by 90 basis points.  The initial differences were arguably consistent with the fact that the Panel Bank Defendants had different creditworthiness and presented different risks for unsecured short-term wholesale lenders.[103]  Figure 4 below plots the USD overnight bbaLIBOR™ submissions for the Panel Bank Defendants from August 7, 2007 through August 28, 2007.  As can be seen in Figure 4, bbaLIBOR™ submissions showed significant differences in early August but then showed significant uniformity by the end of the month.  This pattern is consistent with allegations that the Panel Bank Defendants began colluding on USD bbaLIBOR™ in August 2007.

**Figure 4:  Overnight USD LIBOR Submissions**



---

[103] *See, e.g.,* Wheatley Final Report, *supra* note 27, at 79 ("[I]t could be argued that, in the current environment inter-bank lending rates are dominated by credit risk and there is a large dispersion in the perceived creditworthiness of banks."); Final Notice from the Fin. Conduct Auth. to Lloyds Bank plc & Bank of Scot. plc ¶ 4.49 (July 24, 2014) (hereinafter "Lloyds Final Notice") (admitting the borrowing rates of the Panel Bank Defendants diverged as lenders became more sensitive to credit risk), attached as Exhibit 6 and incorporated into this Complaint by reference.

85.     During this same time period, the BBA issued a press release titled "Key Facts about LIBOR" in which the BBA falsely stated that bbaLIBOR™ "closely reflects the real rates of interest being used by the world's big financial institutions" and that it "reflects the actual rate at which banks borrow money from each other."[104]

86.     On August 20, 2007, RBS's London-based head of money markets trading and the person responsible for USD bbaLIBOR™ submissions, Paul Walker, reportedly telephoned RBS's head of short-term markets for Asia, Scott Nygaard, in Tokyo, to discuss how banks were using bbaLIBOR™ to profit on its movements rather than submitting rates that honestly reflected their perceived costs of borrowing.  Mr. Walker is quoted as telling Mr. Nygaard:  "People are setting to where it suits their book. . . .  LIBOR is what you say it is."[105]  Senior RBS managers reportedly knew, that at least as of August 2007, that the Panel Bank Defendants were systematically rigging LIBOR.[106]

87.     Also in August 2007, senior managers at Barclays instructed their USD bbaLIBOR™ submitters to lower their USD bbaLIBOR™ submissions so that they would stay "within the pack" and be nearer to the depressed rates of other Panel Bank Defendants rather than rates that were consistent with the BBA's definition of bbaLIBOR™.[107]  In one internal Barclays email dated August 28, 2007, a Barclays employee noted that Lloyds's USD

---

[104] Press Release, BBA, Key Facts About BBA LIBOR (Aug. 10, 2007), *available at* http://www.mondovisione.com/media-and-resources/news/british-bankers-association-libor-falls-on-central-bank-intervention/.

[105] Liam Vaughan & Gavin Finch, *Secret Libor Transcripts Expose Trader Rate-Manipulation*, Bloomberg (Dec. 13, 2012), http://www.bloomberg.com/news/print/2012-12-13/rigged-libor-with-police-nearby-shows-flaw-of-light-touch.html.

[106] *Id.*

[107] Nonprosecution Agreement Between U.S. Dep't of Justice, Criminal Div. Fraud Section and Barclays Bank plc, Appendix A, ¶ 37 (June 26, 2012) (hereinafter "Barclays SOF"), attached as Exhibit 7 and incorporated into this Complaint by reference.

bbaLIBOR™ submission was artificially low.[108] Similarly, in October 2007, a Barclays employee noted internally that an unidentified Contributor Bank submitted a bbaLIBOR™ rate that was lower than the rate it actually paid.[109]

88.  Barclays's directive to stay "within the pack" with other Panel Bank Defendants remained in place, and was repeated, through at least 2009. Barclays has admitted that its USD bbaLIBOR™ submissions were false because they were lower than what Barclays would otherwise have submitted and contrary to the definition of bbaLIBOR™.[110]

89.  On November 29, 2007, a Barclays manager contacted a representative of BBA to advise that USD "LIBORs are being set lower than where they ought to be" and informed the BBA that this issue applied to all of the Panel Bank Defendants.[111] The Barclays manager explained that the Panel Bank Defendants were submitting rates that were too low because "banks are afraid to stick their heads above the parapet and post higher numbers because of what happened to [Barclays] when [Barclays] did. You get shot at."[112] The Barclays manager specifically identified certain other Panel Bank Defendants that were submitting bbaLIBOR™ rates lower than where those banks could actually get funds.[113]

90.  On November 30, 2007, a representative of Barclays and the FSA had a private discussion. The Barclays representative internally wrote that he did not disclose to the FSA that

---

[108] Email to Pat Leising (Aug. 28, 2007, 11:27), attached as Exhibit 8 and incorporated into this Complaint by reference.

[109] Email to Jason Miu (Oct. 3, 2007, 07:34), attached as Exhibit 9 and incorporated into this Complaint by reference.

[110] Barclays SOF, *supra* note 107, ¶ 36.

[111] *Id*. ¶ 43.

[112] *Id*.

[113] *Id*.

"'we're not posting where we think we should.'"[114]  On December 4, 2007, a Barclays bbaLIBOR™ submitter sent an internal email stating that s/he was submitting USD bbaLIBOR™ "lower than s/he would have set if given a 'free hand,'" and that the Panel Bank Defendants, including Barclays, were submitting false and dishonest submissions.[115]

91.     On March 5, 2008, the FSA asked Barclays what it was paying for funding in certain currencies.[116]  A Barclays manager stated internally that s/he did not want to disclose that Barclays was borrowing USD "way over LIBOR" and would rather indicate that it was paying a rate equal to bbaLIBOR™.[117]  A Barclays bbaLIBOR™ submitter agreed that if s/he responded with "the honest truth" it might open a "can of worms."[118]  Barclays responded to the FSA that it was paying for one-year USD at bbaLIBOR™ "flat," which was untrue.[119]

92.     On April 11, 2008, a Barclays employee told an employee of the Federal Reserve Bank of New York ("NY Fed") that he was aware of Panel Bank Defendants putting in USD bbaLIBOR™ submissions that were lower than what they were actually paying and that "the ones that need the cash most put in the lowest, lowest rates."[120]  The Barclays employee said that Barclays could not borrow money at the rates submitted by other Panel Bank Defendants and that "if we can't borrow money at that rate . . . [t]hen no one else could really. . . .  I mean we,

---

[114] *Id.* ¶ 45.

[115] *Id.*

[116] *Id.* ¶ 46.

[117] *Id.*

[118] *Id.*

[119] *Id.*

[120] *Transcript of Phone Call Between Barclays Employee and Analyst in the Markets Group of the N.Y. Fed*, Apr. 11, 2008, at 7, *available at* http://www.newyorkfed.org/newsevents/news/markets/2012/ibor/April_11_2008_ transcript.pdf, *attachment to* Press Release, Fed. Reserve Bank of N.Y., New York Fed Responds to Congressional Request for Information on Barclays - LIBOR Matter (July 13, 2012), http://www.newyorkfed.org/newsevents/ news/markets/2012/Barclays_LIBOR_Matter.html (hereinafter "N.Y. Fed Press Release").

you-you know we speak to everyone that everyone else does so, um, yeah, it's a quite, quite an uncomfortable feeling and . . . I don't know if at some stage LIBORs will correct themselves."[121]

93.    On Wednesday, April 16, 2008, the Wall Street Journal published an article questioning the accuracy of bbaLIBOR™.[122]  The article quotes Mr. Ewan as saying that the BBA is "closely watching the rates banks contribute" and that "[i]f it is deemed necessary, we will take action to preserve the reputation and standing in the market of our rates."[123]  The article states that bbaLIBOR™ was to be on the agenda of an upcoming BBA board meeting.[124]

94.    Over the next week, the BBA launched what its executives internally described as a "charm offensive,"[125] reaching out to investors and journalists to dispel concerns about bbaLIBOR™.  For example, on April 17, 2008 the BBA publicly announced that it would expel any Contributor Bank that made deliberately inaccurate bbaLIBOR™ submissions.[126]  The BBA stated that it would fast-track an "intensive review" of its bbaLIBOR™ process, but that it did not believe that Contributor Banks had submitted false quotes.[127]  USD bbaLIBOR™ rates rose temporarily after the BBA's statement.[128]

---

[121] *Id.* at 16.

[122] Carrick Mollenkamp, *Bankers Cast Doubt On Key Rate Amid Crisis*, Wall St. J., Apr. 16, 2008, http://online.wsj.com/article/SB120831164167818299.html.

[123] *Id.*

[124] *Id.*

[125] Enrich & Colchester, *supra* note 4.

[126] UBS SOF, *supra* note 62, ¶ 114.

[127] Carrick Mollenkamp & Laurence Norman, *British Bankers Group Steps Up Review of Widely Used Libor*, Wall St. J., Apr. 17, 2008, http://online.wsj.com/article/SB120838284713820833.html.

[128] Carrick Mollenkamp, *Libor Surges After Scrutiny Does Too*, Wall St. J., April 18, 2008, http://online.wsj.com/articles/SB120846842484224287.

95.     The true purpose of this "charm offensive" was not to address the fraud and collusion causing USD bbaLIBOR™ depression but rather to create the false impression that the Panel Bank Defendants provided accurate and honest USD bbaLIBOR™ submissions.

96.     In May 2008, the Markets Group of the NY Fed stated in an internal report published on its website that "it is difficult to find convincing evidence of actual [bbaLIBOR™] misreporting."[129]

97.     During a six-month period in 2008, Thomson Reuters reportedly alerted Mr. Ewan on a weekly basis that the bbaLIBOR™ process was being distorted.[130] Mr. Ewan reportedly told Thomson Reuters that he would investigate its concerns.[131] There is no public evidence that he did.

98.     On May 19, 2008, the FX & MM Committee met to discuss questions raised about bbaLIBOR™. The meeting was "confidential" and the BBA refused to admit that it took place.[132] Senior bank executives described this gathering as a "working level pre meeting" to determine what should happen at the BBA's formal meeting scheduled for May 30, 2008.[133] Contributor Bank executives reportedly decided that they would make no substantive changes to

---

[129] Samuel Cheun & Matt Raskin, MarketSOURCE, Recent Concerns Regarding LIBOR's Credibility 3 (May 20, 2008), *available at* http://www.newyorkfed.org/newsevents/news/markets/2012/libor/MarketSource_Report_ May202008.pdf. As the FSA recently noted, the evidence of "dislocation did not in itself . . . carry any implication that "lowballing" was occurring." Fin. Services Auth., Internal Audit Report: A Review of the Extent of Awareness Within the FSA of Inappropriate LIBOR Submissions, Management Response ¶ 1.5 (Mar. 2013), *available at* www.fsa.gov.uk/static/pubs/other/ia-libor-management-response.pdf (hereinafter "FSA Internal Audit"). Indeed, the Wall Street Journal article warned that "no specific evidence has emerged that banks have provided false information about borrowing rates." Mollenkamp, *Bankers Cast Doubt On Key Rate Amid Crisis*, *supra* note 122.

[130] Ian Pollock, *Libor: BBA 'Warned Weekly' Says Former Rate-Compiler*, BBC (July 25, 2012), http://www.bbc.co.uk/news/business-18930191.

[131] *Id.*

[132] Email from Angela Knight to Paul Tucker (May 21, 2008, 4:40 PM), attached as Exhibit 10 and incorporated into this Complaint by reference. Barclays publicly disclosed the cover email but, apparently, not the attachment, which is said to provide the "blow-by-blow" account of what transpired at the May 19, 2008 meeting.

[133] Email from Paul Tucker (May 28, 2008, 4:36 PM), attached as Exhibit 11 and incorporated into this Complaint by reference.

the way bbaLIBOR™ was calculated, but would instead embark on a publicity campaign to alter

perceptions that bbaLIBOR™ was flawed.[134]

99.    In May 2008, the broker ICAP plc announced it intended to create an alternative

index of interbank lending rates called the New York Funding Rate ("NYFR").  According to

ICAP, the NYFR would be determined by an anonymous survey of at least 24 banks (potentially

including the Panel Bank Defendants).  ICAP would ask participants each morning to estimate

the cost of funding for one- and three- month loans to a "representative" bank.  NYFR would be

calculated using the quotes of the middle half of that group.[135]  Regarding NYFR, the BBA's

Chief Executive, Angela Knight, stated in a May 12, 2008 interview:  "We have had contact with

ICAP and they have assured us that this is complementary, and in no way were they intending to

do something competitive to Libor."[136]  The Panel Bank Defendants, and other members of the

BBA, were among ICAP's most important customers at the time.[137]

100.    On May 29, 2008, the Wall Street Journal published another article questioning

USD bbaLIBOR™ submissions made by Citigroup, Portigon, HBOS, JPMorgan, UBS, and other

Panel Bank Defendants.[138]  Numerous Panel Bank Defendants disputed the Wall Street Journal's

---

[134] *Id.*

[135] Gavin Finch & Ben Livesey, *ICAP's Libor Alternative Lacks 'Concrete Timetable,'* Bloomberg (May 14, 2008, 11:48 AM), http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home&sid=asgvKFvA0iio.

[136] *Id.*

[137] ICAP, Annual Report 2008, at 3 (2008), *available at* http://www.icap.com/~/media/Files/I/Icap-Corp/Annual%20Reports/annual-report2008.pdf.  ICAP obtained 42% of its revenue from brokering interest-rate derivative transactions.  *Id.* at 20.  It obtained another 37% of its revenue from brokering transactions in foreign exchange rate derivatives, commodities derivatives, and credit derivatives.  *Id.*  ICAP earned 43% of its revenues from its top 10 customers.  ICAP, Morgan Stanley European Financials Conference (Apr. 2, 2009), *available at* http://www.icap.com/investor-relations/reports-and-presentations/~/media/Files/I/Icap-Corp/reports-and-presentations/year-2009-10/morgan-stanley-2009.pdf.  Defendants possessed enormous market power in all of these markets.

[138] Carrick Mollenkamp & Mark Whitehouse, *Study Casts Doubt on Key Rate*, Wall St. J., May 29, 2008, http://online.wsj.com/article/SB121200703762027135.html.  The article also stated as follows:  "The Journal's

analysis.  The head of global fixed-income strategy at JPMorgan, for example, asserted that the Wall Street Journal's methodology was flawed because it was "based on too high a risk-free rate which produces a large upward bias in the Journal's measure of bank borrowing costs."[139]  A Citigroup spokesman said, "We continue to submit our LIBOR rates at levels that accurately reflect our perception of the market."[140]  WestLB insisted that it provided accurate data.[141]

101.    An HBOS spokesman said in late May 2008, "We believe our Libor fixings are a genuine and realistic indication of our average cost of funding.  Our postings are on the whole in line with the market."[142]  Defendant HBOS has since admitted in connection with its settlement with government regulators that, just weeks before the HBOS spokesman's announcement, an HBOS senior manager wrote an internal email admitting that the Panel Bank Defendants were effectively required to coordinate because "no bank can be seen to be an outlier," including HBOS.[143]  HBOS's public statement in late May 2008 was an intentional misrepresentation. Many published reports also attributed movements in bbaLIBOR™ rates to factors other than the fraud and collusion alleged in this Complaint.[144]  Only the other Panel Bank Defendants and the BBA could have known of this misrepresentation.

---

analysis doesn't prove that banks are lying or manipulating Libor. Analysts offer various reasons why some banks might report Libor rates lower than what other markets indicate."  *Id.*

[139] *Id.*

[140] John Parry et al., *Banks May Be Understating Key Lending Rate:  Report*, Reuters (May 29, 2008), http://www.reuters.com/article/2008/05/29/us-banks-libor-idUSN2930208320080529.

[141] *Id.*

[142] *Id.*

[143] *In re Lloyds Banking Group plc*, No. 14-18, at 14 (C.F.T.C. July 28, 2014) (hereinafter "Lloyds CFTC Order"), attached as Exhibit 12 and incorporated into this Complaint by reference.

[144] *See, e.g.*, Int'l Monetary Fund, Global Financial Stability Report:  Financial Stress and Deleveraging 72 (Oct. 2008), *available at* http://www.imf.org/External/Pubs/FT/GFSR/2008/02/pdf/chap2.pdf  (concluding in October 2008 that the "U.S. dollar LIBOR remains an accurate measure of a typical creditworthy bank's marginal cost of unsecured U.S. dollar term funding"); Gillian Tett & Michael Mackenzie, *Debate Over Libor Breeds a Crisis of Confidence*, Fin. Times, Apr. 28, 2012, http://www.ft.com/cms/s/0/240c311a-1004-11dd-8871-0000779fd2ac.html#

102.    These pretextual explanations and/or denials were materially false and intended to conceal the fact that the Panel Bank Defendants were fraudulently and collusively depressing USD bbaLIBOR™.

103.    In another article published on May 29, 2008, the BBA insisted: "We have every confidence in the integrity of the bbaLIBOR-setting process and the accuracy of the figures it produces."[145]  The BBA's statement was false because the BBA knew that the Panel Bank Defendants had been submitting false and dishonest rates, and that the BBA had helped to coordinate the Panel Bank Defendants' unlawful agreements.[146]

104.    After its formal meeting on May 30, 2008, the BBA announced that it would be strengthening the oversight of bbaLIBOR™ and that "it would give more details in due course."[147]  The unidentified attendees at the May 30, 2008 BBA meeting signed confidentiality agreements limiting their ability to disclose what was discussed.[148]  In fact, the Panel Bank Defendants and the BBA intended only to make minor cosmetic changes to the bbaLIBOR™

---

axzz3Dm3mmPpK ("It seems unlikely that this discrepancy has arisen because banks have deliberately been colluding to keep Libor rates down."); *Update 2-European, U.S. Bankers Work on Libor Problems*, Reuters (May 16, 2008), http://in.reuters.com/article/2008/05/16/markets-rates-bba-idINL162110020080516 ("There's more wind being made about [the Libor] issue than is being merited by the facts . . . Libor will retain its present function for the foreseeable future . . . . Due to capital pressures not seen for decades[,] . . . Libor rates . . . are historically high." (internal quotation marks omitted)).

[145] Gavin Finch & Elliot Gotkine, *Libor Banks Misstated Rates, Bond at Barclays Says*, Bloomberg (May 29, 2008), http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aMSoLbYpbHWk.

[146] *Id.*; Mollenkamp & Whitehouse, *supra* note 138 (As with its April 2008 article, the *Wall Street Journal* cautioned that its analysis "doesn't prove that banks are lying or manipulating Libor.").

[147] *International: Libor Process*, N.Y. Times, http://www.nytimes.com/2008/06/06/news/06iht-6oxan-LIBOR.13532018.html (last visited Oct. 1, 2014).

[148] Email from Angela Knight to Paul Tucker (May 31, 2008, 4:09 PM), attached as Exhibit 13 and incorporated into this Complaint by reference.

process.  The BBA shared its proposed changes with the Bank of England, which internally concluded that the BBA's proposal was "wholly inadequate."[149]

105.    On June 10, 2008, the BBA issued a press statement asserting that Contributor Banks "are invariably those with the best credit ratings and in the current diminished credit capacity of the market it is therefore not surprising that some institutions will not be able to access funds at the LIBOR rate."[150]  The BBA's statement represented that the BBA was incorporating a tight scrutiny mechanism that would require any contribution discrepancies to be reviewed and justified.  In fact, the BBA's statement was false and the Panel Bank Defendants and the BBA did not intend to employ a tight scrutiny mechanism but, rather, intended to allow the Panel Bank Defendants to continue to fraudulently and collusively depress USD bbaLIBOR™.

106.    On August 5, 2008, the BBA represented that Panel Banks which had responded to the BBA's request for consultation were "confident" that their submitted rates were "truly reflective of their perceived borrowing costs" and that bbaLIBOR™ was a "fundamentally robust and accurate benchmark, with contributors inputting rates that they believe reflect their future funding costs."[151]  The FX & MM Committee stated that, based on its supposed independent review of responses and investigation, it "believes that current submissions are accurate."[152]  By this statement, the Panel Bank Defendants and the BBA further sought to

---

[149]  Transcript of Governor's written comments, Email to Governors—GPS (May 30 2008, 19:06),  attached as Exhibit 14 and incorporated into this Complaint by reference.

[150] *Understanding the Construction and Operation of LIBOR*, *supra* note 65, at 1.

[151] BBA, Libor Consultation Feedback Statement ¶¶ 3.14, 3.19 (Aug. 5, 2008), attached as Exhibit 15 and incorporated into this Complaint by reference.

[152] *Id*. at ¶ 4.8.

falsely portray the bbaLIBOR™ "dislocations" as the product of market forces rather than fraud and collusion.

107.    HBOS has since admitted that on August 8, 2008, one of its senior managers internally circulated a presentation that said, among other things, "As a bank we must be extremely careful about the rates we pay in different markets for different types of funds as paying too much risks not only causing a re-pricing of all short-term borrowings but, more importantly in this climate, may give the impression of HBOS being a desperate borrower and so lead to a general withdrawal of wholesale lines."[153]  HBOS submitters knew at least by that time, that its bbaLIBOR™ submissions had to be coordinated with other Panel Bank Defendants, notwithstanding the bbaLIBOR™ rules.

108.    According to a Wall Street Journal article in September 2012, Ms. Knight, head of the BBA, told regulators in April 2008 that bbaLIBOR had become too big to manage, but BBA's member banks "clung to control of Libor."[154]  After November 2008,  BBA staffers pitched the idea of selling bbaLIBOR™ or spinning it off into a wholly independent entity.[155] According to the Wall Street Journal article, the BBA in late 2008 drew up plans to license bbaLIBOR™ to an independent third party that would pay a fee to administer the rate instead of the BBA.  But when BBA staffers pitched the idea to industry executives, they got the impression that the big banks—which paid most of the BBA's bills through their membership fees—wanted bbaLIBOR™ kept in-house so that they could continue to influence it, according to the Wall Street Journal article.[156]  As a result, the idea ultimately was abandoned.

---

[153] Lloyds CFTC Order, *supra* note 143, at 14.

[154] Enrich & Colchester, *supra* note 4.

[155] *Id.*

[156] *Id.*

109.    According to that same Wall Street Journal article, Ms. Knight, then head of the BBA, was heard to argue with Mr. Ewan about bbaLIBOR™.[157]  Ms. Knight reportedly wanted to scale back the BBA's role and took the position that bbaLIBOR™ had become too big for her organization to manage.[158]  Mr. Ewan, on the other hand, reportedly advocated further expansion, touting the revenue that the BBA generated from bbaLIBOR™.[159]  According to the BBA, bbaLIBOR earned more than £1.8 million and £1.7 million in 2011 and 2012 respectively in licensing fees.[160]

110.    In September 2008, an internal UBS discussion confirmed that the Panel Bank Defendants were continuing to make artificially low bbaLIBOR™ submissions.  In a documented discussion, a UBS employee stated, "LIBORs currently are even more fictitious than usual."[161]  On September 18, 2008, Lloyds announced the terms of an offer to acquire HBOS.  In late September, HBOS's USD bbaLIBOR™ submitter increased its submissions to more closely align with the published bbaLIBOR™ rules.  On September 26, 2008, the submitter's supervisor told the submitter that HBOS USD bbaLIBOR™ submissions should be lower relative to other panel members.

111.    In a recorded electronic chat that day, the HBOS submitter wrote to an employee of another financial institution (the identity of this institution has not been disclosed) that "youll like this ive been pressured by senior management to bring my rates down into line with

---

[157] *Id.*

[158] *Id.*

[159] *Id.*

[160] BBA, Audited Consolidated Financial Statements Year Ended 31 December 2012, at 13 (2012), *available at* https://www.bba.org.uk/wp-content/uploads/2014/01/BBA_2012_Financials.pdf.

[161] UBS SOF, *supra* note 62, ¶ 101.

everyone else."[162]  Consistent with the management directive, the HBOS USD bbaLIBOR™ submitter began submitting lower rates again.

112.     Throughout this time, HBOS management also directed employees not to make bids for cash in the wholesale funding market above the rate of the daily bbaLIBOR™ rate.  This instruction reinforced the supervisor's prior direction that HBOS should not be an outlier in the bbaLIBOR™ submissions, regardless of the published bbaLIBOR™ rules.

113.     On October 10, 2008, a Barclays employee privately reported to the NY Fed that its USD bbaLIBOR™ submissions were "unrealistic."[163]  An October 17, 2008 email from a Rabobank LIBOR submitter stated, "We are now setting all libors [sic] significantly under the market levels."[164]  On October 24, 2008, another Barclays employee privately reported to the NY Fed that USD bbaLIBOR™ rates were "absolute rubbish,"[165] citing submissions by WestLB and Deutsche Bank as being too low.[166]  The employee told the NY Fed that he was aware of banks that were making bbaLIBOR™ submissions that were below what they actually paid in comparable transactions.[167]  Publicly, however, Barclays and other Panel Bank Defendants continued to falsely represent that bbaLIBOR™ was based on accurate and honest submissions.

---

[162] Lloyds CFTC Order, *supra* note 143, at 15.

[163] *Transcript of Phone Call Between Barclays Employee and Analyst in the Markets Group of the New York Fed*, Oct. 10, 2008, at BARC-MAY6-000095, *available at* http://www.newyorkfed.org/newsevents/news/markets/ 2012/libor/October_10_2008_transcript.pdf, *attachment to* N.Y. Fed Press Release, *supra* note 120.

[164] *United States v. Cooperative Centrale Raiffeisen Boerenleenbank, B.A.,* Deferred Prosecution Agreement, Attachment A, Statement of Facts (Oct. 29, 2013) ¶ 40, *available at* http://www.justice.gov/iso/opa/resources/ 645201310298755805528.pdf (hereinafter "Rabobank SOF"), attached as Exhibit 16 and incorporated into this Complaint by reference.

[165] *Transcript of Phone Call Between Barclays Employee and Analyst in the Markets Group of the New York Fed*, Oct. 24, 2008*,* at 000098, *available at*  http://www.newyorkfed.org/newsevents/news/markets/2012/libor/ October_24_2008_transcript.pdf, *attachment to* N.Y. Fed Press Release, *supra* note 120.

[166] *Id*. at 000100.

[167] *Id*.

114.    The conspiracy to depress bbaLIBOR™ superseded the prior and ongoing efforts of individual traders to manipulate bbaLIBOR™ to benefit their trading positions.[168]  For example, UBS management on several occasions received requests made by individual traders to deviate slightly from the systematic depression to manipulate a particular submission for Japanese Yen bbaLIBOR™ on a given day.[169]  On information and belief, those requests were rejected and/or did not prevent USD bbaLIBOR™ depression.

### B.    Conduct to Benefit Individual Trader Positions

115.    Public disclosures reveal that certain derivatives traders employed by the Panel Bank Defendants routinely asked their bbaLIBOR™ submitters to provide false and dishonest bbaLIBOR™ submissions to the BBA.[170]  The bbaLIBOR™ submitters for these Panel Bank Defendants agreed to accommodate, and did accommodate, the traders' requests for favorable bbaLIBOR™ submissions on hundreds, and perhaps thousands, of occasions.[171]

116.    Over a period of years, a culture of collusion developed that ultimately enabled the systematic LIBOR suppression discussed above.[172]  Through coordination with Panel Bank Defendants, on information and belief, these traders improved their ability to effectively fraudulently and collusively manipulate bbaLIBOR™.[173]  Barclays, UBS, RBS, Rabobank, Lloyds and HBOS all have admitted to government authorities that they submitted false and

---

[168] UBS SOF, *supra* note 62, ¶ ¶ 132-133.

[169] *Id.*

[170] UBS SOF, *supra* note 62, ¶ 19; Barclays SOF, *supra* note 107, ¶ 11; *United States v. Royal Bank of Scotland plc,* Deferred Prosecution Agreement, Attachment A ¶ 14 (Feb. 5, 2013) (hereinafter "RBS SOF"), attached as Exhibit 17 and incorporated into this Complaint by reference.

[171] Barclays SOF *supra* note 107, ¶ 11; UBS SOF, *supra* note 62, ¶ 20; RBS SOF, *supra* note 170,  ¶¶ 14-15, 19.

[172] *See, e.g.*, Editors, *Libor Gives Prosecutors Chance to Change Banking Culture*, Bloomberg (Sept. 24, 2012), http://www.bloomberg.com/news/2012-09-24/libor-gives-prosecutors-chance-to-change-banking-culture.html.

[173] Barclays SOF, *supra* note 107,  ¶¶ 23-24.

misleading bbaLIBOR™ submissions to the BBA, and that the bbaLIBOR™ fixings published by and through the BBA were materially false and misleading.[174]

### C.    Harmful Effects of the Unlawful Conduct

117.    By submitting and publishing interbank lending rates that were determined by collusion rather than by competition, the Panel Bank Defendants interfered with the competitive process in the markets for short-term wholesale funding, USD interest-rate benchmarks, USD OTC interest-rate derivatives, floating-rate retail loans, and floating-rate MBS.

118.    Absent collusion, banks compete for cash based on the interest rates that they pay.[175]  As noted above, the interest rate that a borrower is willing to pay, and a lender is willing to accept, is determined in large part by the borrower's credit standing and liquidity.  In a competitive environment, less creditworthy banks are incentivized to become more efficient and shed risk to compete more effectively.[176]  For example, in 2007 and 2008, absent collusion, Barclays would be expected to have responded to concerns about its credit risk and liquidity by improving its balance sheet and limiting exposure to illiquid assets (i.e., competing "on the merits"), and not by entering into a secret agreement with other Panel Bank Defendants to hide their respective abilities to obtain funds, and the interest rates they had to pay to obtain those funds.

---

[174] *Id.* ¶ 33; RBS SOF, *supra* note 170,  ¶ 81; UBS SOF, *supra* note 62, ¶ 97.  On information and belief, other Panel Defendant Banks engaged in the same type of conduct that Barclays, UBS, RBS, Rabobank, Lloyds and HBOS have admitted occurred.

[175] *See e.g.*, Citigroup, Citi Annual Report 2009, at 262 (2009), *available at* http://www.citigroup.com/citi/fin/data/ar09c_en.pdf (Citigroup "actively competes for access to capital at competitive rates to fund its operations, including competition for deposits and funding in the short- and long-term debt markets.").

[176] Xavier Freixas et al., Fed. Reserve Bank of N.Y. Staff Reports, Bank Liquidity, Interbank Markets, and Monetary Policy (May 2009) (revised Sep. 2009), *available at* http://www.newyorkfed.org/research/staff_reports/sr371.pdf.

119.     In addition, the Panel Bank Defendants' and the BBA's fraudulent and collusive conduct artificially biased the competitive process for interest-rate derivatives and floating-rate MBS in favor of the Panel Bank Defendants.  As shown above, prices for USD OTC interest-rate derivatives and floating-rate MBS were set based on the expectation that the Panel Bank Defendants and the BBA would determine USD bbaLIBOR™ according to the published rules and governance mechanisms.  By secretly agreeing to depress USD bbaLIBOR™, the Panel Bank Defendants obtained a competitive advantage over their counterparties that artificially inflated the margins that the Panel Bank Defendants would earn in transactions for USD pay-fixed interest-rate swaps and floating-rate MBS.

120.     Prior to the contract settlement date, the price of a three-month Eurodollar futures contract is an indication of the market's prediction of the three-month USD bbaLIBOR™.  As shown in Figure 5 below, from at least 1992, USD bbaLIBOR™ was consistently a few basis points above the Eurodollar Bid Rate published by the Federal Reserve Board from 2002-2006.[177]  Eurodollars are time deposits in USD held in commercial banks outside the United States, primarily London.  Eurodollar futures contracts, based on a notional $1 million three-month deposit, are traded on the CME.[178]  Prior to the contract settlement date, the price of a three-month Eurodollar futures contract is an indication of the market's prediction of the three-month USD bbaLIBOR™  on its settlement date.[179]

121.     In other words, before the Panel Bank Defendants' and the BBA's fraud and collusion, a Eurodollar futures contract provided an estimate of USD bbaLIBOR™ in the future

---

[177] *Ask Dr. Econ*, Fed. Reserve Bank of S.F. (July 2006), http://www.frbsf.org/education/activities/drecon/2006/0607.html.

[178] Barclays SOF, *supra* note 107, ¶ 9.

[179] *Id.*

for the given maturity.  The Eurodollar bid rate represents the interest rate at which a bank would lend money to another bank, while bbaLIBOR™ is intended to represent the rate at which a Panel Bank would ask to pay.[180]  As a result, one would expect to see a small bid (Eurodollar)/ask (bbaLIBOR™) spread as reflected in the relationship that existed from 1992 through 2006.[181]  One academic study has found that from 1992 through 2007, the Eurodollar Bid Rate reportedly was a better predictor than bbaLIBOR™ rates of the following day's bbaLIBOR™.[182]

122.    The relationship between the Eurodollar Bid Rate and bbaLIBOR™ fundamentally changed in the summer of 2007, with bbaLIBOR™ rates falling below the Eurodollar Bid Rate, sometimes dramatically, through late 2011.  These data confirm that the Panel Bank Defendants' behavior changed in 2007 with regard to USD bbaLIBOR™ submissions at the same time that UBS, Barclays, RBS, and other Panel Bank Defendants secretly adopted policies to depress bbaLIBOR™ and maintain submitted rates within a narrow range.  From at least 2007 through at least mid-2011, every one of the Panel Bank Defendants submitted USD bbaLIBOR™ submissions that were significantly lower than the Eurodollar Bid Rate.

---

[180] Connan Snider & Thomas Youle, *Does the LIBOR Reflect Banks' Borrowing Costs?* at 3, 7 (Apr. 10, 2010), *available at* http://www.econ.umn.edu/~youle001/libor_4_01_10.pdf.

[181] *Id.* at 7.

[182] *Id.* at 8.

**Figure 5:  Difference between 3M USD bbaLIBOR™ and 3M Eurodollar Bid Rate**



123.    On a Defendant-by-Defendant basis, the average USD bbaLIBOR™/Eurodollar Bid Rate spread during that time ranged from 25 basis points (BTMU, Barclays, Norinchukin) to 35 basis points (JPMorgan, WestLB).[183]  Notably, there appears to be no distinction between the Panel Bank Defendants that have admitted submitting artificially depressed USD bbaLIBOR™s and those that have not yet done so.  Barclays's submissions were at the high end of the range at an average 25 basis points spread, UBS and HBOS were in the middle with an average 29 basis points spread.

124.    Similarly, focusing only on the last two weeks of September 2008, the average USD bbaLIBOR™/Eurodollar Bid Rate spread generally ranged from 110 basis points (HBOS) to 153 basis points (JPMorgan).[184]  The outlier was Barclays (87 bp), which has admitted that it

---

[183] The remaining Panel Bank Defendants are:  Bank of America (30 bp), Citigroup (32 bp), Credit Suisse (27 bp), Deutsche Bank (31 bp), HBOS (29 bp), HSBC (32 bp), Lloyds (30 bp), Rabobank (32 bp), RBC (26 bp), RBS (26 bp), and UBS (29 bp).

[184] The remaining Panel Bank Defendants are:  BTMU (120 bp), Bank of America (144 bp), Citigroup (142 bp), Credit Suisse (122 bp), Deutsche Bank (129 bp), HSBC (141 bp), Lloyds (146), Norinchukin (126 bp), Rabobank (143 bp), RBC and RBS (140 bp), UBS (141 bp), and WestLB (138 bp).

consistently submitted artificially low bbaLIBOR™ rates.  Similarly, the next highest

submissions were provided by HBOS, which has also admitted to depressing bbaLIBOR™.  The

fact that these two Panel Bank Defendants were at the high end of bbaLIBOR™ submissions

supports the inference that the other Panel Bank Defendants were all submitting artificially

depressed rates at the time.

125.     The individual participants in the fraudulent and collusive conduct described in

this Complaint would not have engaged in the conduct, which carries the potential for criminal

penalties, absent a reasonable belief that the conduct actually influenced the USD bbaLIBOR™

fixings.

126.     By collusively depressing USD bbaLIBOR™, Defendants distorted prices in the

markets for financial products that incorporated interest-rate benchmarks (e.g., pay-fixed swaps

and MBS), and diminished the quality of financial products that incorporated interest-rate

benchmarks.  The unlawful agreements also limited the choice of interest-rate benchmarks

available to non-conspirators that negotiated for OTC interest-rate derivatives, floating-rate retail

loans, and floating-rate MBS purchasers.  As the EC recently wrote:  "In order for users of

benchmarks to make appropriate choices of, and understand the risks of, benchmarks, they need

to know what the benchmark measures and their vulnerabilities."[185]

127.     The Panel Bank Defendants falsely purported to fully compete in all of these

financial product markets.  Further, to the extent that the Panel Bank Defendants used false and

dishonest USD bbaLIBOR™ submissions to inflate their apparent creditworthiness and their

respective reputations, they artificially increased their ability to charge higher underwriting fees

---

[185] EC Proposal, *supra* note 33, at 16.

and obtain higher offering prices for financial products to the detriment of the Closed Banks and other consumers.

128.     The Closed Banks engaged in numerous financial transactions with Panel Bank Defendants and others involving products that incorporated USD bbaLIBOR™.  The Closed Banks reasonably relied on the honesty of the affected benchmark rates in undertaking these transactions and holding bbaLIBOR™-based financial products.  As a direct and proximate result of Defendants' wrongful conduct as described in this Complaint, the Closed Banks have been injured in their business and property and have suffered damages in an amount presently undetermined.

## DISCLOSURE OF THE FRAUDULENT AND COLLUSIVE CONDUCT

129.     On March 15, 2011, UBS disclosed in a note to its Annual Report that it had received subpoenas from the U.S. Commodity Futures Trading Commission ("CFTC") and the U.S. Department of Justice ("DOJ") in connection with investigations into bbaLIBOR™.  This note marked the first public acknowledgment by any Defendant of the confidential CFTC investigation, which had begun in late 2008.[186]  The Annual Report stated that the investigations focused on whether there were improper attempts by UBS, either acting on its own behalf or together with others, to manipulate bbaLIBOR™ rates.  Over the next months, the Panel Bank Defendants, regulators, and media reports gradually revealed the scope of the investigation until Barclays admitted its participation in bbaLIBOR™ manipulation in June 2012.

### A.     Barclays's Admissions

130.     On June 26, 2012, Barclays entered into a non-prosecution agreement with the Criminal Fraud Division of the DOJ relating to, among other things, USD bbaLIBOR™.  As part

---

[186] FSA Internal Audit, *supra* note 129, ¶ 1.1.

of that agreement, Barclays agreed to a Statement of Facts that explains the basis of the

non-prosecution agreement.  Barclays further received conditional leniency from the DOJ's

Antitrust Division for potential Sherman Act violations involving financial instruments that

reference Euribor.  Barclays also entered into a settlement with the CFTC to resolve charges

related to bbaLIBOR™ that it violated Sections 6(c), 6(d), and 9(a)(2) of the Commodity

Exchange Act ("CEA"), 7 U.S.C. §§ 9, 13b, and 13(a)(2).[187]

131.     According to these filings, Barclays through its agents, officers, and employees

repeatedly made false, misleading, or knowingly inaccurate submissions concerning USD

bbaLIBOR™ and other currencies.  More specifically, Barclays admitted that it engaged in a

deceptive course of conduct in an effort to gain an advantage over its counterparties and that

Barclays's USD bbaLIBOR™ submissions were false or misleading.[188]  Barclays admitted that it

lacked specific internal controls and procedures concerning its submission processes for

bbaLIBOR™ and that its inadequate supervision allowed the fraudulent and collusive conduct to

occur.  Barclays further admitted that it knew that the fraudulent and collusive suppression of

affected interest-rate derivatives tied to bbaLIBOR™ benefited Barclays at the expense of its

counterparties.[189]

132.     The BBA, which had known of the investigation since late 2008, publicly claimed

to be "shocked" by Barclays's disclosures.[190]  Just a few months earlier, the BBA deleted links

on its website that detailed its involvement with setting bbaLIBOR™, including a statement that

---

[187] Barclays CFTC Order, *supra* note 90.

[188] Barclays SOF, *supra* note 107, ¶ 33.

[189] *Id.* ¶¶ 30-32.

[190] Rachel Cooper, *Barclays Libor Scandal:  As It Happened—June 28, 2012*, The Telegraph, June 28, 2012, http://www.telegraph.co.uk/finance/newsbysector/banksandfinance/9361646/Barclays-Libor-scandal-as-it-happened-June-28-2012.html.

it "calculates and produces BBA LIBOR at the request of our members for the good of the market."[191]

133.     The day after Barclays's June 2012 disclosure, its stock price dropped dramatically, reflecting a loss of more than $5 billion in market capitalization.[192]  This sudden drop in stock price was further evidence that market participants, including the Closed Banks, were unaware that Barclays had been propping up its creditworthiness through bbaLIBOR™ manipulation.

### B.     UBS Admissions

134.     On December 18, 2012, UBS entered into a non-prosecution agreement with the Criminal Fraud Division of DOJ related to bbaLIBOR™.  UBS also obtained conditional leniency for potential Sherman Act violations involving financial instruments that reference Yen bbaLIBOR™ and Euroyen TIBOR.

135.     On December 19, 2012, the Swiss Financial Market Supervisory Authority ("FINMA") issued a Summary Report regarding its investigation of UBS.[193]  The Final Notice summarizes UBS's misconduct and notes that UBS's "[s]ubstantial failings in the system and control processes for LIBOR submissions prevented those responsible at UBS from detecting and acting" on the misconduct.[194]

---

[191] Liam Vaughan & Jesse Westbrook, *Libor Links Deleted as U.K. Bank Group Backs away from Rate*, Bloomberg Businessweek (Mar. 7, 2012), http://www.businessweek.com/news/2012-03-06/libor-links-deleted-as-bank-group-backs-away-from-tarnished-rate#p2.

[192] Cooper, *supra* note 190.

[193] FINMA, *FINMA Investigation into the Submission of Interest Rates for the Calculation of Interest Reference Rates such as LIBOR by UBS AG*, at 2 (Dec. 19, 2012), attached as Exhibit 18 and incorporated into this Complaint by reference.

[194] *Id.*

136.     In December 2012, UBS Securities Japan Co. Ltd. ("UBSSJ") agreed to plead guilty to one count of wire fraud (18 U.S.C. § 1343) for secretly manipulating Yen bbaLIBOR™ and TIBOR.[195] UBSSJ admitted in its plea that false and misleading bbaLIBOR™ submissions were "material" from the perspective of counterparties to financial transactions.[196]

137.     In December 2012, the DOJ charged two former UBS traders—Tom Hayes and Roger Darin (collectively, the "UBS traders")—with wire fraud and conspiracy to commit wire fraud for secretly manipulating bbaLIBOR™ and other benchmark rates.[197] In addition, the DOJ charged the UBS traders with a violation of Section 1 of the Sherman Act for conspiring with an unidentified employee at a major financial institution and others to fix Yen bbaLIBOR™, a key price component of Yen bbaLIBOR™-based derivative products.[198]

138.     On December 19, 2012, UBS and UBSSJ entered into a settlement with the CFTC to resolve allegations that UBS violated Sections 6(c), 6(d), and 9(a)(2) of the CFTC, 7 U.S.C. §§ 9, 13b, and 13(a)(2) related to bbaLIBOR™.[199] According to the CFTC's findings, from at least January 2005 through 2011, UBS by and through acts of dozens of employees, officers, and agents located around the world, engaged in systematic misconduct that undermined the integrity of certain global benchmarks, including USD bbaLIBOR™. UBS admitted that its false submissions contained market information that affected or tended to affect USD bbaLIBOR™, and USD bbaLIBOR™ was a commodity in interstate commerce.[200] Further, UBS continued its

---

[195] UBS SOF, *supra* note 62, at Appendix B.

[196] *Id.* at Appendix B, Ex. 3  ¶¶ 9-10, Ex. 4 ¶ 75.

[197] Compl. at 1-2, *United States of America v. Alexander, et al.*, No. 12 MAG 3229 (S.D.N.Y. Dec. 12, 2012), attached as Exhibit 19 and incorporated into this Complaint by reference.

[198] *Id.* at 3.

[199] *In re UBS AG*, No. 13-09 (C.F.T.C. Dec. 19, 2012), attached as Exhibit 20 and incorporated into this Complaint by reference.

[200] *Id.* at 4, 41, 52-53.

"rampant misconduct," including collusive conduct, long after it was on notice (in October 2008) of an investigation into its USD bbaLIBOR™ practices.[201]

### C.   RBS Admissions

139.    On February 5, 2013, RBS executed a Deferred Prosecution Agreement with the Criminal Fraud Section of the DOJ.  Under the terms of that agreement, RBS admitted various facts relating to its involvement in fraudulent and collusive practices relating to bbaLIBOR™ submissions.  The United States filed a two-count criminal information charging RBS with wire fraud and price fixing in connection with RBS's conduct and agreed to defer prosecution of that case pursuant to its agreement with RBS.[202]  In addition, RBS Securities Japan Ltd. pleaded guilty to one count of wire fraud for its participation in fraudulent and collusive practices relating primarily to BBA Yen bbaLIBOR™.[203]

140.    The agreements reached between (a) the United States and Barclays, (b) the United States and UBS, and (c) the United States and RBS all refer to an ongoing investigation into misconduct related to additional, unidentified benchmark rates.  The United States has declined to reveal those benchmark rates.  On information and belief, USD bbaLIBOR™ is among the interest rates under investigation by the United States.

### D.   Rabobank Admissions

141.    On October 29, 2013, Rabobank settled bbaLIBOR™ investigations by the DOJ, CFTC, FSA and Dutch authorities.  Rabobank admitted to the CFTC that its manipulation of USD bbaLIBOR™, Pound Sterling bbaLIBOR™, Yen bbaLIBOR™ and EURIBOR violated the

---

[201] *Id.* at 5.

[202] RBS SOF, *supra* note 170, ¶¶ 1-2.

[203] *Id.* ¶ 3.

CEA and it paid a $475 million fine.[204]  Rabobank also entered into a deferred prosecution

agreement with the Criminal Fraud Section of the DOJ to resolve charges of wire fraud based on

the manipulation of bbaLIBOR™ and EURIBOR and paid a $235 million fine.  As part of the

settlements, Rabobank admitted that more than two dozen of its traders, including its Global

Head of Liquidity and Finance, participated in ongoing and pervasive manipulation of USD and

Yen bbaLIBOR™ to favor its day-to-day trading positions.[205]

142.    According to these filings, Rabobank, through its agents, officers, and employees

repeatedly made false, misleading, or knowingly inaccurate submissions concerning USD

bbaLIBOR™ and other currencies.  More specifically, Rabobank admitted that by falsely

representing that its bbaLIBOR™ submissions were based on its perceived costs of borrowing

unsecured funds in the relevant interbank market, it engaged in a deceptive course of conduct in

an effort to gain an advantage over its counterparties and that Rabobank's bbaLIBOR™

submissions were false or misleading.[206]

### E.    Lloyds and HBOS Admissions

143.    On July 28, 2014, the FCA fined Lloyds and HBOS for colluding to manipulate

USD, pound sterling ("GBP"), and yen ("JPY") bbaLIBOR™, as well as the GBP repo rate.[207]

Among other things, the FCA found that traders at Lloyds and HBOS had conversations and

---

[204] *In re Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A.*, No. 14-02 (C.F.T.C. Oct. 29, 2013), attached as Exhibit 21 and incorporated into this Complaint by reference.

[205] *United States v. Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A.,* Deferred Prosecution Agreement, (Oct. 29, 2013), *available at* http://www.justice.gov/iso/opa/resources/976201310298727797926.pdf; Rabobank SOF, *supra* note 164, at para 40.

[206] Rabobank SOF, *supra* note 164, ¶ 97.

[207] A "repo" is a repurchase agreement, in which one party sells securities together with an agreement to buy the securities back at a specific later date.  The difference between the sale and repurchase prices effectively represents the interest charged by the original purchaser.  *See* Lloyds Final Notice, *supra* note 103, ¶ 3.2 (Definitions).

communications with other Panel Bank Defendants to manipulate GBP and USD bbaLIBOR™ for profit on derivative transactions.

144.    In addition, the FCA found that in September and October 2008, an HBOS manager instructed HBOS traders to depress GBP and USD bbaLIBOR™ submissions to stay in line with other Panel Bank Defendants, rather than comply with the published methodology for bbaLIBOR™.[208]  In their government admissions, Lloyds and HBOS management stated that they did not discover the unlawful conduct until after they had been asked to investigate potential issues in 2010.[209]  In March 2011, Lloyds attested to the FCA that its systems and controls for its bbaLIBOR™ submissions were adequate.[210]  Lloyds later admitted that this attestation was false.[211]

145.    The FCA further found that Lloyds and HBOS colluded to manipulate the BBA Repo Rate.  That rate, published by the BBA, served as a benchmark which purported to provide the rates offered by major banks in London for general collateral repo transactions of normal market size with other banks at 11 a.m. London time.[212]  Both Lloyds and HBOS were Repo Rate Panel banks.  In 2008, the Bank of England gave United Kingdom banks cash under a Special Liquidity Scheme ("SLS"), in which the banks could swap illiquid securities with the UK for UK Treasury bills, which the banks could then use as collateral to borrow cash in secured transactions.[213]  The fee for participating in the SLS was measured by the difference between

---

[208] *Id.* ¶¶ 4.48-.59.

[209] *Id.* ¶ 4.70.

[210] *Id.* ¶ 5.15.

[211] *Id.*

[212] *Id.* ¶¶ 2.2-2.9, 3.2.

[213] *Id.* ¶ 4.9.

three month GBP bbaLIBOR™ and the three-month GBP Repo Rate.  Thus, banks had an

incentive to depress GBP bbaLIBOR™ and increase the Repo Rate.

146.    Also on July 28, 2014, Lloyds consented to entry of an Order Making Findings

and Imposing Remedial Sanctions with the CFTC and agreed to pay a $105 million fine.[214]  The

CFTC found that Lloyds and HBOS had misrepresented that they were following the published

bbaLIBOR™ methodology from at least 2006 through 2010.  The CFTC findings quote an

HBOS USD bbaLIBOR™ submitter as saying the following during an electronic chat with "an

employee of another financial institution":  "'youll like this ive been pressured by senior

management to bring my rates down into line with everyone else.'"[215]

147.    The CFTC also quoted an HBOS manager as complaining that GBP bbaLIBOR™

rates "could potentially create an issue with buyers of our paper."[216]  The CFTC found that

HBOS was concerned that lenders might be unwilling to transact business or deal with HBOS or

might have demanded higher interest rates had HBOS submitted bbaLIBOR™s that complied

with the bbaLIBOR™ methodology.[217]  In addition, the CFTC found that an HBOS

bbaLIBOR™ supervisor had instructed employees that they normally should not make bids for

cash in the market above the relevant bbaLIBOR™ rate.[218]  The CFTC found that at least

through the end of 2008, HBOS had made USD bbaLIBOR™ submissions that did not reflect

---

[214] Lloyds CFTC Order, *supra* note 143, at 23.

[215] *Id*. at 15.

[216] *Id*.

[217] *Id*.

[218] *Id*. at 16.

the bbaLIBOR™ methodology and therefore conveyed false, misleading, or knowingly inaccurate reports concerning USD bbaLIBOR™.[219]

148.    The CFTC further found that Lloyds and HBOS violated Section 9(a)(2) of the CEA by giving false market information that affected, or tended to affect, the price of commodities sold in interstate commerce.  The CFTC found that this false information included information concerning the costs of borrowing funds in USD, the liquidity and stress conditions in the money markets, and Lloyds's and HBOS's ability to borrow funds in the particular markets.

149.    In the Consent Order, Lloyds agreed to abide by a set of principles to ensure the integrity and reliability of submissions in the market for benchmark interest rates.[220]

150.    The same day, Lloyds entered into an agreement with DOJ to pay an $86 million penalty for manipulating bbaLIBOR™ submissions.[221]  "Lloyds's conduct undermined financial markets domestically and abroad," said Deputy Assistant Attorney General Brent Snyder of the DOJ's Antitrust Division.[222]  As one example, DOJ quoted an exchange on May 19, 2009 between a money markets trader who was a former USD bbaLIBOR™ submitter at a subsidiary of Lloyds, who wrote:  "have 5 yard [billion] 3 month liability rolls today so would be advantageous to have lower 3month libor setting if doesn't conflict with any of your fix's," and a

---

[219] *Id.*

[220] *Id.* at 25.

[221] Press Release, U.S. Dep't Justice, Lloyds Banking Group Admits Wrongdoing in LIBOR Investigation, Agrees to Pay $86 Million Criminal Penalty (July 28, 2014), http://www.justice.gov/opa/pr/lloyds-banking-group-admits-wrongdoing-libor-investigation-agrees-pay-86-million-criminal.

[222] *Id.*

then-current USD bbaLIBOR™ submitter, who responded later that day:  "obviously we got the Libors down for you."[223]

151.     The Closed Banks, and after they failed, the FDIC as Receiver for the Closed Banks, could not discover the fraud and collusion described in this Complaint until June 2012 at the earliest when Barclays admitted that it knowingly and intentionally submitted false and dishonest bbaLIBOR™ submissions to the BBA.  Prior to that time, the only information available was that other government regulators had initiated an investigation into bbaLIBOR™, and that bbaLIBOR™ "dislocations" were unusual and deviated from patterns predating the financial crisis.  As explained above, however, the Panel Bank Defendants and the BBA offered facially plausible pretextual explanations for these "dislocations" and repeatedly denied the existence of any fraudulent or collusive conduct relating to bbaLIBOR™ submissions.  In particular, the BBA held itself out as an independent entity that exercised meaningful oversight of bbaLIBOR™ and on several occasions falsely represented that it had confirmed that bbaLIBOR™ submissions were honest and accurate.  The FDIC-R and the Closed Banks therefore did not know that USD bbaLIBOR™ was false, made intentionally and knowingly, with intent to mislead, and/or pursuant to an agreement among the Panel Bank Defendants and the BBA.  The claims alleged in this Complaint arise, among other things, from the same wrongful acts and concern the same evidence, memories, and witnesses as the class actions filed in this MDL (11-MD-2262 (NRB)).

152.     The FDIC-R and the Closed Banks did not have access to the information that could have revealed the fraud and collusion.  For example, the FDIC-R and the Closed Banks did not have access to, among other things, (a) internal communications at the Panel Bank

---

[223] *Id.*

- 70 -

Defendants regarding fraud and collusion, (b) communications between and among the Panel

Defendant Banks regarding bbaLIBOR™, (c) communications between the Panel Defendant

Banks and government regulators regarding the bbaLIBOR™ investigation, (d) documents

produced in connection with the confidential investigations, (e) meetings of the FX & MM

Committee, or (f) communications within the BBA or between Panel Bank Defendants and the

BBA.

153.     The admissions by Barclays, UBS, RBS, Rabobank, Lloyds, and HBOS reveal

some of the efforts that the Panel Bank Defendants undertook to conceal their fraudulent and

collusive conduct.  For example, (a) a UBS trader scolded a manager for internally transmitting

in writing a request to manipulate a bbaLIBOR™ submission,[224] (b) a Barclays trader

consciously sought to move bbaLIBOR™ submissions in small increments over time to avoid

detection,[225] (c) a UBS derivatives desk manager instructed a bbaLIBOR™ submitter to lie when

interviewed by UBS attorneys investigating bbaLIBOR™ manipulation,[226] and (d) in 2010, long

after learning of the investigation into bbaLIBOR™, RBS traders continued their conduct but

sought to avoid communicating in writing because "at the moment the FED are all over us about

libors [sic]."[227] On information and belief, the other Panel Bank Defendants engaged in similar

conduct to cover up their fraudulent and collusive activities involving USD bbaLIBOR™.  The

evidence of such conduct is solely within the custody and control of the Panel Bank Defendants,

the BBA and/or government regulators other than the FDIC.

---

[224] UBS SOF, *supra* note 62, ¶ 38.

[225] Barclays SOF, *supra* note 107, ¶ 44.

[226] UBS SOF, *supra* note 62, ¶ 39.

[227] RBS Final Notice, *supra* note 74, ¶ 52.

154. The former head of the FSA, Adair Turner, told Parliament on February 27, 2013, that there was "no information" of bbaLIBOR™ manipulation and that regulators could not have spotted the fraudulent and collusive conduct even with "intensive supervision."[228]  Similarly, Former Chairman of the United States Federal Reserve Board, Alan Greenspan, was recently quoted as saying:  "Through all of my experience, what I never contemplated was that there were bankers who would purposely misrepresent facts to banking authorities.  You were honor bound to report accurately, and it never entered my mind that, aside from a fringe element, it would be otherwise."[229]  The CFTC, which led the effort to expose the unlawful conduct, required 20 months to obtain actionable evidence.[230]

## COUNT I:  BREACH OF CONTRACT WITH AMCORE
### (MERRILL LYNCH CAPITAL SERVICES, INC.)

155. The FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

156. On September 3, 1996, Amcore entered into an ISDA Master Agreement with Defendant Merrill Lynch Capital Services, Inc., under which Amcore entered into pay-fixed swaps with Merrill Lynch Capital Services, Inc. ("Amcore-ML Master Agreement").[231]

---

[228] Huw Jones, *It Was Impossible To Spot Libor Rigging:  UK Watchdog*, Reuters (Feb. 27, 2013), http://www.reuters.com/article/2013/02/27/us-libor-britain-fsa-idUSBRE91Q0NX20130227.

[229] Liam Vaughn & Gavin Finch, *Libor Lies Revealed in Rigging of $300 Trillion Benchmark*, Bloomberg (Jan. 28, 2013), http://www.bloomberg.com/news/2013-01-28/libor-lies-revealed-in-rigging-of-300-trillion-benchmark.html. As William Dudley, the President and CEO of the New York Federal Reserve Bank, recently stated with respect to the bbaLIBOR™ investigation:  "We have learned that false reporting and manipulative behavior was pervasive across firms and over time, took many forms and was often conducted in a nonchalant manner."  William C. Dudley, Pres. & CEO, Fed. Reserve Bank of N.Y., Remarks at the Salomon Center for the Study of Financial Institutions, New York University Stern School of Business, New York City (Oct. 2, 2014), *available at* http://www.ny.frb.org/ newsevents/speeches/2014/dud141002.html.

[230] Joe Nocera, *The Little  Agency That Could*, N.Y. Times, Nov. 15, 2013, http://www.nytimes.com/2013/11/16/opinion/the-little-agency-that-could.html?_r=0.

[231] The Amcore-ML Master Agreement is attached as Exhibit 22 and incorporated into this Complaint by reference.

157.    In the Amcore-ML Master Agreement, the parties represented that the execution, delivery, and performance of the Amcore-ML Master Agreement did not violate or conflict with any law applicable to it.[232]  The Amcore-ML Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, and complete in every material respect."[233]  The Amcore-ML Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Amcore-ML Master Agreement or any Credit Support Document to which it is a party.[234]

158.    The Amcore-ML Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[235]  The Amcore-ML Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Amcore-ML Master Agreement.[236]

---

[232] Amcore-ML Master Agreement ¶ 3(a)(iii).

[233] *Id.* ¶ 3(d).

[234] *Id.* ¶ 4(c).

[235] *Id.* ¶ 5(a)(iv).

[236] *Id.* ¶ 11.

159.     The Amcore-ML Master Agreement states that all transactions between Amcore and Merrill Lynch Capital Services, Inc. are entered into in reliance on the fact that the Amcore-ML Master Agreement and all confirmations form a single agreement between the parties.[237]  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

160.     During the relevant period, Amcore entered into pay-fixed swaps governed by the Amcore-ML Master Agreement.

161.     Merrill Lynch Capital Services, Inc. knowingly breached and defaulted on the Amcore-ML Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, and its underpayments to Amcore tied to the artificially depressed USD bbaLIBOR™.

162.     As a result of Merrill Lynch Capital Services, Inc.'s breach of the Amcore-ML Master Agreement, Amcore and the FDIC as Receiver for Amcore have suffered damages under the Amcore-ML Master Agreement.

## COUNT II:  BREACH OF CONTRACTS WITH AMTRUST
### (CITIBANK, N.A. AND RBS)

163.     The FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

164.     On, September 11, 2006, Ohio Savings Bank, predecessor-in-interest to AmTrust, entered into an ISDA Master Agreement with Defendant Citibank, N.A., under which AmTrust entered into pay-fixed swaps with Citibank ("AmTrust-Citibank Master Agreement").[238]

---

[237] *Id.* ¶ 1(c).

[238] The AmTrust-Citibank Master Agreement is attached as Exhibit 23 and incorporated into this Complaint by reference.

165.     On October 12, 2006, Ohio Savings Bank, predecessor-in-interest to AmTrust, entered into an ISDA Master Agreement with Defendant the Royal Bank of Scotland plc, under which AmTrust entered into pay-fixed swaps with RBS ("AmTrust-RBS Master Agreement").[239] The AmTrust-Citibank Master Agreement and the AmTrust-RBS Master Agreement are referenced collectively in this Complaint as the AmTrust Master Agreements.

166.     In the AmTrust Master Agreements, the parties each represented that the execution, delivery, and performance of the AmTrust Master Agreements did not violate or conflict with any law applicable to them.[240]  The AmTrust Master Agreements further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."[241]  The AmTrust Master Agreements require that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the AmTrust Master Agreements or any Credit Support Document to which it is a party.[242]

167.     The AmTrust Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[243]  The AmTrust Master Agreements provide that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable

---

[239] The AmTrust-RBS Master Agreement is attached as Exhibit 24 and incorporated into this Complaint by reference.

[240] AmTrust Master Agreements ¶ 3(a)(iii).

[241] *Id.* ¶ 3(d).

[242] *Id.* ¶ 4(c).

[243] *Id.* ¶ 5(a)(iv).

out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the AmTrust Master Agreements.[244]

168.     The AmTrust Master Agreements state that all transactions between AmTrust and Citibank or RBS are entered into in reliance on the fact that the AmTrust Master Agreements and all confirmations form a single agreement between the parties.[245]  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

169.     During the relevant period, AmTrust entered into pay-fixed swaps governed by the AmTrust Master Agreements.

170.     Citibank and RBS knowingly breached and defaulted on the AmTrust Master Agreements through their fraudulent and collusive conduct, their failure to disclose fraudulent and collusive conduct, their intentional misrepresentation and manipulation of USD bbaLIBOR™, and their underpayments to AmTrust tied to the artificially depressed USD bbaLIBOR™.

171.     As a result of the Citibank's and RBS's breach of the AmTrust Master Agreements, AmTrust and the FDIC as Receiver for AmTrust have suffered damages under the AmTrust Master Agreements.

## COUNT III:  BREACH OF CONTRACTS WITH CORUS
### (BANK OF AMERICA, N.A. AND JPMORGAN CHASE BANK, N.A.)

172.     The FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

---

[244] *Id.* ¶ 11.

[245] *Id.* ¶ 1(c).

173.     On April 26, 2002, Corus entered into an ISDA Master Agreement with Defendant Bank of America, N.A., under which Corus entered into pay-fixed swaps with Bank of America, N.A. ("Corus-BOA Master Agreement").[246]

174.     On February 21, 1995, Corus entered into an ISDA Master Agreement with Defendant JPMorgan Chase Bank, N.A. under which Corus entered into pay-fixed swaps with JPMorgan Chase Bank, N.A. ("Corus-JP Master Agreement").[247]  The Corus-BOA Master Agreement and the Corus-JP Master Agreement are referenced collectively in this Complaint as the Corus Master Agreements.

175.     In the Corus Master Agreements, the parties represented that the execution, delivery, and performance of the Corus Master Agreements did not violate or conflict with any law applicable to them.[248]  The Corus Master Agreements further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, and complete in every material respect."[249]  The Corus Master Agreements require that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Corus Master Agreements or any Credit Support Document to which it is a party.[250]

176.     The Corus Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when

---

[246] The Corus-BOA Master Agreement is attached as Exhibit 25 and incorporated into this Complaint by reference.

[247] The Corus-JP Master Agreement is attached as Exhibit 26 and incorporated into this Complaint by reference.

[248] Corus Master Agreements ¶ 3(a)(iii).

[249] *Id.* ¶ 3(d).

[250] *Id.* ¶ 4(c).

made or repeated.[251]  The Corus Master Agreements provide that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Corus Master Agreements.[252]

177.    The Corus Master Agreements state that all transactions between Corus and Bank of America, N.A. or JPMorgan Chase Bank, N.A. are entered into in reliance on the fact that the Corus Master Agreements and all confirmations form a single agreement between the parties.[253] A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

178.    During the relevant period, Corus entered into pay-fixed swaps governed by the Corus Master Agreements.

179.    Bank of America, N.A. and JPMorgan Chase Bank, N.A. knowingly breached and defaulted on the Corus Master Agreements through their fraudulent and collusive conduct, their failure to disclose fraudulent and collusive conduct, and their underpayments to Corus tied to the artificially depressed USD bbaLIBOR™.

180.    As a result of Bank of America, N.A.'s and JPMorgan Chase Bank, N.A.'s breach of the Corus Master Agreements, Corus and the FDIC as Receiver for Corus have suffered damages under the Corus Master Agreements.

---

[251] *Id.* ¶ 5(a)(iv).

[252] *Id.* ¶ 11.

[253] *Id.* ¶ 1(c).

**COUNT IV:  BREACH OF CONTRACTS WITH INDYMAC**
**(BANK OF AMERICA, N.A., MERRILL LYNCH CAPITAL SERVICES, INC.,**
**BARCLAYS, CITIBANK, N.A., CITIGROUP FINANCIAL PRODUCTS, INC.,**
**CREDIT SUISSE INTERNATIONAL, DEUTSCHE BANK, J.P. MORGAN BANK**
**DUBLIN PLC, JPMORGAN CHASE BANK, N.A., J.P. MORGAN MARKETS LTD.,**
**RBC, RBS, AND UBS )**

181.    The FDIC-R incorporates by reference the preceding paragraphs of this

Complaint.

182.    On May 15, 2000, as amended on April 2, 2003 and June 10, 2005, IndyMac

entered into an ISDA Master Agreement with Defendant Bank of America, N.A., under which

IndyMac entered into pay-fixed swaps with Bank of America, N.A.  On March 16, 2000 and

January 23, 2001, IndyMac entered into ISDA Master Agreements with Fleet National Bank,

predecessor-in-interest to Defendant Bank of America, N.A., under which IndyMac entered into

pay-fixed swaps with Bank of America, N.A.  The Master Agreements between IndyMac and

Bank of America, N.A. are referenced collectively in this complaint as the "IndyMac-BOA

Master Agreements".[254]

183.    On July 3, 2000, IndyMac entered into an ISDA Master Agreement with

Defendant Merrill Lynch Capital Services, Inc., under which IndyMac entered into pay-fixed

swaps with Merrill Lynch Capital Services, Inc. ("IndyMac-ML Master Agreement").[255]

184.    On April 26, 2005, IndyMac entered into an ISDA Master Agreement with

Defendant Barclays Bank plc, under which IndyMac entered into pay-fixed swaps with Barclays

("IndyMac-Barclays Master Agreement").[256]

---

[254] The IndyMac-BOA Master Agreements are attached as Exhibits 27-29 and incorporated into this Complaint by reference.

[255] The IndyMac-ML Master Agreement, as amended on October 7, 2005, is attached as Exhibit 30 and incorporated into this Complaint by reference.

[256] The IndyMac-Barclays Master Agreement is attached as Exhibit 31 and incorporated into this Complaint by reference.

185.    On October 30, 2001, IndyMac entered into an ISDA Master Agreement with Defendant Citibank, N.A., under which IndyMac entered into pay-fixed swaps with Citibank, N.A. ("IndyMac-Citibank Master Agreement").[257]

186.    On March 15, 2005, IndyMac entered into an ISDA Master Agreement with Defendant Citigroup Financial Products, Inc., under which IndyMac entered into pay-fixed swaps with Citigroup Financial Products, Inc. ("IndyMac-CFP Master Agreement").[258]

187.    On February 16, 2001, IndyMac entered into an ISDA Master Agreement with Credit Suisse First Boston International, predecessor-in-interest to Credit Suisse International, under which IndyMac entered into pay-fixed swaps with Defendant Credit Suisse International ("IndyMac-Credit Suisse Master Agreement").[259]

188.    On May 18, 2007, IndyMac entered into an ISDA Master Agreement with Defendant Deutsche Bank, under which IndyMac entered into pay-fixed swaps with Deutsche Bank ("IndyMac-Deutsche Master Agreement").[260]

189.    On September 5, 2002, IndyMac entered into an ISDA Master Agreement with Defendant J.P. Morgan Bank Dublin plc (f.k.a. Bear Stearns Bank plc), under which IndyMac entered into pay-fixed swaps with J.P. Morgan Bank Dublin plc ("IndyMac-Bear Bank Master Agreement").[261]

---

[257] The IndyMac-Citibank Master Agreement, as amended on March 28, 2003, is attached as Exhibit 32 and incorporated into this Complaint by reference.

[258] The IndyMac-CFP Master Agreement is attached as Exhibit 33 and incorporated into this Complaint by reference.

[259] The IndyMac-Credit Suisse Master Agreement is attached as Exhibit 34 and incorporated into this Complaint by reference.

[260] The IndyMac-Deutsche Master Agreement is attached as Exhibit 35 and incorporated into this Complaint by reference.

[261] The IndyMac-Bear Bank Master Agreement is attached as Exhibit 36 and incorporated into this Complaint by reference.

190.     On January 29, 2004, IndyMac entered into an ISDA Master Agreement with Defendant JPMorgan Chase Bank, N.A., under which IndyMac entered into pay-fixed swaps with JPMorgan Chase Bank, N.A. ("IndyMac-JP Master Agreement").[262]

191.     On March 7, 2006, IndyMac entered into an ISDA Master Agreement with Defendant J.P. Morgan Markets Ltd. (f.k.a. Bear Stearns International Ltd.), under which IndyMac entered into pay-fixed swaps with J.P. Morgan Markets Ltd. ("IndyMac-Bear Int'l Master Agreement").[263]

192.     On July 14, 2004, IndyMac entered into an ISDA Master Agreement with Defendant Royal Bank of Canada, under which IndyMac entered into pay-fixed swaps with RBC ("IndyMac-RBC Master Agreement").[264]

193.     On November 18, 2005, IndyMac entered into an ISDA Master Agreement with Defendant the Royal Bank of Scotland plc, under which IndyMac entered into pay-fixed swaps with RBS ("IndyMac-RBS Master Agreement").[265]

194.     On June 2, 2004, IndyMac entered into two ISDA Master Agreements with Defendant UBS AG, under which IndyMac entered into pay-fixed swaps with UBS ("IndyMac-UBS Master Agreements").[266]  The Master Agreements involving IndyMac are referenced collectively in this Complaint as the IndyMac Master Agreements and the

---

[262] The IndyMac-JP Master Agreement, as amended on March 14, 2008, is attached as Exhibit 37 and incorporated into this Complaint by reference.

[263] The IndyMac-Bear Int'l Master Agreement is attached as Exhibit 38 and incorporated into this Complaint by reference.

[264] The IndyMac-RBC Master Agreement is attached as Exhibit 39 and incorporated into this Complaint by reference.

[265] The IndyMac-RBS Master Agreement, as amended on December 7, 2007, is attached as Exhibit 40 and incorporated into this Complaint by reference.

[266] The IndyMac-UBS Master Agreements are attached as Exhibits 41 and 42 and incorporated into this Complaint by reference.

Counterparties to the IndyMac Master Agreements are referenced collectively in this Complaint as the IndyMac Contracting Defendants.

195.    In the IndyMac Master Agreements, the parties represented that the execution, delivery, and performance of the IndyMac Master Agreements did not violate or conflict with any law applicable to them.[267]  The IndyMac Master Agreements further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, and complete in every material respect."[268]  The IndyMac Master Agreements require that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the IndyMac Master Agreements or any Credit Support Document to which it is a party.[269]

196.    The IndyMac Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[270]  The IndyMac Master Agreements provide that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the IndyMac Master Agreements.[271]

197.    The IndyMac Master Agreements state that all transactions between IndyMac and the IndyMac Contracting Defendants are entered into in reliance on the fact that the IndyMac

---

[267] IndyMac Master Agreements ¶ 3(a)(iii).

[268] *Id.* ¶ 3(d).

[269] *Id.* ¶ 4(c).

[270] *Id.* ¶ 5(a)(iv).

[271] *Id.* ¶ 11.

Master Agreements and all confirmations form a single agreement between the parties.[272]  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

198.    During the relevant period, IndyMac entered into pay-fixed swaps governed by the IndyMac Master Agreements.

199.    The IndyMac Contracting Defendants knowingly breached and defaulted on the IndyMac Master Agreements through their fraudulent and collusive conduct, their failure to disclose fraudulent and collusive conduct, their intentional misrepresentation and manipulation of USD bbaLIBOR™, and their underpayments to IndyMac tied to the artificially depressed USD bbaLIBOR™.

200.    As a result of the IndyMac Contracting Defendants' breach of the IndyMac Master Agreements, IndyMac and the FDIC as Receiver for IndyMac have suffered damages under the IndyMac Master Agreements.

## COUNT V:  BREACH OF CONTRACT WITH INTEGRA
### (CITIGROUP FINANCIAL PRODUCTS, INC.)

201.    The FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

202.    On February 4, 2003, Integra entered into an ISDA Master Agreement with Defendant Citigroup Financial Products, Inc., under which Integra entered into pay-fixed swaps with Citigroup Financial Products, Inc. ("Integra-CFP Master Agreement").[273]

---

[272] *Id.* ¶ 1(c).

[273] The Integra-CFP Master Agreement, as amended on September 20, 2006, is attached as Exhibit 43 and incorporated into this Complaint by reference.

203.     In the Integra-CFP Master Agreement, the parties each represented that the execution, delivery, and performance of the Integra-CFP Master Agreement did not violate or conflict with any law applicable to it.[274]  The Integra-CFP Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."[275]  The Integra-CFP Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Integra-CFP Master Agreement or any Credit Support Document to which it is a party.[276]

204.     The Integra-CFP Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[277]  The Integra-CFP Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Integra-CFP Master Agreement.[278]

---

[274] Integra-CFP Master Agreement ¶ 3(a)(iii).

[275] *Id.* ¶ 3(d).

[276] *Id.* ¶ 4(c).

[277] *Id.* ¶ 5(a)(iv).

[278] *Id.* ¶ 11.

205.     The Integra-CFP Master Agreement states that all transactions between Integra and Citigroup Financial Products are entered into in reliance on the fact that the Integra-CFP Master Agreement and all confirmations form a single agreement between the parties.[279]   A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

206.     During the relevant period, Integra entered into pay-fixed swaps governed by the Integra-CFP Master Agreement.

207.     Citigroup Financial Products knowingly breached and defaulted on the Integra-CFP Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, and its underpayments to Integra tied to the artificially depressed USD bbaLIBOR™.

208.     As a result of the Citigroup Financial Products's breach of the Integra-CFP Master Agreement, Integra and the FDIC as Receiver for Integra have suffered damages under the Integra-CFP Master Agreement.

### COUNT VI:  BREACH OF CONTRACT WITH SILVERTON (CITIGROUP FINANCIAL PRODUCTS, INC.)

209.     The FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

210.     On May 8, 2008, Silverton entered into an ISDA Master Agreement with Defendant Citigroup Financial Products, Inc., under which Silverton entered into pay-fixed swaps with Citigroup Financial Products ("Silverton-CFP Master Agreement.").[280]

---

[279] *Id.* ¶ 1(c).

[280] The Silverton-CFP Master Agreement is attached as Exhibit 44 and incorporated into this Complaint by reference.

211.    In the Silverton-CFP Master Agreement, the parties each represented that the execution, delivery, and performance of the Silverton-CFP Master Agreement did not violate or conflict with any law applicable to it.[281]   The Silverton-CFP Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."[282]   The Silverton-CFP Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Agreement or any Credit Support Document to which it is a party.[283]

212.    The Silverton-CFP Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[284]   The Silverton-CFP Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Silverton-CFP Master Agreement.[285]

213.    The Silverton-CFP Master Agreement states that all transactions between Silverton and Citigroup Financial Products are entered into in reliance on the fact that the Silverton-CFP Master Agreement and all confirmations form a single agreement between the

---

[281] Silverton-CFP Master Agreement ¶ 3(a)(iii).

[282] *Id.* ¶ 3(d).

[283] *Id.* ¶ 4(c).

[284] *Id.* ¶ 5(a)(iv).

[285] *Id.* ¶ 11.

parties.[286]  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

214.    During the relevant period, Silverton entered into pay-fixed swaps governed by the Silverton-CFP Master Agreement.

215.    Citigroup Financial Products breached and defaulted on the Silverton-CFP Master Agreement through its fraudulent and collusive conduct, its failure to disclose the fraudulent and collusive conduct, and its underpayments to Silverton tied to the artificially depressed USD bbaLIBOR™.

216.    As a result of the Citigroup Financial Products's breach of the Silverton-Citigroup Master Agreement, Silverton and the FDIC as Receiver for Silverton have suffered damages under the Silverton-Citigroup Master Agreement.

## COUNT VII:  BREACH OF CONTRACT WITH SUPERIOR
### (CREDIT SUISSE INTERNATIONAL)

217.    The FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

218.    On June 25, 2002, Superior entered into an ISDA Master Agreement with Credit Suisse First Boston International, predecessor-in-interest to Defendant Credit Suisse International, under which Superior entered into pay-fixed swaps with Credit Suisse International ("Superior-Credit Suisse Master Agreement").[287]

219.    In the Superior-Credit Suisse Master Agreement, the parties represented that the execution, delivery, and performance of the Superior-Credit Suisse Master Agreement did not

---

[286] *Id.* ¶ 1(c).

[287] The Superior-Credit Suisse Master Agreement is attached as Exhibit 45 and incorporated into this Complaint by reference.

violate or conflict with any law applicable to it.[288]  The Superior-Credit Suisse Master

Agreement further states that "[a]ll applicable information that is furnished in writing by or on

behalf of [a party] to the other party [is] true, accurate and complete in every material respect."[289]

The Superior-Credit Suisse Master Agreement requires that the parties comply in all material

respects with all applicable laws and orders to which a party may be subject if failure so to

comply would materially impair its ability to perform its obligations under the Superior-Credit

Suisse Master Agreement or any Credit Support Document to which it is a party.[290]

220.    The Superior-Credit Suisse Master Agreement provides that a party defaults any

time that it makes or repeats a representation that proves to be incorrect or misleading in any

material respect when made or repeated.[291]  The Superior-Credit Suisse Master Agreement

provides that a defaulting party will, on demand, indemnify and hold harmless the other party for

and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other

party by reason of the enforcement and protection of its rights under the Superior-Credit Suisse

Master Agreement.[292]

221.    The Superior-Credit Suisse Master Agreement states that all transactions between

Superior and Credit Suisse International are entered into in reliance on the fact that the

Superior-Credit Suisse Master Agreement and all confirmations form a single agreement

---

[288] Superior-Credit Suisse Master Agreement ¶ 3(a)(iii).

[289] *Id.* ¶ 3(d).

[290] *Id.* ¶ 4(c).

[291] *Id.* ¶ 5(a)(iv).

[292] *Id.* ¶ 11.

between the parties.[293]  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

222.    During the relevant period, Superior entered into pay-fixed swaps governed by the Superior-Credit Suisse Master Agreement.

223.    Credit Suisse International breached and defaulted on the Superior-Credit Suisse Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, and its underpayments to Superior tied to the artificially depressed USD bbaLIBOR™.

224.    As a result of the Credit Suisse International's breach of the Superior-Credit Suisse Master Agreements, Superior and the FDIC as Receiver for Superior have suffered damages under the Superior-Credit Suisse Master Agreement.

## COUNT VIII:  BREACH OF CONTRACTS WITH UCB
### (BANK OF AMERICA, N.A., MERRILL LYNCH INTERNATIONAL BANK LTD., MERRILL LYNCH & CO., BARCLAYS, CITIBANK, N.A., THE HONGKONG AND SHANGHAI BANKING CORP. LTD., JPMORGAN CHASE BANK, N.A., AND UBS)

225.    The FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

226.    On February 9, 2005, UCB entered into an ISDA Master Agreement with Defendant Bank of America, N.A., under which UCB entered into pay-fixed swaps with Bank of America, N.A. ("UCB-BOA Master Agreement").[294]

227.    On May 19, 2004, UCB entered into an ISDA Master Agreement with Defendant Merrill Lynch International Bank Ltd. and Merrill Lynch & Co., under which UCB entered into

---

[293] *Id.* ¶ 1(c).

[294] The UCB-BOA Master Agreement, as amended on October 28, 2008, is attached as Exhibit 46 and incorporated into this Complaint by reference.

pay-fixed swaps with Merrill Lynch International Bank Ltd. and Merrill Lynch & Co. ("UCB-ML Master Agreement").[295]

228.    On May 19, 2009, UCB entered into an ISDA Master Agreement with Defendant Barclays Bank plc, under which UCB entered into pay-fixed swaps with Barclays ("UCB-Barclays Master Agreement").[296]

229.    On February 3, 2004, UCB entered into an ISDA Master Agreement with Defendant Citibank, N.A., under which UCB entered into pay-fixed swaps with Citibank, N.A. ("UCB-Citibank Master Agreement").[297]

230.    On January 28, 2005, UCB entered into an ISDA Master Agreement with Defendant The Hongkong and Shanghai Banking Corporation Ltd. under which UCB entered into pay-fixed swaps with The Hongkong and Shanghai Banking Corporation Ltd. ("UCB-HSBC Master Agreement").[298]

231.    On March 24, 2004, UCB entered into an ISDA Master Agreement with Defendant JPMorgan Chase Bank, N.A., under which UCB entered into pay-fixed swaps with JPMorgan Chase Bank, N.A. ("UCB-JP Master Agreement").[299]

232.    On February 12, 2004, UCB entered into an ISDA Master Agreement with Defendant UBS AG, under which UCB entered into pay-fixed swaps with UBS ("UCB-UBS Master Agreement").[300]  The Master Agreements involving UCB are referenced collectively in

---

[295] The UCB-ML Master Agreement is attached as Exhibit 47 and incorporated into this Complaint by reference.

[296] The UCB-Barclays Master Agreement is attached as Exhibit 48 and incorporated into this Complaint by reference.

[297] The UCB-Citibank Master Agreement is attached as Exhibit 49 and incorporated into this Complaint by reference.

[298] The UCB-HSBC Master Agreement is attached as Exhibit 50 and incorporated into this Complaint by reference.

[299] The UCB-JP Master Agreement is attached as Exhibit 51 and incorporated into this Complaint by reference.

[300] The UCB-UBS Master Agreement is attached as Exhibit 52 and incorporated into this Complaint by reference.

this Complaint as the UCB Master Agreements and the Counterparties to the UCB Master Agreements are referenced collectively in this Complaint as the UCB Contracting Defendants.

233.    In the UCB Master Agreements, the parties represented that the execution, delivery, and performance of the UCB Master Agreements did not violate or conflict with any law applicable to them.[301]  The UCB Master Agreements further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, and complete in every material respect."[302]  The UCB Master Agreements require that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the UCB Master Agreements or any Credit Support Document to which it is a party.[303]

234.    The UCB Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[304]  The UCB Master Agreements provide that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the UCB Master Agreements.[305]

235.    The UCB Master Agreements state that all transactions between UCB and the UCB Contracting Defendants are entered into in reliance on the fact that the UCB Master

---

[301] UCB Master Agreements ¶ 3(a)(iii).

[302] *Id.* ¶ 3(d).

[303] *Id.* ¶ 4(c).

[304] *Id.* ¶ 5(a)(iv).

[305] *Id.* ¶ 11.

Agreements and all confirmations form a single agreement between the parties.[306]  A

"confirmation" is defined in the first paragraph as the documents and other confirming evidence

exchanged between the parties for each transaction.

236.    During the relevant period, UCB entered into pay-fixed swaps governed by the

UCB Master Agreements.

237.    The UCB Contracting Defendants breached and defaulted on the UCB Master

Agreements through their fraudulent and collusive conduct, their failure to disclose fraudulent

and collusive conduct, their intentional misrepresentation and manipulation of USD

bbaLIBOR™, and their underpayments to UCB tied to the artificially depressed USD

bbaLIBOR™.

238.    As a result of the UCB Contracting Defendants' breach of the UCB Master

Agreements, UCB and the FDIC as Receiver for UCB have suffered damages under the UCB

Master Agreements.

### COUNT IX:  BREACH OF CONTRACTS WITH WAMU
**(BANK OF AMERICA, N.A., MERRILL LYNCH CAPITAL SERVICES, INC.,
MERRILL LYNCH INTERNATIONAL BANK LTD., BARCLAYS, CITIBANK, N.A.,
CREDIT SUISSE INTERNATIONAL, HSBC BANK USA, N.A., BEAR STEARNS
CAPITAL MARKETS, INC., JPMORGAN CHASE BANK, N.A.,
RBC, UBS, AND PORTIGON)**

239.    The FDIC-R incorporates by reference the preceding paragraphs of this

Complaint.

240.    On March 3, 1998 and April 23, 1998, WaMu entered into ISDA Master

Agreements with Bank of America National Trust & Savings Association,

---

[306] *Id.* ¶ 1(c).

predecessor-in-interest to Defendant Bank of America, N.A., under which WaMu entered into pay-fixed swaps with Bank of America, N.A. ("WaMu-BOA Master Agreements").[307]

241.    On June 1, 1989, WaMu entered into an ISDA Master Agreement with Defendant Merrill Lynch Capital Services, Inc., under which WaMu entered into pay-fixed swaps with Merrill Lynch Capital Services, Inc. ("WaMu-ML Cap. Master Agreement").[308]

242.    On October 31, 2001, WaMu entered into an ISDA Master Agreement with Defendant Merrill Lynch International Bank Ltd., under which WaMu entered into pay-fixed swaps with Merrill Lynch International Bank Ltd.  ("WaMu-ML Int'l Master Agreement").[309]

243.    On January 10, 2002, WaMu entered into an ISDA Master Agreement with Defendant Barclays Bank plc, under which WaMu entered into pay-fixed swaps with Barclays ("WaMu-Barclays Master Agreements").[310]

244.    On July 28, 1995, American Savings Bank, F.A., predecessor-in-interest to WaMu, entered into an ISDA Master Agreement with Defendant Citibank, N.A., under which WaMu entered into pay-fixed swaps with Citibank, N.A. ("WaMu-Citibank Master Agreement").[311]

245.    On March 26, 1998, WaMu entered into an ISDA Master Agreement with Credit Suisse Financial Products, predecessor-in-interest to Defendant Credit Suisse International,

---

[307] The WaMu-BOA Master Agreements are attached as Exhibits 53 and 54 and incorporated into this Complaint by reference.

[308] The WaMu-ML Cap. Master Agreement is attached as Exhibit 55 and incorporated into this Complaint by reference.

[309] The WaMu-ML Int'l Master Agreement is attached as Exhibit 56 and incorporated into this Complaint by reference.

[310] The WaMu-Barclays Master Agreement is attached as Exhibit 57 and incorporated into this Complaint by reference.

[311] The WaMu-Citibank Master Agreement is attached as Exhibit 58 and incorporated into this Complaint by reference.

under which WaMu entered into pay-fixed swaps with Credit Suisse International ("WaMu-Credit Suisse Master Agreement").[312]

246.    On April 11, 2002, WaMu entered into an ISDA Master Agreement with Defendant HSBC Bank USA, N.A., under which WaMu entered into pay-fixed swaps with HSBC Bank USA, N.A. ("WaMu-HSBC Master Agreement").[313]

247.    On December 19, 1997 and May 21, 1998, WaMu entered into ISDA Master Agreements with Defendant Bear Stearns Capital Markets, Inc., under which WaMu entered into pay-fixed swaps with Bear Stearns Capital Markets, Inc. ("WaMu-Bear Master Agreements").[314]

248.    On February 23, 1996, WaMu entered into an ISDA Master Agreement with The Chase Manhattan Bank, predecessor-in-interest to Defendant JPMorgan Chase Bank, N.A., under which WaMu entered into pay-fixed swaps with JPMorgan Chase Bank, N.A. ("WaMu-Chase Master Agreement").[315]

249.    On February 2, 1998, WaMu entered into an ISDA Master Agreement with Morgan Guaranty Trust Co. of New York, predecessor-in-interest to Defendant JPMorgan Chase Bank, N.A. under which WaMu entered into pay-fixed swaps with JPMorgan Chase Bank, N.A. ("WaMu-Morgan Master Agreement.").[316]

250.    On November 21, 2002, WaMu entered into an ISDA Master Agreement with Bank One, N.A., predecessor-in-interest to Defendant JPMorgan Chase Bank, N.A. under which

[312] The WaMu-Credit Suisse Master Agreement is attached as Exhibit 59 and incorporated into this Complaint by reference.

[313] The WaMu-HSBC Master Agreement is attached as Exhibit 60 and incorporated into this Complaint by reference.

[314] The WaMu-Bear Master Agreements are attached as Exhibits 61 and 62 and incorporated into this Complaint by reference.

[315] The WaMu-Chase Master Agreement is attached as Exhibit 63 and incorporated into this Complaint by reference.

[316] The WaMu-Morgan Master Agreement is attached as Exhibit 64 and incorporated into this Complaint by reference.

WaMu entered into pay-fixed swaps with JPMorgan Chase Bank, N.A. ("WaMu-Bank1 Master Agreement.").[317]

251.   On February 2, 1998, Homeside Lending, Inc., predecessor-in-interest to WaMu entered into an ISDA Master Agreement with Defendant Royal Bank of Canada, under which WaMu entered into pay-fixed swaps with RBC ("WaMu-RBC Master Agreement.").[318]

252.   On June 17, 1998, WaMu entered into an ISDA Master Agreement with Defendant UBS AG, under which WaMu entered into pay-fixed swaps with UBS ("WaMu-UBS Master Agreement").[319]

253.   On June 24, 1998, WaMu entered into an ISDA Master Agreement with WestLB, predecessor-in-interest to Defendant Portigon AG, under which WaMu entered into pay-fixed swaps with Portigon ("WaMu-Portigon Master Agreement").[320]   The Master Agreements involving WaMu are referenced collectively in this Complaint as the WaMu Master Agreements and the Counterparties to the WaMu Master Agreements are referenced collectively in this Complaint as the WaMu Contracting Defendants.

254.   In the WaMu Master Agreements, the parties represented that the execution, delivery, and performance of the WaMu Master Agreements did not violate or conflict with any law applicable to then.[321]   The WaMu Master Agreements further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true,

---

[317] The WaMu-Bank1 Master Agreement is attached as Exhibit 65 and incorporated into this Complaint by reference.

[318] The WaMu-RBC Master Agreement is attached as Exhibit 66 and incorporated into this Complaint by reference.

[319] The WaMu-UBS Master Agreement is attached as Exhibit 67 and incorporated into this Complaint by reference.

[320] The WaMu-Portigon Master Agreement is attached as Exhibit 68 and incorporated into this Complaint by reference.

[321] WaMu Master Agreements ¶ 3(a)(iii).

and complete in every material respect."[322]  The WaMu Master Agreements require that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the WaMu Master Agreements or any Credit Support Document to which it is a party.[323]

255.    The WaMu Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[324]  The WaMu Master Agreements provide that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the WaMu Master Agreements.[325]

256.    The WaMu Master Agreements state that all transactions between WaMu and the WaMu Contracting Defendants are entered into in reliance on the fact that the WaMu Master Agreements and all confirmations form a single agreement between the parties.[326]  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

257.    During the relevant period, WaMu entered into pay-fixed swaps governed by the WaMu Master Agreements.

258.    The WaMu Contracting Defendants breached and defaulted on the WaMu Master Agreements through their fraudulent and collusive conduct, their failure to disclose fraudulent

---

[322] *Id.* ¶ 3(d).

[323] *Id.* ¶ 4(c).

[324] *Id.* ¶ 5(a)(iv).

[325] *Id.* ¶ 11.

[326] *Id.* ¶ 1(c).

and collusive conduct, their intentional misrepresentation and manipulation of USD

bbaLIBOR™, and their underpayments to WaMu tied to the artificially depressed USD

bbaLIBOR™.

259.    As a result of the WaMu Contracting Defendants' breach of the WaMu Master

Agreements, WaMu and the FDIC as Receiver for WaMu have suffered damages under the

WaMu Master Agreements.

### COUNT X:  BREACH OF CONTRACTS WITH WESTERNBANK
### (MERRILL LYNCH CAPITAL SERVICES, INC., CITIBANK, N.A., CITIGROUP, INC., CREDIT SUISSE INTERNATIONAL, JPMORGAN CHASE BANK, N.A.)

260.    The FDIC-R incorporates by reference the preceding paragraphs of this

Complaint.

261.    On May 19, 2004, Westernbank entered into an ISDA Master Agreement with

Defendant Merrill Lynch Capital Services, Inc., under which Westernbank entered into pay-fixed

swaps with Merrill Lynch Capital Services, Inc. ("Westernbank-ML Master Agreement").[327]

262.    On February 25, 1993, Western Federal Savings Bank, predecessor-in-interest to

Westernbank entered into an ISDA Master Agreement with Defendant Citibank, N.A., under

which Westernbank entered into pay-fixed swaps with Citibank, N.A. ("Westernbank-Citibank

Master Agreement").[328]

263.    On December 2, 1996, Westernbank entered into an ISDA Master Agreement

with Smith Barney Capital Services, Inc., a joint venture between Defendant Citigroup and

Morgan Stanley, under which Westernbank entered into pay-fixed swaps with Citigroup

---

[327] The Westernbank-ML Master Agreement is attached as Exhibit 69 and incorporated into this Complaint by reference.

[328] The Westernbank-Citibank Master Agreement is attached as Exhibit 70 and incorporated into this Complaint by reference.

("Westernbank-SB Master Agreement").[329]  The Westernbank-SB Master Agreement was

guaranteed by Citigroup on April 4, 2006.

264.    On October 9, 2001, Westernbank entered into an ISDA Master Agreement with

Credit Suisse First Boston International, predecessor-in-interest to Defendant Credit Suisse

International, under which Westernbank entered into pay-fixed swaps with Credit Suisse

International ("Westernbank-Credit Suisse Master Agreement").[330]

265.    On February 2, 1996, Westernbank, entered into an ISDA Master Agreement with

The Chase Manhattan Bank, predecessor-in-interest to Defendant JPMorgan Chase Bank, N.A.

under which Westernbank entered into pay-fixed swaps with JPMorgan Chase Bank, N.A.

("Westernbank-Chase Master Agreement.").[331]  The Master Agreements involving Westernbank

are referenced collectively in this Complaint as the Westernbank Master Agreements and the

Counterparties to the Westernbank Master Agreements are referenced collectively in this

Complaint as the Westernbank Contracting Defendants.

266.    In the Westernbank Master Agreements, the parties represented that the

execution, delivery, and performance of the Westernbank Master Agreements did not violate or

conflict with any law applicable to them.[332]  The Westernbank Master Agreements further state

that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the

other party [is] true, and complete in every material respect."[333]  The Westernbank Master

---

[329] The Westernbank-SB Master Agreement, and Citigroup Guarantee, is attached as Exhibit 71 and incorporated into this Complaint by reference.

[330] The Westernbank-Credit Suisse Master Agreement is attached as Exhibit 72 and incorporated into this Complaint by reference.

[331] The Westernbank-Chase Master Agreement is attached as Exhibit 73 and incorporated into this Complaint by reference.

[332] Westernbank Master Agreements ¶ 3(a)(iii).

[333] Id. ¶ 3(d).

Agreements require that the parties comply in all material respects with all applicable laws and

orders to which a party may be subject if failure so to comply would materially impair its ability

to perform its obligations under the Westernbank Master Agreements or any Credit Support

Document to which it is a party.[334]

267.     The Westernbank Master Agreements provide that a party defaults any time that it

makes or repeats a representation that proves to be incorrect or misleading in any material

respect when made or repeated.[335]  The Westernbank Master Agreements provide that a

defaulting party will, on demand, indemnify and hold harmless the other party for and against all

reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason

of the enforcement and protection of its rights under the Westernbank Master Agreements.[336]

268.     The Westernbank Master Agreements state that all transactions between

Westernbank and the Westernbank Contracting Defendants are entered into in reliance on the

fact that the Westernbank Master Agreements and all confirmations form a single agreement

between the parties.[337]  A "confirmation" is defined in the first paragraph as the documents and

other confirming evidence exchanged between the parties for each transaction.

269.     During the relevant period, Westernbank entered into pay-fixed swaps governed

by the Westernbank Master Agreements.

270.     The Westernbank Contracting Defendants breached and defaulted on the

Westernbank Master Agreements through their fraudulent and collusive conduct, their failure to

disclose fraudulent and collusive conduct, their intentional misrepresentation and manipulation

---

[334] *Id.* ¶ 4(c).

[335] *Id.* ¶ 5(a)(iv).

[336] *Id.* ¶ 11.

[337] *Id.* ¶ 1(c).

of USD bbaLIBOR™, and their underpayments to Westernbank tied to the artificially depressed USD bbaLIBOR™.

271.    As a result of the Westernbank Contracting Defendants' breach of the Westernbank Master Agreements, Westernbank and the FDIC as Receiver for Westernbank has suffered damages under the Westernbank Master Agreements.

**COUNT XI:  BREACH OF THE IMPLIED COVENANT OF
GOOD FAITH AND FAIR DEALING
(CONTRACTING DEFENDANTS)**

272.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically paragraphs 155-271.

273.    As alleged above, certain Defendants (collectively the "Contracting Defendants")[338] entered into contracts with certain Closed Banks (collectively the "Contracting Closed Banks")[339] for bbaLIBOR™-based financial products.  These contracts are referenced collectively in this Complaint as the Master Agreements.

274.    Within each Master Agreement there is an implied duty of good faith and fair dealing, whereby each Contracting Defendant had a duty to act in good faith and not engage in any conduct that would destroy or injure its Contracting Closed Bank counterparty's rights to the benefits of their contracts.

275.    During the relevant period, the Contracting Closed Banks entered into pay-fixed swaps governed by the Master Agreements.

---

[338] The Contracting Defendants include at least:  Bank of America, N.A.; Merrill Lynch & Co.; Merrill Lynch International Bank Ltd.; Merrill Lynch Capital Services, Inc.; Barclays Bank plc; Citigroup, Inc.; Citibank, N.A.; Citigroup Financial Products, Inc.; Credit Suisse International; Deutsche Bank; The Hongkong and Shanghai Bank Corp. Ltd.; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; J.P. Morgan Bank Dublin plc; J.P. Morgan Markets Ltd.; Bear Stearns Capital Markets, Inc.; the Royal Bank of Canada; the Royal Bank of Scotland plc; UBS AG; and Portigon.

[339] The Contracting Closed Banks include at least:  Amcore; AmTrust; Corus; IndyMac; Integra; Silverton; Superior; UCB; WaMu; and Westernbank.

276.     The Contracting Defendants violated the duty of good faith and fair dealing through their fraudulent and collusive conduct, their failure to disclose fraudulent and collusive conduct, their intentional misrepresentation and manipulations of USD bbaLIBOR™, and their underpayments to the Contracting Closed Banks tied to the artificially depressed USD bbaLIBOR™.

277.     These actions which were intended to, and did, impair the Contracting Closed Banks' rights to the benefits of their contracts, increase the Contracting Defendants' revenues related to bbaLIBOR™-based financial products, and lower interest-rate payments to the Contracting Closed Banks.

278.     As a result of the Contracting Defendants' breach of the duty of good faith and fair dealing, the Contracting Closed Banks and the FDIC as Receiver for the Contracting Closed Banks have suffered damages under the Master Agreements.

## COUNT XII:  UNJUST ENRICHMENT/RESTITUTION
### (CONTRACTING DEFENDANTS)

279.     The FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically paragraphs 155-271.

280.     The Contracting Defendants entered into contracts with the Contracting Closed Banks for bbaLIBOR™-based financial products.

281.     The Contracting Defendants engaged in wrongful acts and omissions, as described above, whereby the Contracting Defendants were unjustly enriched at the expense of and to the detriment of the Contracting Closed Banks and have interfered with the Contracting Closed Banks' protected interests.

282.     As described throughout this Complaint, the Contracting Defendants knowingly acted in an unfair, unconscionable, and oppressive manner towards the Contracting Closed

Banks and acted in conscious disregard for the Contracting Closed Banks' rights by

manipulating bbaLIBOR™ and making numerous misrepresentations and/or omissions regarding

bbaLIBOR™'s accuracy.

283.     Through their wrongful conduct, the Contracting Defendants have knowingly

received and retained wrongful financial and other benefits at the Contracting Closed Banks'

expense and have received windfall profits.

284.     As a direct and proximate result of the Contracting Defendants' wrongful and

inequitable conduct, as set forth above, the Contracting Defendants have been unjustly enriched

and the Contracting Closed Banks have suffered damages in the form of, among other things,

higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from

Defendants and others from bbaLIBOR™-based financial products.  The Contracting

Defendants' retention of funds under these circumstances constitutes unjust enrichment as the

Contracting Defendants have no right to the benefits that were obtained through their wrongful

conduct.

285.     The financial benefits that the Contracting Defendants derived from their

wrongful manipulation of bbaLIBOR™ belong to the Contracting Closed Banks and the FDIC as

Receiver for the Contracting Closed Banks.  The Contracting Closed Banks and the FDIC as

Receiver for the Contracting Closed Banks may have no adequate remedy at law for the

Contracting Defendants' misappropriated gains.  The Court should compel the Contracting

Defendants to disgorge to the Contracting Closed Banks and the FDIC as Receiver for the

Contracting Closed Banks all wrongful or inequitable proceeds that the Contracting Defendants

received.

### COUNT XIII:  FRAUD
### (ALL DEFENDANTS)

286.     The FDIC-R incorporates by reference the preceding paragraphs in this

Complaint.

287.     Each Defendant owed a duty to the Closed Banks to honestly and accurately

report USD bbaLIBOR™ and not to intentionally mislead the Closed Banks and others by

secretly and collectively manipulating USD bbaLIBOR™ for their gain and to the detriment of

others in the financial markets.  The Panel Bank Defendants' and the BBA's duty arises from

representations that they made, individually and/or through the BBA, that bbaLIBOR™ was a

reliable indicator of the state of the money markets, that it was a reliable barometer of risk, that it

reflected competitive rates in the London interbank lending market, that submissions were made

in accord with published rules, and other such public representations.  The Contracting

Defendants' duty arises from the contractual relationships they entered into with the Contracting

Closed Banks, under which the Contracting Defendants owed a duty of good faith and fair

dealing to the Contracting Closed Banks.  The Closed Banks reasonably relied on Defendants'

fraudulent misrepresentations and conduct because, among other things, Defendants held USD

bbaLIBOR™ out as a trustworthy, reliable benchmark and Defendants' fraud could only have

been known to Defendants.

### Fraudulent USD bbaLIBOR™Submissions (Panel Bank Defendants)

288.     As described above, beginning in August 2007 and continuing through at least

mid-2011, each Panel Bank Defendant falsely represented on a daily basis the following:

- Its USD bbaLIBOR™ submissions were consistent with the published definition of bbaLIBOR™.

- It based its USD bbaLIBOR™ submissions on its honest perception of its cost of funds in the London interbank market without reference to rates submitted by other Panel Bank Defendants.

- Its USD bbaLIBOR™ submissions represented the actual competitive rates at which it honestly believed another bank would offer it funds in the London interbank market.

289.  The Panel Bank Defendants made these representations knowing that they were false, or with reckless disregard for their truth.

290.  These representations were material because they formed the basis for USD bbaLIBOR™ published by and through the BBA and affected the price of bbaLIBOR™-based financial products.  In addition, each Panel Bank Defendant's published submission provided information regarding its creditworthiness and liquidity.  When a Panel Bank Defendant with high credit risk and liquidity problems submitted bbaLIBOR™ rates that were artificially low in relation to other Panel Bank Defendants, that Panel Bank Defendant's submission was material because it led market participants to believe that the Panel Bank Defendant presented the same credit standing as the other Panel Bank Defendants.  Had market participants and purchasers of bbaLIBOR™-based financial products known the true credit risk and liquidity issues facing those Panel Bank Defendants, some market participants would have declined to do business with them or would have demanded more favorable terms.

291.  The Panel Bank Defendants recognized the importance of USD bbaLIBOR™ and falsely and publicly held it out as a trustworthy benchmark.  In doing so, the Panel Bank Defendants intended for the Closed Banks and others to rely on their false representations of material fact.  The Closed Banks reasonably relied on these false representations of material fact.

292.  As a result of the Closed Banks' reasonable reliance on these false representations of material fact, the Closed Banks and the FDIC-R have suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

**Fraudulent Representations Regarding USD bbaLIBOR™**
**(Panel Bank Defendants and BBA)**

293.     As described above, beginning in August 2007 and continuing through at least

mid-2011, the Panel Bank Defendants and the BBA falsely represented on a daily basis that USD

bbaLIBOR™ rates electronically communicated by, and through, the BBA were based on honest

submissions by the Panel Bank Defendants of competitively set London interbank lending rates

that were consistent with the published definition of bbaLIBOR™.

294.     The Panel Bank Defendants and the BBA made these misrepresentations knowing

that they were false, or with reckless disregard for their truth.  These misrepresentations were

material because they (a) formed the basis for pricing bbaLIBOR™-based financial products and

(b) helped to sustain bbaLIBOR™ as the dominant benchmark for competitive interbank lending

rates.  The Panel Bank Defendants and the BBA recognized the importance of USD

bbaLIBOR™ and falsely and publicly held it out as a trustworthy benchmark.  In doing so, the

Panel Bank Defendants and the BBA intended for the Closed Banks and others to rely on their

false representations of material fact.

295.     The Closed Banks reasonably relied on these false representations of material fact

in deciding whether to enter into transactions indexed to USD bbaLIBOR™ and whether to

continue holding bbaLIBOR™-based financial products.  The Closed Banks specifically relied

on Defendants' false representations in calculating the expected future cash flows from financial

products with interest rates based on USD bbaLIBOR™.

296.     As a result of the Closed Banks' reasonable reliance on these false representations

of material fact, the Closed Banks and the FDIC-R suffered damages in the form of, among other

things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments

from Defendants and others from bbaLIBOR™-based financial products.

**The BBA's Fraud**

297.    Beginning in mid-2008, as described in this Complaint, the BBA falsely represented to the Closed Banks and others that it actively and independently monitored the Panel Bank Defendants' USD bbaLIBOR™ submissions to ensure that they were consistent with the published definition of bbaLIBOR™.  From 2007 through at least 2011, the BBA represented that bbaLIBOR™ was a "transparent" benchmark and that bbaLIBOR™ provided a "reliable indicator" of the state of the money markets and risk in the global economy.

298.    In April 2008, the BBA falsely represented that (a) it was closely watching USD bbaLIBOR™ submissions, (b) it would expel any Contributor Bank that made deliberately inaccurate bbaLIBOR™ submissions, (c) it would fast-track an "intensive review" of its bbaLIBOR™ process, and (d) it did not believe that Panel Bank Defendant had submitted false rates.

299.    In June 2008, the BBA falsely represented that (a) the Panel Bank Defendants' USD bbaLIBOR™ submissions were honest and accurate, and (b) it was incorporating a tight scrutiny mechanism that would require any contribution discrepancies to be reviewed and justified.

300.    On August 5, 2008, the BBA falsely represented that rates submitted by the Panel Bank Defendants were "truly reflective of their perceived borrowing costs" and that bbaLIBOR™ was a "fundamentally robust and accurate benchmark."[340]

301.    The BBA made these misrepresentations knowing that they were false, or with reckless disregard for their truth.  These misrepresentations were material because the BBA held itself out as an independent entity that would exercise strong oversight of bbaLIBOR™ to ensure

---

[340] Libor Consultation Feedback Statement, *supra* note 151.

that bbaLIBOR™ submissions by individual Panel Bank Defendants would be honest and consistent with the published definition of bbaLIBOR™.  Had market participants known that USD bbaLIBOR™ was set by collusion, and not competitive market forces, market participants would have turned to other, more accurate, benchmarks to incorporate into their financial contracts.

302.    The BBA intended for the Closed Banks and others to rely on these false representations of material fact.  The Closed Banks reasonably relied on these false representations in deciding whether to enter into transactions tied to USD bbaLIBOR™ and whether to continue holding bbaLIBOR™-based financial products.

303.    As a result of the Closed Banks' reasonable reliance on these false representations of material fact, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

### Contracting Defendants' Fraud

304.    As discussed above, the Contracting Closed Banks entered into contracts with the Contracting Defendants for bbaLIBOR™-based financial products.  By virtue of these contractual relationships, the Contracting Defendants owed a duty of good faith and fair dealing to the Contracting Closed Banks.

305.    Contrary to their duty, Contracting Defendants knowingly provided the Contracting Closed Banks information regarding settling positions based on false submissions used to calculate USD bbaLIBOR™, thereby affirmatively misrepresenting that USD bbaLIBOR™ accurately captured the competitive market forces that influence London interbank lending rates.  Further, the Contracting Defendants failed to disclose the fraud and collusion

relating to USD bbaLIBOR™.  The Contracting Defendants made these false representations and material omissions knowing that they were false, or with reckless disregard for their truth. The Contracting Defendants made these misrepresentations and omissions during negotiations for each pay-fixed swap and each time that payments were made and/or exchanged with the Contracting Closed Banks under the pay-fixed swaps in order to induce the Contracting Closed Banks to enter into these transactions.  The Contracting Closed Banks would not have entered into the pay-fixed swaps at the same prices if the Contracting Closed Banks had known the Contracting Defendants intended to substitute collusion for competition in the setting of USD bbaLIBOR™.

306.    The Contracting Closed Banks reasonably relied on the Contracting Defendants' misrepresentations and nondisclosures in deciding whether to enter into financial transactions incorporating USD bbaLIBOR™ and, if so, on what terms, and whether to continue holding bbaLIBOR™-based financial products.

307.    As a result of the Contracting Closed Banks' reasonable reliance on these Defendants' fraudulent misrepresentations and omissions, the Contracting Closed Banks and the FDIC as Receiver for the Contracting Closed Banks suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

### COUNT XIV:  AIDING AND ABETTING FRAUD
**(ALL DEFENDANTS)**

308.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically paragraphs 286-307.

309.     As explained above, the Defendants committed acts of fraud through their manipulation of bbaLIBOR™ and their misrepresentations regarding bbaLIBOR™, which the Closed Banks reasonably relied upon.

310.     Defendants had actual knowledge of the fraudulent acts of the other Defendants.

311.     Each Defendant aided and abetted the fraud committed by the other Defendants by providing substantial assistance and/or participating in the fraudulent acts committed by the other Defendants, as explained in the paragraphs above.

312.     As a result of Defendants' aiding and abetting, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

<u>COUNT XV:  CIVIL CONSPIRACY TO COMMIT FRAUD</u>
**(ALL DEFENDANTS)**

313.     The FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically paragraphs 286-307.

314.     As explained above, Defendants committed acts of fraud through their manipulation of bbaLIBOR™ and their misrepresentations and/or omissions regarding bbaLIBOR™, which the Closed Banks reasonably relied upon.

315.     Defendants formed a conspiracy or agreement to commit fraud by manipulating bbaLIBOR™ and submitting false USD bbaLIBOR™ rates that were inconsistent with the public definition of bbaLIBOR™, below their actual borrowing costs, and within a narrow range among the Panel Bank Defendants, as well as by engaging in a course of material misrepresentations and/or omissions to conceal the fraudulent acts.

316.     As explained throughout this Complaint, Defendants conspired together to commit fraud by manipulating bbaLIBOR™ through false and fraudulent bbaLIBOR™ submissions, as well as engaging in a course of material misrepresentations and/or omissions to conceal the fraudulent acts.

317.     Defendants intentionally and knowingly committed acts in furtherance of this conspiracy, as explained above, by manipulating bbaLIBOR™ and making false and fraudulent bbaLIBOR™ submissions, as well as making repeated misrepresentations and omissions regarding bbaLIBOR™'s accuracy.

318.     As a result of Defendants' conduct, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

## COUNT XVI:  NEGLIGENT MISREPRESENTATION
### (ALL DEFENDANTS)

319.     The FDIC-R incorporates by reference the preceding paragraphs in this Complaint.

320.     As discussed above, the Contracting Closed Banks entered into contracts with the Contracting Defendants for bbaLIBOR™-based financial products.  By virtue of these contractual relationships, the Contracting Closed Banks had a special relationship with the Contracting Defendants and the Contracting Defendants owed a duty of good faith and fair dealing to the Contracting Closed Banks.  As a result of this special relationship, the Contracting Defendants had a duty to impart correct information to the Contracting Closed Banks.

321.     The Panel Bank Defendants and the BBA also owed a duty to the Closed Banks to honestly and accurately report USD bbaLIBOR™ and not to intentionally mislead the Closed

Banks and others by secretly and collectively manipulating USD bbaLIBOR™ for their gain and to the detriment of others in the financial markets.  Defendants' duty arises from representations that they made, individually and/or through the BBA, that bbaLIBOR™ was "a reliable indicator of the state of the money markets," that it was a "reliable barometer of risk," that it reflected competitive rates in the London interbank lending market, and other public representations regarding the nature and reliability of bbaLIBOR™.

**Misrepresentations in USD bbaLIBOR™ Submissions (Panel Bank Defendants)**

322.   As described above, beginning in August 2007 and continuing through at least mid-2011, each Panel Bank Defendant falsely represented on a daily basis the following:

- Its USD bbaLIBOR™ submissions were consistent with the published definition of bbaLIBOR™;

- It based its USD bbaLIBOR™ submissions on its honest perception of its cost of funds in the London interbank market without reference to rates submitted by other Panel Bank Defendants; and

- Its USD bbaLIBOR™ submissions represented the actual competitive rates at which it honestly believed another bank would offer it funds in the London interbank market.

323.   The Panel Bank Defendants made these representations, at a minimum, negligently and without reasonable justification.

324.   These representations were material because they formed the basis for USD bbaLIBOR™ published by and through the BBA and affected the price of bbaLIBOR™-based financial products.  In addition, an individual bank's published submission provided information regarding its creditworthiness and liquidity.  When a Panel Bank Defendant with high credit risk and liquidity problems submitted bbaLIBOR™ rates that were artificially low in relation to other Panel Bank Defendants, that Panel Bank Defendant's submission was material because it led market participants to believe that the Panel Bank Defendant presented the same credit standing

- 111 -

as the other Panel Bank Defendants.  Had market participants and purchasers of bbaLIBOR™-based financial products known the true credit risk and liquidity issues facing those Panel Bank Defendants, they would have declined to do business with them.

325.    The Panel Bank Defendants intended for the Closed Banks and others to rely on these false representations of material fact.  The Closed Banks reasonably relied on these false representations of material fact in deciding whether to do business with a particular Panel Bank Defendant.

326.    As a result of the Closed Banks' reasonable reliance on these false representations of material fact, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

**Misrepresentations Regarding USD bbaLIBOR™ (Panel Bank Defendants and BBA)**

327.    As described above, beginning in August 2007 and continuing through at least mid-2011, the Panel Bank Defendants and the BBA falsely represented on a daily basis that USD bbaLIBOR™ rates electronically communicated by, and through, the BBA were based on honest submissions by the Panel Bank Defendants of competitively set London interbank lending rates that were consistent with the published definition of bbaLIBOR™.

328.    The Panel Bank Defendants and the BBA made these misrepresentations, at a minimum, negligently and without reasonable care.  These misrepresentations were material because they (a) formed the basis for pricing bbaLIBOR™-based financial products and (b) helped to sustain bbaLIBOR™ as the dominant benchmark for competitive interbank lending rates.  The Panel Bank Defendants and the BBA intended for the Closed Banks and others to rely on these false representations of material fact.

329.     The Closed Banks reasonably relied on these false representations of material fact in deciding whether to enter into transactions indexed to USD bbaLIBOR™ and whether to continue holding bbaLIBOR™-based financial products.  The Closed Banks specifically relied on Defendants' false representations in calculating the expected future cash flows from USD bbaLIBOR™ and, consequently, the prices the Closed Banks were willing to pay for pay-fixed swaps.

330.     As a result of the Closed Banks' reasonable reliance on these false misrepresentations of material fact, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

### The BBA's Misrepresentations

331.     Beginning in mid-2008, as described in this Complaint, the BBA falsely represented to the Closed Banks and others that it actively and independently monitored the Panel Bank Defendants' USD bbaLIBOR™ submissions to ensure that they were consistent with the published definition of bbaLIBOR™.  From 2007 through at least mid- 2011, the BBA represented that bbaLIBOR™ was a "transparent" benchmark and that bbaLIBOR™ provided a "reliable indicator" of the state of the money markets and risk in the global economy.

332.     In April 2008, the BBA falsely represented that (a) it was closely watching USD bbaLIBOR™ submissions, (b) it would expel any Contributor Bank that made deliberately inaccurate bbaLIBOR™ submissions, (c) it would fast-track an "intensive review" of its bbaLIBOR™ process, and (d) it did not believe that Panel Bank Defendant had submitted false rates.

333.    In June 2008, the BBA falsely represented that (a) the Panel Bank Defendants' USD bbaLIBOR™ submissions were honest and accurate, and (b) it was incorporating a tight scrutiny mechanism that would require any contribution discrepancies to be reviewed and justified.

334.    On August 5, 2008, the BBA falsely represented that rates submitted by Contributor Banks were "truly reflective of their perceived borrowing costs" and that bbaLIBOR™ was a "fundamentally robust and accurate benchmark."[341]

335.    The BBA made these misrepresentations, at a minimum, negligently and without reasonable care.  These misrepresentations were material because the BBA held itself out as an independent entity that would exercise strong oversight of bbaLIBOR™ to ensure that bbaLIBOR™ submissions by individual Panel Bank Defendants would be honest and consistent with the published definition of bbaLIBOR™.  Had market participants known that USD bbaLIBOR™ was set by collusion, and not competitive market forces, market participants would have turned to other, more accurate, benchmarks to incorporate into their financial contracts.

336.    The BBA intended for the Closed Banks and others to rely on these false representations of material fact.  The Closed Banks reasonably relied on these false representations in deciding whether to enter into transactions tied to USD bbaLIBOR™ and whether to continue holding bbaLIBOR™-based financial products.

337.    As a result of the Closed Banks' reasonable reliance on these false representations, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

---

[341] Libor Consultation Feedback Statement, *supra* note 151.

**Contracting Defendants' Misrepresentations**

338.    As discussed above, the Contracting Closed Banks entered into contracts with the Contracting Defendants for bbaLIBOR™-based financial products.  By virtue of these contractual relationships, the Contracting Defendants owed a duty of good faith and fair dealing to the Contracting Closed Banks.

339.    Contrary to its duty, the Contracting Defendants affirmatively misrepresented their credit risk and liquidity through fraudulent and collusive USD bbaLIBOR™ submissions. In addition, the Contracting Defendants affirmatively misrepresented that USD bbaLIBOR™ accurately captured the competitive market forces that influence London interbank lending rates. Further, the Contracting Defendants failed to disclose the fraud and collusion relating to USD bbaLIBOR™.  The Contracting Defendants made these false representations and material omissions, at a minimum, negligently and without reasonable care.  The Contracting Defendants made these misrepresentations and omissions during negotiations for each pay-fixed swap and each time that payments were made and/or exchanged with the Contracting Closed Banks under the pay-fixed swaps in order to induce the Contracting Closed Banks to enter into these transactions.  The Contracting Closed Banks would not have entered into the pay-fixed swaps at the same prices if the Contracting Closed Banks had known the Contracting Defendants intended to substitute collusion for competition with respect to USD bbaLIBOR™.

340.    The Contracting Closed Banks reasonably relied on the Contracting Defendants' misrepresentations and nondisclosures in deciding whether to enter into financial transactions incorporating USD bbaLIBOR™ and, if so, on what terms, and whether to continue holding bbaLIBOR™-based financial products.

- 115 -

341.     As a result of the Contracting Closed Banks' reasonable reliance on these

Defendants' fraudulent misrepresentations and omissions, the Contracting Closed Banks and the

FDIC as Receiver for the Contracting Closed Banks suffered damages in the form of, among

other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate

payments from Defendants and others from bbaLIBOR™-based financial products.

## COUNT XVII:  TORTIOUS INTERFERENCE WITH CONTRACT
### (PANEL BANK DEFENDANTS AND BBA)

342.     The FDIC-R incorporates by reference the preceding paragraphs in this

Complaint.

343.     The Closed Banks entered into pay-fixed swaps and other financial contracts tied

to USD bbaLIBOR™ with the Contracting Defendants and counterparties other than Defendants.

344.     Each Panel Bank Defendant and the BBA knew that USD bbaLIBOR™ was

incorporated into ISDA Master Agreements and other financial instruments.

345.     The Panel Bank Defendants and the BBA intentionally and fraudulently held

USD bbaLIBOR™ out to the world, including the Closed Banks, as a trustworthy and reliable

benchmark.

346.     Each Panel Bank Defendant and the BBA knew, or should have known, that the

Closed Banks had entered into financial instruments with one or more of the other Panel Bank

Defendants, as well as counterparties other than Defendants, that incorporated USD

bbaLIBOR™.  In fact, as detailed above, certain Panel Bank Defendants were counterparties to

similar contracts with the Closed Banks.

347.     The Panel Bank Defendants and the BBA intentionally and improperly interfered

with these contracts and agreements, as described above, including by their collusive

manipulation of USD bbaLIBOR™ and fraudulent misrepresentations and/or omissions about

bbaLIBOR™'s accuracy.  The Panel Bank Defendants' and BBA's tortious acts caused those contracts to be breached and the Closed Banks to receive reduced payments from those contracts and/or a decrease in value.

348.    As a result of the Panel Bank Defendants' and the BBA's intentional interference with the Closed Banks' contracts and agreements, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, receiving lower interest-rate payments from the Contracting Defendants and others.

**COUNT XVIII:  AIDING AND ABETTING
TORTIOUS INTERFERENCE WITH CONTRACT
(PANEL BANK DEFENDANTS AND BBA)**

349.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically paragraphs 342-348.

350.    As explained above, the Panel Bank Defendants and the BBA tortiously interfered with the Closed Banks' contracts and agreements with the Contracting Defendants and counterparties other than the Contracting Defendants.

351.    The Panel Bank Defendants and the BBA had actual knowledge of the acts of tortious interference of each other.

352.    Each Panel Bank Defendant and the BBA aided and abetted the tortious interference committed by the other Panel Bank Defendants and the BBA by providing substantial assistance and/or participating in the tortious acts committed by the other Panel Bank Defendants and the BBA, including through their collusive manipulation of USD bbaLIBOR™ and fraudulent misrepresentations and/or omissions about bbaLIBOR™'s accuracy.  The Panel Bank Defendants' and the BBA's acts of aiding and abetting caused those contracts to be

breached and the Closed Banks to receive reduced payments from those contracts and/or a decrease in value.

353.     As a result of the Panel Bank Defendants' and the BBA's aiding and abetting, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from the Contracting Defendants and others from bbaLIBOR™-based financial products.

**COUNT XIX:  CIVIL CONSPIRACY TO COMMIT
TORTIOUS INTERFERENCE WITH CONTRACT
(PANEL BANK DEFENDANTS AND BBA)**

354.     The FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically paragraphs 342-348.

355.     As explained above, the Panel Bank Defendants and the BBA tortiously interfered with the Closed Banks' contracts with the Contracting Defendants and counterparties other than Defendants.

356.     As explained throughout this Complaint, the Panel Bank Defendants and the BBA conspired together to tortiously interfere with the Closed Banks' contracts by manipulating bbaLIBOR™ through false and fraudulent bbaLIBOR™ submissions, as well as engaging in a course of material misrepresentations and/or omissions to conceal their tortious acts.

357.     The Panel Bank Defendants and the BBA intentionally and knowingly committed acts in furtherance of this conspiracy, as explained above, by manipulating bbaLIBOR™ and making false and fraudulent bbaLIBOR™ submissions, as well as by making repeated misrepresentations and omissions regarding bbaLIBOR™'s accuracy.

358.     As a result of the Panel Bank Defendants' and the BBA's conduct, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for

bbaLIBOR™-based financial products and lower interest-rate payments from the Contracting

Defendants and others from bbaLIBOR™-based financial products.

### COUNT XX:  TORTIOUS INTERFERENCE WITH
### PROSPECTIVE ECONOMIC ADVANTAGE
### (PANEL BANK DEFENDANTS AND BBA)

359.    The FDIC-R incorporates by reference the preceding paragraphs in this

Complaint.

360.    The Closed Banks had valid business expectancies in that the Closed Banks were

engaged in interest-rate swap contracts and other bbaLIBOR™-based financial instruments with

certain Defendants and counterparties other than Defendants.  The Closed Banks' contractual

relationships at that time expressly incorporated USD bbaLIBOR™ and provided that the Closed

Banks would receive payments based on the level of USD bbaLIBOR™.

361.    The Panel Bank Defendants and the BBA knew that USD bbaLIBOR™ was

incorporated into ISDA Master Agreements and other financial instruments.

362.    The Panel Bank Defendants and the BBA knew of the Closed Banks' contractual

relationships and business expectancies and understood that USD bbaLIBOR™, as the "world's

most important number," was incorporated into many contracts similar to the ones to which the

Closed Banks were parties.  In fact, certain Defendants were counterparties to similar contracts

with the Closed Banks.  The Panel Bank Defendants and the BBA further knew, or should have

known, that the Closed Banks expected payments from these contracts based on the level of USD

bbaLIBOR™.

363.    The Panel Bank Defendants and the BBA intentionally interfered with the Closed

Banks' business expectancies by means of improper, fraudulent, wrongful methods, as described

throughout this Complaint, and caused the Closed Banks to receive reduced payments from these

contracts and/or a decrease in value over what the Closed Banks would have realized, absent the Panel Bank Defendants' and the BBA's conduct.

364.    As a result of the Panel Bank Defendants' and the BBA's intentional interference with the Closed Banks' business expectancies, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, lower interest-rate payments from the Contracting Defendants and others, and paying artificially high prices for financial products tied to USD bbaLIBOR™.

**COUNT XXI:  AIDING AND ABETTING TORTIOUS INTERFERENCE
WITH PROSPECTIVE ECONOMIC ADVANTAGE
(PANEL BANK DEFENDANTS AND BBA)**

365.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically paragraphs 359-364.

366.    As explained above, the Panel Bank Defendants and the BBA tortiously interfered with the Closed Banks' valid business expectancies with certain Defendants and counterparties other than the Defendants.

367.    The Panel Bank Defendants and the BBA had actual knowledge of the acts of tortious interference of the other Panel Bank Defendants and the BBA.

368.    Each Panel Bank Defendant and the BBA, through improper and fraudulent means, aided and abetted the tortious interference committed by the other Panel Bank Defendants and the BBA by providing substantial assistance and/or participating in the tortious acts committed by the other Panel Bank Defendants and the BBA, including through their collusive manipulation of USD bbaLIBOR™ and fraudulent misrepresentations and/or omissions about bbaLIBOR™'s accuracy.  The Panel Bank Defendants' and the BBA's acts of aiding and abetting caused the Closed Banks to receive reduced payments from their contracts

and/or a decrease in value over what the Closed Banks would have realized, absent the Panel Bank Defendants' and the BBA's conduct.

369.    As a result of the Panel Bank Defendants' and the BBA's aiding and abetting, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from the Contracting Defendants and others from bbaLIBOR™-based financial products.

### COUNT XXII:  CIVIL CONSPIRACY TO COMMIT TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (PANEL BANK DEFENDANTS AND BBA)

370.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically paragraphs 359-364.

371.    As explained above, the Panel Bank Defendants and the BBA tortiously interfered with the Closed Banks' valid business expectancies with certain Defendants and counterparties other than Defendants.

372.    As explained throughout this Complaint, the Panel Bank Defendants and the BBA conspired together to tortiously interfere with the Closed Banks' valid business expectancies by manipulating bbaLIBOR™ through false and fraudulent bbaLIBOR™ submissions, as well as by engaging in a course of material misrepresentations and/or omissions to conceal their tortious acts.

373.    The Panel Bank Defendants and the BBA intentionally and knowingly committed acts in furtherance of this conspiracy, as explained above, by manipulating bbaLIBOR™ and making false and fraudulent bbaLIBOR™ submissions, as well as by making repeated misrepresentations and omissions regarding bbaLIBOR™'s accuracy.

374.    As a result of the Panel Bank Defendants' and the BBA's conduct, the Closed

Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for

bbaLIBOR™-based financial products and lower interest-rate payments from the Contracting

Defendants and others from bbaLIBOR™-based financial products.

### COUNT XXIII:  VIOLATIONS OF SHERMAN ACT SECTION 1
### (PANEL BANK DEFENDANTS AND BBA)

375.    The FDIC-R incorporates by reference the preceding paragraphs of this

Complaint.

### Agreement

376.    From in or about August 2007 and lasting through at least mid-2011, the Panel

Bank Defendants and the BBA participated in a combination, conspiracy, and/or agreement that

involved multiple horizontal and vertical levels.  In this case, the complaint alleges a set of

agreements among the Panel Bank Defendants and the BBA that restricted competition in

various markets.  As shown above, the unlawful agreements consisted of the following:

- The Panel Bank Defendants agreed to (a) disregard the bbaLIBOR™ published rules to coordinate the interest rates that they submitted to the BBA for calculation, (b) keep those coordinated submissions below the rates at which they would be offered funds in the London interbank lending market for USD, and (c) keep those coordinated submissions within a narrow range.

- The Panel Bank Defendants and the BBA agreed to falsely hold USD bbaLIBOR™ out as a reliable interest-rate benchmark calculated according to its published methodology and conceal the fact that the Panel Bank Defendants had agreed to disregard the published methodology for USD bbaLIBOR™.

- The Panel Bank Defendants and the BBA agreed to conceal the extent to which conditions in the London interbank loan market had deteriorated.

- The Panel Bank Defendants and the BBA agreed to publicly, and falsely, maintain that USD bbaLIBOR™ would be protected by a strict governance protocol, that it would be overseen by an "independent" committee of active market participants, and that the BBA would ensure compliance with bbaLIBOR™'s published rules.

377.    The Panel Bank Defendants and the BBA had a conscious commitment to common objectives, namely insulating bbaLIBOR™ from the forces of competition so that the Panel Bank Defendants and the BBA could collectively control the product standard in the market for USD interest-rate benchmarks.  Through control of bbaLIBOR™, the Panel Bank Defendants could manipulate it for their personal gain and systematically depress it to unfairly profit from USD bbaLIBOR™-based financial transactions.  Certain Panel Bank Defendants also had a common interest in manipulating bbaLIBOR™ to protect their respective credit ratings.

378.    As set forth above, the Panel Bank Defendants and the BBA had strong motives to conspire.  Because of the way that USD bbaLIBOR™ was calculated based upon the Panel Bank Defendants' bbaLIBOR™ submissions, a single Contributor Bank acting unilaterally had little ability to affect bbaLIBOR™.  By cooperating, the Panel Bank Defendants' collusion gave them the power to affect the USD bbaLIBOR™ fixing published by and through the BBA.  In addition, the unlawful scheme required collective action to avoid detection.  If any Panel Bank Defendant deviated from the unlawful agreements on a sustained basis or disclosed that Defendants had agreed to disregard the bbaLIBOR™ rules, the scheme would have been exposed and bbaLIBOR™'s integrity and reliability would have been fundamentally undermined.  Disclosure of the unlawful agreements would also have exposed bbaLIBOR™ to the forces of competition from other interest-rate indices, imperiling bbaLIBOR™'s position as the market standard for interest-rate benchmarks, and triggering government investigations and lawsuits.  In fact, these are precisely the consequences that followed Barclays's disclosure of systematic depression in 2012.

379.    There is abundant evidence that the conduct of the Panel Bank Defendants and the BBA was the product of agreement and not independent action.  To date, three Panel Bank

Defendants (UBS, Barclays, HBOS) have already admitted systematically submitting artificially depressed USD bbaLIBOR™ rates to the BBA.  Without the Panel Bank Defendants' and the BBA's conspiracy, the USD bbaLIBOR™ submissions from these three Panel Bank Defendants would have been noticeably lower than the other Panel Bank Defendants.  They were not.  USD bbaLIBOR™ submissions were closely grouped together throughout the conspiracy period, which could not have occurred without explicit coordination.

380.    For example, Figure 6 below plots the submissions for three-month USD bbaLIBOR™ during a two-month period in 2008 for the three Panel Bank Defendants that have admitted to systematic depression (Barclays, UBS, and HBOS) and the submissions of Panel Bank Defendants Bank of America, Citigroup, Credit Suisse, and JP Morgan.  The chart shows that the latter four banks submitted USD bbaLIBOR™ rates that were within *or below* the range of the admittedly depressed rates.  The submissions of other Panel Bank Defendants shows the same trend.  This pattern of coordinated submissions cannot be credibly explained in the absence of a conspiracy.

**Figure 6:  Comparison of bbaLIBOR™ submissions**



381.    While very little evidence contained in the internal documents maintained by the

Panel Bank Defendants and the BBA has been disclosed to date, the sparse evidence that has

been revealed confirms the existence of the unlawful agreements:

- In an electronic chat between an HBOS USD bbaLIBOR™ submitter and an employee of "another financial institution" (unidentified), the HBOS submitter states:  "youll like this ive been pressured by senior management to bring my rates down into line with everyone else."[342]

- In one message dated August 19, 2007, former trader for RBS, Tan Chi Min, wrote in an electronic discussion with traders at other banks, including Deutsche

---

[342] Lloyds CFTC Order, *supra* note 143, at 15.

Bank's Mark Wong:  "It's just amazing how Libor fixing can make you that much money or lose if opposite.  It's a cartel now in London."[343]

- In October 2007, a Barclays employee noted internally that an unidentified Contributor Bank had submitted a bbaLIBOR™ rate that was lower than the rate it actually paid.[344]

- On November 29, 2007, a Barclays manager contacted a representative of BBA to advise that USD "LIBORs are being set lower than where they ought to be" and informed the BBA that all of the Panel Bank Defendants were doing this.[345]  The Barclays manager specifically identified certain other Panel Bank Defendants that were submitting bbaLIBOR™ rates lower than rates at which those banks could actually get funds.[346]

- On December 4, 2007, a Barclays bbaLIBOR™ submitter sent an internal email stating that the Panel Bank Defendants, including Barclays, were submitting false and dishonest submissions.[347]

- On April 11, 2008, a Barclays employee told an employee of the NY Fed that he was aware of Panel Bank Defendants putting in USD bbaLIBOR™ submissions that were lower than what they were actually paying and that "the ones that need the cash most put in the lowest, lowest rates."[348]  The Barclays employee noted "if we can't borrow money at that rate, then no one else could really. . . .  I mean we, you-you know we speak to everyone that everyone else does so, um, yeah, it's a quite, quite an uncomfortable feeling and I don't know if at some stage LIBORs will correct themselves."[349]

- On October 24, 2008, a Barclays employee privately reported to the NY Fed that USD bbaLIBOR™ rates were "absolute rubbish," citing submissions by WestLB and Deutsche Bank as being too low.[350]  The employee told the NY Fed that he

---

[343] Andrea Tan, Gavin Finch & Liam Vaughan, *RBS Instant Messages Show Libor Rates Skewed for Traders*, Bloomberg (Sept. 26, 2012), http://www.bloomberg.com/news/2012-09-25/rbs-instant-messages-show-libor-rates-skewed-for-traders.html.

[344] Email to Jason Miu, *supra* note 109.

[345] Barclays SOF, *supra* note 107, ¶ 43.

[346] *Id.* ¶ 43.

[347] *Id.* ¶ 45.

[348] *Transcript of Phone Call Between Barclays Employee and Analyst in the Markets Group of The New York Fed*, *supra* note 120, at 7.

[349] *Id.* at 16.

[350] *Transcript of Phone Call Between Barclays Employee and Analyst in the Markets Group of The New York Fed*, *supra* note 120, at 000098, 000100.

was aware of banks that were making bbaLIBOR™ submissions that were below what they actually paid in comparable transactions.[351]

- In an internal email, a Barclays employee noted that Lloyds's USD bbaLIBOR™ submission was artificially low.[352]

382.    In addition, Panel Bank Defendant RBS has admitted that its employees participated in agreements to submit bbaLIBOR™ submissions that were inconsistent with the published definitions.  Although RBS did not admit systematic depression, the head of its money markets trading and the person responsible for USD bbaLIBOR™ submissions reportedly told a subordinate that Panel Bank Defendants were setting bbaLIBOR™ "to where it suits their book" and that "LIBOR is what you say it is."[353]  This communication occurred in August 2007, within days of the admitted directives issued by Barclays and UBS executives.

383.    Because the BBA's instructions prohibited Contributor Banks from basing their USD bbaLIBOR™ submissions on submissions by other Contributor Banks, the Panel Bank Defendants cannot claim that their conduct was merely the result of conscious parallelism without admitting that they secretly and fraudulently deviated from bbaLIBOR™'s published methodology.  The Panel Bank Defendants' pretextual explanations for their artificially low USD bbaLIBOR™ submissions further confirm the existence of the unlawful agreements.

384.    Moreover, the Panel Bank Defendants acted against their legitimate independent self-interest in several regards.  First, absent agreement with other Panel Bank Defendants, any Panel Bank Defendant that unilaterally chose to deviate from the published bbaLIBOR™ rules would have exposed itself to civil and criminal sanctions that would have undermined the Panel Bank Defendant's reputation.  According to the bbaLIBOR™ rules, banks that deviated from the

---

[351] *Id.* at 000100.

[352] Email to Pat Leising, *supra* note 108.

[353] Vaughan & Finch, *Secret Libor Transcripts Expose Trader Rate-Manipulation*, *supra* note 105.

rules would be removed from the bbaLIBOR™ panel.[354]  Removal from the bbaLIBOR™ panel would have harmed the bank's perceived integrity, exposed it to investigation by government regulators, and led to civil action by counterparties.  Removal also could have proven catastrophic if the market interpreted the bank's fraud as a desperate attempt to protect its reputation.

385.    Second, Panel Bank Defendants that were more creditworthy than their supposed rivals on the USD bbaLIBOR™ panel acted against their independent economic self-interest by submitting USD bbaLIBOR™ rates that were not significantly lower than their less creditworthy "competitor" banks on the USD bbaLIBOR™ panel and tolerating false submissions that created the appearance that all of the Panel Banks presented the same perceived credit risk.  A bank's creditworthiness is an important part of a bank's ability to obtain wholesale funding at competitive prices. In the absence of collusion, the more creditworthy Panel Bank Defendants would be expected to have used their stronger credit standing as a competitive advantage to obtain lower costs of funds than their rivals and to use those lower costs to compete on price in downstream markets for interest-rate derivatives, floating-rate retail loans, and other financial products.  Similarly, it was in the independent economic self-interest of the more creditworthy Panel Banks to publicly expose and/or report to the authorities the artificially low bbaLIBOR™ rates submitted by their supposed rivals.

386.    The Panel Bank Defendants had ample opportunity to conspire through, among other things, BBA and FX & MM Committee meetings, numerous interbank communications, electronic chats, and telephone calls.  Even the minimal evidence publicly disclosed to date in connection with government regulatory actions, some of which is set forth above, reveals a

---

[354] LIBOR Governance and Scrutiny, *supra* note 72, § 1.13.

sustained pattern of illicit and anticompetitive communications among the Panel Bank

Defendants.

387.    The economic evidence also supports the existence of the unlawful agreements in

that the USD bbaLIBOR™'s relationship to the Eurodollar Bid Rate fundamentally changed

during the alleged conspiracy period.  During the conspiracy, the Panel Bank Defendants and the

BBA offered a number of explanations for that change, but the disclosures following Barclays's

June 2012 admission of unlawful conduct confirm that the agreements alleged above caused that

fundamental change.

### Restraint of Trade

388.    The purpose and effect of the unlawful agreements was to maintain market

dominance for USD interest-rate benchmarks during the conspiracy period and limit competition

in the markets for interest-rate benchmarks, interest-rate derivatives, floating-rate loans, floating-

rate MBS, and wholesale funding.  The Panel Bank Defendants and the BBA achieved this

objective by colluding to create the false impression that USD bbaLIBOR™ was suited for its

intended purpose and that the London interbank loan market was a reliable source of data for the

Panel Bank Defendants' cost of unsecured funds.  Only the Panel Bank Defendants and the BBA

knew whether the Panel Bank Defendants were following the bbaLIBOR™ methodology, the

extent to which the opaque London interbank loan market was active, and whether the Panel

Bank Defendants were submitting rates consistent with the actual interest rates available in the

London interbank loan market. The Panel Bank Defendants' and the BBA's conspiracy harmed

competition in numerous markets.

389.    The Panel Bank Defendants and the BBA foreclosed competition by alternative

interest-rate benchmarks and shielded bbaLIBOR™'s dominant position as the market standard

from the forces of competition.  Taking advantage of their large, if not dominant, market

positions (and pursuant to the unlawful agreements), the Panel Bank Defendants continued to

incorporate bbaLIBOR™ into USD interest-rate derivatives, floating-rate loans, and floating-rate

MBS, even though the Panel Bank Defendants and the BBA knew that bbaLIBOR™ was not

what they held it out to be.  This conduct was intended to, and did, insulate bbaLIBOR™ from

the forces of competition, and that foreclosure allowed the Panel Bank Defendants and the BBA

to maintain bbaLIBOR™ as the market standard without even attempting to innovate its rules or

improve its governance mechanism.  In short, the Panel Bank Defendants and the BBA

maintained USD bbaLIBOR™ as the standard in the market for USD interest-rate benchmarks

and the leading reference interest-rate benchmark in markets for USD interest-rate derivatives,

floating-rate loans and floating-rate MBS not by competing on the merits, but by entering into

secret agreements to exclude competition.

> 390.     The unlawful agreements had especially pernicious effects because the market for

USD interest-rate benchmarks was characterized by network effects.  These network effects were

driven by the widespread use of bbaLIBOR™ throughout the interconnected USD interest-rate

derivative, floating-rate loan and floating-rate MBS markets, in which the Panel Bank

Defendants were major players.  The Panel Bank Defendants were among the dominant sellers of

OTC USD interest-rate derivatives, which gave them additional market power as the most

important users of USD interest-rate benchmarks. Thus, the Panel Bank Defendants' agreements

as dealers in the OTC interest-rate derivatives market necessarily diminished competition in the

related floating-rate loan market and in the upstream market for interest-rate benchmarks.

> 391.     The Panel Bank Defendants and the BBA knew, or should have known, that the

unlawful agreements would affect the prices and returns on financial products tied to USD

bbaLIBOR™.  By agreeing to systematically and secretly depress bbaLIBOR™ into the future, the Panel Bank Defendants harmed the competitive process.

392.     As explained in the Wheatley Report, an interest-rate benchmark serves two important purposes.[355]  First, it functions as the reference interest rate incorporated into financial contracts as a payment (and price) term.  Thus, depression of the benchmark will cause economic loss to companies that hold interest-rate derivatives, floating-rate loans, or floating-rate MBS.  Second, the benchmark functions as a discount rate used in negotiations to price products that incorporate the benchmark.  As explained above, an interest-rate swap is determined by applying the rules of the interest-rate benchmark to the notional value over the duration of the proposed swap to determine the net present value of those payments which, in turn, determines the fixed rate that the counterparty will pay.  Thus, the price of an interest-rate swap is set by the net present value of the interest-rate benchmark.  The net present value calculation is expressly premised on the reliability, predictability, and integrity of the interest-rate benchmark.

393.     By providing a benchmark supposedly tied to competitively determined interbank lending rates, bbaLIBOR™ purported to serve the price-discovery purpose in markets for interest-rate derivatives, floating-rate loans, and floating-rate MBS.  By foreclosing competition in the market for USD interest-rate benchmarks, the Panel Bank Defendants and the BBA harmed the competitive process by which parties discovered the price of interest-rate derivatives,

---

[355] Wheatley Final Report, *supra* note 27, at 45.

floating-rate loans, and floating-rate MBS.[356]  As one District Court observed:  "Fraud and deceit are not legitimate market forces.  Fundamentally, markets are information processing systems. The market price is only as 'real' as the data that inform the process of price discovery.  By the same token, the market price is 'artificial' when the market is misinformed."[357]

394.     By artificially depressing USD bbaLIBOR™, the Panel Bank Defendants caused purchasers of products that incorporated bbaLIBOR™ as an interest-rate benchmark to overpay for those products.  Had purchasers known the true manner in which the Panel Bank Defendants and the BBA calculated, and intended to continue to calculate, USD bbaLIBOR™, purchasers would have chosen not to enter into the transaction at all or requested an alternative interest-rate benchmark.  Had the Panel Bank Defendants and the BBA not prevented purchasers from making an informed choice to incorporate bbaLIBOR™ as the benchmark based on the actual rules that the Panel Bank Defendants intended to apply, the true discounted value of the products would have been far less than what purchasers paid.  Similarly, purchasers, including the Closed Banks, suffered economic losses on financial products that incorporated USD bbaLIBOR™ as a price term.  As explained above, market participants were not informed of the actual methodology that the Panel Bank Defendants used to submit USD bbaLIBOR™ and therefore the unlawful agreements prevented market participants from being able to make informed decisions whether to keep those financial products and, if so, whether to demand changes to the benchmark methodology.  Through the unlawful agreements, the Panel Bank Defendants

---

[356] For example, assume a monopolist offers a product for $30 when its internal cost to produce and sell the product is just $10.  Absent competition, buyers will not know that $30 represents a three-fold increase over the seller's costs.  Now, assume instead that there are multiple sellers of the same product, all with similar costs.  Rather than lose a sale, the second seller will offer a price below $30, which should trigger a price reaction from the seller's rivals.  Eventually, through the competitive process, buyers will "discover" that the market price for the product is just above $10.  *See* Robert C. Marshall and Leslie M. Marx, The Economics of Collusion—Cartels and Bidding Rings 83-84 (2012).

[357] *United States v. Reliant Energy Servs., Inc.*, 420 F. Supp. 2d 1043, 1058 (N.D. Cal. 2006).

artificially increased the profit margins that they earned in certain financial transactions tied to USD bbaLIBOR™ to the Closed Banks' economic detriment.

395.    Second, the Panel Bank Defendants and the BBA also interfered with the ability of non-conspirator banks to fairly compete against the Panel Bank Defendants in the markets for interest-rate derivatives, floating-rate loans, and floating-rate MBS.  Non-conspirator banks were unaware of the alleged fraud and collusion and therefore priced interest-rate derivatives, floating-rate loans, and floating-rate MBS based on the reasonable expectation that USD bbaLIBOR™ would be determined according to the published rules.  As a result of their conspiracy, the Panel Bank Defendants could slightly undercut prices offered by non-conspirators knowing that even the undercut price would provide a profit due to the Panel Bank Defendants' unlawful agreements.

396.    Third, each artificially depressed bbaLIBOR™ submission by an individual Panel Bank Defendant enhanced that Panel Bank Defendant's reputation and public perception of its credit risk and liquidity.[358]  In the absence of collusion, banks with superior credit and liquidity profiles would have used their reputation as a competitive advantage and banks with lower reputations would have been forced to compete on the merits by providing better prices, improving efficiency, and shedding risk.  Numerous Panel Bank Defendants, in fact, have admitted that individual bbaLIBOR™ submissions contained market information that affected or tended to affect prices of financial contracts and products that incorporated the interest-rate benchmark.[359]

---

[358] Business reputation is an "asset of significant value" in the banking sector.  Rosa M. Abrantes-Metz et al., *LIBOR Manipulation?*, 36 J. Banking & Fin. 137, 138 (2008).

[359] *See, e.g.*, UBS SOF, *supra* note 62, ¶ 97.

397.     Fourth, the Panel Bank Defendants and the BBA stifled innovation and limited demand for alternative (competing) benchmarks.  Through their agreement to submit rates that appeared to be fair and honest reflections of interbank lending, the Panel Bank Defendants and the BBA maintained the façade that market forces determined bbaLIBOR™ and that a more reliable benchmark was unnecessary.  But for the collusion, the Panel Bank Defendants would have been forced to compete on the merits by showing that bbaLIBOR™ served its intended purpose as a proxy for competition or by incorporating other floating interest-rate benchmarks into financial products they sold.  One benchmark provider recently acknowledged that "the existing LIBOR framework [has] failed to keep pace with market needs as they have developed over the past two decades."[360]  Another provider recently wrote that enforcement of existing laws prohibiting fraud and price-fixing was the key to avoiding scandals like bbaLIBOR™.[361]

398.     Finally, the Panel Bank Defendants and the BBA interfered with the supply/demand balance for wholesale funding.  The Panel Bank Defendants treated their bbaLIBOR™ submissions as an upper limit on interest rates they would offer for other unsecured funding products.  Panel Bank Defendants Lloyds and HBOS have admitted that they instructed employees not to bid for cash at rates that were out of line with their bbaLIBOR™ submissions.  In a competitive environment, market forces determine interest rates and efficiently allocate money.

399.     The antitrust charges filed against subsidiaries of Panel Bank Defendants UBS and RBS confirm that agreements to manipulate bbaLIBOR™ constitute *per se* restraints of trade

---

[360] Rate Validation Servs., *Regulation of Benchmarks and Indices:  RVS Response to the EU Consultation Document*, at 10 (Nov. 15, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/ benchmarks/individual-others/rate-valuations-services_en.pdf.

[361] Russell Resp., *supra* note 36, at 12-13.

that harmed competition in the markets for USD interest-rate benchmarks, interest-rate derivatives, floating-rate loans, and floating-rate MBS in violation of Sherman Act Section 1. *Per se* treatment of the conspiracy is appropriate because the unlawful agreements were specifically related to price and quality. Where, as here, a plaintiff alleges a *per se* violation of the Sherman Act, no allegations with respect to relevant product market, geographic market, or market power are required. To the extent allegations may otherwise be necessary, the markets and harm to competition caused by the unlawful agreements are addressed below.

### Antitrust Injury and Damages

400.    During the conspiracy period, the Closed Banks purchased and owned interest-rate derivatives, including pay-fixed, receive-floating interest-rate swaps, that incorporated USD bbaLIBOR™ as a price term. In addition, the Closed Banks purchased and held floating-rate MBS that incorporated USD bbaLIBOR™ as the interest-rate benchmark and made floating-rate loans that incorporated USD bbaLIBOR™ as a price term. In the absence of the unlawful agreements, competitive market forces would have created overwhelming incentives for the Panel Bank Defendants and the BBA to calculate and publish USD bbaLIBOR™ in compliance with its published rules and to ensure that the London interbank market used to calculate USD bbaLIBOR™ was sufficient to measure the Panel Bank Defendants' cost of funds. In addition, the unlawful agreements injected false information into financial markets that depended on interest-rate benchmarks for accurate information regarding the Panel Bank Defendants' costs of funds.

401.    As a result, in some circumstances the Closed Banks paid artificially high prices for financial instruments tied to USD bbaLIBOR™. Conversely, as a result of the collusion and anticompetitive effects, the Closed Banks received less in interest-rate payments from these

financial instruments tied to USD bbaLIBOR™.  These damages flow directly from the unlawful agreements' interference with competitive market forces.

402.    In the absence of collusion, the Panel Bank Defendants could not have achieved the supracompetitive prices that they were able to charge (and increased profit margins that they were able to earn) in transactions for certain financial instruments tied to USD bbaLIBOR™.

### Rule of Reason

403.    Alternatively, analyzed under either a "quick look" or full rule-of-reason framework, the unlawful agreements unreasonably restrained trade in the markets for USD interest-rate benchmarks, OTC USD interest-rate derivatives, USD floating-rate retail loans, and floating-rate MBS.  The unlawful agreements arose from "competitor collaborations" as that term is used in the United States' Guidelines for Collaborations Among Competitors[362] because the Panel Bank Defendants were purported competitors in each of the defined markets as well as in the market for unsecured short-term wholesale funding.  As noted above, absent collusion, each Panel Bank Defendant would have individually competed to submit the lowest USD rates to the BBA consistent with the published bbaLIBOR™ methodology and prevented any other Panel Bank Defendant from submitting artificially low rates to the BBA.

404.    Even if the bbaLIBOR™ data gathering process, in fact, was intended to be a cooperative one, that does not mean that the actual submission process was intended to be collaborative and not competitive.  Even for collaborative ventures, agreements are evaluated

---

[362] U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Guidelines for Collaborations Among Competitors, Apr. 2000, *available at* http://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf.

based on their effects on competition in relevant markets.[363]  The unlawful agreements harmed

the competitive processes in several markets and in several ways.

### A.     Relevant Market:  USD Short-Term Interest-Rate Benchmarks

### Market Definition

405.    During the relevant period, there were no reasonable substitutes for USD short-

term interest-rate benchmarks.  Interest-rate derivatives and floating-rate loans require an

interest-rate benchmark.  The market for USD short-term interest-rate benchmarks was global.

406.    The Panel Bank Defendants and the BBA had substantial power in the market for

short-term interest-rate benchmarks.  bbaLIBOR™ was by far the dominant short-term interest-

rate benchmark and the phenomenon of network effects protected the Panel Bank Defendants'

and the BBA's market power.  Panel Bank Defendants served on the supposedly independent FX

& MM Committee responsible for overseeing and implementing bbaLIBOR™ during the

conspiracy period.  The Panel Bank Defendants were in the very small minority of financial

institutions that could provide upstream information on the unsecured costs of funds for the

largest commercial banks in the world.  The Panel Bank Defendants were also among the

dominant sellers of OTC USD interest-rate derivatives, which gave them additional market

power as the most important downstream users of USD short-term interest-rate benchmarks.

407.    In addition, Panel Bank Defendants were significant providers of USD floating-

rate retail loans and floating-rate MBS, which increased their power in the market for USD short-

term interest-rate benchmarks.  The phenomenon of network effects further increased the Panel

Bank Defendants' and the BBA's market power because end users will prefer to purchase

---

[363] *Id.* at 3-4, 24-25.

interest-rate derivatives that incorporate the same short-term interest-rate benchmark that is incorporated into floating-rate loans and MBS that they held.

### Harm to Competition

408. The unlawful agreements harmed competition in the market for USD interest-rate benchmarks by limiting choice, deterring innovation, artificially increasing barriers to entry, injecting false information in the market, limiting transparency, and increasing prices. Defendants created the false impression that USD bbaLIBOR™ was suited for its intended purpose, that users could reliably predict USD bbaLIBOR™ (the price) over the term of interest-rate derivatives, floating-rate loans, and floating-rate MBS, and that was carefully monitored by an "independent" overseer.

409. One of the reasons that the Panel Bank Defendants and the BBA entered into the unlawful agreements was to foreclose competition by alternative benchmarks and thereby insulate themselves from the forces of competition. The Panel Bank Defendants benefited from maintaining control of the market standard interest-rate benchmark, USD bbaLIBOR™, because it allowed them to profit on transactions involving interest-rate derivatives, floating-rate loans, and floating-rate MBS. In addition, the BBA generated revenues through the licensing of USD bbaLIBOR™ and the Panel Bank Defendants indirectly benefited from those licensing fees as BBA members.

410. As shown above, had the Panel Bank Defendants and the BBA publicly disclosed their agreement to disregard the published USD bbaLIBOR™ methodology and governance mechanisms, market participants would have sought out, or developed, alternative benchmarks that would better serve the purpose of USD short-term interest-rate benchmarks, or at the very least negotiated lower prices that better reflected the additional uncertainty that would have been created by the Panel Bank Defendants' and the BBA's self-serving rules. In the absence of the

agreement to secretly revise the USD bbaLIBOR™ methodology and governance, the Panel

Bank Defendants and the BBA would have been forced to compete on the merits to protect the

status of USD bbaLIBOR™ as the dominant USD short-term interest-rate benchmark.

411.    Real-world insights into the way competition would have encouraged innovation,

integrity, and reliability can be gained from market developments following the conspiracy's

end.  Soon after Barclays admitted its participation in the bbaLIBOR™ manipulation, the BBA

voluntarily sought to reassure users that USD Panel Banks would adhere to the published

methodology in the future.[364]  The BBA stated that its top priority was to ensure the provision of

a reliable benchmark which had the confidence and support of users.[365]

412.    In addition, the UK's FCA sponsored a wide-ranging report overseen by its CEO,

Martin Wheatley, that eventually recommended numerous improvements to "get back to what

this reference rate is supposed to do."[366]  The Wheatley Report reforms included stripping the

BBA of its administrative role due to unresolvable conflicts of interest, imposing mechanisms to

corroborate USD bbaLIBOR™ submissions with actual trade data, expanding the number of

Panel Banks, reducing the number of currencies, and delaying publication of individual Panel

Bank submissions by three months.

413.    In 2013, IOSCO drafted and published its Principles for Financial Benchmarks

that outlined best practices for all indices, including bbaLIBOR™.[367]  Market participants

---

[364] Press Release, BBA, Libor Statement—Thursday 28 June (June 28, 2012), *available at*
http://www.mondovisione.com/media-and-resources/news/british-bankers-association-libor-statement-thursday-28-
june/.

[365] British Bankers' Association Statement Regarding the Treasury Committee's Preliminary Findings On Libor,
*supra* note 95.

[366] Martin Wheatley, Managing Director, FSA, and CEO Designate, FCA at the Wheatley Review of LIBOR,
Pushing the Reset Button on LIBOR (Sept. 28, 2012), *available at* http://www.fsa.gov.uk/library/communication/
speeches/2012/0928-mw.shtml.

[367] IOSCO Principles, *supra* note 41.

advocated for a broader set of interest-rate benchmarks that could be adapted to a range of applications.  The news service Bloomberg, for example, demanded more alternatives to bbaLIBOR™.[368]  CFTC Chairman Gary Gensler advocated for the abolishment of bbaLIBOR™.[369]

414.    The BBA, in fact, implemented a number of the reforms recommended in the Wheatley Report.  In February 2014, the BBA handed control of USD bbaLIBOR™ over to a private benchmark provider, the ICE.  In response to competitive threats, ICE has since implemented additional screens to prevent manipulation, imposed additional measures to boost LIBOR's reliability, and has vowed to continue to improve LIBOR.

415.    As shown, the unlawful agreements harmed competition in the market for short-term interest-rate benchmarks by deterring innovation, eroding product quality, limiting product choice, injecting false information into the market, limiting transparency, and increasing price.

416.    In addition, the Panel Bank Defendants' and the BBA's agreement to conceal deterioration in the unsecured interbank loan market limited the ability of market participants to determine whether the interbank loan market was a trustworthy source of data.  In the absence of collusion, the Panel Bank Defendants and the BBA would have had an incentive to apprise users of this issue and clearly identify contingency measures to respond to it.[370]

417.    The unlawful agreements did not provide any pro-competitive benefits.

---

[368] Darrell Duffie & Jeremy Stein, *Libor Needs More Competition*, Bloomberg View (July 22, 2014), http://www.bloombergview.com/articles/2014-07-22/libor-needs-more-competition.

[369] Gary Gensler, Chairman, U.S. C.F.T.C., Remarks of Chairman Gary Gensler on Libor Before the Global Financial Markets Association's Future of Global Benchmarks Conference (Feb. 28, 2013), *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opagensler-133.

[370] *See* IOSCO Consultation Report, *supra* note 37, at 20-21 (benchmark providers should clearly disclose changes to the methodology so that users can determine whether it remains a suitable reference); IOSCO Principles, *supra* note 41, at 22-23 (benchmark providers should publish methodology in sufficient detail to allow users to understand how it is derived and its appropriateness as a reference for financial instruments).

**Antitrust Injury**

418.    The reduction of competition in the market for USD interest-rate benchmarks was a direct and material cause of the Closed Banks' and the FDIC-R's injuries.  The Closed Banks negotiated financial instruments with the Panel Bank Defendants and others that incorporated USD bbaLIBOR™ as a price term.  In a competitive market for interest-rate benchmarks, USD bbaLIBOR™ would have been calculated according to its published rules and not subject to manipulation and systematic depression.  In the absence of the unlawful agreements, the competitive process would have created overwhelming incentives for Defendants to reliably apply the published USD bbaLIBOR™ methodology and the Closed Banks would have received the consideration for which they bargained.

419.    In addition, but for the collusion, the Panel Bank Defendants and the BBA would have disclosed the extent of deterioration in the unsecured interbank loan market and identified methods to improve the reliability of the underlying data.  Virtually all of the recent proposals for improvement of interest-rate benchmarks would broaden the range of data to include actual transactions in unsecured wholesale funding markets.

420.    In their capacities as USD floating-rate lenders, the Closed Banks were consumers of USD short-term interest-rate benchmarks and therefore suffered direct injury because they were forced to participate in a non-competitive and non-transparent market for interest-rate benchmarks.  In addition, the Closed Banks paid artificially inflated prices for interest-rate derivatives that incorporated bbaLIBOR™ as a payment term for the Closed Banks, and received lower payments from derivatives, floating-rate loans, and floating-rate MBS where payments were determined by USD bbaLIBOR™.

**B.    Relevant Market:  OTC USD Interest-Rate Derivatives**

**Market Definition**

421.    OTC USD interest-rate derivatives include interest-rate swaps and similar instruments used by market participants to hedge exposure to interest rates.[371]  During the conspiracy period, USD bbaLIBOR™ was the dominant interest-rate benchmark used in OTC USD interest-rate derivatives.

422.    The OTC interest-rate derivatives market differed from futures markets in a number of important respects.  Whereas futures and futures options were standardized agreements that traded on organized exchanges, the OTC market was an informal bilateral market consisting of broker/dealers that traded price information and negotiated transactions over electronic communications networks.  Although a great deal of contract standardization existed in the OTC market, dealers active in this market custom-tailored agreements to meet the specific needs of their customers. And unlike futures markets, where futures exchange clearinghouses guarantee contract performance through a system of margin requirements combined with the daily settlement of gains or losses, counterparties to OTC derivative agreements must bear some default or credit risk.[372]  The unlawful agreements made the OTC USD interest-rate derivatives market even more opaque during the conspiracy period.

423.    OTC USD interest-rate derivatives are traded in a global market.  A small set of dealers—comprised primarily of Panel Bank Defendants—dominated the market for OTC USD interest-rate derivatives during the conspiracy period.  According to a July 2010 ISDA market

---

[371] Anatoli Kuprianov, *Chapter 16:  Over-the-Counter Interest Rate Derivatives*, *in* Fed. Reserve Bank of Richmond, Instruments of the Money Market 238, 238-39 (1998), *available at* https://www.richmondfed.org/ publications/research/special_reports/instruments_of_the_money_market/pdf/chapter_16.pdf.

[372] *Id.*

survey, the largest 14 dealers held 82% of interest-rate derivatives by notional amount.[373]  Of

these 14 dealers, 10 were USD bbaLIBOR™ Panel Bank Defendants:  Defendants Bank of

America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, HSBC, JPMorgan, RBS, Société

Générale, and UBS.[374]  Similarly, the top five United States bank holding companies—Panel

Defendants Bank of America, Citigroup, JP Morgan, HSBC, and the investment bank Goldman

Sachs, accounted for more than 95% of all OTC swaps and derivatives transactions in the United

States.[375]

424.    There were no reasonable alternatives to OTC USD interest-rate derivatives.

**Harm to Competition**

425.    Competition in the OTC USD interest-rate derivatives market depends on a

reliable and predictable interest-rate benchmark.  As noted above, OTC dealers quote prices for

interest-rate swaps in two parts:  (1) an interest-rate benchmark and (2) a fixed interest rate.  The

fixed rate is calculated to provide the net present value today of the expected cash flows from the

quoted benchmark over the life of the swap.  The potential purchaser of a pay-fixed, receive-

floating derivative calculates the expected cash flows by applying the published rules of the

quoted benchmark to the predicted market conditions over the length of the swap to determine

the price it will pay for that swap.

426.    The unlawful agreements harmed competition in the market for OTC USD

interest-rate derivatives by undermining price transparency and excluding alternative

benchmarks from being used to price OTC USD interest-rate derivatives.  In a competitive

---

[373] Mengle, *supra* note 51, at 1.

[374] *Id*. at 2.

[375] *Id*. at 1.

market, bbaLIBOR™ would have been a reliable benchmark or it would have been replaced by an alternative benchmark that better served its intended purposes.

427.    The unlawful agreements did not provide any pro-competitive benefits in this market.

### Antitrust Injury

428.    The Closed Banks' and the FDIC-R's injuries arose from the harm to competition alleged above.  In a competitive environment, Defendants could not have sustained their conspiracy and USD bbaLIBOR™ would have been calculated according to its published methodology and therefore would have been consistently higher throughout the conspiracy period.  These injuries flow directly from the substitution of collusion for competition in the market for OTC USD interest-rate derivatives.

### C.    Relevant Market:  USD Floating-Rate Retail Loans

### Market Definition

429.    USD floating-rate retail loans are loans made by banks, including the Panel Bank Defendants, for mortgages and other consumer uses.  Retail loans were of longer duration than the loans available in the wholesale funding markets.  There are markets for USD floating-rate retail loans worldwide. [376]  During the conspiracy period, the Panel Bank Defendants made billions of dollars' worth of USD floating-rate retail loans, which Panel Bank Defendants packaged into MBS for sale to investors.  For example, in 2010, more than half of all mortgages in the United States were originated by three banks:  Wells Fargo, Bank of America, and JP

---

[376] Wholesale loans are also referred to as "trades," with "buy" corresponding to borrow and "sell" corresponding to lend.

Morgan.[377]  During the conspiracy period, these three banks and Citigroup were consistently among the top five mortgage originators.[378]  They were also, by far, the four largest commercial banks in the United States.[379]  In 2010, these four banks held $3.6 trillion in deposits at the end of the fourth quarter, whereas the next 46 institutions in the top 50 collectively held $2.68 trillion in deposits.

430.    There were no reasonable substitutes for USD floating-rate retail loans. Participants in the market for floating-rate loans seek to transfer risk of higher future interest rates from the lender to the borrower for a price.

### Harm to Competition

431.    The unlawful agreements harmed competition in the market for USD floating-rate retail loans by limiting competition for the key interest-rate benchmark and by injecting false information that obscured the price-discovery process.  The Panel Bank Defendants were among the largest lenders and, as a result of their conspiracy, foreclosed competition for interest-rate benchmarks.  Also as a result of the conspiracy, lenders other than the Panel Bank Defendants were unaware that bbaLIBOR™ no longer served its intended purpose and therefore non-defendant lenders had no incentive to demand alternative interest-rate benchmarks.  The unlawful agreements therefore restricted choice, deterred innovation, artificially increased barriers to entry, limited transparency, and increased prices.

432.    The unlawful agreements did not provide any pro-competitive benefits in this market.

---

[377] Press Release, Mortgate Daily, 3 Biggest Lenders Close Over Half of U.S. Mortgages (Feb. 15, 2011), http://www.mortgagedaily.com/PressRelease021511.asp.

[378] *Id.*

[379] *See, e.g.,* Aarti Kanjani, *Top 50 U.S. Banks and Thrifts by Assets*, SNL Fin., Mar. 21, 2011, http://www.snl.com/InteractiveX/article.aspx?CDID=A-12500123-14138&KPLT=2.

**Antitrust Injury**

433.    The Closed Banks' and the FDIC-R's injuries arose from this harm to

competition.  In a competitive environment, the Panel Bank Defendants and the BBA could not

have sustained their conspiracy and USD bbaLIBOR™ would have been calculated according to

its published methodology.  As a result of the reduction of competition in the market for interest-

rate benchmarks, the Closed Banks lacked adequate alternatives to USD bbaLIBOR™ and were

deceived into believing that USD bbaLIBOR™ sufficiently served its intended purpose.  As a

direct result of the competitive harms caused by the Panel Bank Defendants' conduct, payments

to the Closed Banks on floating-rate loans that incorporated USD bbaLIBOR™ were lower than

they would have been in the absence of the conspiracy.

### D.    Relevant Market:  USD Floating-Rate MBS

**Market Definition**

434.    The market for USD floating-rate MBS was a global one.  During the conspiracy

period, the Panel Bank Defendants were among the largest issuers and underwriters of USD

floating-rate MBS.  For example, in 2009 Bank of America was the leading underwriter of U.S.

mortgaged-backed securities with 17.5 percent of the total market.  Other Panel Bank Defendants

in the top 10 included Barclays, Credit Suisse, JP Morgan, Citigroup, RBS, and Deutsche

Bank.[380]

435.    There were no reasonable substitutes for USD floating-rate MBS.

**Harm to Competition**

436.    The unlawful agreements harmed competition in the market for USD floating-rate

MBS by limiting competition for the key interest-rate benchmark and by injecting false

---

[380] Adam Quinones, *Bank of America Top MBS Underwriter in 2009.  What is an MBS Underwriter?*, Mortgage
News Daily, Jan. 4, 2010, http://www.mortgagenewsdaily.com/01042010_bank_of_america_mbs_uw.asp.

information that obscured the price-discovery process.  The Panel Bank Defendants were among

the largest issuers and underwriters of USD floating-rate MBS and, as a result of their

conspiracy, were uninterested in promoting competition for interest-rate benchmarks.  As a result

of the conspiracy, purchasers of USD floating-rate MBS paid artificially high prices for products

and received lower quality.  The unlawful agreements also limited choice, deterred innovation,

artificially increased barriers to entry, injected false information into the market, and limited

transparency.

437.    The unlawful agreements did not provide any pro-competitive benefits in this

market.

### Antitrust Injury

438.    The harms to competition in the market for USD floating-rate retail loans were a

material contributing factor to the Closed Banks and the FDIC-R's injuries because the Closed

Banks purchased significant amounts of USD floating-rate MBS from the Panel Bank

Defendants and others.  In a competitive environment, USD bbaLIBOR™ would have been

calculated according to its published methodology and the Closed Banks and the FDIC-R would

not have suffered their alleged injuries because the payments that the Closed Banks received

from floating-rate MBS were less than they would have been in the absence of the conspiracy.

### COUNT XXIV:  VIOLATIONS OF THE DONNELLY ACT
#### (PANEL BANK DEFENDANTS AND BBA)

439.    The FDIC-R incorporates by reference the preceding paragraphs of this

Complaint, including specifically paragraphs 375-438.

440.    As explained in detail above, the Panel Bank Defendants and the BBA unlawfully

interfered with competition or the free exercise of any activity in the conduct of any business,

trade or commerce or in the furnishing of any service in violation of N.Y. Gen. Bus. Law § 340.

441.    As a result of the Panel Bank Defendants' and the BBA's fraudulent and collusive conduct, the Closed Banks and the FDIC-R have suffered damages from the artificial depression of bbaLIBOR™ in the form of, among other things, paying artificially high prices for bbaLIBOR™-based financial instruments and receiving artificially low interest payments on bbaLIBOR™-based financial products.  These damages flow directly from the unlawful agreements' interference with competition and the free exercise of any activity in the conduct of any business, trade or commerce.

442.    In the absence of collusion, the Panel Bank Defendants could not have achieved the supracompetitive prices that they were able to charge (and increased profit margins that they were able to earn) in transactions for certain bbaLIBOR™-based financial instruments.

## PRAYER FOR RELIEF

WHEREFORE, FDIC as Receiver for the Closed Banks requests the Court to:

a.    Enter judgment for the FDIC-R awarding full damages for all economic, monetary, actual, consequential, and compensatory damages that the Closed Banks suffered as a result of Defendants' wrongful and/or inequitable conduct.

b.    Award punitive damages to the extent allowable by law.

c.    Award treble damages for violations of the Sherman Act and/or Donnelly Act.

d.    Award attorneys' fees and costs of suit.

e.    Award pre- and post-judgment interest to the extent allowable by law.

f.    Grant such other further relief as allowed by law.

## JURY DEMAND

The FDIC-R demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated:  October 6, 2014

Respectfully submitted,

DICKSTEIN SHAPIRO LLP

By:   /s/ Richard J. Leveridge
      Richard J. Leveridge
      James R. Martin
      Jennifer D. Hackett
      1825 I Street, NW
      Washington, DC  20006
      202-420-2200

*Attorneys for the FDIC-R*