**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR AMCORE BANK, N.A.; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR AMTRUST BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR BANKUNITED, F.S.B.; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR CALIFORNIA NATIONAL BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COLONIAL BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COMMUNITY BANKS OF COLORADO; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR CORUS BANK, N.A.; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR DORAL BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR DOWNEY SAVINGS AND LOAN ASSOCIATION, F.A.; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR EUROBANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST COMMUNITY BANK; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST FEDERAL BANK OF CALIFORNIA, F.S.B.; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST NATIONAL BANK; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**SECOND AMENDED
COMPLAINT**

**1:14-cv-01757-NRB**

**1:18-cv-01540-NRB**

**MDL No. 2262**

**ECF CASE**

**JURY TRIAL DEMANDED**

FEDERAL DEPOSIT INSURANCE                   )
CORPORATION AS RECEIVER FOR FIRST           )
REGIONAL BANK; FEDERAL DEPOSIT              )
INSURANCE CORPORATION AS RECEIVER           )
FOR FRONTIER BANK; FEDERAL DEPOSIT          )
INSURANCE CORPORATION AS RECEIVER           )
FOR GEORGIAN BANK; FEDERAL DEPOSIT          )
INSURANCE CORPORATION AS RECEIVER           )
FOR GUARANTY BANK; FEDERAL DEPOSIT          )
INSURANCE CORPORATION AS RECEIVER           )
FOR HILLCREST BANK; FEDERAL DEPOSIT         )
INSURANCE CORPORATION AS RECEIVER           )
FOR IMPERIAL CAPITAL BANK; FEDERAL          )
DEPOSIT INSURANCE CORPORATION AS            )
RECEIVER FOR INDYMAC BANK, F.S.B.;          )
FEDERAL DEPOSIT INSURANCE                   )
CORPORATION AS RECEIVER FOR INTEGRA         )
BANK, N.A.; FEDERAL DEPOSIT INSURANCE       )
CORPORATION AS RECEIVER FOR IRWIN           )
UNION BANK AND TRUST COMPANY;               )
FEDERAL DEPOSIT INSURANCE                   )
CORPORATION AS RECEIVER FOR LA              )
JOLLA BANK, F.S.B.; FEDERAL DEPOSIT         )
INSURANCE CORPORATION AS RECEIVER           )
FOR LYDIAN PRIVATE BANK; FEDERAL            )
DEPOSIT INSURANCE CORPORATION AS            )
RECEIVER FOR MIDWEST BANK AND               )
TRUST COMPANY; FEDERAL DEPOSIT              )
INSURANCE CORPORATION AS RECEIVER           )
FOR ORION BANK; FEDERAL DEPOSIT             )
INSURANCE CORPORATION AS RECEIVER           )
FOR PACIFIC NATIONAL BANK; FEDERAL          )
DEPOSIT INSURANCE CORPORATION AS            )
RECEIVER FOR PARK NATIONAL BANK;            )
FEDERAL DEPOSIT INSURANCE                   )
CORPORATION AS RECEIVER FOR PFF             )
BANK & TRUST; FEDERAL DEPOSIT               )
INSURANCE CORPORATION AS RECEIVER           )
FOR R-G PREMIER BANK OF PUERTO RICO;        )
FEDERAL DEPOSIT INSURANCE                   )
CORPORATION AS RECEIVER FOR                 )
RIVERSIDE NATIONAL BANK OF FLORIDA;         )
FEDERAL DEPOSIT INSURANCE                   )
CORPORATION AS RECEIVER FOR SAN             )
DIEGO NATIONAL BANK; FEDERAL                )
DEPOSIT INSURANCE CORPORATION AS            )

RECEIVER FOR SILVERTON BANK, N.A.;                )
FEDERAL DEPOSIT INSURANCE                          )
CORPORATION AS RECEIVER FOR                        )
SUPERIOR BANK; FEDERAL DEPOSIT                     )
INSURANCE CORPORATION AS RECEIVER                 )
FOR TIERONE BANK; FEDERAL DEPOSIT                  )
INSURANCE CORPORATION AS RECEIVER                 )
FOR UNITED COMMERCIAL BANK;                        )
FEDERAL DEPOSIT INSURANCE                          )
CORPORATION AS RECEIVER FOR UNITED                )
WESTERN BANK; FEDERAL DEPOSIT                      )
INSURANCE CORPORATION AS RECEIVER                 )
FOR WASHINGTON MUTUAL BANK; and                   )
FEDERAL DEPOSIT INSURANCE                          )
CORPORATION AS RECEIVER FOR                        )
WESTERNBANK PUERTO RICO                            )
                                                   )
                    Plaintiffs,                    )
                                                   )
                         v.                        )
                                                   )
BANK OF AMERICA CORPORATION; BANK                 )
OF AMERICA, N.A.; MERRILL LYNCH & CO.;            )
MERRILL LYNCH CAPITAL SERVICES, INC.;            )
MERRILL LYNCH INTERNATIONAL;                      )
MERRILL LYNCH INTERNATIONAL BANK                 )
LTD.; BARCLAYS BANK PLC; BRITISH                  )
BANKERS' ASSOCIATION; BBA                          )
ENTERPRISES, LTD.; BBA TRENT LTD.                 )
(F.K.A. BBA LIBOR, LTD.); CITIGROUP, INC.;        )
CITIBANK, N.A.; CITIGROUP FINANCIAL              )
PRODUCTS, INC.; COÖPERATIEVE                       )
RABOBANK UA (F.K.A. COÖPERATIEVE                  )
CENTRALE RAIFFEISEN-                               )
BOERENLEENBANK, B.A.); CREDIT SUISSE             )
AG; CREDIT SUISSE INTERNATIONAL                   )
(F.K.A. CREDIT SUISSE FIRST BOSTON               )
INTERNATIONAL); DEUTSCHE BANK AG;                )
HSBC BANK PLC; HSBC BANK USA, N.A.;              )
THE HONGKONG AND SHANGHAI BANKING                )
CORPORATION LTD.; JPMORGAN CHASE &               )
CO.; JPMORGAN CHASE BANK, N.A.; BEAR             )
STERNS CAPITAL MARKETS, INC.; J.P.               )
MORGAN MARKETS LTD. (F.K.A. BEAR                 )
STEARNS INTERNATIONAL LTD.); J.P.                )
MORGAN BANK DUBLIN PLC (F.K.A. BEAR              )

STEARNS BANK PLC); BANK OF SCOTLAND )
PLC; LLOYDS BANKING GROUP PLC; )
LLOYDS BANK PLC (F.K.A. LLOYDS TSB )
BANK PLC); SOCIÉTÉ GÉNÉRALE; THE )
NORINCHUKIN BANK; ROYAL BANK OF )
CANADA; NATWEST MARKETS PLC (F.K.A. )
THE ROYAL BANK OF SCOTLAND PLC); THE )
BANK OF TOKYO-MITSUBISHI UFJ LTD.; )
UBS AG; and PORTIGON AG (F.K.A. )
WESTLB),
                                          )
                    Defendants.           )

# TABLE OF CONTENTS

**Page**

TABLE OF FIGURES ........................................................................................................ vii

NATURE OF THE CASE ....................................................................................................1

JURISDICTION AND VENUE ..........................................................................................2

PARTIES ..............................................................................................................................6

    Plaintiffs ...........................................................................................................................6

    Defendants ......................................................................................................................10

        Bank of America .........................................................................................................10

        Barclays......................................................................................................................11

        BBA ...........................................................................................................................15

        Citibank .....................................................................................................................17

        Rabobank ...................................................................................................................18

        Credit Suisse .............................................................................................................21

        Deutsche Bank ..........................................................................................................22

        HSBC ........................................................................................................................24

        JPMorgan ..................................................................................................................25

        Lloyds/Bank of Scotland...........................................................................................27

        Société Générale .......................................................................................................28

        Norinchukin ..............................................................................................................29

        Royal Bank of Canada ..............................................................................................29

        Royal Bank of Scotland ............................................................................................30

        The Bank of Tokyo-Mitsubishi UFJ Ltd. .................................................................32

        UBS............................................................................................................................33

        Portigon/WestLB ......................................................................................................34

BACKGROUND .................................................................................................36

    A.     Interest Rate Fundamentals.................................................................36

    B.     The Role of Indices and Benchmarks in Financial Markets ................................38

    C.     The Role of Interest-Rate Benchmarks in Lending ..............................................42

    D.     The Role of Interest-Rate Benchmarks in Derivatives .........................................43

    E.     Development of bbaLIBOR™.............................................................47

    F.     Calculation of bbaLIBOR™...............................................................48

    G.     bbaLIBOR™ Governance ...................................................................55

    H.     Defendants' Knowledge of bbaLIBOR™'s Importance ........................................59

FRAUDULENT AND COLLUSIVE CONDUCT RELATING TO bbaLIBOR™....................63

    A.     Systematic bbaLIBOR™ Suppression:  The Conduct Begins..............................63

    B.     Barclays Moves to a "Within-the-Pack" Directive Which Enabled
           Further Suppression ...........................................................................69

    C.     The Panel Bank Defendants Suppress USD bbaLIBOR™ By
           At Least 20-30 Basis Points.................................................................72

    D.     Defendants Collectively Seek to Continue Suppression and Maintain
           bbaLIBOR™'s Credibility and Dominance .........................................79

    E.     Agreement to Exclude a Potential Competitor in the Market for
           Interest-Rate Benchmarks ...................................................................100

    F.     Harmful Effects of Unlawful Conduct.................................................101

    G.     Conduct Benefitted Individual Trader Positions..................................107

DISCLOSURE OF THE FRAUDULENT AND COLLUSIVE CONDUCT ...........................108

    A.     Barclays Admissions..........................................................................108

    B.     UBS Admissions ................................................................................110

    C.     RBS Admissions ................................................................................112

    D.     Rabobank Admissions ........................................................................112

    E.     Lloyds Admissions ............................................................................113

F.      Deutsche Bank Admissions .................................................117

G.      Citibank Admissions.........................................................119

H.      Société Générale Findings ................................................120

THE ALLEGED FRAUD AND COLLUSION COULD NOT REASONABLY
HAVE BEEN DISCOVERED BEFORE BARCLAYS'S ADMISSIONS  OF
INTENTIONAL MISREPRESENTATIONS OF MATERIAL FACT ......................121

COUNT I:  BREACH OF CONTRACT WITH AMCORE
(MERRILL LYNCH CAPITAL SERVICES, INC.)..................................129

COUNT II:  BREACH OF CONTRACTS WITH AMTRUST
(CITIBANK, N.A. AND RBS).......................................................131

COUNT III:  BREACH OF CONTRACTS WITH CORUS
(BANK OF AMERICA, N.A. AND JPMORGAN CHASE BANK, N.A.)...............133

COUNT IV:  BREACH OF CONTRACTS WITH INDYMAC
(BANK OF AMERICA, N.A., MERRILL LYNCH CAPITAL SERVICES, INC.,
BARCLAYS, CITIBANK, N.A., CITIGROUP FINANCIAL PRODUCTS, INC.,
CREDIT SUISSE INTERNATIONAL, DEUTSCHE BANK, J.P. MORGAN BANK
DUBLIN PLC, JPMORGAN CHASE BANK, N.A.,  J.P. MORGAN MARKETS LTD.,
RBC, RBS, AND UBS) ..............................................................135

COUNT V:  BREACH OF CONTRACT WITH INTEGRA
(CITIGROUP FINANCIAL PRODUCTS, INC.) ....................................140

COUNT VI:  BREACH OF CONTRACT WITH SILVERTON
(CITIGROUP FINANCIAL PRODUCTS, INC.) ....................................142

COUNT VII:  BREACH OF CONTRACT WITH SUPERIOR
(CREDIT SUISSE INTERNATIONAL).............................................144

COUNT VIII:  BREACH OF CONTRACTS WITH UCB
(BANK OF AMERICA, N.A., MERRILL LYNCH INTERNATIONAL BANK LTD.,
MERRILL LYNCH & CO., BARCLAYS, CITIBANK, N.A., THE HONGKONG AND
SHANGHAI BANKING CORP. LTD., JPMORGAN CHASE BANK, N.A., AND UBS) ......146

COUNT IX:  BREACH OF CONTRACTS WITH WAMU
(BANK OF AMERICA, N.A., MERRILL LYNCH CAPITAL SERVICES, INC.,
MERRILL LYNCH INTERNATIONAL, BARCLAYS,  CITIBANK, N.A.,
CREDIT SUISSE INTERNATIONAL,  HSBC BANK USA, N.A., BEAR STEARNS
CAPITAL MARKETS, INC.,  JPMORGAN CHASE BANK, N.A., RBC, UBS, AND
PORTIGON)..........................................................................149

COUNT X:  BREACH OF CONTRACTS WITH WESTERNBANK
(MERRILL LYNCH CAPITAL SERVICES, INC., CITIBANK, N.A.,
CITIGROUP, INC., CREDIT SUISSE INTERNATIONAL,
JPMORGAN CHASE BANK, N.A.) .........................................................................153

COUNT XI:  BREACH OF THE IMPLIED COVENANT OF  GOOD FAITH
AND FAIR DEALING (CONTRACTING DEFENDANTS) ....................................156

COUNT XII:  UNJUST ENRICHMENT/RESTITUTION
(CONTRACTING DEFENDANTS).........................................................................158

COUNT XIII:  FRAUD (ALL DEFENDANTS).........................................................160

    Fraudulent USD bbaLIBOR™ Submissions (Panel Bank Defendants and BBA) ..........160

    Fraudulent Representations Regarding USD bbaLIBOR™
        (Panel Bank Defendants and BBA) ....................................................162

    The BBA's Fraud..........................................................................................163

    Contracting Defendants' Fraud.......................................................................164

COUNT XIV:  AIDING AND ABETTING FRAUD (ALL DEFENDANTS) .........................165

COUNT XV:  CIVIL CONSPIRACY TO COMMIT FRAUD (ALL DEFENDANTS)............166

COUNT XVI:  NEGLIGENT MISREPRESENTATION (ALL DEFENDANTS) ...................167

    Misrepresentations in USD bbaLIBOR™ Submissions (Panel Bank Defendants).........168

    Misrepresentations Regarding USD bbaLIBOR™
        (Panel Bank Defendants and BBA) ..................................................169

    The BBA's Misrepresentations.........................................................................170

    Contracting Defendants' Misrepresentations.......................................................172

COUNT XVII:  TORTIOUS INTERFERENCE WITH CONTRACT
(PANEL BANK DEFENDANTS AND BBA)...........................................................173

COUNT XVIII:  AIDING AND ABETTING  TORTIOUS INTERFERENCE
WITH CONTRACT (PANEL BANK DEFENDANTS AND BBA).........................174

COUNT XIX:  CIVIL CONSPIRACY TO COMMIT  TORTIOUS INTERFERENCE
WITH CONTRACT (PANEL BANK DEFENDANTS AND BBA).........................175

COUNT XX:  TORTIOUS INTERFERENCE  WITH PROSPECTIVE ECONOMIC
ADVANTAGE  (PANEL BANK DEFENDANTS AND BBA) ................................176

COUNT XXI:  AIDING AND ABETTING TORTIOUS  INTERFERENCE
WITH PROSPECTIVE ECONOMIC ADVANTAGE
(PANEL BANK DEFENDANTS AND BBA)....................................................177

COUNT XXII:  CIVIL CONSPIRACY TO COMMIT TORTIOUS  INTERFERENCE
WITH PROSPECTIVE ECONOMIC ADVANTAGE
(PANEL BANK DEFENDANTS AND BBA)....................................................178

COUNT XXIII:  VIOLATIONS OF SHERMAN ACT SECTION 1 (ALL DEFENDANTS) ..179

    Agreement...............................................................................................179

    Restraint of Trade .................................................................................187

    Antitrust Injury and Damages ..............................................................192

    Rule of Reason .......................................................................................193

    A.    Relevant Market:  USD Short-Term Interest-Rate Benchmarks .........194

        Market Definition...................................................................194

        Harm to Competition .............................................................195

        Antitrust Injury......................................................................198

    B.    Relevant Market:  OTC USD Interest-Rate Derivatives....................199

        Market Definition...................................................................199

        Harm to Competition .............................................................200

        Antitrust Injury......................................................................201

    C.    Relevant Market:  USD Floating-Rate Retail Loans ..........................201

        Market Definition...................................................................201

        Harm to Competition .............................................................202

        Antitrust Injury......................................................................203

    D.    Relevant Market:  USD Floating-Rate MBS ......................................203

        Market Definition...................................................................203

        Harm to Competition .............................................................204

        Antitrust Injury......................................................................204

COUNT XXIV:  VIOLATIONS OF THE DONNELLY ACT (ALL DEFENDANTS) ............205

PRAYER FOR RELIEF ...........................................................................................205

JURY DEMAND ....................................................................................................206

## <u>TABLE OF FIGURES</u>

Figure 1:  Vanilla Interest-Rate Swap.................................................................. 44

Figure 2:  Relationship Between Product Markets ............................................... 47

Figure 3:  bbaLIBOR™ Processes........................................................................ 52

Figure 4:  Overnight USD bbaLIBOR™ Submissions.......................................... 67

Figure 5:  Difference between 3M USD bbaLIBOR™ and 3M Eurodollar Bid Rate............... 105

Figure 6:  Comparison of bbaLIBOR™ submissions ............................................. 182

## NATURE OF THE CASE

1.      This Complaint arises from the manipulation and suppression of U.S. dollar

("USD") bbaLIBOR™, an interest-rate benchmark incorporated in trillions of dollars of

interest-rate derivatives and floating-rate loans that played a fundamentally important role in

financial systems throughout the world.  According to the Defendant British Bankers'

Association ("BBA"), bbaLIBOR™ represented the average interest rate paid in the London

interbank-loan market by a panel of banks, which during the relevant time period, was comprised

of many of the largest and most reputable commercial banks in the world.  During the relevant

period, sixteen banks comprised the panel of banks for USD bbaLIBOR™ interbank loans,

referred to herein as "Panel Bank Defendants."[1]  Each working day that they were on the panel,

the Panel Bank Defendants submitted to the BBA the interest rates that purportedly represented

the rates at which the Panel Bank Defendants would be offered USD interbank loans in a

competitive market.

2.      The Panel Bank Defendants were not only contributors to USD bbaLIBOR™,

they also were among the most important members of the BBA, active participants in the

committees that oversaw bbaLIBOR™, and the most important users of the benchmark in

downstream financial markets, such as the markets for USD interest-rate derivatives, floating-

rate loans, and floating-rate mortgage-backed securities ("MBS").  While some Defendants have

admitted wrongful conduct and disclosed some of the facts giving rise to the unlawful conduct,

most of the facts remain known only to Defendants and the enforcement agencies investigating

the manipulation of bbaLIBOR™.

---

[1] Most Panel Bank Defendants were on the USD bbaLIBOR™ panel throughout the relevant period.  Defendant Société Générale replaced Defendant Bank of Scotland plc on the USD bbaLIBOR™ panel in 2009.  Defendant Portigon joined the USD bbaLIBOR™ panel in 2009 after acquiring WestLB AG, which had been on the USD bbaLIBOR™ panel prior to its acquisition.

3.      The Federal Deposit Insurance Corporation ("FDIC") is a corporation organized and existing under the laws of the United States of America.  Under the Federal Deposit Insurance Act, the FDIC is authorized to be appointed as receiver for failed insured depository institutions, 12 U.S.C. § 1821(c), including the 39 institutions listed in paragraph 15 (the "Closed Banks").  The FDIC succeeds to, and is empowered to sue and complain in any court of law to pursue, all claims held by banks for which it is the receiver, 12 U.S.C. §§ 1819, 1821(d)(2)(A)(i), including the Closed Banks.

4.      Defendants' wrongful conduct as described in this Complaint caused substantial losses to the Closed Banks with regard to their loan portfolios and derivative holdings.  The Closed Banks reasonably expected that accurate representations of competitive market forces, and not fraudulent conduct or collusion among the Defendants, would determine USD bbaLIBOR™ and consequently, the value of financial instruments tied to USD bbaLIBOR™.  The Closed Banks' losses flowed directly from, among other things, the harms to competition caused by the fraud and collusion alleged in this Complaint.

5.      Plaintiffs, the FDIC receiverships for the Closed Banks (collectively the "FDIC-R"), seek to recover for losses that the Closed Banks sustained as a result of Defendants' wrongful conduct.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over the claims set forth in this Complaint under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), as well as 28 U.S.C. §§ 1331 and 1337.  This Court has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1367 because all of the claims set forth in this Complaint arise from the same facts and circumstances and form part of the same case or controversy.

7.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 pursuant to 12 U.S.C. § 1819(b)(2)(A), which provides that all suits to which the FDIC is a party, in any capacity, shall be deemed to arise under the laws of the United States.

8.     This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and N.Y. C.P.L.R. §§ 301 and 302.  Defendants have deliberately and purposefully conducted business in the United States and in New York.  Defendants are either incorporated in or maintain their principal places of business in the United States, or maintain significant ongoing operations in the United States.  All Defendants transacted business and derived substantial revenue from that business within New York.  Most, if not all, Defendants have offices located in New York and/or have engaged in a regular and continuous course of business in New York.  Some Defendants are resident corporations of New York, with their headquarters or primary places of business located within the State.[2]

9.     As explained below, certain Defendants also entered into contracts with certain of the Closed Banks for interest-rate swaps,[3] which incorporate USD bbaLIBOR™ as the interest-rate benchmark.  Those contracts provide that disputes arising under the contracts will be governed by New York law and name courts in New York, including the United States District Court for the Southern District of New York, as the fora in which such disputes shall be decided.  Defendants therefore purposefully availed themselves of the privilege of conducting business in the United States and New York in connection with the wrongful activities described in this Complaint.

---

[2] For example, Defendant Citibank, N.A. is headquartered in New York, New York.  Defendant Deutsche Bank AG maintains a "regional head office" in New York, New York.

[3] An interest rate swap is a contract in which two parties agree to exchange cash flows for a fixed period of time based on a defined principal amount (known as its notional value).  In its simplest form, one counterparty agrees to pay a fixed rate on the notional amount and, in exchange, receives a floating rate on the notional amount.

10.     Furthermore, the Defendants purposefully availed themselves of the benefits and privileges of the laws of New York and the United States in multiple ways, including, but not limited to, the following:

a.   Bank Defendants,[4] directly and/or through their agents, each voluntarily solicited business in New York by, for example, buying and selling financial instruments in New York for the purpose of deriving revenues from New York residents.

b.   Bank Defendants, directly and/or through their agents, owned property in New York, which, on information and belief, they claimed as business expenses on their tax forms.

c.   Bank Defendants voluntarily incorporated New York choice of law and forum selection clauses in financial instruments they bought and sold in New York.

d.   Panel Bank Defendants and the BBA voluntarily published USD bbaLIBOR™ to licensed vendors in New York, including Bloomberg and the Wall Street Journal.

e.   Panel Bank Defendants and the BBA voluntarily published individual Panel Bank Defendants' USD bbaLIBOR™ submissions to licensed vendors in New York, including Bloomberg and the Wall Street Journal.  This information was relied upon by market participants in New York and the United States.

f.   Bank Defendants put financial products into the stream of commerce in New York.

---

[4] "Bank Defendants" refers collectively to the Panel Banks Defendants and the parents, subsidiaries, or affiliates of the Panel Bank Defendants which are named as Defendants in this Complaint.

g.  Defendants voluntarily met with the Federal Reserve Bank of New York ("NY Fed") to discuss USD bbaLIBOR™ in an effort to convince the NY Fed that USD bbaLIBOR™ remained a reliable USD interest-rate benchmark.

h.  Bank Defendants traded USD interest-rate derivatives in New York in over-the-counter ("OTC") transactions.

i.  The BBA licensed USD bbaLIBOR™ to vendors in the United States in contracts that provided that the BBA had a right to sue those vendors for breaches of the licensing agreements.

11.  Defendants also expressly aimed the conduct alleged in this Complaint at the United States and New York in many ways, including, but not limited to, the following:

a.  Bank Defendants sought to project financial strength to investors in New York.

b.  Defendants, directly and through their agents, hid their collusion and made false statements, in part, to avoid sanctions by regulators in New York.

c.  Defendants sought to exclude potential competitors in the market for USD interest-rate benchmarks, efforts that were focused on New York.

12.  Moreover, Defendants acted as co-conspirators with each other and performed acts in furtherance of their unlawful conspiracy within New York, and elsewhere in the United States.

13.  The Closed Banks' claims as set forth in this Complaint are related to Defendants' purposeful contacts with the United States and New York.  But for Defendants' voluntary contacts with New York, and the United States as a whole, the Closed Banks would not have suffered the financial injuries for which the FDIC-R seeks relief in this Complaint.

14.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C.

§ 1391 and Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15, 22).  All Defendants have

offices or agents, transact business, and/or are found within the Southern District of New York.

The interstate commerce giving rise to the claims described in this Complaint was carried out, in

part, within the Southern District of New York.

## PARTIES

### Plaintiffs

15.     The Plaintiffs, collectively the FDIC-R, are the 39 separate and distinct FDIC

receiverships identified in subparagraphs (a)-(mm) below.  The FDIC-R is empowered to pursue

claims held by the Closed Banks, including the claims against the Defendants in this action.

  a.   On April 23, 2010, the FDIC was duly appointed as receiver for Amcore
    Bank, N.A. ("Amcore"), Rockford, Illinois.

  b.   On December 4, 2009, the FDIC was duly appointed as receiver for AmTrust
    Bank ("AmTrust"), Cleveland, Ohio.

  c.   On May 21, 2009, the FDIC was duly appointed as receiver for BankUnited,
    F.S.B. ("BankUnited"), Coral Gables, Florida.

  d.   On October 30, 2009, the FDIC was duly appointed as receiver for California
    National Bank ("Cal. National"), Los Angeles, California.

  e.   On August 14, 2009, the FDIC was duly appointed as receiver for Colonial
    Bank ("Colonial"), Montgomery, Alabama.

  f.   On October 21, 2011, the FDIC was duly appointed as receiver for
    Community Banks of Colorado ("Cmty. of Co."), Greenwood Village,
    Colorado.

g.   On September 11, 2009, the FDIC was duly appointed as receiver for Corus

Bank, N.A. ("Corus"), Chicago, Illinois.

h.   On February 27, 2015, the FDIC was duly appointed as receiver for Doral

Bank ("Doral"), San Juan, Puerto Rico.

i.   On November 21, 2008, the FDIC was duly appointed as receiver for Downey

Savings and Loan Association, F.A. ("Downey"), Newport Beach, California.

j.   On April 30, 2010, the FDIC was duly appointed as receiver for Eurobank

("Eurobank"), San Juan, Puerto Rico.

k.   On January 28, 2011, the FDIC was duly appointed as receiver for First

Community Bank ("First Cmty."), Taos, New Mexico.

l.   On December 18, 2009, the FDIC was duly appointed as receiver for First

Federal Bank of California, F.S.B. ("First Fed."), Santa Monica, California.

m.   On September 13, 2013, the FDIC was duly appointed as receiver for First

National Bank ("First National"), Edinburg, Texas.

n.   On January 29, 2010, the FDIC was duly appointed as receiver for First

Regional Bank ("First Regional"), Los Angeles, California.

o.   On April 30, 2010, the FDIC was duly appointed as receiver for Frontier Bank

("Frontier"), Everett, Washington.

p.   On September 25, 2009, the FDIC was duly appointed as receiver for

Georgian Bank ("Georgian"), Atlanta, Georgia.

q.   On August 21, 2009, the FDIC was duly appointed as receiver for Guaranty

Bank ("Guaranty"), Austin, Texas.

r.   On October 22, 2010, the FDIC was duly appointed as receiver for Hillcrest Bank ("Hillcrest"), Overland Park, Kansas.

s.   On December 18, 2009, the FDIC was duly appointed as receiver for Imperial Capital Bank ("Imperial"), La Jolla, California.

t.   On July 11, 2008, the FDIC was duly appointed as receiver for IndyMac Bank, F.S.B. ("IndyMac"), Pasadena, California.

u.   On July 29, 2011, the FDIC was duly appointed as receiver for Integra Bank, N.A. ("Integra"), Evansville, Indiana.

v.   On September 18, 2009, the FDIC was duly appointed as receiver for Irwin Union Bank and Trust Company ("Irwin"), Columbus, Indiana.

w.   On February 19, 2010, the FDIC was duly appointed as receiver for La Jolla Bank, F.S.B. ("La Jolla"), La Jolla, California.

x.   On August 19, 2011, the FDIC was duly appointed as receiver for Lydian Private Bank ("Lydian"), Palm Beach, Florida.

y.   On May 14, 2010, the FDIC was duly appointed as receiver for Midwest Bank and Trust Company ("Midwest"), Elmwood Park, Illinois.

z.   On November 13, 2009, the FDIC was duly appointed as receiver for Orion Bank ("Orion"), Naples, Florida.

aa.  On October 30, 2009, the FDIC was duly appointed as receiver for Pacific National Bank ("Pacific National"), San Francisco, California.

bb.  On October 30, 2009, the FDIC was duly appointed as receiver for Park National Bank ("Park National"), Chicago, Illinois.

cc. On November 21, 2008, the FDIC was duly appointed as receiver for PFF Bank & Trust ("PFF"), Pomona, California.

dd. On April 30, 2010, the FDIC was duly appointed as receiver for R-G Premier Bank of Puerto Rico ("Premier"), Hato Rey, Puerto Rico.

ee. On April 16, 2010, the FDIC was duly appointed as receiver for Riverside National Bank of Florida ("Riverside"), Fort Pierce, Florida.

ff. On October 30, 2009, the FDIC was duly appointed as receiver for San Diego National Bank ("San Diego National"), San Diego, California.

gg. On May 1, 2009, the FDIC was duly appointed as receiver for Silverton Bank, N.A. ("Silverton"), Atlanta, Georgia.

hh. On April 15, 2011, the FDIC was duly appointed as receiver for Superior Bank ("Superior"), Birmingham, Alabama.

ii. On June 4, 2010, the FDIC was duly appointed as receiver for TierOne Bank ("TierOne"), Lincoln, Nebraska.

jj. On November 6, 2009, the FDIC was duly appointed as receiver for United Commercial Bank ("UCB"), San Francisco, California.

kk. On January 21, 2011, the FDIC was duly appointed as receiver for United Western Bank ("United Western"), Denver, Colorado.

ll. On September 25, 2008, the FDIC was duly appointed as receiver for Washington Mutual Bank ("WaMu"), Henderson, Nevada.

mm.   On April 30, 2010, the FDIC was duly appointed as receiver for Westernbank Puerto Rico ("Westernbank"), Mayaguez, Puerto Rico.

**Defendants**[5]

*Bank of America*

16.     Defendant Bank of America Corporation ("Bank of America") is a Delaware

corporation headquartered in Charlotte, North Carolina.  Its wholly owned subsidiary, Defendant

Bank of America, N.A. is a National Association headquartered in Charlotte, North Carolina,

with offices in New York, New York.  Bank of America, N.A. is the successor-in-interest to

Bank of America National Trust & Savings Association.  Bank of America, N.A. is the primary

banking subsidiary of Bank of America.  Bank of America, N.A. claims that it was at all relevant

times a member of the USD bbaLIBOR™ panel.[6]  Bank of America, N.A. operated in the United

States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and

predecessors.  Bank of America, N.A. participated in the wrongful conduct alleged in this

Complaint both directly and through its subsidiaries and affiliates in the Southern District of

New York and elsewhere in the United States.

17.     Defendant Merrill Lynch & Co. is a Delaware corporation with offices in New

York, New York and a wholly owned indirect subsidiary of Bank of America.  Defendant Merrill

Lynch Capital Services, Inc. is a Delaware corporation headquartered in New York and a wholly

owned indirect subsidiary of Bank of America.  Defendant Merrill Lynch International Bank Ltd.

(n.k.a. Bank of America Merrill Lynch International Designated Activity Company) is a

---

[5] Jurisdictional allegations for Defendants are based upon the best available information accessible to the FDIC-R
Plaintiffs without having had the benefit of discovery.  More specific details concerning the relationship between
parents and subsidiaries and banking affiliates are necessarily within Defendants' control and thus would only be
available to FDIC-R through jurisdictional discovery.

[6] During the relevant period, Bank of America Corporation and Bank of America, N.A. did not contemporaneously
specify which of them served on the USD bbaLIBOR™ panel, listing themselves only as "Bank of America."  *See*
BBA LIBOR Panels 2005, http://www.bba.org.uk/media/article/bba-libor-panels-2005; BBA LIBOR Panels 2006,
http://www.bba.org.uk/media/article/bba-libor-panels-2006; BBA LIBOR Panels 2007,
http://www.bba.org.uk/media/article/bba-libor-panels-2007 (on file with FDIC-R).

corporation based in Ireland and a wholly owned indirect subsidiary of Bank of America.

Defendant Merrill Lynch International is a wholly owned indirect subsidiary of Bank of America

with its head office in the United Kingdom.  This Complaint refers to Merrill Lynch & Co.,

Merrill Lynch Capital Services, Inc., Merrill Lynch International Bank Ltd., and Merrill Lynch

International collectively as "the Merrill Defendants."

18.     During the relevant period, Bank of America operated its global banking unit,

which included global corporate and commercial banking and investment banking operations,

primarily through Bank of America, N.A and its subsidiaries, including the Merrill Defendants.

Bank of America's Global Corporate and Investment Banking ("GCIB") segment, which

included Bank of America, N.A., was responsible for, among other things, Bank of America's

derivatives business.[7]

***Barclays***

19.     Defendant Barclays Bank plc ("Barclays") is a public limited company

headquartered in London, England.  Barclays was at all relevant times a member of the USD

bbaLIBOR™ panel.

20.     Barclays is registered as a financial holding company with the NY Fed.  It

maintained two branch offices and a representative office in New York, New York, to solicit

business from U.S. financial institutions and manage its USD funding position.  Barclays leased

its New York branch properties for the purpose of soliciting business from residents of New

York and the United States.  In 2016, Barclays employed more than 9,700 people in New York

---

[7] *See, e.g.*, Bank of Am., 2008 Annual Report 38-44 (2008), *available at* http://media.corporate-ir net/media_
files/irol/71/71595/reports/2008_AR.pdf (last visited on June 12, 2018).

and the United States.[8]  Barclays maintains its representative offices in the United States for the purpose of liaising with clients in New York and the United States, collecting information about the U.S. economy, and providing information to investors.  Barclays's parent company, Barclays plc, is listed on the New York Stock Exchange.[9]

21.     As alleged more fully below, Barclays operated directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors in the United States.[10] Barclays participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

22.     Barclays operated its investment banking operations through its Barclays Capital business unit ("BCBU").  In 2007, BCBU accounted for 31% of the Investment Banking and Investment Management unit of Barclays plc's revenues.  In 2008, Barclays acquired Lehman Brothers Holdings Inc. as part of its strategy to expand the global Barclays Capital franchise, and integrated Lehman into BCBU.

23.     During the relevant period, Barclays's Board of Directors was collectively responsible for the success of all Barclays entities and determined the overall strategic objectives and policies of the group as a whole.[11]  For example, then Chief Executive Officer ("CEO") Mr. Diamond was responsible for BCBU.  Another Barclays executive, Jerry del Missier, was

---

[8] Barclays also had access to the NY Fed's discount window.  In 2016, Barclays's branches in the United States generated $1.67 billion in revenue.  As of 2011, Barclays's U.S. office held more than $4.67 billion in notional value in interest-rate derivatives, nearly all of which were tied to USD bbaLIBOR™.

[9] In 2007, Barclays paid $400 million for the naming rights of Barclays Center—a sports arena located in Brooklyn.

[10] *See Barclays in the USA*, Barclays, http://www.barclays.com/about-barclays/around-the-world/usa.html (last visited Oct. 1, 2014).

[11] Barclays, 2010 Annual Report 153 (2010), *available at* https://www.home.barclays/content/dam/barclayspublic/docs/InvestorRelations/AnnualReports/AR2010/2010-barclays-plc-annual-report.pdf.

President of BCBU.  Reporting to Mr. del Missier were BCBU's Global Head of Strategic

Portfolio and Liquidity Management John Porter, and BCBU's Global Head of Fixed Income

(with responsibility for trading mortgage-backed securities and interest rate swaps), Eric

Bommensath.  These executives helped determine the global strategy for BCBU and implement

that strategy in the United States.

24.     During the relevant period, Barclays engaged in derivatives transactions in New

York and the United States and obtained funding via business units within Barclays, known

respectively, as the Treasury unit and the Money Market unit.  Barclays's employees from these

business units, including employees located in the United States, reported to the same

supervisors within their respective business units.[12]  BCBU earned billions of dollars in revenues

for the benefit of Barclays from its New York offices through the trading of interest-rate

derivatives that incorporated USD bbaLIBOR™ as the interest-rate benchmark.[13]

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Barclays also used its U.S. trading desks to obtain dollars to cover its growing USD book.

BCBU also ran a proprietary trading fund that profited from artificially suppressed USD

bbaLIBOR™ rates.

---

[12] Alex Pabon on Twitter, *Purple Names had documented knowledge of requests by desks to #LIBOR submitters*, July 12, 2017, https://twitter.com/AJx2HP/status/885215025987801090 (last visited June 7, 2018).

[13] Barclays, 2010 Annual Report, *supra* note 11, at 56, 57.

███████████████████████████████████████████████████████████

25.     Barclays suffered from cultural deficiencies and "failed to have adequate systems and controls in place" relating to its bbaLIBOR™ submissions.[15]  During the relevant period, BCBU employees in the United States communicated regularly with Barclays employees in London regarding USD bbaLIBOR™ submissions and helped determine, from the United States, Barclays's USD bbaLIBOR™ submissions.  BCBU failed to install separation or ethical walls between the trading teams and those contributing USD bbaLIBOR™ submissions.[16]

26.     

27.     Barclays employees in New York were either unaware of, or disregarded, any supposed lines of responsibility for USD bbaLIBOR™ submissions.  Barclays employees used their knowledge of USD bbaLIBOR™ suppression to enter into derivatives trades with unsuspecting counterparties and reap illicit profits at the expense of those counterparties, many of whom were located in New York.

---

[15] Anthony Salz & Russell Collins, Salz Review: An Independent Review of Barclays' Business Practices ¶ 6.58 (Apr. 2013).

[16] For example, in 2005, Mr. Bommensath, told a subordinate Barclays derivatives trader "to introduce the New York swaps desk" to USD bbaLIBOR™ manipulation and "teach [the New York swaps desk] how to communicate with the cash desk in London and make the New York desk more profitable."  Jeremy Hodges & Stephen Morris, *Ex-Barclays Trader Told SFO His Bosses Knew About Libor Fix*, Bloomberg, Apr. 7, 2016, http://www.bloomberg.com/news/articles/2016-04-07/ex-barclays-traders-quit-rate-rigging-as-crisis-hit-sfo-says.

28.     Barclays employees in New York not only requested, and obtained, USD bbaLIBOR™ submissions that benefited them financially, they also bought and sold derivatives that incorporated USD bbaLIBOR™ as an interest-rate benchmark from and to counterparties located in New York and elsewhere in the United States.

***BBA***

29.     The BBA is a trade association based in the United Kingdom.  Throughout the 2000s, the BBA owned bbaLIBOR™.  The BBA was governed by a Board, which officially met four times per year, comprised of the BBA Chief Executive and the Chief Executives of a number of Bank Defendants.  Defendant BBA Enterprises, Ltd. was a wholly owned subsidiary of the BBA located in London.  In late 2009, the BBA incorporated a new legal subsidiary, Defendant BBA LIBOR, Ltd., to house bbaLIBOR™.  One published report stated that the BBA created BBA LIBOR, Ltd. to help shield the BBA from potential liability arising from the type of misconduct alleged in this Complaint.[19]  On September 23, 2014, BBA LIBOR, Ltd. changed its name to BBA Trent Ltd.

30.     ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████  During the relevant period, the FX & MM Committee was comprised of thirteen Panel Bank Defendants.  The FX & MM Committee, via these thirteen Panel Bank Defendants, was responsible for determining bbaLIBOR™'s rules, choosing panel banks, and disciplining panel banks that failed to adhere to bbaLIBOR™'s rules.  The FX & MM

---

[19] *See* David Enrich & Max Colchester, *Before Scandal, Clash over Control of Libor*, Wall St. J., Sept. 11, 2012, http://online.wsj.com/article/SB10000872396390443847404577631404235329424.html.

█ ██████████████████████████████████████████████████████████
████████████████████████

Committee was not a traditional trade association committee.  It met in secret, did not include an antitrust lawyer to oversee committee meetings and communications, did not publish minutes of its meetings, and did not publicly identify its members.  ████████████████████

██████████████████████████████████████████████████████

████████████████████████

31.      As set forth more fully below, the BBA advertised bbaLIBOR™ in the United States and in the Southern District of New York, and solicited business in the United States.  In 2007, the BBA sought and obtained a trademark for bbaLIBOR™ from the United States Patent and Trademark Office (Registration No. 3212218).  During the relevant period, the BBA electronically communicated news and information through BBA websites (*e.g.*, www.bba.org, www.bbalibor.org), the Thomson Reuters website (www.reuters.com), the Wall Street Journal, and through other data vendor websites in New York.[22]  The BBA distributed USD bbaLIBOR™ data via a number of data vendors, including Bloomberg and the Wall Street Journal, to more than a million computer screens around the world, including in the United States and in the Southern District of New York.[23]  In 2009, the BBA launched a Twitter social media news feed to bypass the print media[24] because interest in bbaLIBOR™ had soared "since so many loans are

---

██ █████████████████████████████

[22] *See, e.g.*, *Frequently Asked Questions (FAQs)*, BBA Libor, https://web.archive.org/web/20110303121338/http:// www.bbalibor.com/bbalibor-explained/faqs (last visited May 31, 2018); *Worldwide Offices*, IDC, http://www.idc. com/about/wwoffices.jsp#.UTkzDo6BBMY (last visited May 31, 2018).

[23] *See Frequently Asked Questions (FAQs)*, *supra* note 22.  The BBA explained to the United Kingdom's House of Commons Treasury Committee that LIBOR data "can be seen on a range of financial vendor screens."  U.K. House of Commons Treasury Comm., Fixing LIBOR: Some Preliminary Findings, Written Evidence 79, *available at* https://www.parliament.uk/documents/commons-committees/treasury/Fixing-LIBOR-evidence2.pdf.  Those vendors included Bloomberg.

[24] *See BBA LIBOR*, Capital Markets Bull., June 2009, at 5, *available at* http://hb.betterregulation.com/external/ Capital%20Markets%20Bulletin%20-%20June%2009.pdf.

linked to it."[25]  The BBA also maintained a Facebook page accessible from the Southern District of New York (https://www.facebook.com/BritishBankers).  On information and belief, the BBA participated in the wrongful conduct alleged in this Complaint in the Southern District of New York and elsewhere in the United States.

32.     The BBA and its employees engaged in overt acts and extensive communication with entities in New York and the United States to ensure regulators and market participants perceived USD bbaLIBOR™ as an accurate and reliable benchmark, and would not seek alternatives.  For example, BBA documents state that the LIBOR Secretariat "met with regulatory authorities in the US to discuss a number of issues related to LIBOR" between 2005 and 2009.[26]

*Citibank*

33.     Defendant Citigroup Inc. ("Citigroup") is a Delaware corporation headquartered in New York, New York, with numerous corporate offices and branches in the Southern District of New York.  Citigroup's indirectly wholly owned subsidiary, Defendant Citibank, N.A., ("Citibank") is a National Association headquartered in New York, New York, that was at all relevant times a member of the USD bbaLIBOR™ panel of banks.  Citibank is the primary banking entity of Citigroup, providing consumer finance, investment banking, commercial banking, and other services around the world.  Citibank is provisionally registered with the U.S. Commodity Futures Trading Commission ("CFTC") as an interest-rate swaps dealer.  Defendant

---

[25] Press Release, BBA, BBA LIBOR:  The World's Most Important Number Now Tweets Daily (May 21, 2009), *available at* https://www.easier.com/25225-bba-libor-the-world-s-most-important-number-now-tweets-daily.html.

[26] U.K. House of Commons Treasury Comm., Fixing LIBOR: Some Preliminary Findings, Written Evidence, *supra* note 23.

Citigroup Financial Products, Inc. ("CFPI"), is a wholly owned subsidiary of Citigroup that engaged in financial transactions incorporating bbaLIBOR™ with the Closed Banks.

34.     On information and belief, and as set forth more fully below, Citigroup and Citibank participated in the wrongful conduct alleged in this Complaint both directly and through their subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

35.     During the relevant period, Citigroup managed its businesses along segment and product lines, without regard for corporate formalities.  One of those segments was the Institutional Clients Group ("ICG").[27]  Citibank's USD bbaLIBOR™ submitters were within the ICG segment.  Specifically, the London desk of G10 Risk Treasury Europe within ICG was responsible for submitting USD bbaLIBOR™.  Among others, the New York desk of G10 Risk Treasury interacted regularly with the London desk of G10 Risk Treasury Europe.  Further, as detailed more fully below, U.S.-based executives for Citibank (all under ICG) communicated regularly with USD bbaLIBOR™ submitters regarding USD bbaLIBOR™, at times directing the submission of USD bbaLIBOR™ contributions that did not reflect Citibank's true cost of interbank borrowing.

***Rabobank***

36.     Defendant Coöperatieve Rabobank UA ("Rabobank") (f.k.a. Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A.) is a financial services provider with its headquarters in Utrecht, the Netherlands, and branches in the United States, including in New York, New

---

[27] *Citi Rearranges Its Wealth Management Unit*, DealBook N.Y. Times (Mar. 3, 2008), https://dealbook nytimes.com/2008/03/03/citi-rearranges-its-wealth-management-unit/.

York.[28]  Rabobank operated in the United States directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, including through Rabobank's "Member Banks," which Rabobank supported and supervised.[29]  Rabobank participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

37.     The New York branch of Rabobank, which operates in the United States as a legal extension of Rabobank, is licensed by the New York State Department of Financial Services ("NYSDFS") and is regulated by the NY Fed.  Rabobank has employed more than 500 employees in New York and generated substantial revenue from its New York branch. Rabobank conducts its wholesale activities through its New York branch and certain wholly owned subsidiaries of Utrecht-America Holdings, Inc., including Rabo Securities USA, Inc., a broker-dealer registered with the Securities and Exchange Commission ("SEC"), and Rabo Capital Services, headquartered in New York, New York.

38.     In 2000, the BBA selected Rabobank to be a member of the USD bbaLIBOR™ panel even though Rabobank rarely participated in the interbank loan market.

39.     On information and belief, Rabobank operated its derivatives business globally, without regard for corporate formalities.[30]  On information and belief, Rabobank employees in New York were aware of USD bbaLIBOR™ manipulation, and bought and sold derivatives that

---

[28] *See, e.g.*, *Rabobank Group United States of America*, Rabobank Grp., https://www.rabobank.com/en/locate-us/americas/usa.html (last visited May 31, 2018).

[29] *See, e.g.*, *Rabobank Group United States of America*, Rabobank Grp., https://www.rabobank.com/en/locate-us/americas/usa.html (last visited May 31, 2018).

[30] *See, e.g.*, Trial Tr. 62:17-20, Oct. 14, 2015 (Day 2), *United States. v. Allen*, 1:14-cr-00272 (JSR) (S.D.N.Y.) ("Rabobank Traders Tr.") (describing former Rabobank executive Anthony Allen as "global head of cash desks" with supervisory responsibility for U.S. desk); *id.* 1170:17-19, Oct. 22, 2015 (Day 7) (Mr. Allen describing his role as encompassing supervision of six trading desks around the world).

incorporated USD bbaLIBOR™ as an interest-rate benchmark from and to counterparties located in New York and elsewhere in the United States.  Rabobank held weekly conference calls with its derivatives traders, including traders located in New York, in which USD bbaLIBOR™ manipulation, including persistent suppression and agreements to align Rabobank USD bbaLIBOR™ submissions with other Panel Bank submissions, was openly discussed.[31]  In addition, Rabobank derivative traders in New York openly discussed USD bbaLIBOR™ manipulation via instant messages and chats with Rabobank USD bbaLIBOR™ submitters.[32]  During the relevant period, Rabobank employees in New York helped determine Rabobank's USD bbaLIBOR™ submissions.[33]

40.     Rabobank's "book" of USD derivatives transactions was the most important trading vehicle at Rabobank and was the primary consideration for Rabobank's USD bbaLIBOR™ submissions.[34]  On information and belief, a majority of Rabobank's USD bbaLIBOR™ derivatives transactions were with counterparties located in the United States and New York.[35]  On information and belief, Rabobank employees used their knowledge of USD bbaLIBOR™ suppression to enter into derivatives trades with unsuspecting counterparties and reap illicit profits at the expense of those counterparties, many of whom were located in New York.

---

[31] *Id.* 277:15-278:24, Oct. 19, 2015 (Day 4).

[32] *Id.* 238:16-239:9.

[33] *Id.* 865:4-868:14, Oct. 23, 2015 (Day 8).

[34] Defense Ex. 608C at 7, *United States v. Allen,* 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 202-1.

[35] According to its Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, Rabobank's New York office held more than $7.8 billion in notional value in interest-rate derivatives for trading, nearly all of which were tied to USD bbaLIBOR™.

*Credit Suisse*

41.     Defendant Credit Suisse AG ("Credit Suisse") is a company headquartered in

Zurich, Switzerland.  Credit Suisse was at all relevant times a member of the USD bbaLIBOR™

panel of banks.  Defendant Credit Suisse International ("CSI") (f.k.a. Credit Suisse First Boston

International) is an indirect wholly owned subsidiary of Credit Suisse.  CSI is the global

derivatives trading entity of Credit Suisse.[36]

42.     As alleged more fully below, Credit Suisse operated directly, or through its

wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors (including CSI),

in the United States.[37]  Credit Suisse participated in the wrongful conduct alleged in this

Complaint both directly and through its subsidiaries and affiliates in the Southern District of

New York and elsewhere in the United States.

43.     On information and belief, during the relevant period, Credit Suisse pursued the

investment banking side of its business through its Investment Banking Division ("IBD").  IBD

was responsible for, *inter alia*, trading interest-rate derivatives and underwriting/selling asset-

backed securities.  IBD operated globally without regard to corporate formalities.  IBD

implemented global strategies and directives in the United States through CSI.[38]  On information

and belief, IBD was responsible for, *inter alia*, submitting Credit Suisse's bbaLIBOR™

contributions and transacting business with U.S counterparties.  In the United States, Credit

Suisse operated its investment operations under IBD through its wholly owned New York branch

---

[36] Credit Suisse, Credit Suisse International Annual Report 2009, *available at* https://www.credit-suisse.com/.../financial.../international/csi-annual-report-2009.pdf.

[37] *See, e.g.*, *Office Locator*, Credit Suisse, https://www.credit-suisse.com/who_we_are/en/office_locator.jsp (last visited May 31, 2018).

[38] According to its Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, Credit Suisse's U.S. branch held more than $27 billion in notional value in interest-rate derivatives for trading, including derivatives that incorporated USD bbaLIBOR™ as the interest-rate benchmark.

and CSI.  Credit Suisse employees used their knowledge of USD bbaLIBOR™ suppression to enter into derivatives trades with unsuspecting counterparties and reap illicit profits at the expense of those counterparties, many of whom were located in New York.

44.     Credit Suisse promoted its global brand, international reach, and increased profits from the perception that it was a "strong counterparty."[39]

### Deutsche Bank

45.     Defendant Deutsche Bank AG ("Deutsche Bank") is a financial services company headquartered in Frankfurt, Germany, with subsidiaries and affiliates located in the Southern District of New York.  Deutsche Bank was at all relevant times a member of the USD bbaLIBOR™ panel of banks.  Deutsche Bank engaged in financial transactions incorporating USD bbaLIBOR™ with the Closed Banks.  As alleged more fully below, Deutsche Bank operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in New York and the United States.[40]  Deutsche Bank participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

46.     Deutsche Bank maintains a branch office in the United States, which is registered to do business with the NYSDFS and is regulated by the U.S. Federal Reserve System, and has subsidiaries (*e.g.*, Deutsche Bank Securities Inc.) with substantial operations in the United

---

[39] Renato Fassbind, Credit Suisse, Bank am Bellevue "The perfect business model?!" (Jan. 16, 2009), *available at* https://www.credit-suisse.com/media/assets/corporate/docs/about-us/web-events/shareholder-events/bank-am-bellevue-16012009.pdf.

[40] *See, e.g.*, *Location Finder*, Deutsche Bank, https://www.db.com/company/en/location-finder htm (last visited May 31, 2018).

States.[41]  In 2012, Deutsche Bank registered with the CFTC as a swap dealer for the purpose of engaging in financial transactions incorporating USD bbaLIBOR™ in the United States, including New York.  Deutsche Bank has employed more than 10,000 people in the United States, including in New York.

47.     On information and belief, during the relevant period, Deutsche Bank operated its interest-rate derivatives and securities businesses through its Global Finance and Foreign Exchange business unit ("GFFX").[42]  From 2006 to 2011, GFFX consisted of Global Finance and FX Forwards ("GFF") and Foreign Exchange ("FX") and employed traders in both its Pool Trading groups and its Money Market Derivatives ("MMD") groups.[43]  The Pool Trading and MMD desks were organized by currency, with senior traders overseeing the desks and regional managers overseeing the business lines by location.[44]

48.     GFFX was overseen by Deutsche Bank's Executive Committee, which included executives who participated in LIBOR suppression.  GFFX employees reported up the same chain of management, with a global senior manager responsible for both desks "instruct[ing] all traders to have open communication across offices and instill[ing] an expectation that the derivatives traders and submitters would communicate routinely about relevant market conditions and individual trading positions."[45]  Members of the GFFX unit were responsible for

---

[41] According to its Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, Deutsche Bank's U.S. branch held nearly $20 trillion in notional value in interest-rate derivatives for trading, nearly all of which were tied to USD bbaLIBOR™.

[42] *In re Deutsche Bank AG*, Consent Order Under New York Banking Law §§ 44-44a ¶ 11(NYSDFS Apr. 23, 2015) (hereinafter "DB NYSDFS CO"), attached as Exhibit 1 and incorporated into this Complaint by reference.

[43] *United States v. Deutsche Bank AG*, Deferred Prosecution Agreement, Attachment A, Statement of Facts ¶14 (Apr. 23, 2015) (hereinafter "DB SOF"), attached as Exhibit 2 and incorporated into this Complaint by reference.

[44] *In re Deutsche Bank AG*, No. 15-20, at 8 (C.F.T.C. Apr. 25, 2015) (hereinafter "DB CFTC Order"), attached as Exhibit 3 and incorporated into this Complaint by reference.

[45] *Id.* at 8; *see also* DB SOF, *supra* note 43, ¶ 15.

formulating and making Deutsche Bank's USD bbaLIBOR™ submissions and trading a variety

of derivatives that incorporated USD bbaLIBOR™ as an interest-rate benchmark. Many of these

trades were initiated by GFFX members based in New York, New York and involved

counterparties also located in the United States, including in New York.[46]

49.     GFFX employees, including those based in New York, participated in weekly

meetings during which USD bbaLIBOR™ manipulation was openly discussed.[47]  GFFX

employees in New York also made requests of Deutsche Bank's USD bbaLIBOR™ submitters

to manipulate USD bbaLIBOR™ for Deutsche Bank's profit.[48]

***HSBC***

50.     Defendant HSBC Bank plc ("HSBC") is a public limited company headquartered

in London, England, with numerous corporate offices and branches in the Southern District of

New York.  HSBC was at all relevant times a member of the USD bbaLIBOR™ panel of banks.

Defendant HSBC Bank USA, N.A. ("HBUS") is a national banking association with its main

office in McLean, Virginia.[49]  Defendant The Hongkong and Shanghai Banking Corporation Ltd.

("HSBC Ltd.") is a limited liability corporation based in Hong Kong, China.[50]  HSBC, HBUS,

and HSBC Ltd. are all wholly owned subsidiaries of HSBC Holdings plc.

51.     As set forth more fully below, HSBC operated directly, or through its wholly

owned and/or controlled subsidiaries, affiliates, agents, and predecessors, including Defendant

---

[46] DB SOF, *supra* note 43, ¶¶ 17-19.

[47] DB CFTC Order, *supra* note 44, at 9.

[48] *Id.* at 11; DB SOF, *supra* note 43, ¶ 18.

[49] *See, e.g.*, *Fact Sheet*, HSBC Bank USA, Nat'l Ass'n, http://www.us.hsbc.com/1/PA_1_083Q9FJ08A002FBP5 S00000000/content/new_usshared/shared_fragments/pdf/hbus_factsheet_0912.pdf (on file with FDIC-R).

[50] *See, e.g.*, The Hongkong & Shanghai Banking Corp. Ltd., Annual Report and Accounts 2012 at 1, *available at* http://vpr.hkma.gov.hk/pdf/100002/ar_12/ar_12_pt01.pdf.

HBUS and HSBC Ltd., in New York.[51]  HBUS and HSBC Ltd.,[52] engaged in financial transactions incorporating USD bbaLIBOR™ with the Closed Banks.  HSBC participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

52.     During the relevant period, HSBC operated on a "group" basis under the control and direction of various business segments.  On information and belief, HSBC operated its derivatives and asset-backed securities businesses worldwide through the bank's Global Banking & Markets group ("HSBC Global Banking").  On information and belief, HSBC Global Banking was responsible for, *inter alia*, submitting HSBC's bbaLIBOR™ contributions and transacting business with U.S counterparties.

***JPMorgan***

53.     Defendant JPMorgan Chase & Co. ("JPMorgan") is a Delaware corporation headquartered in New York, New York,[53] with numerous corporate offices and branches in the Southern District of New York.  JPMorgan is the marketing name for JPMorgan Chase & Co. and its subsidiaries and affiliates.[54]  JPMorgan's wholly owned subsidiary, Defendant JPMorgan Chase Bank, N.A. ("JPMorgan N.A."), a National Association headquartered in Columbus, Ohio

---

[51] *See, e.g.*, *Country Contacts*, HSBC Holdings plc, http://www hsbc.com/about-hsbc/structure-and-network/country-contacts#USA (last visited May 31, 2018).

[52]  *See, e.g.*, *Fact Sheet*, *supra* note 49.

[53] In August 2007, JPMorgan borrowed $500 million from the U.S. Federal Reserve System's Discount Window to provide liquidity and bolster its reputation with investors and regulators in the United States.  Gretchen Morgansen, *The Bank Run We Knew So Little About*, N.Y. Times, April 2, 2011, https://www nytimes.com/2011/04/03/business/03gret html.

[54] *See, e.g.*, T. Belton, F. Bassi, A. Roever, & S. Ramaswamy, *The Outlook for Libor*, JPMorgan, US Fixed Income Weekly, May 16, 2008, at 10, *available at* http://www.levow.com/wp-content/uploads/SG/LIBOR%20Outlook.pdf.

with numerous locations in New York, was at all relevant times a member of the USD bbaLIBOR™ panel of banks (the BBA listed "JP Morgan Chase" as the panel bank).[55]

54.     JPMorgan held itself out as a "global leader" in financial services,[56] and in its 2008 Annual Report, JPMorgan proclaimed itself as "a large player in the asset-backed securities market."  JPMorgan operated on a "line of business basis."[57]  JPMorgan N.A. was a part of JPMorgan's global Investment Bank division.  During the relevant period, as a part of JPMorgan's Investment Bank division, several subsidiaries of JPMorgan engaged in financial transactions incorporating USD bbaLIBOR™ with the Closed Banks.  These subsidiaries included JPMorgan N.A.; Defendant Bear Stearns Capital Markets, Inc., a Delaware corporation headquartered in New York; Defendant J.P. Morgan Markets Ltd. (f.k.a. Bear Stearns International Ltd.), a company based in London, United Kingdom; and Defendant J.P. Morgan Bank Dublin plc[58] (f.k.a. Bear Stearns Bank plc), a company based in Dublin, Ireland.

55.     JPMorgan and JPMorgan, N.A. operated in the United States directly or through their wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors. JPMorgan and JPMorgan, N.A. participated in the wrongful conduct alleged in this Complaint both directly and through their subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

---

[55] BBA LIBOR Panels 2005, *supra* note 6; BBA LIBOR Panels 2006, *supra* note 6; BBA LIBOR Panels 2007, *supra* note 6.

[56] JPMorgan Chase & Co. Resolution Plan 7, 9, 30 (Oct. 2013), *available at* https://www.federalreserve.gov/bankinforeg/resolution-plans/jpmorgan-chase-1g-20131001.pdf (last visited June 13, 2018).

[57] *Id.* at 6-8, 14, 16, 28.

[58] It appears J.P. Morgan Bank Dublin plc changed its name to J.P. Morgan Dublin plc in 2013.

*Lloyds/Bank of Scotland*

56.     Defendant Lloyds Banking Group plc ("Lloyds") is a public limited company headquartered in London, England, with an office in New York, New York, in which, as of September 30, 2014, more than 300 people have been employed full-time.  Lloyds Banking Group plc is traded on the New York Stock Exchange.[59]  Defendant Lloyds Bank plc, formerly known as Lloyds TSB Bank plc ("LTSB") is a wholly owned subsidiary of Lloyds and was a member of the USD BBALIBOR™ panel of banks until February 2009.  Defendant Bank of Scotland plc ("Bank of Scotland") is a wholly owned subsidiary of LTSB.[60]  Until February 2009, Bank of Scotland was an independent bank known as HBOS and was a member of the USD BBALIBOR™ panel of banks.[61]  Lloyds was formed in 2009 through the acquisition of HBOS plc ("HBOS"), parent of Lloyds TSB Group plc, at which time Lloyds joined the USD bbaLIBOR™ panel.  Defendants Lloyds Banking Group plc, Lloyds Bank plc, and Bank of Scotland, and HBOS are referenced collectively in this Complaint as "Lloyds."

57.     Lloyds conducts its activities in the United States and New York primarily through U.S. branches of Lloyds Bank plc and Bank of Scotland.  Lloyds also conducts capital markets activities in the United States and New York through its subsidiary Lloyds Securities Inc., which has been registered to do business as a broker-dealer in the United States since

---

[59] *See Investors & Performance: Share Price*, Lloyds Banking Grp.,
http://www.lloydsbankinggroup.com/investors/share-price-info (last visited June 14, 2018).
[60] *In re Lloyds Banking Group plc*, No. 14-18, at 1 (C.F.T.C. July 28, 2014) (hereinafter "Lloyds CFTC Order"), attached as Exhibit 4 and incorporated into this Complaint by reference.
[61] Bank of Scotland had taken over submissions from the HBOS plc subsidiary HBOS Treasury Services plc in September 2007.

February 10, 2011.[62]  Lloyds Securities' main office is located in the Southern District of New York at 1095 Avenue of the Americas, New York, New York 10036.[63]

58.     Lloyds operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.  Lloyds participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

***Société Générale***

59.     Defendant Société Générale is a banking corporation, headquartered in Paris, France, with offices in New York, New York.  Société Générale replaced Bank of Scotland on the USD bbaLIBOR™ panel on February 9, 2009.  It has been provisionally registered as a swap dealer since December 31, 2012.

60.     During the relevant period, Société Générale operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States, including in the Southern District of New York.[64]  Société Générale participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

61.     Société Générale operated its investment banking division globally through its Corporate Banking and Investment Group.  On information and belief, the Corporate Banking and Investment Group was responsible for, *inter alia*, submitting Société Générale's bbaLIBOR™ contributions and transacting business with U.S counterparties.

---

[62] *Contact Us*, Lloyds Bank, http://www.lbusa.com/contact-us (last visited May 31, 2018).

[63] *Id.*

[64] *See, e.g.*, *Our Locations*, Société Générale Grp., http://www.societegenerale.com/en/about-us/our-businesses/our-locations (last visited May 31, 2018).

*Norinchukin*

62.     Defendant The Norinchukin Bank ("Norinchukin") is a cooperative bank headquartered in Tokyo, Japan, with a branch office in New York, New York, which is supervised by the NYSDFS and the NY Fed.  Norinchukin was at all relevant times a member of the USD bbaLIBOR™ panel.  Norinchukin is one of Japan's largest institutional investors and has a reputation as Japan's largest hedge fund.  Norinchukin operated in the New York directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[65] Norinchukin participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

*Royal Bank of Canada*

63.     Defendant Royal Bank of Canada ("RBC") is the largest financial institution in Canada and is headquartered in Toronto, Canada, with affiliates in New York, New York.  RBC was at all relevant times a member of the USD bbaLIBOR™ panel.  RBC and its subsidiaries presently employ more than 8,000 people in their branches and offices located in the United States.[66]

64.     During the relevant period, RBC operated in New York directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[67]  RBC engaged in financial transactions incorporating USD bbaLIBOR™ with the Closed Banks.  RBC

---

[65] *See, e.g.*, *Global Network*, The Norinchukin Bank, http://www.nochubank.or.jp/en/about/globalnetwork html (last visited May 31, 2018).

[66] According to its Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, RBC's New York office held more than $37 billion in notional value in interest-rate derivatives for trading, nearly all of which were tied to bbaLIBOR™ and specifically, USD bbaLIBOR™.

[67] *See, e.g.*, *RBC Companies*, RBC Bank, http://www rbc.com/aboutus/about2 html (last visited May 31, 2018).

participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

***Royal Bank of Scotland***

65.     Defendant The Royal Bank of Scotland plc (n.k.a. NatWest Markets plc) ("RBS") is a public limited company headquartered in Edinburgh, Scotland.  RBS is a wholly owned subsidiary of The Royal Bank of Scotland Group plc headquartered in Edinburgh, Scotland, with numerous corporate offices and branches in the Southern District of New York and elsewhere in the United States.  RBS was at all relevant times a member of the USD bbaLIBOR™ panel of banks.  During the relevant period, RBS engaged in financial transactions incorporating USD bbaLIBOR™ with the Closed Banks.

66.     RBS operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[68]  As set forth more fully below, RBS participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

67.     RBS's headquarters in the United States is in Stamford, Connecticut.  RBS's U.S. branch is supervised by the NYSDFS and is subject to supervision by the NY Fed.  During the relevant period, RBS generated 20% of its global revenues, including revenues from the

---

[68] *See, e.g.*, *Where We Do Business*, RBS, http://www.rbs.com/about/worldwide-locations html (last visited May 31, 2018).

transaction of financial instruments that incorporated USD bbaLIBOR™ as the interest-rate benchmark, from the United States.[69]

68.     During the relevant period, RBS operated its banking divisions and subsidiaries through a group structure.  From 2006-2010, one of RBS's most important divisions was its investment banking arm, Global Banking & Markets ("RBS GBM"), which had employees in multiple legal entities associated with RBS, including RBS Securities Inc. ("RBSI") (f.k.a. RBS Greenwich Capital), a wholly owned indirect subsidiary of RBS, headquartered in Stanford, Connecticut.

69.     In 2006, RBS GBM brought its money market and derivatives traders under one umbrella known as the Short-Term Markets ("STM") unit.  The purpose of this reorganization was to encourage the sharing of information among traders, including traders in the United States.[70]  Such information included, as set forth more fully below, systematic suppression of USD bbaLIBOR™.

70.     RBS GBM employed money market traders and derivatives traders in the United States.[71]  RBS GBM's derivatives traders were responsible for trading financial instruments that incorporated USD bbaLIBOR™ as an interest-rate benchmark.  RBS GBM's money market traders were responsible for, among other things, trading cash and ensuring that RBS had sufficient funding with regard to specific currencies.  Through its GBM division, RBS traders were responsible for contributing USD bbaLIBOR™ submissions.  During the relevant period,

---

[69] According to its Reports of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, RBS's U.S. office held more than $72 million, and RBS's Chicago office held more than $1.9 billion, in notional value in interest-rate derivatives for trading, nearly all of which were tied to USD bbaLIBOR™.

[70] Fin. Servs. Auth., Final Notice to the Royal Bank of Scotland plc ¶ 39 (Feb. 6, 2013) (hereinafter "RBS Final Notice"), attached as Exhibit 5 and incorporated into this Complaint by reference.

[71] *United States v. Royal Bank of Scotland plc,* Deferred Prosecution Agreement, Attachment A ¶ 11 (Feb. 5, 2013) (hereinafter "RBS SOF"), attached as Exhibit 6 and incorporated into this Complaint by reference.

RBS encouraged its derivatives traders, including those located in New York, to communicate with USD bbaLIBOR™ submitters, and *vice versa*, for RBS's profit. At least twenty-one members of the RBS GBM division (whose identities are exclusively known by RBS) were involved in bbaLIBOR™ manipulation.

71.     During the relevant period, RBS GBM implemented a strategy of selling in the United States financial products backed by mortgages. In a December 2007 securities filing, RBS stated that its GBM division had a "leading position" in structuring, distributing, and trading asset-backed securities, including securities backed by U.S. sub-prime mortgages. RBS gave its GBM unit access to its entire balance sheet to assemble and sell MBS in the United States. By 2007, RBS was ranked in the top three underwriters and sellers of MBS backed by mortgages from the United States.[72]

***The Bank of Tokyo-Mitsubishi UFJ Ltd.***

72.     Defendant The Bank of Tokyo-Mitsubishi UFJ Ltd. ("BTMU") is a subsidiary of Mitsubishi UFJ Financial Group, Inc. ("MUFG") and is headquartered in Tokyo, Japan, with an office in New York, New York. BTMU was at all relevant times a member of the USD bbaLIBOR™ panel. BTMU operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[73]  BTMU participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

---

[72] Complaint ¶ 56, *FHFA v. The Royal Bank of Scotland Group plc*, No. 3:11-cv-1383 (D. Conn.), ECF No. 1.

[73] *See, e.g.*, *Global Network—The Americas*, MUFG, http://www.bk mufg.jp/global/globalnetwork/ americas/index html (last visited May 31, 2018). According to its Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, BTMU's New York office held more than $361 billion in notional value in interest-rate derivatives for trading, nearly all of which were tied to USD bbaLIBOR™.

*UBS*

73.     Defendant UBS AG ("UBS") is a financial services company based in Basel and Zurich, Switzerland, with offices in New York, New York.  UBS was at all relevant times a member of the USD bbaLIBOR™ panel of banks.  UBS was formed in 1998 through the merger of Swiss Bank Corporation and the Union Bank of Switzerland.  UBS shares are listed on the New York Stock Exchange.

74.     UBS operates directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[74]  As set forth more fully below, UBS participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

75.     UBS maintains banking divisions and subsidiaries around the world, including in the United States.  Its headquarters in the United States are located in New York, New York and Stamford, Connecticut.  During the relevant period, UBS engaged in financial transactions incorporating USD bbaLIBOR™ with the Closed Banks.  UBS generated substantial revenues from its branch office in New York, including revenues from the transaction of financial instruments that incorporated USD bbaLIBOR™ as the interest-rate benchmark.

76.     During the relevant period, UBS operated its banking divisions and subsidiaries through a "group" structure designed to efficiently support its businesses globally by use of a single legal platform.[75]  UBS transacted business globally through its global investment banking

---

[74] *See, e.g.*, *UBS Locations*, UBS, https://www.ubs.com/global/en/about_ubs/about_us/locations.html (last visited June 1, 2018).

[75] UBS, 2009 Annual Report 187, *available at* https://www.ubs.com/global/en/about_ubs/investor_relations/annualreporting/archive/_jcr_content/par/accordionbox _c1db/teaserbox_97a6/teaser_c2fa/linklist/link_f814.1913599476.file/bGluay9wYXRoPS9jb250ZW50L2RhbS91Y

group ("UBS IB").  UBS IB operated through UBS's New York and Stamford branches and its

indirectly wholly owned U.S. subsidiaries.

77.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████    UBS IB was responsible for, *inter alia*, submitting UBS's bbaLIBOR™[76] and

transacting business with U.S counterparties.[77]

***Portigon/WestLB***

78.    WestLB AG was a joint stock company headquartered in Dusseldorf, Germany.

Defendant Portigon AG is a company headquartered in Dusseldorf, Germany, with an office in

New York, New York.  Portigon AG acquired WestLB AG in 2009.  Prior to 2009, WestLB AG

was a member of the USD bbaLIBOR™ panel.  Portigon joined the USD bbaLIBOR™ panel

after acquiring WestLB AG.

79.    Portigon operated directly, or through its wholly owned and/or controlled

subsidiaries, affiliates, agents, and predecessors, in the United States.[78]  Specifically, Portigon

operated in the United States through two entities:  Portigon AG New York Branch and Portigon

nMvZ2xvYmFsL2ludmVzdG9ycy9hbm51YWxfcmVwb3J0aaW5nMjAwOS8xNzU3U3MTlfQVIwOV9lbmdsaXNhXNoLn
BkZg==/175719_AR09_english.pdf (last visited June 14, 2018).

[76] Specifically, prior to 2009, the Rates trading desks were responsible for submitting USD bbaLIBOR™, after
which time the submissions were then taken over by UBS's Asset and Liability Management ("UBS ALM") group.
Letter from Denis J. McInerney, Chief, Fraud Section, Criminal Div., U.S. Dep't Justice, Appendix A, Statement of
Facts ¶ 19 (Dec. 18, 2012) (hereinafter "UBS SOF"), attached as Exhibit 7 and incorporated into this Complaint by
reference.

[77] *Id.* ¶ 16.

[78] *See, e.g.*, *Our Locations*, Portigon Fin. Servs., http://www.1fins.com/1cm/cm/content/efs/i/en/ueber-
EFS/standorte html (last visited June 1, 2018).

Securities Inc.[79]  Through these entities, Portigon engaged in interest rate swap and securities transactions in the United States.[80]  In particular, Portigon engaged in financial transactions incorporating USD bbaLIBOR™ with the Closed Banks.  Portigon participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

80.     The unlawful acts charged in this Complaint, as having been done by Defendants, were authorized, ordered, or done by Defendants' officers, directors, agents, employees, or representatives, while actively engaged in the management of Defendants' businesses or affairs.

81.     Various other individuals, companies, corporations, partnerships, associations, and other entities, the identities of which are unknown to the FDIC-R and were unknown to the Closed Banks, and which cannot, at present, be named as defendants in this action, may have participated as co-conspirators with Defendants in the unlawful conduct alleged in this Complaint, and/or performed substantial acts and made statements in the Southern District of New York in furtherance of the alleged violations.

82.     At all relevant times, Defendants were acting as the agents, employees, co-conspirators, and/or representatives of their respective "affiliates" and of each other, and were acting within the course and scope of their agency, employment, and/or conspiracy with the full knowledge, consent, permission, authorization, and ratification, either express or implied, of each of their respective affiliates and of each other, in performing the acts alleged in this Complaint.

---

[79] NRW.Bank (Portigon) Resolution Plan 2013 at 2-4, (Dec. 31, 2013), *available at* https://www.fdic.gov/regulations/reform/resplans/plans/nrw-165-1312.pdf (last visited June 1, 2018).

[80] According to its Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, Portigon's New York office held more than $179 billion in notional value in interest-rate derivatives for trading, nearly all of which were tied to bbaLIBOR™ and specifically, USD bbaLIBOR™.

## BACKGROUND

83.     Banks compete in a number of markets.  Among other markets, they compete in the markets for cash in specific currencies.  For example, there is a market for USDs.  Banks compete to obtain USDs principally through customer deposits and short-term wholesale funds.  To obtain USDs through those means, banks must agree to pay an interest rate.[81]  Banks compete to obtain short-term wholesale funds from, among other sources, major financial institutions, including each other.[82]  Banks also compete in the markets for interest-rate derivatives, loans to businesses and consumers ("retail loans"), and the purchase and sale of MBS.

### A.     Interest Rate Fundamentals

84.     Absent collusion, interest rates are set in arms-length negotiations between a lender with cash and a borrower in need of cash.  The interest rate charged by the lender is the price the lender charges to let the borrower use the cash for a period of time.  An interest rate has two basic components:  the "risk-free rate," which represents the return that a lender will expect for losing access to its funds for a period of time (*i.e.*, the time-value of money), and a "risk premium," which compensates the lender for the risk that the borrower will not fully repay the loan on time.  Absent collusion, and all else being equal, lenders will charge a higher risk premium to borrowers with lower relative creditworthiness.  In fact, a financial entity's ability to access short-term wholesale funds at all will depend on its creditworthiness.

85.     In a competitive market, the interest rate that banks pay for short-term wholesale funds is negotiated at arm's length and accounts for the factors described above.  For example,

---

[81] Bank of Am., 2008 Annual Report, *supra* note 7, at 56.

[82] *See, e.g.*, Barclays PLC, Annual Report 2009, at 130-32 (2009), *available at* http://www.barclays.com/content/dam/barclayspublic/docs/InvestorRelations/AnnualReports/AR2009/barclays-plc-annual-report-2009.pdf (last visited June 1, 2018) ("Important factors in assuring liquidity are competitive rates and the maintenance of depositors' confidence.").

all else being equal, a bank that receives a credit downgrade will have to pay higher interest rates for short-term wholesale funds than it would have to pay absent the downgrade.[83]  Short-term wholesale loans can be secured or unsecured.  Unsecured wholesale loans are backed only by the borrowing bank's creditworthiness.  During the relevant period, Defendants held out bbaLIBOR™ as a reliable index that measured competitive interest rates for unsecured interbank loans, which market participants referred to as the bank's "cost of funds."[84]

86.     By the mid-2000s, the London interbank market had been a major source of cash for banks seeking to fund USD loans for more than 30 years.  The London interbank market enabled banks in need of cash to obtain deposits of USDs ("Eurodollar deposits"), either on an overnight basis or for fixed terms (typically, one, two, three, or six months), from banks with excess cash.

87.     A bank's "liquidity" is determined by the amount of cash that it has, or can raise quickly, to pay off its debts.[85]  Banks also compete in the capital markets for longer-term assets. Longer-term assets, such as residential mortgages, tend to pay higher rates of return[86] but are less "liquid" than cash.  A bank's profitability rests on its ability to attract money through customer deposits and short-term assets and to invest (lend) that money in longer-term assets that pay higher interest rates.

---

[83] *See, e.g., id.*

[84] *See, e.g.*, Martin Wheatley, *The Wheatley Review of LIBOR: Final Report* 82 (2012), *available at* https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/191762/wheatley_review_libor_finalreport_280912.pdf (hereinafter "Wheatley Final Report").

[85] An asset is liquid if the market in which it is traded has many buyers and sellers and the asset is bought and sold frequently with low transaction costs.  All else equal, the more liquid an asset is relative to alternative assets, the greater the demand will be for that asset and, consequently, it will be priced higher.  Frederic S. Mishkin, The Economics of Money, Banking, and Financial Markets 90 (3d. ed. 2013).

[86] For example, mortgage lenders sometimes charge a premium over bbaLIBOR™, usually in the form of a set rate on top of bbaLIBOR™.

**B.      The Role of Indices and Benchmarks in Financial Markets**

88.      An index is a statistical measure, typically of price or quantity, calculated from a representative set of underlying data.[87]  Index providers invest significant amounts of time and money to develop and market financial indices.  The market for financial indices is competitive, with providers differentiating their indices through incremental improvements and innovation.[88]  As stated by an association representing the benchmark industry: "A well-functioning benchmark industry is one in which index administrators have an incentive to invest continuously in innovation . . . .  Without this incentive, innovation and competition in the industry is likely to decrease."[89]

89.      By providing reliable information to market participants, financial indices promote what economists refer to as "price discovery"—the process by which parties to a transaction come to an agreement on a price for a given product.  In economics, "perfect competition" involves a market in which, among other things, buyers and sellers equally have all relevant information about the market.  All else being equal, when consumers have more information about a product, they will receive higher quality and lower prices than when they are deprived of information or given false information.

---

[87] Commission Staff Working Document, Impact Assessment Accompanying the Document Proposal for a Regulation of the European Parliament and of the Council on Indices Used as Benchmarks in Financial Instruments and Financial Contracts, at 1, SWD (2013) 336 final (Sep. 18, 2013).

[88] *See, e.g.*, BlackRock, *Response to Consultation Document on the Regulation of Indices* 17 (Nov. 29, 2012), *available at* https://www.blackrock.com/corporate/en-ch/literature/whitepaper/regulation-of-benchmarks-and-market-indices-european-commission.pdf (hereinafter "BlackRock Resp.").

[89] Deutsche Börse Group, *White Paper on the Benchmark Industry* 16-17 (Dec. 2013), *available at* https://deutsche-boerse.com/dbg/dispatch/en/binary/gdb_content_pool/imported_files/public_files/10_downloads/11_about_us/Public_Affairs/The_benchmark_industry_1213.pdf (last visited June 1, 2018) (hereinafter "*The Benchmark Industry*"); *see also* BlackRock Resp., *supra* note 88, at 17 ("We note that significant investment and research is involved in creating and calculating indices and it is a competitive market place with providers differentiating through incremental improvements and innovation.").

90.     If an index is used as a reference price for a financial instrument or a financial

contract, it becomes a benchmark.[90]  There are four main types of players in benchmark markets:

(1) those that contribute the data ("contributors"); (2) administrators who provide the benchmark

("providers"); (3) institutions that issue products that incorporate the benchmark ("issuers"); and

(4) end users.

91.     Absent collusion, the forces of competition choose financial benchmarks.[91]  Thus,

providers in a competitive market will only succeed in creating commercially viable benchmarks

if they provide accurate and reliable data, establish appropriate governance structures, and

provide sufficient transparency around their methodology and data inputs.[92]  If a benchmark does

---

[90] *Proposal for a Regulation of the European Parliament and of the Council on Indices Used as Benchmarks in Financial Instruments and Financial Contracts*, at 2, COM (2013) 641 final (Sept. 18, 2013) (hereinafter "EC Proposal"); Wheatley Final Report, *supra* note 84, at 54.

[91] *See, e.g.*, Argus Media, *Response to Consultation Document on the Regulation of Indices* 15, *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/argus_en.pdf (last visited Jan. 29, 2018) (hereinafter "Argus Resp.") ("[T]he choice of benchmarks for financial contract must be largely market driven."); BDEW, *Position Paper on European Commission's Consultation Document on the Regulation of Indices* 2 (Nov. 15, 2012), *available at* http://ec.europa.eu/finance/consultations/2012/benchmarks/docs/contributions/registered-organisations/bdew-en_en.pdf ("[M]arket participants know best, which index is efficient and fits best for their needs."); BlackRock Resp., *supra* note 88, at 15 (competition gives end-users options "and the recourse to change providers if governance and transparency are deemed to be insufficient"); Euribor-EBF, *Response to the European Commission Consultation Document on the Regulation of Indices* 21 (Nov. 28, 2012), *available at* http://www.emmi-benchmarks.eu/assets/files/D2161C-2012-Euribor-EBF%20response%20to%20the%20EC%20Consultation%20on%20the%20Regulation%20of%20Indices_clean.pdf; Federation Bancaire Francaise, *Response to the European Commission Consultation Document for the Regulation of the Production and Use of Indices* 3, *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/fbf_en.pdf  (last visited Jan. 29, 2018) ("[T]he choice of alternative benchmarks should be market-led, with users choosing the best alternatives for their needs."); Finance Watch, *Response to Consultation Document on the Regulation of Indices* 16 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/finance-watch_en.pdf ("A self-regulation principle will state that competition will let the 'best' benchmarks impose themselves.").  Even the BBA has advocated for choice in the market for interest-rate benchmarks.  *See* BBA, LIBOR—Update (Mar. 5, 2012), *available at* http://www.betterregulation.com/doc/2/128582 (on file with FDIC-R) (quoting Ian Mair, then Chairman of the London Money Market Ass'n, as saying that "[i]t is important that all market participants have a choice of benchmarks").

[92] *See* Markit, *Response to Consultation Document on the Regulation of Indices* 11 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/markit_en.pdf (hereinafter "Markit Resp."); *The Benchmark Industry*, *supra* note 89, at 15 ("Indices are only beneficial if users can trust them fully.").

not command the confidence of all participants in the market, parties will cease to use it.  As one index provider recently wrote: "Absent fraud and collusion . . . financial markets, investors, consumers and government agencies will efficiently rout poorly constructed benchmarks and condemn . . . illogical/ill-conceived uses of benchmarks."[93]

92.    Because the actual market or economic reality is likely to change over time, benchmark providers in a competitive market regularly reassess key terms of, and inputs to, a financial benchmark to ensure that the benchmark still provides a reliable representation of the actual market or economic reality that the benchmark is intended to measure.[94]  For example, absent collusion, Defendants would have re-evaluated the reliance of bbaLIBOR™ on unsecured interbank loan interest rates as the sole source of input data.  Recent proposals to improve bbaLIBOR™ include provisions to corroborate unsecured interbank loan interest rates with actual transaction data and by referencing other forms of wholesale funding.

93.    In a competitive market, issuers and end users choose financial benchmarks based on how they weigh various quality factors.[95]  First, will the benchmark serve its intended purpose?[96]  If not, issuers and end users will not use it.

94.    Second, is the benchmark anchored in observable transactions or high-quality data?  Absent collusion, issuers and users demand input data that is sufficient to represent the

---

[93] Russell Indexes, *Response to Consultation Document on the Regulation of Indices* 9 (July 2012) (hereinafter "Russell Resp."); *see also* BlackRock Resp., *supra* note 88, at 3 ("[B]ecause of competition and innovation in the marketplace, index providers will be incentivised through market forces to ensure their products are of a certain quality and viable indices for the end investor.").

[94] Bd. Int'l Org. Sec. Comm'ns [IOSCO], *Financial Benchmarks Consultation Report* 25, IOSCO Doc. CR01/13 (Jan. 2013), *available at* http://www.iosco.org/library/pubdocs/pdf/IOSCOPD399.pdf (hereinafter "IOSCO Consultation Report"); EC Proposal, *supra* note 90, at 8.

[95] *See* ICAP, *Response to the European Commission Consultation on the Regulation of Indices* 4 (Nov. 27, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/icap_en.pdf (hereinafter "ICAP Resp.").

[96] EC Proposal, *supra* note 90, at 2.

actual market or economic reality that the benchmark is intended to measure.[97]  For interest-rate

benchmarks in particular, users want input data that is formed by competitive supply and demand

conditions.[98]

95.     Third, does the benchmark provide a clearly defined calculation methodology that

users can replicate and predict?  Transparency as to what benchmarks measure and their most

relevant characteristics is critical because it allows issuers and end users to make correct

assessments about whether to choose a particular benchmark.[99]  Market transparency is a "core

principle" because "the market demands it."[100]

96.     Fourth, will the benchmark be published by a provider with high professional

standards and proven experience and does the benchmark have controls in place to deter

manipulation and ensure that rates are properly calculated in accordance with the published

---

[97] *Id.* at 15-16; Wheatley Final Report, *supra* note 84, at 55-56.

[98] IOSCO, *Principles for Financial Benchmarks:  Final Report*, at 10, 20, 33, IOSCO Doc. FR07/13 (July 2013), *available at* http://www.iosco.org/library/pubdocs/pdf/IOSCOPD415.pdf (hereinafter "IOSCO Principles"); Market Participants Grp. on Reforming Interest Rate Benchmarks, Final Report 28 (Mar. 2014) ("Rates should be based on prices formed by competitive supply and demand and anchored in observable transactions.").

[99] *See, e.g.*, *The Benchmark Industry*, *supra* note 89, at 5-6 (index should be fully replicable and completely transparent); AFG, Response to the European Commission's Consultation on the Regulation of Indices 3 (Nov. 29, 2012); Amundi, Answer to E.C.'s Consultation Document on the Regulation of Indices 2 (Nov. 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/amundi_en.pdf; Wheatley Final Report, *supra* note 84, at 55-56.

[100] S&P Dow Jones Indices, *Response to Consultation Document on the Regulation of Indices* ¶ 6 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/individual-others/s-p-dow-jones-indices_en.pdf ; Markit Resp., *supra* note 92, at 11 ("[C]ommercial benchmark providers will only succeed in creating commercially viable products if they manage to provide accurate and reliable data, establish appropriate governance structures, and provide sufficient transparency around their methodology and data inputs."); *The Benchmark Industry*, *supra* note 89, at 15 ("End customers . . . need transparency about the index methodology to understand what the index is measuring."); Barclays, *Response to the Wheatley Review of Libor:  Initial Discussion Paper* 2 (Sept. 6, 2012) ("It is essential that the market has access to benchmarks that are well-constructed, transparent, and that inspire the confidence of both market participants and regulators.").  Transparency enhances investor protection.  EC Proposal, *supra* note 90, at 9.

methodology?  If not, issuers and end users will avoid the benchmark as insufficiently trustworthy.[101]

97.     Absent collusion, "if benchmarks are found wanting, the market will migrate towards an alternative through choice."[102]  As a result, absent a conspiracy, providers seek to provide the most reliable and accurate indices "in order to retain a competitive advantage in the marketplace."[103]

### C.     The Role of Interest-Rate Benchmarks in Lending

98.     Lenders can offer loans at fixed or floating rates.  In a fixed-rate loan, the interest rate stays the same through the term of the loan.  As the term increases, however, so does the risk that market-wide interest rates will go up, leaving the lender with an asset paying below market rates.  In a competitive market, the price of a fixed-rate loan reflects these risks.

99.     In a floating-rate loan, the interest rate can change over time as determined by an agreed-upon benchmark.  This allows the lender to transfer the risk of market-wide changes in interest rates to the borrower.  This in turn allows the lender to charge a lower interest rate at the outset of the floating-rate loan.

100.     Lenders in a competitive market should gravitate toward interest-rate benchmarks that reliably represent a bank's actual cost of funds because that enables them to pass those costs

---

[101] *See, e.g.*, Wheatley Final Report, *supra* note 84, at 55-56; Argus Resp., *supra* note 91, at 2 ("Continued commercial success in this competitive marketplace is directly related to the integrity of an organisation's services.").

[102] ICAP Resp., *supra* note 95, at 9.

[103] Index Indus. Ass'n, *Response to Consultation Document—Regulation of Indices* 6 (Nov. 29, 2012), *available at* http://www.indexindustry.org/?page_id=1405 (last visited June 1, 2018).

on to borrowers and lock in a profit.  For example, a lender may offer a 20-year loan at its cost-of-funds plus a margin.[104]

### D.    The Role of Interest-Rate Benchmarks in Derivatives

101.    A floating-rate loan reduces a lender's risk that interest rates will increase (and increases the risk that rates will decrease), but it transfers that same risk to borrowers.  The market for interest-rate derivatives provides a way for borrowers to transfer interest-rate risk to third parties for a price.  An interest-rate derivative is a derivative where the underlying asset is the right to pay or receive a principal amount of money at a given interest rate.  For example, a borrower may accept a floating-rate loan tied to an interest-rate benchmark and contemporaneously enter into a contract with a third party where the borrower agrees to make fixed-rate payments in exchange for floating interest rates tied to the same benchmark—an interest-rate swap.  Through this "hedging" strategy, the borrower has effectively converted its floating-rate loan into a fixed-rate one.  The ability to hedge is increased if the same interest-rate benchmark is incorporated into the swap and the floating-rate loan because it synchronizes changes in the interest rates.

102.    This synchronization creates a "network effect" in which a product tends towards dominance because its utility increases with the number of people that use it.[105]  For example, a consumer's demand for a telephone network increases with the number of other users on the network whom she can call or from whom she can receive calls.  In industries characterized by

---

[104] *See, e.g.*, Wheatley Final Report, *supra* note 84, at 44 ("The use of a benchmark such as LIBOR allows lenders to use it as a barometer of the inter-bank funding market to base the margin to be applied to its customers.").

[105] *See, e.g.*, *id.* at 46, 76; European Comm'n, Consultation Document on the Regulation of Indices:  A Possible Framework for the Regulation of the Production and Use of Indices Serving as Benchmarks in Financial and Other Contracts, at 19 (Sept. 5, 2012), *available at* http://ec.europa.eu/internal_market/consultations/docs/2012/ benchmarks/consultation-document_en.pdf.

network effects, competing networks can "tip" so that if one network overtakes the other, the other becomes insignificant.[106]

103.     The vast majority of interest-rate swaps were traded OTC.  In addition, interest-rate swaps are traded on exchanges, such as the Chicago Mercantile Exchange ("CME") and Intercontinental Exchange ("ICE").  Exchange-traded swaps are standardized financial instruments, with pre-defined notional values, repayment dates, benchmarks, and length.

**Figure 1:  Vanilla Interest-Rate Swap**



104.     The advantage of OTC swaps was that they can be adjusted to meet a user's needs, for example by synchronizing the payment dates and duration within a loan.  OTC swaps are typically negotiated pursuant to a standardized Master Agreement that was developed by the International Securities and Derivatives Association ("ISDA").  Many of the Panel Bank Defendants served on ISDA's Board of Directors and had other prominent roles in that trade association.[107]  A swap contract is negotiated for an agreed-upon term—10 years, for example— with pre-defined dates on which the interest rates are calculated and payments made (known as "payment dates").  On each payment date, the interest payments are "netted" out and the "loser" pays its counterparty the difference between the fixed- and floating-rate payments.  For example, if on the first payment date, application of the fixed interest rate to the notional results in a

---

[106] *See* Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization 393 (4th ed. 2005).

[107] *See, e.g.*, 2011 Board of Directors, International Swaps & Derivatives Ass'n, Inc., http://www.isda.org/wwa/bod html (on file with FDIC-R).  Through their membership in ISDA (which is located in New York, New York), the Panel Bank Defendants agreed to, and did, chose to incorporate USD bbaLIBOR™ as the default interest-rate benchmark in the standardized ISDA contracts.

payment due of $10,000 and application of the predefined benchmark interest rate to the notional results in a payment due of $9,000, then the fixed-rate payer must pay the difference ($1,000) to its counterparty.

105.    In the OTC interest-rate swap market, broker-dealers functioned as market makers.  A small set of dealers dominated the market for OTC USD interest-rate derivatives during the relevant period.  According to a July 2010 ISDA market survey, the largest 14 broker-dealers held 82% of all interest-rate derivatives by notional amount.[108]  Of these 14 largest dealers, 10 were on the USD bbaLIBOR™ panel of banks at the time:  Bank of America, Barclays, Citibank, Credit Suisse, Deutsche Bank, HSBC, JPMorgan, RBS, Société Générale, and UBS.[109]  Similarly, the top five bank holding companies in the United States—Bank of America, JPMorgan, Citigroup, and HSBC, and Goldman Sachs—accounted for more than 95% of all OTC swaps and derivatives transactions in the United States in 2009.[110]

106.    As Defendant UBS has acknowledged, in interest-rate swap transactions, "the benchmark is a price, not an index."[111]  OTC dealers quote prices for interest-rate swaps in two parts: (1) an interest-rate benchmark and (2) a fixed interest rate.  In the absence of collusion, the fixed rate is calculated to provide the same value today (net present value or "NPV") of the expected cash flows from the quoted benchmark over the life of the swap.  The fixed-rate payer

---

[108] David Mengle, *Concentration of OTC Derivatives Among Major Dealers*, ISDA Research Notes, July 2010, *available at* https://www.isda.org/a/8PDDE/concentrationrn-4-10.pdf (last visited on June 12, 2018).

[109] *See id.*  Bank of America's, Citigroup's, and JPMorgan's respective primary banking entities, Bank of America, N.A., Citibank, JPMorgan, N.A. were on the USD bbaLIBOR™ panel.

[110] *See* Office of the Comptroller of the Currency, OCC's Quarterly Report on Bank Trading and Derivatives Activities:  First Quarter 2009, *available at* http://www.occ.gov/news-issuances/news-releases/2009/nr-occ-2009-72a.pdf.  In the first quarter of 2009, Bank Defendants JPMorgan, Bank of America, and Citigroup collectively earned more than $6 billion in trading revenue from interest-rate derivative positions.  *See id.*

[111] UBS, *Re: Consultation Document on the Regulation of Indices* 3 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/individual-others/ubs_en.pdf.

calculates the expected cash flows by applying the published rules of the quoted benchmark to the predicted market conditions over the length of the swap.  For example, for a three-year swap, the counterparty would use bbaLIBOR™'s published rules to predict competitive interbank interest rates over the three-year period and use those predictions to determine the NPV of those interest-rate payments.[112]

107.    For example, assume that on January 1, 2014, an OTC dealer offers a three-year swap where the floating rate is indexed to 3-month USD bbaLIBOR™ on a notional $10 million with payment dates at the end of each year.  Applying the USD bbaLIBOR™ methodology, a potential counterparty will predict the floating-rate payments on each payment date and then calculate the NPV of those payments.  If the NPV of the quoted fixed rate exceeds the NPV of the quoted benchmark, then the swap would be over-priced.  In other words, the price of the swap is expressly predicated on the USD bbaLIBOR™ published rules and application of those rules to expected market conditions.

108.    Thus, the markets for interest-rate benchmarks, interest-rate derivatives, and floating-rate loans are inextricably intertwined in that: (a) interest-rate benchmarks serve as a component of the prices of interest-rate derivatives and floating-rate loans; (b) interest-rate derivatives and floating-rate loans require a reliable interest-rate benchmark; (c) network effects support adoption of a single standard interest-rate benchmark for interest-rate derivatives and floating-rate loans; and (d) the value of an interest-rate benchmark is fundamentally determined by its suitability as a pricing component in interest-rate derivatives and floating-rate loans. Similarly, holders of floating-rate MBS (whose prices incorporate interest-rate benchmarks) seek to hedge their risks through interest-rate derivatives (whose prices likewise incorporate interest-

---

[112] *See* Wheatley Final Report, *supra* note 84, at 45.

rate benchmarks), which further reinforce the network-effect nature of the market for interest-rate benchmarks.  The relationship among these product markets is graphically depicted in Figure 2 below.

**Figure 2:  Relationship Between Product Markets**



### E.      Development of bbaLIBOR™

109.    The origin of bbaLIBOR™ can be traced to 1969, when a Greek banker arranged an $80 million syndicated loan to the Shah of Iran.[113]  At the time, lenders in global markets did not have access to a uniform benchmark that would reflect their cost of funds.  Instead, lending syndicates offered loans with interest rates that were renegotiated every three or six months to reflect changing market conditions.

---

[113] Kirstin Ridley & Huw Jones, *Insight:  A Greek Banker, the Shah and the Birth of Libor*, Reuters (Aug. 7, 2012), http://www.reuters.com/article/2012/08/08/us-banking-libor-change-idUSBRE87702320120808.

110.     The banker, who worked for the London branch of Manufacturer's Hanover (now part of JPMorgan), devised a formula whereby a group of major reference banks within each syndicate agreed to report their funding costs shortly before a loan rollover date.  The weighted average of these rates, rounded to the nearest 1/8th percent plus a spread for profit, became the price of the loan for the next period.  The banker named this rate the London interbank offer rate. Within a few years, this version of "Libor" evolved from a measure used to price individual loans to a much broader benchmark for deals worth hundreds of billions of dollars a year.  As demand for loans surged, demand for interest-rate derivatives followed.

111.     In the mid-1980s, the banks using the informal "Libor" asked the BBA to devise a benchmark to act as a reference point for pricing derivatives and interest-rate swaps, and to make benchmarking more transparent and objective.[114]  The BBA agreed, and working with other parties, such as the Bank of England, renamed the benchmark "bbaLIBOR."

### F.     Calculation of bbaLIBOR™

112.     During the 2000s, the BBA licensed bbaLIBOR™ for 15 maturities (from overnight to 12 months) and for 10 currencies (Australian Dollar, Canadian Dollar, Swiss Franc, Danish Krone, Euro, Pound Sterling ("GBP"), Japanese Yen ("JPY"), New Zealand Dollar, Swedish Krona and USD).  The BBA's licensees included companies located in the United States.[115]

113.     The BBA represented that it chose the banks that would contribute submissions (Panel Banks) based on their scale of market activity, credit rating, and perceived expertise in the

---

[114] Michael R. Koblenz et al., *LIBOR:  Everything You Ever Wanted to Know But Were Afraid to Ask*, 6 J. Bus., Entrepreneurship & L. 281, 283 (2013), *available at* http://digitalcommons.pepperdine.edu/cgi/viewcontent. cgi?article=1094&context=jbel.

[115] The BBA has access to this license information.  The FDIC-R does not.

currency concerned.[116]  The BBA stated that it intended the selection criteria to show that Panel

Banks would have the best and most accurate knowledge of interbank borrowing costs for each

currency.  Only the Panel Banks knew what the rates really were in the opaque interbank loan

market.[117]

114.    The BBA's published rules (its methodology) governed the way that Panel Banks

were required to determine their submissions, and Panel Banks purported to agree to abide by

those rules in order to remain on the bbaLIBOR™ panel of banks.  In 1998, the FX & MM

Committee of the BBA decided that a universal definition of a prime bank could no longer be

given and, in response to user demand, changed the definition to the one that was used through

the 2000s and continues to exist today: "At what rate could you borrow funds, were you to do so

by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11

am?"[118]

115.    The published bbaLIBOR™ rules required each Panel Bank to submit rates:

(a) without reference to rates contributed by other Panel Banks; (b) determined by the Panel

Bank's staff primarily responsible for management of a bank's cash, rather than its derivative

trading book; (c) without reference to the pricing of any derivative financial instrument; and

---

[116] *The Basics*, BBA Libor, https://web.archive.org/web/20130130191334/http://www.bbalibor.com/bbalibor-explained/the-basics (last visited Jan. 29, 2018).  Many, if not all of the Panel Bank Defendants were, during the relevant time period, contributors to other bbaLIBOR™ panels as well as the USD bbaLIBOR™ panel.

[117] The term "opaque" is often used in financial markets as an antonym for "transparent."  Transparent financial markets are those in which much is publicly known about prices and volumes of financial transactions.  *See Transparency and Over-the-counter Derivatives*, ISDA, Research Notes, 2009, *available at* https://www.isda.org/a/cPDDE/isda-research-notes1.pdf.  Transparent financial markets promote price discovery and are therefore considered to be more efficient than opaque markets.  Commercial banks have superior access to information in the financial markets and use that information for profit through their activity in OTC derivative markets.  *See, e.g.*, U.S. C.F.T.C. Chairman Gary Gensler, Remarks at the OTC Derivatives Reform, Consumer Federation of America Financial Services Conference (Dec. 3, 2009), *available at* http://www.cftc.gov/ PressRoom/SpeechesTestimony/opagensler-22.

[118] Until 1998, banks submitted quotes to the BBA answering the question:  "At what rate do you think interbank term deposits will be offered by one prime bank to another prime bank for a reasonable market size today at 11 am?"

(d) that represent the rates it "would be offered funds."[119]  The BBA intended for these rules to show that the inputs to bbaLIBOR™ reflected competitive interest rates in the market for unsecured interbank loans.[120]  In its 2010 Annual Report, the BBA identified bbaLIBOR™'s three main strengths as:  (1) its simplicity; (2) its transparency (because it purportedly published all of the information needed to understand bbaLIBOR™ including the instructions given to contributing banks); and (3) it was "market led."[121]

116.    In addition, the BBA claimed that it was independent of the Panel Banks and that it would aggressively monitor compliance with the published rules.  For example, in 2008, the BBA stated that the bbaLIBOR™ process was overseen by an "independent committee" (the FX & MM Committee) of "market participants."[122]

117.    Every business day, Panel Banks electronically communicated their bbaLIBOR™ submissions by 11:10 a.m. London time to the BBA's calculation agent, Thomson Reuters,

---

[119] UBS SOF, *supra* note 76, ¶ 7; *The Basics*, *supra* note 116; *Setting bbalibor*, BBA Libor, https://web.archive.org/web/20120902014345/http://www.bbalibor.com/technical-aspects/setting-bbalibor (last visited Jan. 29, 2018); *Definitions*, BBA Libor, https://web.archive.org/web/20130205220303/http://www.bbalibor.com/bbalibor-explained/definitions (last visited Oct. 1, 2014).

[120] Wheatley Final Report, *supra* note 84, at 55.  One of the key characteristics for a credible benchmark rate is that the benchmark should "clearly convey the economic realities of the underlying interest it seeks to measure to its users."  IOSCO Consultation Report, *supra* note 94, at 10.

[121] BBA, 2010 Annual Report, at 25 (2010) (on file with FDIC-R).

[122] BBA, *Understanding the Construction and Operation of BBA LIBOR* at 1 (June 10, 2008) (on file with FDIC-R).

which is headquartered in New York, New York.  As calculation agent, Thomson Reuters was under the supervision of the FX & MM Committee.  The BBA's published rules stated that Panel Banks were not to know the bbaLIBOR™ rates submitted by other Panel Banks during this submission window.[125]  USD bbaLIBOR™ was calculated by eliminating the four highest and four lowest submissions, and then averaging the remaining eight submissions.  This average constituted the bbaLIBOR™ "fixing."[126]  Thomson Reuters, as an agent for the BBA (and the FX & MM Committee), then electronically communicated the bbaLIBOR™ fixings to U.S. lenders and others via licensees, including the Wall Street Journal, Telerate, the Bloomberg Professional Service ("Bloomberg")[127] by midday, London time.[128]  The Wall Street Journal and Bloomberg then published bbaLIBOR™.

118.    Figure 3 below presents the BBA's graphic depiction of the bbaLIBOR™ process.[129]

---

[125] *The Basics*, *supra* note 116.

[126] In the parlance of commercial banks, a rate submission for bbaLIBOR™ was referred to as a "submission" and the bbaLIBOR™ rate that the BBA published was known as the "fixing."

[127] The "Bloomberg Terminal" was a specialized computer provided to subscribers to receive real-time market data from Bloomberg.  The Bloomberg Terminal "is a modern icon of financial markets" and sits on the desk of more than 300,000 of the "world's most influential decision makers."  *The Terminal Bloomberg Professional Services*, Bloomberg, https://www.bloomberg.com/professional/solution/bloomberg-terminal/?utm_source=bloomberg-facts (last visted Apr. 4, 2019).  The Bloomberg Terminal had a specialized keyboard to provide access to real-time market data.  Bloomberg provided a unique page of LIBOR data for subscribers which included the LIBOR fixes and the individual panel bank contributions.  The Bloomberg Terminal also provided subscribers with a method of communication.  Subscribers received a unique message address (*e.g.*, Name@bloomberg net).  Bloomberg subscribers could also "chat" with each other via instant messages sent through Bloomberg.  It was common for Bloomberg subscribers, including subscriber Defendants, to send electronic messages to U.S. investors in New York.

[128] *See Frequently Asked Questions (FAQs)*, *supra* note 22.

[129] *The Basics*, *supra* note 116.

**Figure 3: bbaLIBOR™ Processes**



119.     In the United States, market participants sometimes referred to USD bbaLIBOR™ as "LIBOR01" in reference to the Thomson Reuters page transmitted to licensed vendors in the United States and other U.S. financial institutions containing the USD bbaLIBOR™ fixings for that day, or "BBAM" in reference to the Bloomberg page transmitted to licensed vendors in the United States and other U.S. financial institutions containing the USD bbaLIBOR™ fixings for that day.

120.     The Panel Bank Defendants agreed to, and did, transmit and publish their individual USD bbaLIBOR™ submissions into the United States, including New York, to interest-rate derivatives traders in the United States and New York, and licensed vendors, including the Wall Street Journal and Bloomberg. In publishing these individual USD bbaLIBOR™ submissions, each Panel Bank Defendant misrepresented its borrowing rates. But

for Panel Bank Defendants' agreement to publish those individual USD bbaLIBOR™ submissions to investors and lenders in the United States, the individual USD bbaLIBOR™ quotes submitted by each Panel Bank Defendant would have been known only to Defendants. Panel Bank Defendants specifically aimed those individual USD bbaLIBOR™ submissions at investors in the United States, including those in New York.  To the extent that Panel Bank Defendants suppressed their published USD bbaLIBOR™ quotes to protect their reputation, Panel Bank Defendants did so for the express purpose of misleading investors, lenders, and media in the United States through the voluntary publication of their individual USD bbaLIBOR™ submissions into the United States.  Panel Bank Defendants specifically agreed to publish their individual submissions into New York and the United States via their agents and collectively rejected calls to "anonymize" the submission process.

121.    In August 2007, the U.S. Federal Reserve System requested that financial institutions, for example, Citigroup, visit the Federal Reserve System's Discount Window to borrow short-term money—from the United States—to allay some of the concerns that investors in the United States had about the liquidity of Citigroup and other Panel Bank Defendants.[130]

122.    Panel Bank Defendants and/or their parent holding companies made use of the Federal Reserve System's Discount Window.  In August 2007, Citigroup withdrew $3.375 billion of cash from the Discount Window in exchange for $23 billion worth of assets, including commercial mortgage-backed securities, residential mortgages and commercial loans.[131]  In November 2007, Deutsche Bank borrowed $2.4 billion.  JPMorgan and Bank of America each

---

[130] *In re Citibank, N.A.*, No. 16-17, at 14 (C.F.T.C. May 25, 2016) (hereinafter "Citi CFTC Order"), attached as Exhibit 8 and incorporated into this Complaint by reference.

[131] Morgansen, *supra* note 53.

borrowed $500 million in August 2007.  Panel Bank Defendants and/or their parent holding companies obtained these loans both to provide liquidity and to bolster each bank's reputation in the United States with U.S. investors and regulators.[132]  During 2007, Royal Bank of Scotland Group plc borrowed $84.5 billion and UBS borrowed $77.5 billion from the Federal Reserve System.[133]  Société Générale SA borrowed $17.4 billion from the Federal Reserve System in May 2008 alone.[134] ███████████████████████████████

███████████████████████████████.[135]  The U.S. Federal Reserve System allowed these banks, through their respective branches in the United States, to access the Discount Window because the U.S. branches were in good standing with the U.S. and state regulators responsible for overseeing the U.S. branches' operations and the U.S. branches provided sufficient guarantees to the United States that they did not present an undue credit risk.

123.    Table 1 below reflects the peak amounts borrowed from the U.S. Federal Reserve System by certain Panel Bank Defendants and/or their parent holding companies between August 2007 and April 2010.

**Table 1:  Peak borrowing amounts August 2007 - April 2010**

| Bank | Year | Peak Amount of Debt (in billions) |
|---|---|---|
| Bank of America | 2009 | $91.4 |
| BTMU | 2009 | $9.4 |
| Barclays plc | 2008 | $64.9 |
| Citigroup | 2009 | $99.5 |

---

[132] Bradley Keoun and Phil Kuntz, *Wall Street Aristocracy Got $1.2 Trillion in Secret Loans*, Bloomberg, Aug. 21, 2011, http://www.bloomberg.com/news/articles/2011-08-21/wall-street-aristocracy-got-1-2-trillion-in-fed-s-secret-loans.

[133] *The Fed's Secret Liquidity Lifelines*, Bloomberg, http://www.bloomberg.com/data-visualization/federal-reserve-emergency-lending/.

[134] *Id.*

[135] ███████████████████████████  *see also* 12 U.S.C.§ 5202(5) (defining financial institution for purposes of the Emergency Economic Stabilization Act to include banks and institutions with "significant operations in the United States").

| Bank | Year | Peak Amount of Debt (in billions) |
|------|------|-----------------------------------|
| Credit Suisse Group AG | 2008 | $60.8 |
| Deutsche Bank | 2008 | $66 |
| HSBC | 2009 | $3.7 |
| JP Morgan Chase & Co. | 2008 | $68.6 |
| Lloyds | 2007 | $0.505 |
| Norinchukin | 2009 | $22 |
| Rabobank | 2009 | $9.1 |
| RBC | 2008 | $6.9 |
| Royal Bank of Scotland Group plc | 2008 | $84.5 |
| Société Générale SA | 2008 | $17.4 |
| UBS | 2008 | $77.5 |

### G.    bbaLIBOR™ Governance

124.    As alleged, the FX & MM Committee was responsible for managing

bbaLIBOR™.[136]  Thirteen "active market practitioners" comprised the FX & MM Committee.[137]

The BBA did not disclose the names of the members of the FX & MM Committee,[138] but the

identities of many members have been disclosed through public trials and admissions to, or

findings of, enforcement agencies.[139] ███████████████████████████

---

[136] *See, e.g.*, Landon Thomas Jr., *Trade Group for Bankers Regulates a Key Rate*, N.Y. Times, July 5, 2012, http://www.nytimes.com/2012/07/06/business/global/the-gentlemens-club-that-sets-libor-is-called-into-question.html?pagewanted=all; U.K. House of Commons Treasury Comm., *Fixing LIBOR: Some Preliminary Findings*, Second Report of Session 2012-13, Vol. I, at 5 (Aug. 18, 2012), *available at* http://www.publications.parliament.uk/pa/cm201213/cmselect/cmtreasy/481/481.pdf.

[137] *Understanding BBA LIBOR*, BBA, https://web.archive.org/web/20130511195637/http://www.bba.org.uk/media/article/understanding-bba-libor (last visited June 12, 2018); RBS Final Notice, *supra* note 70, ¶ 89.

[138] Enrich & Colchester, *supra* note 19.

[139] Executives from the following banks have been revealed as members of the FX & MM Committee: ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

UBS SOF,



FX & MM Committee members met at least every two months at undisclosed locations to discuss bbaLIBOR™.[142] The FX & MM Committee did not publish official minutes.[143]

125.   The BBA employed a full-time manager to supervise on a day-to-day basis all aspects of the calculation of bbaLIBOR™ and the dissemination of bbaLIBOR™ to the marketplace. The BBA represented that the manager was responsible for ensuring that all bbaLIBOR™ processes met the "highest standards."[144] The bbaLIBOR™ manager acted as an executive on the FX & MM Committee and was responsible for informing the FX & MM Committee about issues pertaining to bbaLIBOR™. The BBA and its agents monitored the Panel Banks' individual submissions in real-time. When one Panel Bank submitted rates that seemed out of line with other submissions, the BBA or its agents would contact the outlier Panel

---

*supra* note 76, ¶ 85; Fin. Servs. Auth., Final Notice to UBS AG ¶ 122 (Dec. 19, 2012), attached as Exhibit 9 and incorporated into this Complaint by reference. The specific entities for which the executives purportedly worked and their relationship to their bank's respective U.S. operations are not publicly known. The identities of other individuals involved in the FX & MM Committee and/or the BBA are not publicly known.

[140] *See, e.g.,* BBA Libor, LIBOR Governance and Scrutiny: Proposals Agreed by the FX & MM Committee § 1.11 (Nov. 17, 2018) (hereinafter "LIBOR Governance and Scrutiny");

[142] Liam Vaughan, *Secret Libor Committee Clings to Anonymity Following Scandal*, Bloomberg (Aug. 21, 2012), http://www.bloomberg.com/news/2012-08-20/secret-libor-committee-clings-to-anonymity-after-rigging-scandal.html.

[143] *Id.*

[144] *See, e.g.*, BBA Libor, LIBOR Governance and Scrutiny, *supra* note 140, § 1.7.

Bank to "confirm" the submission—for example, "Everyone else is coming in a good bit under that."[145]

126.    In April 2005, the BBA hired John Ewan, a 29-year-old financial researcher with a biology degree and no apparent prior experience managing a financial benchmark, to serve as the bbaLIBOR™ manager.[146]  Mr. Ewan, dubbed by one publication as "Mr. LIBOR," has claimed that he was hired to put bbaLIBOR™ on a secure commercial footing and that in his first two years he increased revenue more than tenfold, introduced new products, obtained European Union, United States, and Japanese trademarks for bbaLIBOR™, and successfully negotiated contracts with the derivatives exchanges, major data vendors, and hundreds of other users.[147]

127.    At least by 2007, the BBA required entities that sought to redistribute bbaLIBOR™ or use it for any commercial purpose to first obtain a license from the BBA.[148] Mr. Ewan claims that he was responsible for developing and maintaining relationships with all "stakeholders" in bbaLIBOR™, including the NY Fed, which involved keeping them apprised of changes to the benchmark and the markets it tracks.[149]  Mr. Ewan also claims to have cultivated

---

[145] Donald MacKenzie, *What's in a Number?*, London Rev. Books, Sep. 25, 2008, *available at* http://www.lrb.co.uk/v30/n18/donald-mackenzie/whats-in-a-number.

[146] *John Ewan Public Profile*, LinkedIn, https://www.linkedin.com/pub/john-ewan/5/490/627 (last visited Jan. 29, 2018).  Mr. Ewan left the BBA in the summer of 2012.

[147] Steve Hawkes, *Mr. Libor Quits*, The Sun, July 21, 2012, http://www.thesun.co.uk/sol/homepage/news/money/ 4441913/Mr-Libor-quits.html.

[148] *Licensing*, BBA Libor, http://web.archive.org/web/20111210044943/http://www.bbalibor.com/licencing (last visited on June 12, 2018) ("Please note that without the express permission of the BBA, no company is allowed to display bbalibor on their website or use the data for commercial purposes.").

[149] *John Ewan Public Profile*, *supra* note 146.

"excellent relationships at a senior level" with most major central banks and market participants (principally banks, brokers, trade associations, hedge funds, and exchanges).[150]

128.    On January 1, 2010, more than a year after learning that regulators were investigating bbaLIBOR™, the BBA modified its structure.  It created a new entity, BBA LIBOR, Ltd., to assume responsibility for the day-to-day running of the benchmark.  One report suggested that the BBA created BBA LIBOR, Ltd. to limit the BBA's liability for expected claims relating to bbaLIBOR™.[151]  Despite this change in structure, the processes and procedures followed by Panel Banks and the BBA in calculating and publishing bbaLIBOR™ remained the same.  The FX & MM Committee also continued to oversee bbaLIBOR™.

129.    On September 12, 2012, an independent panel recommended that the BBA be stripped of its role in bbaLIBOR™ rate setting.  As Martin Wheatley, former head of the United Kingdom's Financial Services Authority ("FSA")[152] and later, the FCA, explained at the time, "the BBA acts as the lobby organisation for the same submitting banks that they nominally oversee, creating a conflict of interest that precludes strong and credible governance."[153]  In February 2013, the BBA agreed to cede control of bbaLIBOR™ to a new operator.  On January 31, 2014, the BBA handed over responsibility for the administration of bbaLIBOR™ to the ICE Benchmark Administration ("IBA").[154]

---

[150] *Id.*

[151] Enrich & Colchester, *supra* note 19.

[152] The FSA is now two separate regulatory authorities:  The Financial Conduct Authority ("FCA") and the Prudential Regulation Authority.  This Complaint uses "FSA" when referencing action taken by the FSA prior to its division in April 2013.

[153] Wheatley Final Report, *supra* note 84, at 21.

[154] *Disclaimer*, BBA Libor, http://www.bbalibor.com/disclaimer (on file with FDIC-R).

### H.   Defendants' Knowledge of bbaLIBOR™'s Importance

130.   Defendants understood the importance of bbaLIBOR™ to the global economy and actively promoted bbaLIBOR™ as a key benchmark rate.  For example, the BBA described the importance of that benchmark as follows:

> BBA LIBOR is by far the most widely referenced interest rate index in the world.  Its importance goes beyond that of interbank lending and touches everyone from large international conglomerates to small borrowers.  It is central in interest rate swaps and the great majority of floating rate securities and loans relate to LIBOR. Independent research indicates that around $350 trillion of swaps and $10 trillion of loans are indexed to BBA LIBOR.  It is the basis for settlement of interest rate contracts on the world's major futures and options exchanges.  It is written into standard derivative and loan documentation such as the ISDA terms and is also used for an increasing range of retail products.[155]

131.   Financial instruments that incorporated USD bbaLIBOR™ were priced based on the express understanding that Defendants would adhere to the benchmark's published methodology.  Market participants, including the Closed Banks, reasonably relied on Defendants' representations that bbaLIBOR™ was, and would be, honestly and reliably calculated according to the published rules.  Indeed, the BBA acknowledged in 2008 that bbaLIBOR™ "has always been relied on by the market as a reliable benchmark" of borrowing costs.[156]

132.   USD was by far the most important, and widely used, of the bbaLIBOR™ benchmarks.  An internal BBA document from 2008 stated that USD bbaLIBOR™ "is overwhelmingly the most widely used rate, as it is the reference rate for a vast derivatives

---

[155] *Understanding the Construction and Operation of BBA LIBOR*, *supra* note 122, at 3.

[156] Press Release, BBA, Libor Gets Enhanced Governance and Scrutiny Procedures (Dec. 17, 2008), *available at* http://www.mondovisione.com/media-and-resources/news/british-bankers-association-libor-gets-enhanced-governance-and-scrutiny-procedur.

industry, whose establishment was only possible due to the existence of BBA LIBOR as an objective market rate."[157] ███████████████████████████████████

███████████████████████████████████████████████

███████████████

133.    The United States provided the biggest market for products that incorporated USD bbaLIBOR™ as the interest-rate benchmark.  The United States therefore was the focus of Defendants' efforts to suppress USD bbaLIBOR™, and maintain USD bbaLIBOR™s credibility and status as the dominant short-term USD interest rate benchmark.

134.    ███████████████████████████████████

████████████████████████████████████ The Panel Bank Defendants specifically intended to, and did, seek to induce U.S. lenders to incorporate USD bbaLIBOR™ as the interest-rate benchmark in their mortgage and other loan products.  ██

███████████████████████████████████████

██████████████████████████

135.    ███████████████████████████████████

████████████████████████████ Defendants knew and intended that lenders in the United States, including the Closed Banks, would incorporate USD

---

[157] U.K. House of Commons Treasury Comm., Fixing LIBOR: Some Preliminary Findings, Written Evidence, *supra* note 23, at 138.

██ ██████████████████████████████

██ ████████████████████████

██ ██████████████████████

██ ████████████████████████████████████

bbaLIBOR™ as an interest-rate benchmark in loans made in the United States to U.S. borrowers. Defendants' conduct was thus aimed specifically at the United States.

136.    Defendants knew, and intended, that individual bbaLIBOR™ submissions conveyed information to market participants about each Panel Bank's costs of borrowing unsecured funds, the liquidity conditions and stress in the money markets, and each Panel Bank's ability to borrow funds in particular markets.[162]  And Defendants likewise knew that each individual USD bbaLIBOR™ submission contained market information concerning, *inter alia*, the contributing bank's ability to borrow unsecured funds, which "affected or tended to affect" the daily rates at which USD bbaLIBOR™ was fixed and the prices of financial products that incorporated bbaLIBOR™ as the interest-rate benchmark.[163]  Barclays admitted that bbaLIBOR™ was used to price a variety of global financial products, including U.S.-based swaps transactions and futures contracts, as well as home mortgages and commercial loans.[164]

137.    Because a Panel Bank's individual USD bbaLIBOR™ submissions should correspond to the cost of USD borrowing for that Panel Bank, investors in the United States and consumers of USD bbaLIBOR™ in the United States would view a Panel Bank's bbaLIBOR™ published submission as an indicator of that Panel Bank's financial health and liquidity.  For example, if a Panel Bank's USD bbaLIBOR™ published submission was relatively high as compared to other Panel Banks' published submission, that submission would have suggested to

---

[162] *See, e.g.*, Nonprosecution Agreement Between U.S. Dep't of Justice, Criminal Div. Fraud Section and Barclays Bank plc, App. A, ¶ 35-36 (June 26, 2012) (hereinafter "Barclays SOF"), attached as Exhibit 10 and incorporated into this Complaint by reference; *In re Barclays plc*, No. 12-25, 2012 WL 2500330, at 22 (C.F.T.C. June 27, 2012) (hereinafter "Barclays CFTC Order"), attached as Exhibit 11 and incorporated into this Complaint by reference.

[163] *See, e.g.*, Barclays SOF, *supra* note 162, ¶ 33; Barclays CFTC Order, *supra* note 162, at 22; UBS SOF, *supra* note 76, ¶ 97.

[164] Barclays SOF, *supra* note 162, ¶ 1; *see also* Barclays CFTC Order, *supra* note 162, at 2 (CFTC finding the same).

investors and users of USD bbaLIBOR™ in the United States that the Panel Bank presented a credit risk and had potential liquidity problems.  Commercial banks with liquidity problems have trouble attracting business and could find themselves prohibited from working with financial institutions.

138.    Because the Panel Banks were purportedly among the world's largest and most financially sound commercial banks, market participants valued bbaLIBOR™ as a floor for the borrowing rate of other, less creditworthy, institutions and individuals.[165]  Though bbaLIBOR™ developed into the industry standard, other reference rates existed throughout the relevant period. For example, brokers, such as Tullet Prebon and Tradition Financial Services ("Tradition"), and data providers, such as Bloomberg and Depository Trust & Clearing Corp. ("DTCC"), provided data on various interest-rate benchmarks.

139.    In March 2012, the BBA responded to published reports about an investigation into bbaLIBOR™ by insisting that the BBA and the Panel Banks were "committed to the continuing evolution of Libor so that it adapts to meet the changing market and user requirements and general expectations."[166]  The BBA quoted Ian Mair, then Chairman of the London Money Market Association, as saying "It is important that all market participants ***have a choice*** of benchmarks."[167]  Following Barclays's admission of bbaLIBOR™ manipulation, the

---

[165] David Hou & David Skeie, Fed. Reserve Bank of N.Y., LIBOR:  Origins, Economic Crisis, Scandal, and Reform 3 (March 2014), *available at* http://www.ny frb.org/research/staff_reports/sr667.pdf.

[166] BBA, LIBOR—Update, *supra* note 91.

[167] *Id.* (emphasis added).

BBA again stated that it was committed to providing a benchmark that had the support of all users.[168]

140.    In 2014, the BBA transferred control of bbaLIBOR™ to a commercial benchmark provider, the IBA.  The IBA announced that it would implement additional controls to deter misconduct and ensure that LIBOR served its intended purpose.[169]  Among the changes the IBA made was to cease contemporaneously publishing individual USD bbaLIBOR™ contributions.

141.    Following Barclays's disclosure, multiple providers entered the market for interest-rate benchmarks, including the DTCC, which offers the General Collateral Finance Repo Index (which has gained the support of numerous market participants).  This restored competition in the market for interest-rate benchmarks has also led to the introduction of new financial products, such as futures and options contracts linked to Repo Rate indices and overnight indexed swap rates.

## FRAUDULENT AND COLLUSIVE CONDUCT RELATING TO BBALIBOR™

A.    **Systematic bbaLIBOR™ Suppression:  The Conduct Begins**

142.    In 2007, the United States economy endured a housing correction.  As a result, the market found itself unable to value certain illiquid assets, while creditors demanded additional collateral for secured short-term wholesale funds and became increasingly reluctant to offer unsecured short-term funding.  One major financial institution, U.K.-based Northern Rock, collapsed in late 2007 when it was unable to roll over the short-term funding on which it relied to finance its operations.  These events increased the demand for, and reduced the supply of, cash.

---

[168] Press Release, BBA, British Bankers' Association Statement Regarding the Treasury Committee's Preliminary Findings on Libor (Aug. 18, 2012), *available at* http://www.mondovisione.com/media-and-resources/news/british-bankers-association-statement-regarding-the-treasury-committees-prelim.

[169] Iris Dorbian, *Will Banks Pay Up for a New, Improved Libor?*, CFO (Aug. 19, 2014), http://ww2.cfo.com/credit/2014/08/will-banks-pay-new-improved-libor.

143.    Many of the Panel Bank Defendants' portfolios in at least 2007 and 2008 were weighted such that the Panel Bank Defendants financially benefited from reductions in short-term floating interest rates.  For example, Deutsche Bank reportedly earned more than $650 million in profit during 2008 from trades tied to bbaLIBOR™ because bbaLIBOR™ was lower than predicted by competitive market forces.[170]  Similarly, Bank of America reported that it was "liability sensitive to LIBOR" and net interest income would increase substantially if short-term interest rates fell by 100 basis points while long-term rates remained the same.[171]  Bank of America further stated that it held a notional amount of more than $50 billion in receive fixed/pay floating interest rate swaps that would mature in 2008 or 2009 with no offsetting pay fixed/receive floating interest-rate swaps.[172]  At the same time, many Panel Bank Defendants were exposed to the dangers of their reliance on wholesale funding.[173]

144.    On Thursday, August 9, 2007, the Panel Bank Defendants submitted overnight USD bbaLIBOR™ rates that were significantly higher than the prior day.  Overnight USD bbaLIBOR™ rose from 5.35% on August 8, 2007, to 5.86% on August 9, 2007, which put USD bbaLIBOR™ at its highest level since 2001.  Because these increases were not coincidental with changes in the rates charged by central banks, the media expressed concern that the increase in

---

[170] Jean Eaglesham, *Bank Made Huge Bet, and Profit, on Libor*, Wall St. J., Jan. 10, 2013, http://online.wsj.com/article/SB10001424127887324442304578231721272636626.html.

[171] Bank of Am., 2008 Annual Report, *supra* note 7, at 88-90.

[172] *Id.* at 91 Table 42.

[173] It was common for banks, including the Panel Banks, to rely on short-term wholesale funding to finance longer-term assets.  This meant that banks had to constantly renew, or obtain, short-term loans or risk running out of cash. For example, wholesale funders and interbank lenders grew wary of RBS (which had just acquired ABN AMRO) due to its lack of cash from customer deposits, excessive reliance on wholesale funding, and portfolio of "toxic" U.S. subprime mortgages.  During the relevant period, wholesale funders became increasingly concerned about RBS's potential for insolvency.  As a result, RBS and other Panel Banks had a strong incentive to keep bbaLIBOR™ down (much as a commodities producer has an incentive to reduce the cost of raw materials) and to portray a reputation for financial soundness.

USD bbaLIBOR™ indicated that the Panel Bank Defendants were afraid to lend to each other and that major losses for the Panel Bank Defendants and others were on the horizon.

145.    Also on August 9, 2007, , a senior manager for UBS ALM, sent an internal email The email stated that "it is highly advisable to err on the low side with fixings for the time being to protect our franchise in these sensitive markets.  Fixing risk and [profit and loss] thereof is secondary priority for now" (the "August 9 Email").[174]  confirmed that the directive would be followed,
.[175]

146.    The following day, UBS dropped its overnight USD bbaLIBOR™ submission 50 basis points.  UBS employees understood this secret directive to apply to all bbaLIBOR™ currencies, but was particularly applicable to USD bbaLIBOR™.[176]  UBS traders in the United States were aware of this directive and used it to their advantage in executing trades with U.S. financial institutions.

---

[174] UBS SOF, *supra* note 76, ¶ 105 (alteration in original);

[175] UBS SOF, *supra* note 76, ¶¶ 105-107;

[176] UBS SOF, *supra* note 76, ¶ 108.

147.    From this point forward, in accordance with instructions contained in the August 9 Email,[177] UBS derivatives traders with experience trading in the short-term money markets (including, on information and belief, derivatives traders located in New York and Connecticut) coordinated with UBS's USD bbaLIBOR™ submitters to profit on trades with counterparties in the United States on bbaLIBOR™-based instruments. [178]  The "err on the low side" instruction was well known to various derivatives traders and managers on the trading desks (including, on information and belief, traders and managers located in New York and Connecticut).[179]

148.    By August 16, 2007, all of the Panel Bank Defendants had dropped their submissions significantly.  UBS, for example, lowered its USD overnight bbaLIBOR™ submission by 90 basis points.  The initial differences in each Panel Bank Defendant's contribution on August 10, 2007 were arguably consistent with the fact that the Panel Bank Defendants had different degrees of creditworthiness and presented different risks for unsecured short-term wholesale lenders.[180]  Figure 4 below plots the USD overnight bbaLIBOR™ submissions for the Panel Bank Defendants from August 7, 2007 through August 28, 2007.  As can be seen in Figure 4, bbaLIBOR™ submissions showed significant differences in early August but then showed significant uniformity by the end of the month.  This pattern is consistent with allegations that the Panel Bank Defendants began colluding on USD bbaLIBOR™ in August 2007.

---

[177] UBS SOF, *supra* note 76, ¶ 106.

[178] *Id.*

[179] *Id.* ¶ 108.

[180] *See, e.g.*, Wheatley Final Report, *supra* note 84, at 79 ("[I]t could be argued that, in the current environment inter-bank lending rates are dominated by credit risk and there is a large dispersion in the perceived creditworthiness of banks."); Final Notice from the FCA to Lloyds Bank plc & Bank of Scot. plc ¶ 4.49 (July 24, 2014) (admitting the borrowing rates of the Panel Bank Defendants diverged as lenders became more sensitive to credit risk) (hereinafter "Lloyds Final Notice"), attached as Exhibit 12 and incorporated into this Complaint by reference.

**Figure 4:  Overnight USD bbaLIBOR™ Submissions**



149.    During this same time period, in August 2007, the BBA issued a press release

titled, "Key Facts about LIBOR," in which the BBA falsely stated that bbaLIBOR™ "closely

reflects the real rates of interest being used by the world's big financial institutions" and that it

"reflects the actual rate at which banks borrow money from each other."[181]

150.



---

[181] Press Release, BBA, Key Facts About BBA LIBOR (Aug. 10, 2007), *available at* **Error! Hyperlink reference not valid** http://www.mondovisione.com/media-and-resources/news/british-bankers-association-libor-falls-on-central-bank-intervention; *see also* Barclays SOF, *supra* note 162, ¶ 34.

[182]

██████████████████████████████████ ▪  According to

Mr. King's unclassified interview with the U.S. Federal Bureau of Investigation ("FBI"), after

being shown this document, Mr. King stated that Mr. Connolly's "reference to 'tons of pays

coming up' meant the bank's USD desk in New York had a lot of trading positions rolling off

(i.e., fixings),"[184] *i.e.*, that Deutsche Bank would have to pay counterparties interest payments

tied to USD bbaLIBOR™.

151.    On August 20, 2007, RBS's London-based head of money markets trading and

the person responsible for USD bbaLIBOR™ submissions, Paul Walker, reportedly telephoned

RBS's head of short-term markets for Asia, Scott Nygaard, in Tokyo, to discuss how banks were

using bbaLIBOR™ to profit on its movements rather than submitting rates that honestly reflected

their perceived costs of borrowing.  Mr. Walker is quoted as telling Mr. Nygaard:  "People are

setting to where it suits their book. . . .  LIBOR is what you say it is."[185]  Senior RBS managers

reportedly knew that, at least as of August 2007, the Panel Bank Defendants were systematically

rigging bbaLIBOR™.[186]

152.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

▪▪

[184] Unclassified FBI FD-302 memorandum of the Government's July 31, 2014 interview of James R. King at 31, excerpt attached as Ex. C to the Supp. Decl. of Seth L. Levine in Further Support of Defendants' Joint Motion for a *Kastigar* Hearing, *United States v. Connolly*, No. 1:16-cr-00370 (S.D.N.Y. Sept. 25, 2017) (hereinafter "King FD-302").

[185] Liam Vaughan & Gavin Finch, *Secret Libor Transcripts Expose Trader Rate-Manipulation*, Bloomberg (Dec. 13, 2012), http://www.bloomberg.com/news/print/2012-12-13/rigged-libor-with-police-nearby-shows-flaw-of-light-touch.html.

[186] *Id.*



**B.     Barclays Moves to a "Within-the-Pack" Directive Which Enabled Further Suppression**

153.

Mr. Porter was a good friend of Barclays CEO Robert Diamond.[189]

By this time, Citibank was already suppressing for publication its USD bbaLIBOR™ submissions so that it was "not seen" to be paying higher interest rates because "that would be damaging" to its reputation.[192]

154.    On September 3, 2007, Bloomberg published a story concerning Barclays's perceived liquidity problems titled, "Barclays Takes a Money-Market Beating," that observed

---

[189] *See Larger Loot: Fatcat Barclays Bankers Toast Bonuses with Booze-Filled Breakfast in Posh Pub*, Mirror (Feb. 11, 2012, 2:12 PM), https://www.mirror.co.uk/news/uk-news/barclays-bankers-toast-their-bonuses-with-booze-filled-681354.

[192] Citi CFTC Order, *supra* note 130, at 15.

that Barclays's published 3-month USD bbaLIBOR™ contribution was (as noted above and can be seen in Figure 4) relatively high compared to other Panel Bank Defendants.  The article speculated that Barclays and "its Barclays Capital securities unit" were struggling for cash due to their exposure to United States subprime mortgages.  In response to this article, asking "what in the hell [was] happening" at Barclays and its New York-based Barclays Capital division,[193] senior managers at Barclays instructed their USD bbaLIBOR™ submitters to further suppress their USD bbaLIBOR™ submissions so that they would stay "within the pack" and be nearer to the suppressed rates of other Panel Bank Defendants rather than submit USD bbaLIBOR™ contributions that were consistent with the BBA's definition of bbaLIBOR™.

155.    Barclays's directive to stay "within the pack" with other Bank Defendants remained in place, and was repeated, throughout the remainder of the relevant period.  Barclays has admitted that its USD bbaLIBOR™ submissions were false because they were lower than what Barclays would otherwise have submitted and contrary to the definition of bbaLIBOR™.[194]

156.    On September 4, 2007, ▮▮▮▮ (Citibank) wrote an internal email ▮▮▮▮



on Citibank's USD bbaLIBOR™ submissions.  In response, ▮▮▮▮ submitted for publication USD bbaLIBOR™ contributions that were among the lowest on the panel.

---

[193] Barclays CFTC Order, *supra* note 162, at 19; *see also* Barclays SOF, *supra* note 162, ¶¶ 36-40.

[194] Barclays SOF, *supra* note 162, ¶ 36.

▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

157.    At that same time, Citibank continued its efforts to encourage Barclays to further lower its already suppressed USD bbaLIBOR™ submissions. ▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬

158.    ▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬  ▬▬▬▬▬▬▬▬

▬▬▬▬▬▬ Citibank submitted for publication a 3-month USD bbaLIBOR™ of 5.60%.

159.    Similarly, internal documents from Lloyds, the contents of which later surfaced as a result of enforcement agencies' investigations, reveal that an unidentified HBOS senior manager directed USD bbaLIBOR™ submitters to contribute USD bbaLIBOR™s at the rate of the expected USD bbaLIBOR™ fixing so that HBOS did not stand out as an outlier relative to other Panel Banks.  At the time, HBOS was suffering severe funding and liquidity issues and, all else equal, would have had to pay higher interest rates than its competitors to obtain interbank loans.  The HBOS directive was confirmed in an internal HBOS email sent to two other senior HBOS senior managers and other HBOS personnel.  The email stated that the submissions of all USD bbaLIBOR™ Panel Banks were published and HBOS could not "afford to be significantly away from the pack."[199]  HBOS's directive to align its USD bbaLIBOR™ submissions with those of the other Panel Banks was known to HBOS employees who traded derivatives that incorporated USD bbaLIBOR™ as an interest-rate benchmark.  The HBOS directive was also

_____

▬ ▬▬▬▬▬▬

▬ ▬▬▬▬▬▬

▬ ▬▬▬▬▬

[199] Lloyds CFTC Order, *supra* note 60, at 14.

disclosed to other Panel Banks.  In a recorded electronic chat, HBOS's USD bbaLIBOR™ submitter wrote to an employee of another financial institution (the identity of which has not been disclosed) that "youll [sic] like this ive [sic] been pressured by senior management to bring my rates down into line with everyone else."[200]

C.   **The Panel Bank Defendants Suppress USD bbaLIBOR™ By At Least 20-30 Basis Points**

160.   In October 2007, Deutsche Bank's Global Head of GFFX directed Deutsche Bank's USD bbaLIBOR™ submitter ▮▮▮▮▮▮ to "[m]ake sure our libors are on the low side for all [currencies]."[201]  Members of Deutsche Bank's GFFX unit, including members based in New York, knew of this directive and used it to their advantage in trading financial products tied to USD bbaLIBOR™ with counterparties in the United States, including New York.

161.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  In 2007, in an internal email sent to Mr. Diamond, Mr. del Missier wrote that USD bbaLIBOR™ submissions for all of the Panel Banks were "fantasy rates."[203]

---

[200] *Id.* at 15.

[201] DB NYSDFS CO, *supra* note 42, ¶ 57.

[202] ▮▮▮

[203] Kit Chellel, *Del Missier Called Libor Rates 'Fantasy' in Diamond E-Mail*, Bloomberg (Mar. 21, 2014), http://www.bloomberg.com/news/articles/2014-03-21/del-missier-called-libor-rates-a-fantasy-in-e-mail-to-diamond.

162.    Over a period of years, a culture of collusion had developed that ultimately enabled the systematic bbaLIBOR™ suppression discussed above.[204]  On information and belief, through coordination with Panel Bank Defendants, these traders increased their ability to effectively, fraudulently, and collusively manipulate bbaLIBOR™.[205]  Barclays, Lloyds, Rabobank, RBS, and UBS all have admitted to the U.S. Department of Justice ("DOJ") that they submitted false and misleading bbaLIBOR™ submissions to the BBA, and that the bbaLIBOR™ fixings published by and through the BBA were materially false and misleading.[206]

163.    On November 29, 2007, ▮▮▮▮▮▮▮, Head of Group Balance Sheet at Barclays and a member of the FX & MM Committee contacted a representative of BBA to advise that USD "LIBORs are being set lower than where they ought to be" and informed the BBA that all of the Panel Bank Defendants were doing this.[207] ▮▮▮▮▮▮ explained that the Bank Defendants were submitting rates that were too low because "banks are afraid to stick their heads above the parapet and post higher numbers because of what happened to [Barclays] when [Barclays] did. You get shot at."[208]

164.    On November 29, 2007, the supervisor of Barclays's USD bbaLIBOR™ submitters convened a telephone discussion with the senior Barclays Treasury managers and the

---

[204] *See, e.g.*, Editors, *Libor Gives Prosecutors Chance to Change Banking Culture*, Bloomberg (Sept. 24, 2012), http://www.bloomberg.com/news/2012-09-24/libor-gives-prosecutors-chance-to-change-banking-culture html.

[205] Barclays SOF, *supra* note 162, ¶¶ 23-24.

[206] *Id.* ¶ 33; *United States v. Lloyds Banking Group plc*, Deferred Prosecution Agreement, Attachment A, ¶ 45 (July 28, 2014) (hereinafter "Lloyds SOF"), attached as Exhibit 13 and incorporated into this Complaint by reference; *United States v. Cooperative Centrale Raiffeisen Boerenleenbank, B.A.*, Deferred Prosecution Agreement, Attachment A, Statement of Facts (Oct. 29, 2013) ¶ 97, *available at* http://www.justice.gov/iso/opa/resources/645201310298755805528.pdf (hereinafter "Rabobank SOF"), attached as Exhibit 14 and incorporated into this Complaint by reference; RBS SOF, *supra* note 71, ¶ 81; UBS SOF, *supra* note 76, ¶ 97.  On information and belief, other Panel Defendant Banks engaged in the same type of conduct that Barclays, Lloyds, Rabobank, RBS, and UBS have admitted occurred.

[207] Barclays SOF, *supra* note 162, ¶ 43.

[208] *Id.*

USD bbaLIBOR™ submitters (whose identities are known to Barclays, but not FDIC-R).  The supervisor said if the submitters contributed the rate for a particular tenor at 5.50, which was the rate they believed to be the appropriate submission, Barclays would be twenty basis points above "the pack" and "it's going to cause a shit storm."[209]  The supervisor asked that the issue be taken "upstairs," meaning that it should be discussed among more senior levels of Barclays's management.  ▮▮▮▮▮▮▮▮, Head of Group Balance Sheet at Barclays and a member of the FX & MM Committee, agreed to do so.  The group then decided to set its USD bbaLIBOR™ submissions for the next day at the same level as another bank, a rate of 5.3, which was, again, not at the rate the submitters believed to be appropriate for Barclays.  In an email written by ▮▮▮▮▮▮▮ to an undisclosed list of Barclays executives, ▮▮▮▮▮▮ wrote that "senior management"[210] authorized Barclays's USD bbaLIBOR™ submitters to "stick within the bounds" in their submissions, regardless of the bbaLIBOR™ definition.[211]  The next day, both Barclays and Bank of Scotland submitted for publication a 1-month USD bbaLIBOR™ of 5.3.

165.    On November 30, 2007, a representative of Barclays and an FSA representative had a private discussion.  The Barclays representative in an internal note wrote that he did not disclose to the FSA in that conversation that "'we're not posting where we think we should.'"[212]  On December 4, 2007, a Barclays bbaLIBOR™ submitter sent an internal email stating that s/he was submitting USD bbaLIBOR™ "lower than s/he would have set if given a 'free hand,'" and

---

[209] Barclays CFTC Order, *supra* note 162, at 21.  The documents have not been publicly disclosed, nor has Barclays identified the executives who authorized this decision.

[210] It is not publicly known to whom ▮▮▮▮▮▮ was referring in his reference to "senior management."  At least one of the senior managers at the time, Mr. del Missier, worked from Barclays's office in New York at the time.

[211] Barclays CFTC Order, *supra* note 162, at 21.

[212] Barclays SOF, *supra* note 162, ¶ 45.

that the Panel Bank Defendants, including Barclays, were submitting false and dishonest submissions.[213]





168. ████████████████████████████████

████████████████████████████████████

████████████████████████████ ██ ██████

██████████████████████████████████████

█████████████

169. ████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████████████

███████████████████ █████████████████

██████████████████████████████████████

████████

170. ████████████████████████████████

████████████████ █████████████████████

████████████████████████████████████

███████████████████████ A Barclays bbaLIBOR™ submitter agreed that if s/he responded

---

██ ██████████

██ ████████████████████

██ █████

██ ████████████

██ ██████

██ ██



171.

, Citibank's next USD bbaLIBOR™ submissions were in the middle of the pack for 1, 3, and 6 month USD bbaLIBOR™.[229]  The following day, Citibank's USD bbaLIBOR™ submissions were among the lowest for those tenors.[230]

172.    In an internal communication, the Citibank submitter for Citibank commented that he got calls from ████████, "in New York," who stated, "'[y]eah, why are you posting high LIBORs?'"[231]  ████████ was functionally the USD bbaLIBOR™ submitter's superior.  The submitter's comment, along with the documents discussed above, show that Citibank executives in New York concerned about Citibank's reputation in New York directed the unlawful suppression of its USD bbaLIBOR™ submissions.  Throughout this time period, Citibank expressly recognized a link between its individual LIBOR submissions and the price it would have to pay for cash in the United States.

---

[229] Submissions by tenor Spreadsheet.

[230] Submissions by tenor Spreadsheet.

[231] Citi CFTC Order, *supra* note 130, at 16.

173. ███████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████ ████████████████████

███████████████████████████████████████████

██████████████████████████ ██████████████████

██████████████████████████

174. ████████████████████████████████████

████████████████████████████████████████

███████████████████████████

175.    On April 10, 2008, UBS's ████████████ asked ████████ why UBS's 3-month USD bbaLIBOR™ was not higher. ████████████ replied that it was because "then [UBS GT] will rip our boys a new one for being the highest bank in the poll."[235] █████████████

---

█ █████████████████████████

█ ██

█ ████████████████████████

[235] *In re UBS AG*, No. 13-09, at 47 (C.F.T.C. Dec. 19, 2012) (emphasis added) (hereinafter "UBS CFTC Order"), attached as Exhibit 15 and incorporated into this Complaint by reference.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

176.     On April 11, 2008, a Barclays employee told an employee of the NY Fed that he was aware of Panel Bank Defendants putting in USD bbaLIBOR™ submissions that were lower than what they were actually paying and that "the ones that need the cash most put in the lowest, lowest rates."[237]  The Barclays employee said that Barclays could not borrow money at the rates submitted by other Panel Bank Defendants and that "if we can't borrow money at that rate . . . [t]hen no one else could really. . . .  I mean we, you-you know we speak to everyone that everyone else does so, um, yeah, it's a quite, quite an uncomfortable feeling and . . . I don't know if at some stage LIBORs will correct themselves."[238]

D.     **Defendants Collectively Seek to Continue Suppression and Maintain bbaLIBOR™'s Credibility and Dominance**

177.     On Wednesday, April 16, 2008, the Wall Street Journal published an article questioning the reliability of bbaLIBOR™ as a USD interest-rate benchmark.[239]  The article quotes Mr. Ewan as saying that the BBA is "closely watching the rates banks contribute" and that "[i]f it is deemed necessary, we will take action to preserve the reputation and standing in

---

██ ████████████ .

[237] *Unofficial Transcript of Phone Call Between Barclays Employee and Analyst in the Markets Group of the N.Y. Fed*, Apr. 11, 2008, at 7, *available at* https://www.newyorkfed.org/medialibrary/media/newsevents/news/markets/2012/libor/April_11_2008_ transcript.pdf (last visited on June 12, 2018) (hereinafter "*Apr. 11 Barclays and N.Y. Fed Tr.*"), *attachment to* Press Release, Fed. Reserve Bank of N.Y., New York Fed Responds to Congressional Request for Information on Barclays - LIBOR Matter (July 13, 2012), http://www.newyorkfed.org/newsevents/news/markets/2012/ Barclays_LIBOR_Matter html (last visited on June 12, 2018) (hereinafter "N.Y. Fed Press Release").

[238] *Id.* at 16.

[239] Carrick Mollenkamp, *Bankers Cast Doubt On Key Rate Amid Crisis*, Wall St. J., Apr. 16, 2008, http://online.wsj.com/article/SB120831164167818299 html.

the market of our rates."[240]   The article states that bbaLIBOR™ was to be on the agenda of an

upcoming BBA board meeting.[241]

178.    The article prompted two parallel efforts by the BBA and the Panel Bank

Defendants in order to obscure the fact of suppression and allay concerns about the reliability of

USD bbaLIBOR™.

179.    First, Panel Bank Defendants considered the need to collectively raise USD

bbaLIBOR™ submissions to reduce public scrutiny ██████████████████████████████

████████████████████████████

180.    ████████████████████████████████████



181.    On April 17, 2008, UBS revised its "err on the low side" directive with a "middle

of the pack" directive.[245]

182.    Accordingly, USD bbaLIBOR™ rates increased on April 18, 2008 not because of

any legitimate fear among the Panel Bank Defendants that the BBA would actually discipline

---

[240] *Id.*

[241] *Id.*

██ ████████████████████████████

██ ████████████████████████████████

██ ██████████████████████

[245] UBS SOF, *supra* note 76, ¶ 115.

any Panel Bank for submitting false quotes—the members of the FX & MM Committee had

already agreed that they would not impose any such discipline.  Instead, the temporary rise in

USD bbaLIBOR™ was the result of coordinated action among the Panel Bank Defendants to

avoid detection of their unlawful conduct.

183.   Second, over the next week, at the direction of the FX & MM Committee, the BBA

launched what its executives internally described as a "charm offensive,"[246] reaching out to

investors and journalists in the United States, and the NY Fed,[247] to dispel concerns about

bbaLIBOR™.  For example, on April 17, 2008, the BBA told the Wall Street Journal that it

would "strictly enforce" the bbaLIBOR™ rules and expel any Panel Bank that made deliberately

inaccurate bbaLIBOR™ submissions.[248]  The BBA falsely stated that it did not believe banks

had submitted false quotes.  The BBA stated that it would fast-track an "intensive review" of its

bbaLIBOR™ process, but that it did not believe that Panel Banks had submitted false quotes.[249]

184.   ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████   ███████████████████████████████

---

[246] Enrich & Colchester, *supra* note 19.  Internal notes from the BBA indicate that Mr. Ewan was "dispatched" to New York to "placate investors" and the NY Fed.

[247] According to the BBA, from 2005-08, Mr. Ewan met with regulatory authorities in the United States to discuss a number of issues relating to LIBOR, including proposed improvements to LIBOR.  Following the decision to review LIBOR, Mr. Ewan consulted at length with the NY Fed to provide reassurances about the reliability of bbaLIBOR™.  Mr. Ewan held conference calls with the NY Fed on April 15, April 28, and June 2, 2008.  On November 4, 2008, Mr. Ewan met with the NY Fed to discuss the LIBOR "governance and scrutiny" review.  He met again with the NY Fed in October 2009 to provide updates on LIBOR.  Mr. Ewan also met with the Office of the Comptroller of the Currency in March 2008, June 2008, and November 2008.  *See* U.K. House of Commons Treasury Comm., Fixing LIBOR: Some Preliminary Findings, Written Evidence, *supra* note 23, at 70.

[248] UBS SOF, *supra* note 76, ¶ 114.  On information and belief, the BBA electronically communicated that statement to reporters and regulators in New York.

[249] Carrick Mollenkamp & Laurence Norman, *British Bankers Group Sets Up Review of Widely Used Libor*, Wall St. J., Apr. 17, 2008, http://online.wsj.com/article/SB120838284713820833 html.

███  ███████████████████████████████████



185.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

186.     On information and belief, the purpose of the "charm offensive" was not to address the fraud and collusion causing USD bbaLIBOR™ suppression but rather to create the false impression that the Panel Bank Defendants provided accurate and honest USD bbaLIBOR™ submissions.

187.     In May 2008, the Markets Group of the NY Fed stated in an internal report published on its website that "it is difficult to find convincing evidence of actual [bbaLIBOR™] misreporting."[258]

188.     During a six-month period in 2008, Thomson Reuters reportedly alerted Mr. Ewan on a weekly basis that the bbaLIBOR™ process was being distorted.[259]  Mr. Ewan reportedly told Thomson Reuters that he would investigate its concerns.[260]  There is no public evidence that he did.

189.     In May 2008, the broker ICAP plc ("ICAP") announced it intended to create an alternative index of interbank lending rates called the New York Funding Rate ("NYFR"). According to ICAP, the NYFR would be determined by an anonymous survey of at least twenty-

---

■■■■■■■■■■■■■■■■■■■■■■

[258] Samuel Cheun & Matt Raskin, MarketSOURCE, Recent Concerns Regarding LIBOR's Credibility 3 (May 20, 2008), *available at* https://www.newyorkfed.org/medialibrary/media/newsevents/news/markets/2012/libor/MarketSource_Report_May202008.pdf.  As the FSA recently noted, the evidence of "dislocation did not in itself . . . carry any implication that 'lowballing' was occurring."  Fin. Services Auth., Internal Audit Report:  A Review of the Extent of Awareness Within the FSA of Inappropriate LIBOR Submissions, Management Response ¶ 1.5 (Mar. 2013), *available at* www.fsa.gov.uk/static/pubs/other/ia-libor-management-response.pdf (hereinafter "FSA Internal Audit").  Indeed, the Wall Street Journal article warned that "no specific evidence has emerged that banks have provided false information about borrowing rates."  Mollenkamp, *Bankers Cast Doubt On Key Rate Amid Crisis*, *supra* note 239.

[259] Ian Pollock, *Libor:  BBA 'Warned Weekly' Says Former Rate-Compiler*, BBC (July 25, 2012), http://www.bbc.co.uk/news/business-18930191.

[260] *Id.*

four banks (potentially including the Panel Bank Defendants).  ICAP would ask participants each morning to estimate the cost of funding for one- and three-month loans to a "representative" bank in New York.  NYFR would be calculated using the quotes of the middle half of that group.[261]

190.



, the Panel Banks did not offer USD interest-rate derivatives that incorporated the NYFR to consumers in the United States.

191.    At an FX & MM Committee meeting held on May 19, 2008, one Panel Bank executive stated that any USD bbaLIBOR™ rival would be problematic because "[o]nly one can survive.  Therefore, if another rate did surface for fixing in the US then either that would become prominent or die."[264]  The Panel Bank Defendants, and other members of the BBA, were among ICAP's most important customers at the time.[265]

---

[261] Gavin Finch & Ben Livesey, *ICAP's Libor Alternative Lacks 'Concrete Timetable,'* Bloomberg (May 14, 2008, 11:48 AM), http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home&sid=asgvKFvA0iio. http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home&sid=asgvKFvA0iio (on file with FDIC-R).

[264] U.K. House of Commons Treasury Comm., Fixing LIBOR: Some Preliminary Findings, Written Evidence*, supra* note 23, at 156.

[265] ICAP, Annual Report 2008, at 3 (2008), *available at* http://www.icap.com/~/media/Files/I/Icap-Corp/Annual%20Reports/annual-report2008.pdf.  ICAP obtained 42% of its revenue from brokering interest-rate derivative transactions.  *Id.* at 20.  It obtained another 37% of its revenue from brokering transactions in foreign exchange rate derivatives, commodities derivatives, and credit derivatives.  *Id.*  ICAP earned 43% of its revenues from its top 10 customers.  ICAP, Morgan Stanley European Financials Conference (Apr. 2, 2009), *available at* http://www.icap.com/investor-relations/reports-and-presentations/~/media/Files/I/Icap-Corp/reports-and-presentations/year-2009-10/morgan-stanley-2009.pdf.  Defendants possessed enormous market power in all of these markets.

192.     On May 19, 2008, the FX & MM Committee met to discuss an internal paper

titled, "Evolution of LIBOR," circulated by the BBA to the FX & MM Committee and a research

note published by J.P. Morgan Securities Inc., which argued that any criticisms of LIBOR were a

reflection of extreme market conditions and not indicative of fatal flaws in LIBOR's

construction.  The meeting was "confidential" and the BBA refused to admit that it took place.[266]

The names of the attendees have not been publicly disclosed, but they include employees of

seven Panel Banks, one of whom attended from an undisclosed location via phone.  Senior bank

executives described this gathering as a "working level pre meeting" to determine what should

happen at the BBA's formal meeting scheduled for May 30, 2008.[267]  Contributor Bank

executives reportedly decided that they would make no substantive changes to the way

bbaLIBOR™ was calculated, but would instead embark on a false and misleading publicity

campaign to cover up the truth.[268]

193.     The BBA's notes of the meeting were published by the United Kingdom's House

of Commons Treasury Committee ("U.K. Treasury Committee").  Those notes disclose that the

participants intended to address not only the substance but also the perception of bbaLIBOR™.

The attendees sought to address questions raised by the NY Fed and entities "in America"

---

[266] Email from Angela Knight to Paul Tucker (May 21, 2008, 4:40 PM), attached as Exhibit 16 and incorporated into this Complaint by reference.  Barclays publicly disclosed the cover email but, apparently, not the attachment, which is said to provide the "blow-by-blow" account of what transpired at the May 19, 2008 meeting.

[267] Email from Paul Tucker to Michael Cross, Rachel Lomax, Paul Fisher, and John Gleve (May 28, 2008, 4:36 PM) (hereinafter "May 28 Email from Tucker to Cross et al."), attached as Exhibit 17 and incorporated into this Complaint by reference.

[268] *Id.*

regarding USD bbaLIBOR™.  The attendees on multiple occasions made decisions based on their effect on the "US market" and the need to "manage the Fed's perception on Libor."[269]

194.     The attendees also rejected proposals to add banks located in the United States to the Panel and/or changing the timing of USD bbaLIBOR™ publication to coincide with the U.S. market opening.  Internally, the attendees said Defendants RBS and HSBC were "in the top ten banks in America" and a number of "Euro domiciled" USD bbaLIBOR™ Panel Banks "have US banking licenses and quote on NYSE."[270]  One BBA representative told the attendees that they needed to get "Citi and JP Morgan to back" public statements defending LIBOR's reliability "as they produced the reports."[271]

195.     At an FX & MM Committee meeting, ▓▓▓▓▓ told other members of the FX & MM Committee that any changes to bbaLIBOR™ "could cause problems when taking into consideration the US market" and that the Panel Banks "need to manage the [NY] Fed's perception on LIBOR."[272]

196.     In an email dated May 28, 2008, to Mr. Diamond, the Bank of England's Paul Tucker wrote:  "I have spoken to hsbc and rbs, stuart and johnny.  Sense similar across all three of you.  I encouraged contact amongst Mark Dearlove peer group."[273]  In a separate email, Mr. Tucker wrote that Mr. Diamond was joined by Barclays's group treasurer in the conversation and Mr. Cameron was joined by RBS's group treasurer in their conversation.  Mr. Tucker wrote

---

[269] U.K. House of Commons Treasury Comm., Fixing LIBOR: Some Preliminary Findings, Written Evidence, *supra* note 23, at 158.

[270] *Id.* at 159.

[271] *Id.* at 160.

[272] *Id.* at 158; ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

[273] Email from Paul Tucker (May 28, 2008, 11:24 AM), attached as Exhibit 18 and incorporated into this Complaint by reference.  The references to "stuart" and "johnny" were to HSBC Global Banking head Stuart Gulliver and RBS chairman Johnny Cameron.  Mr. Dearlove was Barclays's head of money markets at the time.

that he encouraged Messrs. Diamond, Cameron, and Gulliver to ensure that their respective

group treasurers "talk to each other" about USD bbaLIBOR™ suppression.[274]  On information

and belief, through at least these individuals, Barclays, HSBC, and RBS engaged in

communications to systematically suppress USD bbaLIBOR™.  During this same time period,

Mr. Tucker spoke on several occasions with Ms. Knight of the BBA about USD bbaLIBOR™

suppression and, on information and belief, his communications with Messrs. Diamond,

Cameron, and Gulliver.[275]  Ms. Knight wrote that she had spoken with the CEOs of several

(undisclosed) Panel Bank Defendants about USD bbaLIBOR™ suppression and made them all

sign confidentiality agreements.

197.    On May 29, 2008, the Wall Street Journal published another article questioning

USD bbaLIBOR™ submissions made by Citibank, WestLB, HBOS, JPMorgan, and UBS.[276]

Numerous Panel Bank Defendants disputed the Wall Street Journal's analysis.  Consistent with

the Panel Bank Defendants' desire to get Citibank and JPMorgan to promote the reliability of

USD bbaLIBOR™, the Head of Global Fixed-Income Strategy at JPMorgan published a

Research Note which asserted that the Wall Street Journal's methodology was flawed because it

was "based on too high a risk-free rate which produces a large upward bias in the Journal's

measure of bank borrowing costs."[277]  A Citigroup spokesman said, "[w]e continue to submit our

---

[274] May 28 Email from Tucker to Cross et al., *supra* note 267.

[275] *See, e.g.*, Email from Angela Knight to Paul Tucker (May 31, 2008, 4:09 PM), attached as Exhibit 19 and incorporated into this Complaint by reference.

[276] Carrick Mollenkamp & Mark Whitehouse, *Study Casts Doubt on Key Rate*, Wall St. J., May 29, 2008, http://online.wsj.com/article/SB121200703762027135 html.  The article also stated as follows:  "The Journal's analysis doesn't prove that banks are lying or manipulating Libor.  Analysts offer various reasons why some banks might report Libor rates lower than what other markets indicate."  *Id.*

[277] John Parry et al., *Banks May Be Understating Key Lending Rate:  Report*, Reuters (May 29, 2008), http://www reuters.com/article/2008/05/29/us-banks-libor-idUSN2930208320080529.

LIBOR rates at levels that accurately reflect our perception of the market."[278]  WestLB insisted

that it provided accurate data.[279]

198.    In late May 2008, an HBOS spokesman said, "[w]e believe our Libor fixings are a

genuine and realistic indication of our average cost of funding.  Our postings are on the whole in

line with the market."[280]  HBOS's public statement in late May 2008 was an intentional

misrepresentation.  None of the Closed Banks could have known, or had reason to know, this to

be misrepresentation.  Many published reports at the time also attributed movements in

bbaLIBOR™ rates to factors other than the fraud and collusion alleged in this Complaint.[281]

199.    These pretextual explanations and/or denials were materially false and intended to

conceal the fact that the Panel Bank Defendants were fraudulently and collusively suppressing

USD bbaLIBOR™.

200.    In another article published in the United States on May 29, 2008, the BBA

insisted as follows: "We have every confidence in the integrity of the bbaLIBOR-setting process

and the accuracy of the figures it produces."[282]  The BBA's statement was false because the BBA

---

[278] Mollenkamp & Whitehouse, *supra* note 276.

[279] *Id.*

[280] Parry et al., *supra* note 277.

[281] *See, e.g.,* Int'l Monetary Fund, Global Financial Stability Report:  Financial Stress and Deleveraging 72 (Oct. 2008) (hereinafter "IMF Global Financial Stability Report"), *available at* http://www.imf.org/External/Pubs/FT/GFSR/2008/02/pdf/chap2.pdf (concluding in October 2008 that the "U.S. dollar LIBOR remains an accurate measure of a typical creditworthy bank's marginal cost of unsecured U.S. dollar term funding"); Gillian Tett & Michael Mackenzie, *Debate Over Libor Breeds a Crisis of Confidence*, Fin. Times, Apr. 22, 2008, http://www.ft.com/cms/s/0/240c311a-1004-11dd-8871-0000779fd2ac html#axzz3Dm3mmPpK ("It seems unlikely that this discrepancy has arisen because banks have deliberately been colluding to keep Libor rates down."); *Update 2-European, U.S. Bankers Work on Libor Problems*, Reuters (May 16, 2008), http://in reuters.com/article/2008/05/16/markets-rates-bba-idINL162110020080516 ("There's more wind being made about [the Libor] issue than is being merited by the facts . . . Libor will retain its present function for the foreseeable future . . . .  Due to capital pressures not seen for decades[,] . . . Libor rates . . . are historically high." (internal quotation marks omitted)).

[282] Gavin Finch & Elliot Gotkine, *Libor Banks Misstated Rates, Bond at Barclays Says*, Bloomberg (May 29, 2008), http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aMSoLbYpbHWk (on file with FDIC-R).

knew that the Panel Bank Defendants had been submitting false and dishonest rates, and that the BBA had helped to coordinate the Panel Bank Defendants' unlawful agreements.[283]

201.    After its formal meeting on May 30, 2008, the BBA publicly announced that it would be strengthening the oversight of bbaLIBOR™ and that "it would give more details in due course."[284]  The unidentified attendees at the May 30, 2008 BBA meeting signed confidentiality agreements limiting their ability to disclose what was discussed.[285]  In fact, the Panel Bank Defendants and the BBA intended only to make minor cosmetic changes to the bbaLIBOR™ process.  The BBA shared its proposed changes with the Bank of England, which internally concluded that the BBA's proposal was "wholly inadequate."[286]

202.    ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

203.    On June 2, 2008, Ms. Knight reached out to the NY Fed to falsely assure the NY Fed that the BBA was undertaking serious efforts to prevent USD bbaLIBOR™ suppression.

204.    On June 10, 2008, the BBA issued a press statement asserting that Panel Banks "are invariably those with the best credit ratings and in the current diminished credit capacity of the market it is therefore not surprising that some institutions will not be able to access funds at

---

[283] *Id.*; Mollenkamp & Whitehouse, *supra* note 276 (As with its April 2008 article, the *Wall Street Journal* cautioned that its analysis "doesn't prove that banks are lying or manipulating Libor.").

[284] *International:  Libor Process*, N.Y. Times, http://www.nytimes.com/2008/06/06/news/06iht-6oxan-LIBOR.13532018 html (last visited Jan. 29, 2018).

[285] May 31 Email from Knight to Tucker, *supra* note 275.

[286] Transcript of Governor's written comments, Email to Governors—GPS (May 30 2008, 19:06), attached as Exhibit 20 and incorporated into this Complaint by reference.

██ ████████████████████

the LIBOR rate."[288]  The BBA's statement represented that the BBA was incorporating a tight

scrutiny mechanism that would require any contribution discrepancies to be reviewed and

justified.  In fact, the BBA's statement was false and the Panel Bank Defendants and the BBA

knew it—they did not intend to employ a tight scrutiny mechanism but rather, intended to allow

the Panel Bank Defendants to continue to fraudulently and collusively suppress USD

bbaLIBOR™.

205.    The BBA sent the June 10, 2008 statement directly to the Wall Street Journal

along with a "consultative paper" titled, "Understanding the construction and operation of BBA

LIBOR—strengthening for the future."[289]  The consultative paper stated that it "represents the

views" of the FX&MM Committee.  The paper purported to "correct a number of

misunderstandings and misperceptions" about bbaLIBOR™, including assertions that

"[d]ifferences between London Euro Dollar rate and domestic US Dollar rates are a reflection of

existing market conditions, not necessarily a distortion in benchmarks," "[r]elevant authorities"

expressed support for bbaLIBOR™, and "[t]he BBA has contacted all contributors to ensure that

their submissions to the rate setting process are fully compliant with the procedures as laid out by

the FX & MM Committee."[290]

206.    In August 2008, the FX & MM Committee considered a number of proposals

from the public to improve bbaLIBOR™'s reliability and accuracy.  One proposal, documented

in an internal memo, called for the "anonymization" of individual bbaLIBOR™ submissions.

Doing so would respond to suggestions in certain research reports that Panel Banks might be

---

[288] *Understanding the Construction and Operation of BBA LIBOR*, *supra* note 122, at 1.

[289] *Id*.

[290] *Id.*

understating their true funding costs or exhibiting "pack behaviour" as in the current strained market, because indicating funding costs out of line with the market would invite scrutiny and speculation in the media. The FX & MM Committee conceded that anonymization "solves this problem" by encouraging Panel Banks to submit "their 'true' rates" and "removes immediately the problem of accusations" that banks were submitting for publication artificially low bbaLIBOR™s.[291] Nevertheless, the FX & MM Committee unanimously agreed to reject the proposal and continue publishing their individual contributions directly to U.S. investors via their agents.

207. On August 5, 2008, the BBA represented that Panel Banks which had responded to the BBA's request for consultation were "confident" that their submitted rates were "truly reflective of their perceived borrowing costs" and that bbaLIBOR™ was a "fundamentally robust and accurate benchmark, with contributors inputting rates that they believe reflect their future funding costs."[292] The FX & MM Committee stated that, based on its supposed independent review of responses and investigation, it "believes that current submissions are accurate."[293] By this statement, the Panel Bank Defendants and the BBA further sought to falsely portray the bbaLIBOR™ "dislocations" as the product of market forces rather than fraud and collusion.

208. According to the CFTC, however, internal Lloyds documents have since revealed that on August 8, 2008, one of HBOS's senior managers internally circulated a presentation that said, among other things, "[a]s a bank we must be extremely careful about the rates we pay in

---

[291] U.K. House of Commons Treasury Comm., Fixing LIBOR: Some Preliminary Findings, Written Evidence, *supra* note 23, at 140.

[292] BBA, Libor Consultation Feedback Statement ¶¶ 3.14, 3.19 (Aug. 5, 2008), attached as Exhibit 21 and incorporated into this Complaint by reference.

[293] *Id.* ¶ 4.8.

different markets for different types of funds as paying too much risks not only causing a re-pricing of all short-term borrowings but, more importantly in this climate, may give the impression of HBOS being a desperate borrower and so lead to a general withdrawal of wholesale lines."[294]

209.    According to a September 2012 Wall Street Journal article, Ms. Knight told regulators in April 2008 that bbaLIBOR™ had become too big to manage, but BBA's member banks "clung to control of Libor."[295]  After November 2008, BBA staffers pitched the idea of selling bbaLIBOR™ or spinning it off into a wholly independent entity.[296]  According to the Wall Street Journal article, in late 2008, the BBA drew up plans to license bbaLIBOR™ to an independent third party that would pay a fee to administer the rate instead of the BBA. However, according to the Wall Street Journal article, when BBA staffers tried to sell the idea to industry executives, the staffers got the impression that the big banks—which paid most of the BBA's bills through their membership fees—wanted bbaLIBOR™ kept in-house so that they could continue to influence it.[297]  As a result, the idea ultimately was abandoned.

210.    According to that same Wall Street Journal article, Ms. Knight was heard to argue with Mr. Ewan about bbaLIBOR™.[298]  Ms. Knight reportedly wanted to scale back the BBA's role and took the position that bbaLIBOR™ had become too big for her organization to manage.[299]  Mr. Ewan, on the other hand, reportedly advocated further expansion, touting the

---

[294] Lloyds CFTC Order, *supra* note 60, at 14.

[295] Enrich & Colchester, *supra* note 19.

[296] *Id.*

[297] *Id.*

[298] *Id.*

[299] *Id.*

revenue that the BBA generated from bbaLIBOR™.[300]  According to the BBA, bbaLIBOR™ earned more than £1.8 million and £1.7 million in 2011 and 2012, respectively, in licensing fees.[301]

211.



212.

213.    An internal UBS discussion in September 2008 confirmed that the Panel Bank Defendants were continuing to make artificially low bbaLIBOR™ submissions.  In a documented discussion, a UBS employee stated, "LIBORs currently are even more fictitious

---

[300] *Id.*

[301] BBA, Audited Consolidated Financial Statements Year Ended 31 December 2012, at 13 (2012), *available at* https://www.bba.org.uk/wp-content/uploads/2014/01/BBA_2012_Financials.pdf.

than usual."[304]  On September 18, 2008, Lloyds announced the terms of an offer to acquire HBOS.  In late September, HBOS's USD bbaLIBOR™ submitter increased its submissions to more closely align with the published bbaLIBOR™ rules.[305]  On September 26, 2008, the submitter's supervisor told the submitter that HBOS USD bbaLIBOR™ submissions should be lower relative to other panel members.[306]

214.    Throughout this time, HBOS management also directed employees not to make bids for cash in the wholesale funding market above the rate of the daily bbaLIBOR™ rate.  This instruction reinforced the supervisor's prior direction that HBOS should not be an outlier in the bbaLIBOR™ submissions, regardless of the published bbaLIBOR™ rules.

215.    Similarly, it has been reported that RBS was having trouble persuading wholesale funders, including the Panel Bank Defendants, to lend it cash for more than 24 hours due to RBS's precarious financial position.[307]  The head of treasury of one major U.K. bank was quoted as saying that s/he had concerns that there was "something going horribly wrong" with RBS.[308]  These events led to a "silent run" on RBS and HBOS as large investors sought to withdraw cash which, in turn, increased the need for RBS and HBOS to access cash through interbank loans and sale of assets (such as their portfolio of U.S.-backed MBS).[309]

---

[304] UBS SOF, *supra* note 76, ¶ 101.

[305] Lloyds CFTC Order, *supra* note 60, at 14.

[306] *Id.* at 15.

[307] Ian Fraser, *Shredded Inside RBS the Bank that Broke Britain* 23-324, 355-356, 361-362, 367 (2014).

[308] *Id.* at 356.

[309] *Id*. at 356, 371-372.

216.     On October 10, 2008, a Barclays employee privately reported to the NY Fed that its USD bbaLIBOR™ submissions were "unrealistic."[310]  An October 17, 2008 email from a Rabobank bbaLIBOR™ submitter stated, "we are now setting all libors [sic] significantly under the market levels."[311]

217.     On October 15, 2008, an unidentified Citibank USD bbaLIBOR™ submitter wrote that "off the record, we are not allowed to be the highest" USD bbaLIBOR™ contributor.[312]  Citibank's Mr. Thursfield, who oversaw Citibank's USD bbaLIBOR™ submitters in London, has submitted an affidavit saying that he was unaware of any Citibank directive to manipulate USD bbaLIBOR™.  It is not publicly known specifically who at Citibank did not allow Citibank's USD bbaLIBOR™ submitters to be the highest, but as alleged above executives with authority to issue that directive were located in Citibank's New York office, ██████████████████████████[313]

218.     A U.S.-based employee of RBSI (Neil Smith) emailed RBS's USD bbaLIBOR™ submitter (Scott Walker) on October 21, 2008 to inform Mr. Walker that "Thursday is a HUGE fixing for all NY banks as it's the mortgage date" and ask Mr. Walker to set USD bbaLIBOR™ "as low as possible" to benefit "all US banks."[314]

---

[310] *Unofficial Transcript of Phone Call Between Barclays Employee and Analyst in the Markets Group of the New York Fed*, Oct. 10, 2008, at BARC-MAY6-000095, *available at* https://www.newyorkfed.org/medialibrary/media/newsevents/news/markets/2012/libor/October_10_2008_transcript.pdf, *attachment to* N.Y. Fed Press Release, *supra* note 237.

[311] Rabobank SOF, *supra* note 206, ¶40.

[312] Citi CFTC Order, *supra* note 130, at 18.

[313] *See supra* ¶¶ 153, 156-58, 171-72.

[314] Written Opening Submissions of the Claimant ¶¶ 424(4), *Property Alliance Group Ltd. v. The Royal Bank of Scotland PLC*, No. FL-2016-000004 (United Kingdom High Court of Justice, Chancery Division, May 16, 2016).

219.     On October 24, 2008, a Barclays employee privately reported to the NY Fed that USD bbaLIBOR™ rates were "absolute rubbish,"[315] citing submissions by WestLB and Deutsche Bank as being too low.[316]  The employee told the NY Fed that he was aware of banks that were making bbaLIBOR™ submissions that were below what they actually paid in comparable transactions.[317]  Publicly, however, Barclays and other Panel Bank Defendants continued to falsely represent that bbaLIBOR™ was based on accurate and honest submissions.

220.     On October 29, 2008, a member of the Bank of England telephoned Mr. Diamond (Barclays's then CEO) to discuss Barclays's USD bbaLIBOR™ submissions.[318]  At the time, Mr. Diamond was located in New York.  After his call with the Bank of England, Mr. Diamond telephoned his next in command, Mr. del Missier.[319]  Barclays and Mr. del Missier both interpreted Mr. Diamond's call as an instruction to artificially suppress Barclays's USD bbaLIBOR™ submissions.[320]  Mr. del Missier relayed that instruction to Barclays's USD bbaLIBOR™ submitters who obeyed the instruction.[321]

221.     ███████████████████████████████████████████

███████████████████████████████████████████████████████

---

[315] *Unofficial Transcript of Phone Call Between Barclays Employee and Analyst in the Markets Group of the New York Fed*, Oct. 24, 2008, at 000098, *available at*
https://www.newyorkfed.org/medialibrary/media/newsevents/news/markets/2012/libor/October_24_2008_transcript.
pdf (hereinafter "*Oct. 24 Barclays and N.Y. Fed Tr.*"), attachment to N.Y. Fed Press Release, *supra* note 237.

[316] *Id.* at 000100.

[317] *Id.*

[318] U.K. House of Commons Treasury Comm., Fixing LIBOR: Some Preliminary Findings, Written Evidence, *supra* note 23, at 9 (Supplementary information regarding Barclays settlement with the Authorities in respect of their investigations into the submission of various interbank offered rates)

[319] *Id.*

[320] *Id.*

[321] *Id.*



222.     The FX & MM Committee agreed that USD bbaLIBOR™ submissions should be within five basis points of the median of all USD bbaLIBOR™ submissions, regardless of the definition of bbaLIBOR™.  The FX & MM Committee agreed to, and did, institute a "flagging system" to identify any USD bbaLIBOR™ submissions outside of this agreed-upon range before publication of those individual submissions to licensed vendors in the United States.[324]

223.



At the time, 3-month USD bbaLIBOR™ was some 40 basis points lower than the Eurodollar Rate.

224.     Rabobank's Global Head of Liquidity and Finance and representative on the BBA's bbaLIBOR™ Steering Group, Paul Robson, told investigators that the BBA wanted all

---

[324] Defense Ex. 608I at 2, *United States v. Allen*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 210-8.

individual USD bbaLIBOR™ submissions "nice and aligned with where everybody else is in the market" and "all the BBA seemed to care about was that panel banks would submit rates that were close to each other's rates."[326]  According to notes taken by the FBI during an interview with Mr. Robson (who was also a Rabobank bbaLIBOR™ submitter), "Rabobank management's sole goal was to ensure Rabobank's submissions were within the range of other panel bank submissions and submitters were 'towing [sic] the line.'"[327]

225.    In the event that a Panel Bank submitted a USD bbaLIBOR™ submission outside of that range, the FX & MM Committee privately and directly contacted that Panel Bank to tell it what other Panel Banks had submitted—even though the bbaLIBOR™ rules stated that Panel Banks should not have any advance knowledge of other USD bbaLIBOR™ submissions.  As agreed upon by the FX & MM Committee members and USD bbaLIBOR™ Panel Banks, the Panel Bank would then re-submit its USD bbaLIBOR™ submission so that the submission was within the range of all other Panel Banks.  When publishing each Panel Bank's individual USD bbaLIBOR™ submissions, the BBA published only the re-submitted rate.

226.    Not only did the Panel Bank Defendants align submissions through the agreed-upon "flagging system" for submission outliers, they also contacted each other directly to discuss their respective USD bbaLIBOR™ submissions.  For example, one eyewitness told the FBI that an unknown Bank of America employee used to call Rabobank executive Tony Allen to discuss bbaLIBOR™ submissions.[328]

---

[326] Rabobank Traders Tr. 553:11-14, Oct. 21, 2015 (Day 6); Defense Ex. 608B at 11, *United States v. Allen*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 210-5.

[327] Defense Ex. 608C, *supra* note 34, at 4.

[328] Defense Ex. 608K at 3, *United States v. Allen*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 210-9.

227.     The agreement to align USD bbaLIBOR™ submissions concealed the fact that in the opaque interbank loan market, more creditworthy Panel Banks could borrow at interest rates that were lower than other, less creditworthy, Panel Banks.  For example, in a transcript of an October 2008 phone call between Rabobank's Tony Allen and BBA's John Ewan, Mr. Allen said that as a AAA-rated bank, Rabobank's USD bbaLIBOR™ submissions should, contrary to its aligned submissions, be "miles away from someone like UBS is at the moment."[329]

228.     According to notes taken by the FBI from an interview with Mr. Robson, a bbaLIBOR™ submitter from Rabobank, the submitter called the bbaLIBOR™ submission process a "charade" and a "crock of rubbish because [the submitter] wanted LIBOR rates to be a bit more reflective of Rabobank's actual borrowing rates."[330]

229.     Thus, the Panel Bank Defendants had to coordinate with each other to align their respective USD bbaLIBOR™ submissions in advance of publication because any non-aligned submissions would draw public scrutiny.

230.     In an April 22, 2010 internal communication, one of Société Générale's USD bbaLIBOR™ submitters stated that "LIBOR is extremely manipulated."

231.     On May 6, 2010, Bloomberg published an article titled, "LIBOR-OIS Spread Increase Suggest Collateral Concern," which stated that a growing spread between 3-month USD bbaLIBOR™ and the overnight indexed swap rate ("OIS") showed that banks may be increasingly reluctant to lend to each other due to concerns about financial stability.

232.     In or about May 20, 2010, Société Générale's Global Head of Treasury, Danielle Sindzingre met with members of Société Générale's General Directorate (Board of Directors)—

---

[329] Government Ex. 110B at 3, *United States v. Allen*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 185-3.

[330] Defense Ex. 608C, *supra* note 34, at 4, 18.

whose names are not publicly known at this time—to discuss news reports about Société

Générale's financial condition and how Société Générale 's USD bbaLIBOR™ submissions

harmed Société Générale 's reputation for financial soundness because those submissions were

near the top of the pack of USD bbaLIBOR™ submissions.  Ms. Sindzingre and the General

Directorate agreed in that meeting that Société Générale should artificially suppress its USD

bbaLIBOR™ submissions.

233.    On May 21, 2010, Ms. Sindzingre sent an email to her subordinate, Muriel

Bescond, and several other Société Générale employees, whose names are not publicly known at

this time, directing Société Générale USD bbaLIBOR™ submitters to submit USD bbaLIBOR™

rates that were lower than the highest of the middle eight USD bbaLIBOR™ submissions.  The

purpose of the directive was, among other things, to make it appear to investors in the United

States that Société Générale was able to borrow money at lower interest rates than the rates that

were actually available to Société Générale through the publication of its artificially suppressed

USD bbaLIBOR™ contributions.

E.    **Agreement to Exclude a Potential Competitor in the Market for Interest-Rate Benchmarks**

234.    As alleged above, at an FX & MM Committee meeting, ▮▮▮▮▮▮ told other

members of the FX & MM Committee that any changes to bbaLIBOR™ "could cause problems

when taking into consideration the US market" and that the Panel Banks "need to manage the

[NY] Fed's perception on LIBOR."[331] ▮▮▮▮▮▮ agreed and noted that the Panel Banks "must

---

[331] U.K. House of Commons Treasury Comm., Fixing LIBOR: Some Preliminary Findings, Written Evidence, *supra* note 23, at 158; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

all agree the LIBOR is okay and a way to defend it."[332]  Ms. Knight later stated that she had contacted ICAP and received its assurance that the NYFR would be "complementary" to bbaLIBOR™ and not "something competitive."[333]  The Panel Bank Defendants, and other members of the BBA, were among ICAP's most important customers at the time and thus had the power to collusively force ICAP's agreement not to compete with USD bbaLIBOR™.[334]

F.    **Harmful Effects of Unlawful Conduct**

235.    By submitting and publishing interbank lending rates that were determined by collusion rather than by competition, the Panel Bank Defendants interfered with the competitive process in the markets for short-term wholesale funding, USD interest-rate benchmarks, USD OTC interest-rate derivatives, floating-rate retail loans, and floating-rate MBS.

236.    Defendants have admitted that the Panel Banks, in part, through the FX & MM Committee and the BBA, were acting in concert.  ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

237.    Absent collusion, banks compete for cash based on the interest rates that they pay.[337]  As noted above, the interest rate that a borrower is willing to pay, and a lender is willing

---

[332] U.K. House of Commons Treasury Comm., Fixing LIBOR: Some Preliminary Findings, Written Evidence, *supra* note 23, at 159.

[333] Gavin Finch & Ben Livesey, *ICAP's Libor Alternative Lacks 'Concrete Timetable,'* Bloomberg (May 14, 2008), http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home&sid=asgvKFvA0iio (on file with FDIC-R).

[334] ICAP, Annual Report 2008, *supra* note 265.

██ ████████████████████████████████████

██ ██████████████

[337] *See e.g.*, Citigroup, Citi Annual Report 2009, at 262 (2009), *available at* http://www.citigroup.com/citi/fin/data/ ar09c_en.pdf (Citigroup "actively competes for access to capital at competitive rates to fund its operations, including competition for deposits and funding in the short- and long-term debt markets.").

to accept, is determined in large part by the borrower's credit standing and liquidity.  In a competitive environment, less creditworthy banks are incentivized to become more efficient and shed risk to compete more effectively.[338]  For example, in 2007 and 2008, absent collusion, Barclays would be expected to have responded to concerns about its credit risk and liquidity by improving its balance sheet and limiting exposure to illiquid assets (*i.e.*, competing "on the merits"), and not by entering into a secret agreement with other Panel Bank Defendants to hide their respective abilities to obtain funds, and the interest rates they had to pay to obtain those funds.

238.    In addition, the Panel Bank Defendants' and the BBA's fraudulent and collusive conduct artificially biased the competitive process for interest-rate derivatives and floating-rate MBS in favor of the Panel Bank Defendants.  As shown above, prices for USD OTC interest-rate derivatives and floating-rate MBS were set based on the expectation that the Panel Bank Defendants and the BBA would determine USD bbaLIBOR™ according to the published rules and governance mechanisms.  By secretly agreeing to suppress USD bbaLIBOR™, the Panel Bank Defendants obtained a competitive advantage over their counterparties that artificially inflated the margins that the Panel Bank Defendants would earn in transactions for USD pay-fixed interest-rate swaps and floating-rate MBS.

239.    Prior to the contract settlement date, the price of a three-month Eurodollar futures contract is an indication of the market's prediction of the three-month USD bbaLIBOR™.  As shown in Figure 5 below, from at least 1992, USD bbaLIBOR™ was consistently a few basis points above the Eurodollar Bid Rate published by the Federal Reserve Board of the U.S. Federal

---

[338] Xavier Freixas et al., Fed. Reserve Bank of N.Y. Staff Reports, Bank Liquidity, Interbank Markets, and Monetary Policy (May 2009) (revised Sep. 2009), *available at* http://www.newyorkfed.org/research/staff_reports/sr371.pdf.

Reserve System from 2002-2006.[339]  Eurodollars are time deposits in USD held in commercial banks outside the United States, primarily in London.  Eurodollar futures contracts, based on a notional $1 million three-month deposit, are traded on the CME.[340]  Prior to the contract settlement date, the price of a three-month Eurodollar futures contract is an indication of the market's prediction of the three-month USD bbaLIBOR™ on its settlement date.[341]

240.     In other words, before the Panel Bank Defendants' and the BBA's fraud and collusion, a Eurodollar futures contract provided an estimate of USD bbaLIBOR™ in the future for the given maturity.  The Eurodollar Bid Rate represents the interest rate at which a bank would lend money to another bank, while bbaLIBOR™ is intended to represent the rate at which a Panel Bank would ask to pay.[342]  As a result, one would expect to see a small bid (Eurodollar)/ask (bbaLIBOR™) spread as reflected in the relationship that existed from 1992 through 2006.[343]  One academic study has found that from 1992 through 2007, the Eurodollar Bid Rate reportedly was a better predictor than bbaLIBOR™ rates of the following day's bbaLIBOR™.[344]

241.     The relationship between the Eurodollar Bid Rate and USD bbaLIBOR™ fundamentally changed in the summer of 2007, with USD bbaLIBOR™ rates falling below the Eurodollar Bid Rate, sometimes dramatically, through late 2011.  For example, from June 2009

---

[339] *Ask Dr. Econ*, Fed. Reserve Bank of S.F. (July 2006), http://www.frbsf.org/education/activities/drecon/2006/0607.html.

[340] Barclays SOF, *supra* note 162, ¶ 9.

[341] *Id.*

[342] Connan Snider & Thomas Youle, *Does the LIBOR Reflect Banks' Borrowing Costs?*, at 3, 11 (July 21, 2010), *available at* https://www.dartmouth.edu/~tyoule/documents/Snider506.pdf.

[343] *Id.* at 11.

[344] *Id.* at 11.

through May 2010, the spread between USD bbaLIBOR™ and the Eurodollar Rate gradually

shrank (as shown in Figure 5 *infra*) from more than 50 basis points to only a few basis points.

242.    This data confirms that the Panel Bank Defendants' behavior changed in 2007

with regard to USD bbaLIBOR™ submissions at the same time that UBS, Barclays, RBS,

Citibank, and other Panel Bank Defendants secretly adopted policies to suppress USD

bbaLIBOR™ and submitted rates within a narrow range.  Defendants artificially suppressed

USD bbaLIBOR™ from at least August 8, 2007 through at least mid-2011.  This date range is

further supported by, *inter alia*, ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████  admissions by Barclays that it artificially suppressed its USD

bbaLIBOR™ submissions from "approximately August 2007 through ***at least*** January 2009,"[346]

and statements by the CFTC that UBS artificially suppressed its USD bbaLIBOR™ submissions

from August 2007 through "***at least***" the first half of 2009.[347]

---

[346] Barclays SOF, *supra* note 162, ¶ 36 (emphasis added).

[347] UBS CFTC Order, *supra* note 235, at 41-52 (emphasis added).

**Figure 5:  Difference between 3M USD bbaLIBOR™ and 3M Eurodollar Bid Rate**



243.     On a Defendant-by-Defendant basis, the average USD bbaLIBOR™/Eurodollar

Bid Rate spread during that time ranged from 25 basis points (BTMU, Barclays, Norinchukin) to

35 basis points (JPMorgan, WestLB).[348]  Notably, there appears to be no meaningful distinction

between the Panel Bank Defendants that have admitted submitting artificially suppressed USD

bbaLIBOR™s and those that have not yet done so.  Barclays's submissions were at the high end

of the range at an average 25 basis points spread; UBS and HBOS were in the middle with an

average 29 basis points spread.

244.     Similarly, focusing only on the last two weeks of September 2008, the average

USD bbaLIBOR™/Eurodollar Bid Rate spread generally ranged from 110 basis points (HBOS)

---

[348] The remaining Panel Bank Defendants are as follows:  Bank of America (30 bp), Citibank (32 bp), Credit Suisse
(27 bp), Deutsche Bank (31 bp), HBOS (29 bp), HSBC (32 bp), Lloyds (30 bp), Rabobank (32 bp), RBC (26 bp),
RBS (26 bp), and UBS (29 bp).

to 153 basis points (JPMorgan).[349]  The outlier was Barclays (87 bp), which has admitted that it

regularly submitted artificially low bbaLIBOR™ rates.  Similarly, the next highest submissions

were provided by HBOS, which has also admitted to suppressing bbaLIBOR™ through HBOS

Treasury and Bank of Scotland.[350]  The fact that these two Panel Bank Defendants were at the

high end of bbaLIBOR™ submissions supports the inference that the other Panel Bank

Defendants were all submitting artificially suppressed rates at the time.

245.    The individual participants in the fraudulent and collusive conduct described in

this Complaint would not have engaged in the conduct, which carries the potential for criminal

penalties, without a reasonable belief that the conduct actually influenced the USD bbaLIBOR™

fixings.

246.    By collusively suppressing USD bbaLIBOR™, Defendants distorted prices in the

markets for financial products that incorporated interest-rate benchmarks (*e.g.*, pay-fixed swaps

and MBS), and diminished the quality of financial products that incorporated interest-rate

benchmarks.  The unlawful agreements also limited the choice of interest-rate benchmarks

available to non-conspirators that negotiated for OTC interest-rate derivatives, floating-rate retail

loans, and floating-rate MBS purchasers.  As the European Commission ("EC") wrote: "In order

for users of benchmarks to make appropriate choices of, and understand the risks of,

benchmarks, they need to know what the benchmark measures and their vulnerabilities."[351]

247.    The Panel Bank Defendants falsely purported to fully compete in all of these

financial product markets.  Further, to the extent that the Panel Bank Defendants used false and

---

[349] The remaining Panel Bank Defendants are as follows:  BTMU (120 bp), Bank of America (144 bp), Citibank (142 bp), Credit Suisse (122 bp), Deutsche Bank (129 bp), HSBC (141 bp), Lloyds (146), Norinchukin (126 bp), Rabobank (143 bp), RBC and RBS (140 bp), UBS (141 bp), and WestLB (138 bp).

[350] Lloyds CFTC Order, *supra* note 60, at 2, 14.

[351] EC Proposal, *supra* note 90, at 16.

dishonest USD bbaLIBOR™ submissions to inflate their apparent creditworthiness and their respective reputations, they artificially increased their ability to charge higher underwriting fees and obtain higher offering prices for financial products to the detriment of the Closed Banks and other consumers.

248.    The Closed Banks engaged in financial transactions with Panel Bank Defendants and others involving products that incorporated USD bbaLIBOR™.  The Closed Banks reasonably relied on the honesty of the affected benchmark rates in undertaking these transactions and holding bbaLIBOR™-based financial products.  As a direct and proximate result of Defendants' wrongful conduct as described in this Complaint, the Closed Banks have been injured in their business and property and the FDIC-R has suffered damages in an amount presently undetermined.

G.    **Conduct Benefitted Individual Trader Positions**

249.    The conspiracy to suppress USD bbaLIBOR™ superseded the prior and ongoing efforts of individual traders to manipulate bbaLIBOR™ to benefit their trading positions.[352]  For example, UBS management on several occasions received requests made by individual traders to deviate slightly from the systematic suppression to manipulate a particular submission for JPY bbaLIBOR™ on a given day.[353]  On information and belief, those requests were rejected and/or did not prevent USD bbaLIBOR™ suppression.  Each time that a Panel Bank submitted an artificially suppressed USD bbaLIBOR™ submission for "trader-based" profit, that act injured any party that held a USD bbaLIBOR™-based instrument in addition to the harm caused by persistent suppression.

---

[352] UBS SOF, *supra* note 76, ¶¶ 132-133.

[353] *Id.*

250.     Public disclosures reveal that certain derivatives traders employed by the Panel Bank Defendants routinely asked their bbaLIBOR™ submitters to provide false and dishonest bbaLIBOR™ submissions to the BBA.[354]  The bbaLIBOR™ submitters for these Panel Bank Defendants agreed to accommodate, and did accommodate, the traders' requests for favorable bbaLIBOR™ submissions on hundreds, and perhaps thousands, of occasions.[355]

## DISCLOSURE OF THE FRAUDULENT AND COLLUSIVE CONDUCT

251.     On March 15, 2011, UBS disclosed in a note to its Annual Report that it had received subpoenas from the CFTC and the DOJ in connection with investigations into bbaLIBOR™.  This note marked the first public acknowledgment by any Defendant of the confidential CFTC investigation, which had begun in late 2008.[356]  The Annual Report stated that the investigations focused on whether there were improper attempts by UBS, either acting on its own behalf or together with others, to manipulate bbaLIBOR™ rates.  Over the next months, the Panel Bank Defendants, regulators, and media reports gradually revealed the scope of the investigation until Barclays admitted its participation in bbaLIBOR™ manipulation in June 2012.

### A.     Barclays Admissions

252.     On June 26, 2012, Barclays entered into a non-prosecution agreement with the Criminal Fraud Division of the DOJ relating to, among other things, USD bbaLIBOR™.  As part of that agreement, Barclays agreed to a Statement of Facts that explains the basis of the non-prosecution agreement.  Barclays further received conditional leniency from the DOJ's

[354] Barclays SOF, *supra* note 162, ¶ 11; RBS SOF, *supra* note 71, ¶ 14; UBS SOF, *supra* note 76, ¶ 19.

[355] Barclays SOF, *supra* note 162, ¶ 11; RBS SOF, *supra* note 71, ¶¶ 14-15, 19; UBS SOF, *supra* note 76, ¶ 20.

[356] FSA Internal Audit, *supra* note 258, ¶ 1.1.

Antitrust Division for potential Sherman Act violations involving financial instruments that reference Euribor. Barclays also entered into a settlement with the CFTC to resolve charges related to bbaLIBOR™ that it violated Sections 6(c), 6(d), and 9(a)(2) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 9, 13b, and 13(a)(2).[357]

253.    According to these filings, Barclays through its agents, officers, and employees repeatedly made false, misleading, or knowingly inaccurate submissions concerning USD bbaLIBOR™ and other currencies. More specifically, Barclays admitted that it engaged in a deceptive course of conduct in an effort to gain an advantage over its counterparties and that Barclays's USD bbaLIBOR™ submissions were false or misleading.[358] Barclays admitted that it lacked specific internal controls and procedures concerning its submission processes for bbaLIBOR™ and that its inadequate supervision allowed the fraudulent and collusive conduct to occur. Barclays further admitted that it knew that the fraudulent and collusive suppression of affected interest-rate derivatives tied to bbaLIBOR™ benefited Barclays at the expense of its counterparties.[359]

254.    The BBA, which had known of the investigation since late 2008, publicly claimed to be "shocked" by Barclays's disclosures.[360] Just a few months earlier, the BBA deleted links on its website that detailed its involvement with setting bbaLIBOR™, including a statement that

---

[357] Barclays CFTC Order, *supra* note 162.

[358] Barclays SOF, *supra* note 162, ¶ 33.

[359] *Id.* ¶¶ 30-32.

[360] Rachel Cooper, *Barclays Libor Scandal:  As It Happened—June 28, 2012*, The Telegraph, June 28, 2012, http://www.telegraph.co.uk/finance/newsbysector/banksandfinance/9361646/Barclays-Libor-scandal-as-it-happened-June-28-2012.html.

it "calculates and produces bbaLIBOR™ at the request of our members for the good of the market."[361]

255.    The day after Barclays's June 2012 disclosure, its stock price dropped dramatically, reflecting a loss of more than $5 billion in market capitalization.[362]  This sudden drop in stock price was further evidence that market participants, including the Closed Banks, were unaware that Barclays had been propping up its creditworthiness through bbaLIBOR™ manipulation.

## B.    UBS Admissions

256.    On December 18, 2012, UBS entered into a non-prosecution agreement with the Criminal Fraud Division of DOJ related to bbaLIBOR™.  UBS also obtained conditional leniency for potential Sherman Act violations involving financial instruments that reference JPY bbaLIBOR™ and Euroyen TIBOR.

257.    On December 19, 2012, the Swiss Financial Market Supervisory Authority ("FINMA") issued a Summary Report regarding its investigation of UBS.[363]  The Final Notice summarizes UBS's misconduct and notes that UBS's "[s]ubstantial failings in the system and control processes for LIBOR submissions prevented those responsible at UBS from detecting and acting" on the misconduct.[364]

---

[361] Liam Vaughan & Jesse Westbrook, *Libor Links Deleted as U.K. Bank Group Backs away from Rate*, Bloomberg Businessweek (Mar. 7, 2012), http://www.businessweek.com/news/2012-03-06/libor-links-deleted-as-bank-group-backs-away-from-tarnished-rate#p2 (on file with FDIC-R).

[362] Cooper, *supra* note 360.

[363] FINMA, FINMA Investigation into the Submission of Interest Rates for the Calculation of Interest Reference Rates such as LIBOR by UBS AG, at 2 (Dec. 19, 2012), attached as Exhibit 22 and incorporated into this Complaint by reference.

[364] *Id.*

258.    In December 2012, UBS Securities Japan Co. Ltd. ("UBSSJ") agreed to plead guilty to one count of wire fraud (18 U.S.C. § 1343) for secretly manipulating JPY bbaLIBOR™ and TIBOR.[365] UBSSJ admitted in its plea that false and misleading bbaLIBOR™ submissions were "material" from the perspective of counterparties to financial transactions.[366]

259.    In December 2012, the DOJ charged two former UBS traders—Tom Hayes and Roger Darin (collectively, the "UBS traders")—with wire fraud and conspiracy to commit wire fraud for secretly manipulating bbaLIBOR™ and other benchmark rates.[367] In addition, the DOJ charged the UBS traders with a violation of Section 1 of the Sherman Act for conspiring with an unidentified employee at a major financial institution and others to fix JPY bbaLIBOR™, a key price component of JPY bbaLIBOR™-based derivative products.[368]

260.    On December 19, 2012, UBS and UBSSJ entered into a settlement with the CFTC to resolve allegations that UBS violated Sections 6(c), 6(d), and 9(a)(2) of the CFTC, 7 U.S.C. §§ 9, 13b, and 13(a)(2) related to bbaLIBOR™.[369] According to the CFTC's findings, from at least January 2005 through 2011, UBS by and through acts of dozens of employees, officers, and agents located around the world, engaged in systematic misconduct that undermined the integrity of certain global benchmarks, including USD bbaLIBOR™. The CFTC also found that UBS's false submissions contained market information that affected or tended to affect USD bbaLIBOR™, and USD bbaLIBOR™ was a commodity in interstate commerce.[370] Further,

---

[365] UBS SOF, *supra* note 76, App. B.

[366] *Id.* at App. B, Ex. 3 ¶¶ 9-10, Ex. 4 ¶ 75.

[367] Compl. at 1-2, *United States v. Alexander*, No. 12 MAG 3229 (S.D.N.Y. Dec. 12, 2012), attached as Exhibit 23 and incorporated into this Complaint by reference.

[368] *Id.* at 3.

[369] UBS CFTC Order, *supra* note 235.

[370] *Id.* at 4, 41, 52-53.

UBS continued its "rampant misconduct," including collusive conduct, long after it was on notice (in October 2008) of an investigation into its USD bbaLIBOR™ practices.[371]

### C.   RBS Admissions

261.     On February 5, 2013, RBS executed a Deferred Prosecution Agreement with the Criminal Fraud Section of the DOJ.  Under the terms of that agreement, RBS admitted various facts relating to its involvement in fraudulent and collusive practices relating to bbaLIBOR™ submissions.  The United States filed a two-count criminal information charging RBS with wire fraud and price fixing in connection with RBS's conduct and agreed to defer prosecution of that case pursuant to its agreement with RBS.[372]  In addition, RBS Securities Japan Ltd. pleaded guilty to one count of wire fraud for its participation in fraudulent and collusive practices relating primarily to JPY bbaLIBOR™.[373]

262.     The agreements reached between (a) the United States and Barclays, (b) the United States and UBS, and (c) the United States and RBS all refer to an ongoing investigation into misconduct related to additional, unidentified benchmark rates.  The United States has declined to reveal those benchmark rates.  On information and belief, USD bbaLIBOR™ is among the interest rates under investigation by the United States.

### D.   Rabobank Admissions

263.     On October 29, 2013, Rabobank settled bbaLIBOR™ investigations by the DOJ, CFTC, FCA, and Dutch authorities.  Specifically, the CFTC fined Rabobank $475 million for Rabobank's manipulation USD, GBP, and JPY bbaLIBOR™ and EURIBOR in violation the

---

[371] *Id.* at 5.

[372] RBS SOF, *supra* note 71, Deferred Prosecution Agreement, ¶¶ 1-2.

[373] *Id.* ¶ 3.

CEA.[374]  The Criminal Fraud Section of the DOJ entered into a Deferred Prosecution Agreement with Rabobank, pursuant to which Rabobank resolved charges of wire fraud based on the manipulation of bbaLIBOR™ and EURIBOR and agreed to pay a $235 million fine.  As part of this Agreement, Rabobank admitted that more than two dozen of its traders, including its Global Head of Liquidity and Finance, participated in ongoing and pervasive manipulation of USD and JPY bbaLIBOR™ to favor its day-to-day trading positions.[375]

264.    According to these settlements, Rabobank, through its agents, officers, and employees, repeatedly made false, misleading, or knowingly inaccurate submissions concerning USD bbaLIBOR™ and other currencies.  For example, Rabobank admitted that by falsely representing that its bbaLIBOR™ submissions were based on its perceived costs of borrowing unsecured funds in the relevant interbank market, it engaged in a deceptive course of conduct in an effort to gain an advantage over its counterparties and that Rabobank's bbaLIBOR™ submissions were false or misleading.[376]

**E.    Lloyds Admissions**

265.    On July 28, 2014, the FCA fined Lloyds (Lloyds Bank plc and Bank of Scotland) for colluding to manipulate USD, GBP, and JPY bbaLIBOR™, as well as the GBP Repo Rate.[377] Among other things, the FCA found that traders at Lloyds had communicated with other Panel

---

[374] *In re Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A.*, No. 14-02 (C.F.T.C. Oct. 29, 2013), attached as Exhibit 24 and incorporated into this Complaint by reference.

[375] *United States v. Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A.,* Deferred Prosecution Agreement, (Oct. 29, 2013), *available at* http://www.justice.gov/iso/opa/resources/976201310298727797926.pdf; Rabobank SOF, *supra* note 206, ¶ 40.

[376] *Id.* ¶ 97.

[377] A "repo" is a repurchase agreement, in which one party sells securities together with an agreement to buy the securities back at a specific later date.  The difference between the sale and repurchase prices effectively represents the interest charged by the original purchaser. *See* Lloyds Final Notice, *supra* note 180, ¶ 3.2 (Definitions).

Bank Defendants to manipulate GBP and USD bbaLIBOR™ for profit on derivative transactions.

266.     From August 2007 through February 6, 2009, employees on the money-markets desks of Bank of Scotland and Lloyds Bank plc (as LTSB) were responsible for (1) contributing USD bbaLIBOR™ submissions and (2) entering into borrowing and lending transactions on behalf of Bank of Scotland and Lloyds Bank plc (as LTSB) at rates tied to USD bbaLIBOR™. During that time, the USD bbaLIBOR™ submitters for both Bank of Scotland and Lloyds Bank plc (as LTSB) contributed USD bbaLIBOR™s that benefited their respective companies' derivatives positions instead of rates that complied with the definition of bbaLIBOR™. Employees of Bank of Scotland and Lloyds Bank plc (as LTSB) initiated USD bbaLIBOR™ derivatives transactions with banks and other financial institutions in the United States.  By entering into these derivative transactions, Bank of Scotland and Lloyds Bank plc (as LTSB) sought to, and did, profit at the expense of their counterparties in the United States.  According to the FCA, there was a "culture of seeking to take a financial advantage [of GBP and USD bbaLIBOR™] wherever possible" at both Bank of Scotland and Lloyds Bank plc (as LTSB).[378]

267.     In addition, the FCA found that in September and October 2008, a Bank of Scotland manager instructed Bank of Scotland traders to suppress GBP and USD bbaLIBOR™ submissions to stay in line with other Panel Bank Defendants, rather than comply with the published methodology for bbaLIBOR™.[379]  Lloyds did not discover the unlawful conduct until after they had been asked to investigate potential issues in 2010.[380]  In March 2011, Lloyds

---

[378] Lloyds Final Notice, *supra* note 180, ¶ 2.14.

[379] *Id.* ¶¶ 4.48-.59.

[380] *Id.* ¶ 4.70.

attested to the FCA that its systems and controls for its bbaLIBOR™ submissions were adequate.[381]   The FCA later found this attestation to be false.[382]

268.    Also on July 28, 2014, Lloyds consented to entry of an Order Making Findings and Imposing Remedial Sanctions with the CFTC and agreed to pay a $105 million fine.[383]   The CFTC found that Lloyds had misrepresented that it was following the published bbaLIBOR™ methodology from at least 2006 through 2010.   The CFTC findings quote an HBOS (Bank of Scotland) USD bbaLIBOR™ submitter as saying the following during an electronic chat with "an employee of another financial institution":   "youll [sic] like this ive [sic] been pressured by senior management to bring my rates down into line with everyone else."[384]   At the time, HBOS was suffering severe funding and liquidity issues.

269.    The CFTC also quoted an HBOS manager as complaining that GBP bbaLIBOR™ rates "could potentially create an issue with buyers of our paper."[385]   The CFTC found that HBOS was concerned that lenders might be unwilling to transact business or deal with HBOS or might have demanded higher interest rates had HBOS (through Bank of Scotland) submitted bbaLIBOR™s that complied with the bbaLIBOR™ methodology.[386]   In addition, the CFTC found that an HBOS bbaLIBOR™ supervisor had instructed employees that they normally

---

[381] *Id.* ¶ 5.15.

[382] *Id.*

[383] Lloyds CFTC Order, *supra* note 60, at 23.   Lloyds Banking Group plc and Lloyds Bank plc agreed to a consent order with the CFTC regarding certain acts of manipulation, attempted manipulation, and false reporting in connection with bbaLIBOR™ "by and through Lloyds TSB and HBOS ['through its subsidiaries, HBOS Treasury Services plc until September 2007 and, thereafter, Bank of Scotland plc']." *Id.* at 2 & n.2.

[384] *Id.* at 15.

[385] *Id.*

[386] *Id.*

should not make bids for cash in the market above the relevant bbaLIBOR™ rate.[387]  The CFTC found that at least through the end of 2008, HBOS (through HBOS Treasury and Bank of Scotland) had made USD bbaLIBOR™ submissions that did not reflect the bbaLIBOR™ methodology and therefore conveyed false, misleading, or knowingly inaccurate reports concerning USD bbaLIBOR™.[388]

270.    The CFTC further found that Lloyds violated Section 9(a)(2) of the CEA by giving false market information that affected, or tended to affect, the price of commodities sold in interstate commerce.  The CFTC found that this false information included information concerning the costs of borrowing funds in USD, the liquidity and stress conditions in the money markets, and Lloyds's ability to borrow funds in the particular markets.

271.    In the Consent Order, Lloyds agreed to abide by a set of principles to ensure the integrity and reliability of submissions in the market for benchmark interest rates.[389]

272.    The same day, Lloyds entered into an agreement with DOJ to pay an $86 million penalty for manipulating bbaLIBOR™ submissions.[390]  Lloyds Banking Group plc admitted through its Deferred Prosecution Agreement with the DOJ that when USD bbaLIBOR™ submitters contributed rates that took trading positions into account, the bank was engaged in a deceptive course of conduct.[391]  Those USD bbaLIBOR™ submissions were misleading because they were published to investors and counterparties in the United States and elsewhere and

---

[387] *Id.* at 16.

[388] *Id.*

[389] *Id.* at 25.

[390] Press Release, U.S. Dep't Justice, Lloyds Banking Group Admits Wrongdoing in LIBOR Investigation, Agrees to Pay $86 Million Criminal Penalty (July 28, 2014), http://www.justice.gov/opa/pr/lloyds-banking-group-admits-wrongdoing-libor-investigation-agrees-pay-86-million-criminal.

[391] Lloyds SOF, *supra* note 206, ¶ 45.

because they artificially suppressed USD bbaLIBOR™, which was incorporated into derivatives that Lloyds Banking Group plc traded for profit.  Lloyds Banking Group plc further admitted that counterparties to derivatives trades were negatively impacted by the manipulation of USD bbaLIBOR™ by Lloyds employees.[392]

273.    "Lloyds's conduct undermined financial markets domestically and abroad," said Deputy Assistant Attorney General Brent Snyder of the DOJ's Antitrust Division.[393]  As one example, the DOJ quoted an exchange on May 19, 2009 between a money markets trader, who was a former USD bbaLIBOR™ submitter at a subsidiary of Lloyds, who wrote, "have 5 yard [billion] 3 month liability rolls today so would be advantageous to have lower 3month libor setting if doesn't conflict with any of your fix's," and the then-current USD bbaLIBOR™ submitter, who responded later that day, "obviously we got the Libors down for you."[394]

F.    Deutsche Bank Admissions

274.    On April 23, 2015, enforcement agencies from the United States, New York, and the United Kingdom publicly disclosed plea and deferred prosecution agreements, statements of facts, and a stipulated consent order, in which Deutsche Bank and various of its affiliates admitted to manipulating, or were found to have manipulated, USD bbaLIBOR™ and other interest-rate benchmarks.  Pursuant to these agreements, Deutsche Bank was required to pay the equivalent of approximately $2.5 billion.

---

[392] *E.g.*, *id.* ¶¶ 41-42.

[393] *Id.*

[394] *Id.*

275.     Deutsche Bank admitted that the purpose of its misconduct was to influence the ultimate rate published by and through the BBA,[395] and that bbaLIBOR™ manipulation affected USD bbaLIBOR™ and harmed contract counterparties in the United States.[396]

276.     The misconduct was "systemic and pervasive" according to the CFTC.[397] Deutsche Bank reaped "tremendous profits" from its GFFX unit's trading strategy.[398]  Deutsche Bank's primary USD bbaLIBOR™ submitter understood and was aware of GFFX trading positions for products indexed to USD bbaLIBOR™ and routinely submitted USD bbaLIBOR™s for the benefit of those trading positions.

277.     Germany's Federal Financial Supervisory Authority ("BaFin") found that Deutsche Bank cultivated a "business culture" that favored "problematic" communications, "especially . . . with regard to the LIBOR."[399]  Deutsche Bank's internal reporting lines were "incomplete and contradictory and the everyday practice deviated from the prescribed structure."[400]  BaFin (1) expressed "major doubts" about the truthfulness of individuals involved in USD bbaLIBOR™ manipulation at Deutsche Bank, (2) found that Deutsche Bank enjoyed "substantially higher earnings" between August 2007 and spring 2010 compared to earlier time periods, (3) concluded that Deutsche Bank failed to properly retain important business records

---

[395] DB SOF, *supra* note 43, ¶¶ 106-08.

[396] *Id.* ¶¶ 109-12.

[397] DB CFTC Order, *supra* note 44, at 2.

[398] *Id.* at 9.

[399] Letter from Frauke Menke, Dep't President Fed. Fin. Supervisory Auth. (BaFin), to Deutsche Bank AG Management Board (Mar. 31, 2015) (convenience translation), attached as Exhibit 25 and incorporated into this Complaint by reference.

[400] *Id.*

and deleted potentially relevant audio files, and (4) found that Deutsche Bank executives knowingly gave false information to regulators.[401]

278.    Enforcement agencies also found that in an effort to conceal its conduct, Deutsche Bank (1) manipulated bbaLIBOR™ in all tenors "so that the manipulation was not conspicuous,"[402] (2) destroyed 482 tapes containing "thousands of hours of potentially responsive audio recordings" sought by authorities,[403] and (3) was "unacceptably slow and ineffective" in its response to inquiries of enforcement agencies, "prolong[ing] the process of formal investigation significantly."[404]

279.    One of the members of the GFFX unit was Michael Curtler, a senior trader and USD bbaLIBOR™ submitter.  In October 2015, Mr. Curtler agreed to plead guilty to criminal wire fraud and conspiracy charges for manipulating USD bbaLIBOR™ in New York and elsewhere for the benefit of Deutsche Bank.[405]  Mr. Curtler was one of Deutsche Bank's USD bbaLIBOR™ submitters who knowingly and intentionally submitted artificially low USD bbaLIBOR™s. ████████████████████████████████████████████

████████████

### G.    Citibank Admissions

280.    On May 25, 2016, the CFTC issued an order filing and settling charges against Citibank and certain of its affiliates, collectively referred to as "Citi," relating to abuses of bbaLIBOR™.  Among other things, Citibank was charged with "the false reporting of U.S.

---

[401] *Id.*

[402] DB SOF, *supra* note 43, ¶¶ 22-23.

[403] *Id.* ¶ 4.b.

[404] Final Notice from the Fin. Conduct Auth. to Deutsche Bank AG ¶¶ 2.3, 2.16, 4.118-121, 5.27-5.30 (Apr. 23, 2015) (hereinafter "DB Final Notice"), attached as Exhibit 26 and incorporated into this Complaint by reference.

[405] Allocution Hr'g Tr. 3:20-4:18, *United States v. Curtler*, 15-cr-670 (VSB) (S.D.N.Y.), ECF No. 6.

Dollar LIBOR at times to avoid generating negative media attention and to protect its reputation during the financial crisis from the spring of 2008 through the summer of 2009." The CFTC found that at times, Citibank's submitters made USD bbaLIBOR™ submissions "based in whole or in part on a desire to avoid that negative scrutiny, rather than based on the fact that Citi, at times would have had to pay above LIBOR in the London interbank market, particularly in the longer tenors, when securing funding for the bank." Citibank was ordered to pay a penalty of $175 million.

### H.   Société Générale Findings

281.   In June 2018, the CFTC issued an order filing and settling charges against Société Générale and the DOJ disclosed a Plea Agreement with Société Générale.[406]  Among other things, Société Générale was charged with systematically suppressing its USD bbaLIBOR™ submissions.  Internal documents disclosed in the CFTC Order show that in 2010, bbaLIBOR™ was "extremely manipulated," "a total charade," and that all Panel Bank Defendants manipulated their submissions.  On at least three occasions, Société Générale's Chief Financial Officer falsely assured three unidentified people that Société Générale's submissions were accurate.  Société Générale sought to position itself as the sixth highest contributor, which necessarily involved advance coordination with other Panel Bank Defendants.  Internal Société Générale documents stated that concerns about reputation emanated from the United States, *e.g.*, "everybody is checking on the U.S. market" and "the American investors are really sensitive" to individual USD bbaLIBOR™ contributions.  Société Générale's Head of Treasury for the Americas, whose identity was not disclosed, was aware of and, on information and belief, participated in the

---

[406] *In the Matter of Société Générale, S.A.,* No. 18-14, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (C.F.T.C. June 4, 2018); Plea Agreement, *United States of America v. Société Générale Acceptance, N.V,* 18-cr-274 (DLI) (June 5, 2018). The allegations in this paragraph are taken from these materials.

directions to suppress USD bbaLIBOR™.  In 2011, Société Générale sought to conceal the manipulation by lying to, or "play[ing] dumb" with, regulators investigating LIBOR manipulation, providing false attestations as to the adequacy of its systems and controls, and sending knowingly false bids for funding into the financial markets.  Société Générale provided its executives with an "indemnification" in anticipation of questions from "the 'Americans'" investigating bbaLIBOR™ manipulation.  Société Générale executives joked about going to jail for "specious LIBOR submissions."  In March 2010, Société Générale conducted an internal audit that the CFTC termed "anemic" for its failure to identify "glaring improprieties with the LIBOR submission process and the rampant inconsistencies between the bank's LIBOR submissions and its costs of funding."  The CFTC recites that Société Générale is liable for the conduct of employees of its subsidiaries.

### THE ALLEGED FRAUD AND COLLUSION COULD NOT REASONABLY HAVE BEEN DISCOVERED BEFORE BARCLAYS'S ADMISSIONS OF INTENTIONAL MISREPRESENTATIONS OF MATERIAL FACT

282.    The Closed Banks could not have discovered the fraud and collusion described in this Complaint until June 2012, at the earliest, when Barclays admitted that it knowingly and intentionally submitted false and dishonest bbaLIBOR™ submissions to the BBA.  Prior to that time, the only information available was that other enforcement agencies had initiated an investigation into bbaLIBOR™, and that bbaLIBOR™ "dislocations" were unusual and deviated from patterns predating the financial crisis.

283.    A reasonably diligent investigation would not have disclosed sufficient *facts* to state a viable fraud claim until, at the earliest, the Barclays admissions.  A reasonable investigation, prior to Barclays's admissions in June 2012, could have disclosed, at most, the following:

- **March 2008**:  A report published by the Bank for International Settlements ("BIS"),[407] titled, "Interbank Rate Fixings During the Recent Turmoil," evaluated the divergence between USD bbaLIBOR™ and the Eurodollar Bid Rate.[408]  Based on information available at that time, BIS found the "main causes of the divergence" were "[a] deterioration in market liquidity, an increase in interest rate volatility and differences in the composition of contributor panels[.]"[409]  The BIS report further undertook a statistical study and concluded that alternative methods of estimating bbaLIBOR™ gave "***no indication that fixings were manipulated***."[410]  The BIS report noted that there were differences between USD bbaLIBOR™ and the Eurodollar Bid Rate that might reasonably explain the divergence due to unprecedented conditions in the financial markets (*e.g.*, the source and methodology).

- **May 16, 2008:**  A Reuters news article in which the Austrian Minister of Finance was quoted as saying, "[t]here's more wind being made about this issue than is being merited by the facts."[411]

- **May 20, 2008:** A study by the NY Fed, part of the same Reserve Bank System that published the Eurodollar Bid Rate, concluded that "it is difficult to find convincing evidence of actual misreporting" beyond anecdotal evidence.[412]  The study noted that there were no sources of data to compare USD bbaLIBOR™ submissions to a Panel Bank's actual interbank borrowing rates and that the Eurodollar Bid Rate is set based on a methodology that could respond differently to market stresses.[413]

- **May 29, 2008**: Analysts at Deutsche Bank Securities and J.P. Morgan Securities issued reports explaining in detail why they believed that questions about USD bbaLIBOR™ were unconvincing.  For example, they concluded that comparisons between USD bbaLIBOR™ and CDS prices were akin to comparing apples and oranges.  The investment firm BlackRock wrote: "The relationship between one year borrowing rates indicated by panel members in

---

[407] BIS is the world's oldest international financial organization. Its members include central banks representing countries from around the world that together make up about 95% of world GDP.  It is an independent organization that routinely publishes analyses of monetary and financial stability issues.

[408] Jacob Gyntelberg & Philip Wooldridge, *Interbank Rate Fixings during the Recent Turmoil*, BIS Quarterly Review (Mar. 3, 2008), *available at* https://www.bis.org/publ/qtrpdf/r_qt0803g.pdf.

[409] *Id.* at 59.  That same article stated as follows:  "Benchmark status is gained through competition; it is not conferred.  Therefore, it can also be lost" in a competitive market.  *Id.* at 60.

[410] *Id.* at 70 (emphasis added).

[411] Reuters Staff, *Bankers work on Libor; ICAP Readies New Index*, Reuters, May 16, 2008, http://uk reuters.com/article/markets-rates/wrapup-1-bankers-work-on-libor-icap-readies-new-index-idUKN1643985220080516.

[412] Cheun & Raskin, *supra* note 258, at 3.

[413] *Id.* at 2-3

the LIBOR submissions and their one year [CDS] spreads is affected by several factors, any of which can account for meaningful differences between the two financial series."[414]

- **August 4, 2008**:  A group of independent U.S.-based economists published a study in the Journal of Banking and Finance titled, "LIBOR Manipulation?"[415] The study attempted to confirm the "conjecture" published in several news articles that some Panel Banks may have had intentionally manipulated their individual USD bbaLIBOR™ submissions.[416]  The study was aimed at "extend[ing] the Wall Street Journal's analysis by employing a wider array of comparative statistical techniques and more recent methodologies and to gain a greater understanding of the issues underlying such speculations."[417]  The authors of the study performed what they held out to be sophisticated statistical analyses that led them to conclude any "apparent anomalies within the individual quotes" suggest that the "evidence is *not consistent* with a material manipulation" of bbaLIBOR™.[418]  The authors found "questionable patterns" for a period of time *ending* on August 8, 2007.[419]

  The authors further found that "the *empirical evidence is not consistent with the hypotheses that the Libor was materially manipulated downward*" (a finding that was subsequently shown to be false by Defendant admissions of manipulation and documents that were known only to Defendants).[420]  The authors specifically considered, and rejected, the supposition that CDS spreads are a useful comparator to infer manipulation of USD bbaLIBOR™ submissions.  In other words, as the U.K. Treasury Committee concluded years later, statistics at the time "did not show that manipulation of LIBOR was successful."[421]

- **August 5, 2008**:  The BBA published its LIBOR Consultation Feedback Statement, which found no intentional misrepresentations in USD bbaLIBOR™ submissions.  The Feedback Statement was based on input from, and carried the imprimatur of, numerous independent sources and regulators, including the

---

[414] BlackRock Resp., *supra* note 88, at 9.

[415] Rosa M. Abrantes-Metz et al., *LIBOR Manipulation?*, 36 J. Banking & Fin. 136, 138 (2012).

[416] *Id.*

[417] *Id.* at 136-137.

[418] *Id.* at 140 (emphasis added).

[419] *Id.* at 137.

[420] *Id.* at 149 (emphasis added).

[421] U.K. House of Commons Treasury Comm., Fixing LIBOR: Some Preliminary Findings, Second Report of Session 2012-13, *supra* note 136, at 27.

European Commission, the CME, the International Monetary Fund ("IMF"), and the New York Stock Exchange.[422]

- **October 2008**: The IMF published a 30-page report investigating (1) interbank lending during the "current stress in interbank markets" and (2) whether USD bbaLIBOR™ was "distorted."[423]  The report examined the relationship between USD bbaLIBOR™ and other benchmarks, including the Eurodollar Bid Rate and CDS prices.  The report conducted empirical analyses.  The report concluded that "[a]lthough the integrity of the U.S. dollar LIBOR fixing process has been questioned by some market participants and the financial press, *it appears that USD LIBOR remains an accurate measure of a typical creditworthy bank's marginal cost of unsecured U.S. dollar term funding*."[424]

- **November 2008**:  The BBA published a document entitled, "LIBOR Governance and Scrutiny," which presented proposed enhancements to the benchmark.  The document represented that the BBA had taken steps to ensure that (1) the proposed methodology for bbaLIBOR™ governance and scrutiny complied with competition and other laws and (2) the bbaLIBOR™ setting process operated to the "highest standards."  The document also represented that all Panel Banks formally reaffirmed their commitment to adhere to the published rules.[425]

- No private lawsuits or criminal or civil actions by enforcement agencies, alleging that the Panel Banks intentionally submitted artificially low USD bbaLIBOR™ submissions, had been filed.  The first such lawsuits were not filed until mid-2011 in response to the first public disclosures of the fact of the CFTC's and DOJ's investigations into bbaLIBOR™ manipulation.

284.    As explained above, the Panel Bank Defendants and the BBA offered facially plausible, pre-textual explanations for "dislocations" and repeatedly denied the existence of any fraudulent or collusive conduct relating to USD bbaLIBOR™ submissions.  In particular, the BBA held itself out as an independent entity that exercised meaningful oversight of bbaLIBOR™ and, on several occasions, falsely represented that the BBA had confirmed that USD bbaLIBOR™ submissions were honest and accurate.  The Closed Banks and the FDIC-R

---

[422] BBA, Libor Consultation Feedback Statement, *supra* note 292.

[423] IMF Global Financial Stability Report, *supra* note 281, at 70.

[424] *Id.* at 72 (emphasis added).

[425] BBA Libor, LIBOR Governance and Scrutiny, *supra* note 140.

therefore did not know, or have reason to know, that USD bbaLIBOR™ was false, made intentionally and knowingly, with intent to mislead, and/or pursuant to an agreement among the Panel Bank Defendants and the BBA.  The claims alleged in this Complaint arise from, among other things, the same wrongful acts and concern the same evidence, memories, and witnesses as the class actions filed in this multidistrict litigation (11-MD-2262 (NRB)).

285.    The Closed Banks and the FDIC-R did not have access to information that could have revealed the fraud and collusion.  For example, the Closed Banks and the FDIC-R did not have access to, among other things, (1) the Panel Bank Defendants' internal communications regarding the fraud and collusion, (2) communications between and among the Panel Bank Defendants regarding USD bbaLIBOR™, (3) communications between the Panel Bank Defendants and enforcement agencies regarding USD bbaLIBOR™ investigations, (4) documents produced in connection with the confidential investigations for enforcement agencies, (5) meetings of the FX & MM Committee, or (6) the BBA's internal communications or communications between the BBA and the Panel Bank Defendants.

286.    Even with the benefit of hindsight, several reliable sources confirmed that during the financial crisis, a reasonable investigation would not have uncovered evidence that the Panel Bank Defendants fraudulently submitted artificially low USD bbaLIBOR™ submissions.  The U.K. Treasury Committee asked the Governor of the Bank of England why regulators had not spotted bbaLIBOR™ manipulation earlier.  The Governor testified under oath that "we had no evidence of wrongdoing."  He further testified that "there were plenty of academic articles that looked in it and said that they could not see in the data any evidence of manipulation," and that "if you go back to the inquiries that the regulators made, it took them three years to work out and

find the evidence of wrongdoing" and there was no reasonable way at the time to distinguish manipulation from a market that was "dysfunctional."

287.    There is also reason to suspect that executive-coordinated and directed persistent suppression was harder to detect than trader manipulation. While traders often communicated in crowded Bloomberg chat rooms and on trader phones, executives communicated via email and desk phones. ███████████████████████████████████

███████████████████████████████████████ ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████ ██ █████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████

288.    The FSA conducted an internal audit in 2013 regarding the extent of awareness within the FSA of inappropriate bbaLIBOR™ submissions.  It found that bbaLIBOR™ "dislocation" manifested itself in five ways, including widening spreads between bbaLIBOR™ and other rates and that the combination of deteriorating market conditions and structural issues

---



in the bbaLIBOR™ fixing process would have caused dislocation "completely independent of low-balling."[429]

289.     The admissions by Barclays, Lloyds, Rabobank, RBS, and UBS reveal some of the efforts that the Panel Bank Defendants undertook to conceal their fraudulent and collusive conduct.  For example, (1) a UBS trader scolded a manager for internally transmitting in writing a request to manipulate a bbaLIBOR™ submission,[430] (2) a Barclays trader consciously sought to move bbaLIBOR™ submissions in small increments over time to avoid detection,[431] (3) a UBS derivatives desk manager instructed a bbaLIBOR™ submitter to lie when interviewed by UBS attorneys investigating bbaLIBOR™ manipulation,[432] and (4) in 2010, long after learning of the investigation into bbaLIBOR™, RBS traders continued their conduct but sought to avoid communicating in writing because "at the moment the FED [sic] are all over us about libors."[433] In or about 2007, Rabobank set up a separate "cash book" account and told its derivative traders, including traders located in New York, to log transactions, for which Rabobank paid interest rates higher than USD bbaLIBOR™, into that book to conceal those transactions.[434]

290.     On information and belief, the other Panel Bank Defendants engaged in similar conduct to cover up their fraudulent and collusive activities involving USD bbaLIBOR™.  The evidence of such conduct is solely within the custody and control of the Panel Bank Defendants, the BBA, and/or enforcement agencies.

---

[429] Fin. Services Auth., Internal Audit Report:  A Review of the Extent of Awareness Within the FSA of Inappropriate LIBOR Submissions, Management Response, *supra* note 258, ¶¶ 25-26.

[430] UBS SOF, *supra* note 76, ¶ 38.

[431] Barclays SOF, *supra* note 162, ¶ 44.

[432] UBS SOF, *supra* note 76, ¶ 39.

[433] RBS Final Notice, *supra* note 70, ¶ 52ii.

[434] Defense Ex. 608C, *supra* note 34, at 17.

291.    The Bank of England's Governor confirmed in a June 2012 hearing before the U.K. Treasury Committee that he "had no suspicion until two weeks [prior to the hearing] that anything had been going wrong in the LIBOR market[.]"[435]  The former head of the FSA, Adair Turner, told Parliament on February 27, 2013, that there was "no information" of bbaLIBOR™ manipulation and that regulators could not have spotted the fraudulent and collusive conduct even with "intensive supervision."[436]  The Bank of England's Governor confirmed in a June 2012 hearing before the U.K. Treasury Committee that he "had no suspicion until two weeks [prior to the hearing] that anything had been going wrong in the LIBOR market[.]"[437]  The Deputy Governor of the Bank of England, Paul Tucker, testified in 2012 that he did not suspect fraud or collusion in 2008 and that "[w]e would not have dreamt of using LIBOR as part of the pricing structure for Bank of England operations had we had doubts about what is now referred to as low-balling . . . ."[438]  He further testified that "[w]e thought the underlying markets were dysfunctional, sporadically illiquid, much less reliable than normal, but we did not have suspicions of dishonesty and we thought, as I said just now, the pattern of LIBOR movements made sense."[439]  The former Deputy Governor of the Financial Stability Board testified that he had no suspicions during the conspiracy period of intentional fraud.  Similarly, the former Chairman of the Federal Reserve Board Alan Greenspan was quoted as saying the following: "Through all of my experience, what I never contemplated was that there were bankers who

---

[435] Uncorrected Tr. of Oral Evidence, U.K. House of Commons Treasury Comm., July 17, 2012.

[436] Huw Jones, *It Was Impossible To Spot Libor Rigging:  UK Watchdog*, Reuters (Feb. 27, 2013), http://www.reuters.com/article/2013/02/27/us-libor-britain-fsa-idUSBRE91Q0NX20130227.

[437] Uncorrected Tr. of Oral Evidence, U.K. House of Commons Treasury Comm., July 17, 2012.

[438] Minutes of Evidence, U.K. House of Commons Treasury Comm., July 9, 2012, *available at* https://publications.parliament.uk/pa/cm201213/cmselect/cmtreasy/481/120709 htm.

[439] *Id.*

would purposely misrepresent facts to banking authorities.  You were honor bound to report accurately, and it never entered my mind that, aside from a fringe element, it would be otherwise."[440]  The CFTC, which led the effort to expose the unlawful conduct surrounding bbaLIBOR™, required twenty months to obtain actionable evidence of manipulation.[441]

### COUNT I:  BREACH OF CONTRACT WITH AMCORE
### (MERRILL LYNCH CAPITAL SERVICES, INC.)

292.    The FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

293.    On September 3, 1996, Amcore entered into an ISDA Master Agreement with Defendant Merrill Lynch Capital Services, Inc., under which Amcore entered into pay-fixed swaps with Merrill Lynch Capital Services, Inc. ("Amcore-ML Master Agreement").[442]

294.    In the Amcore-ML Master Agreement, the parties represented that the execution, delivery, and performance of the Amcore-ML Master Agreement did not violate or conflict with any law applicable to it.[443]  The Amcore-ML Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, and complete in every material respect."[444]  The Amcore-ML Master Agreement

---

[440] Liam Vaughn & Gavin Finch, *Libor Lies Revealed in Rigging of $300 Trillion Benchmark*, Bloomberg (Jan. 28, 2013), http://www.bloomberg.com/news/2013-01-28/libor-lies-revealed-in-rigging-of-300-trillion-benchmark.html. William Dudley, the President and Chief Executive Officer of the NY Fed, stated with respect to the bbaLIBOR™ investigation:  "We have learned that false reporting and manipulative behavior was pervasive across firms and over time, took many forms and was often conducted in a nonchalant manner."  William C. Dudley, Pres. & CEO, Fed. Reserve Bank of N.Y., Remarks at the Salomon Center for the Study of Financial Institutions, New York University Stern School of Business, New York City (Oct. 2, 2014), *available at* https://www.bis.org/review/r141003a.htm.

[441] Joe Nocera, *The Little Agency That Could*, N.Y. Times, Nov. 15, 2013, http://www.nytimes.com/2013/11/16/opinion/the-little-agency-that-could.html?_r=0.

[442] The Amcore-ML Master Agreement is attached as Exhibit 27 and incorporated into this Complaint by reference.

[443] Amcore-ML Master Agreement ¶ 3(a)(iii).

[444] *Id.* ¶ 3(d).

requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Amcore-ML Master Agreement or any Credit Support Document to which it is a party.[445]

295.    The Amcore-ML Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[446]  The Amcore-ML Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Amcore-ML Master Agreement.[447]

296.    The Amcore-ML Master Agreement states that all transactions between Amcore and Merrill Lynch Capital Services, Inc. are entered into in reliance on the fact that the Amcore-ML Master Agreement and all confirmations form a single agreement between the parties.[448]  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

297.    During the relevant period, Amcore entered into pay-fixed swaps governed by the Amcore-ML Master Agreement.

298.    Merrill Lynch Capital Services, Inc. knowingly breached and defaulted on the Amcore-ML Master Agreement through its fraudulent and collusive conduct, its failure to

---

[445] *Id.* ¶ 4(c).

[446] *Id.* ¶ 5(a)(iv).

[447] *Id.* ¶ 11.

[448] *Id.* ¶ 1(c).

disclose fraudulent and collusive conduct, and its underpayments to Amcore tied to the

artificially suppressed USD bbaLIBOR™.

299.    As a result of Merrill Lynch Capital Services, Inc.'s breach of the Amcore-ML

Master Agreement, Amcore and the FDIC as Receiver for Amcore have suffered damages under

the Amcore-ML Master Agreement.

## COUNT II:  BREACH OF CONTRACTS WITH AMTRUST
### (CITIBANK, N.A. AND RBS)

300.    The FDIC-R incorporates by reference the preceding paragraphs of this

Complaint.

301.    On, September 11, 2006, Ohio Savings Bank, predecessor-in-interest to AmTrust,

entered into an ISDA Master Agreement with Defendant Citibank, N.A., under which AmTrust

entered into pay-fixed swaps with Citibank ("AmTrust-Citibank Master Agreement").[449]

302.    On October 12, 2006, Ohio Savings Bank, predecessor-in-interest to AmTrust,

entered into an ISDA Master Agreement with Defendant the Royal Bank of Scotland plc, under

which AmTrust entered into pay-fixed swaps with RBS ("AmTrust-RBS Master Agreement").[450]

The AmTrust-Citibank Master Agreement and the AmTrust-RBS Master Agreement are

referenced collectively in this Complaint as the AmTrust Master Agreements.

303.    In the AmTrust Master Agreements, the parties each represented that the

execution, delivery, and performance of the AmTrust Master Agreements did not violate or

conflict with any law applicable to them.[451]  The AmTrust Master Agreements further state that

---

[449] The AmTrust-Citibank Master Agreement is attached as Exhibit 28 and incorporated into this Complaint by reference.

[450] The AmTrust-RBS Master Agreement is attached as Exhibit 29 and incorporated into this Complaint by reference.

[451] AmTrust Master Agreements ¶ 3(a)(iii).

"[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."[452]  The AmTrust Master Agreements require that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the AmTrust Master Agreements or any Credit Support Document to which it is a party.[453]

304.    The AmTrust Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[454]  The AmTrust Master Agreements provide that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the AmTrust Master Agreements.[455]

305.    The AmTrust Master Agreements state that all transactions between AmTrust and Citibank or RBS are entered into in reliance on the fact that the AmTrust Master Agreements and all confirmations form a single agreement between the parties.[456]  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

306.    During the relevant period, AmTrust entered into pay-fixed swaps governed by the AmTrust Master Agreements.

---

[452] *Id.* ¶ 3(d).

[453] *Id.* ¶ 4(c).

[454] *Id.* ¶ 5(a)(iv).

[455] *Id.* ¶ 11.

[456] *Id.* ¶ 1(c).

307. Citibank and RBS knowingly breached and defaulted on the AmTrust Master Agreements through their fraudulent and collusive conduct, their failure to disclose fraudulent and collusive conduct, their intentional misrepresentation and manipulation of USD bbaLIBOR™, and their underpayments to AmTrust tied to the artificially suppressed USD bbaLIBOR™.

308. As a result of the Citibank's and RBS's breach of the AmTrust Master Agreements, AmTrust and the FDIC as Receiver for AmTrust have suffered damages under the AmTrust Master Agreements.

### COUNT III:  BREACH OF CONTRACTS WITH CORUS
### (BANK OF AMERICA, N.A. AND JPMORGAN CHASE BANK, N.A.)

309. The FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

310. On April 26, 2002, Corus entered into an ISDA Master Agreement with Defendant Bank of America, N.A., under which Corus entered into pay-fixed swaps with Bank of America, N.A. ("Corus-BOA Master Agreement").[457]

311. On February 21, 1995, Corus entered into an ISDA Master Agreement with Defendant JPMorgan Chase Bank, N.A. under which Corus entered into pay-fixed swaps with JPMorgan Chase Bank, N.A. ("Corus-JP Master Agreement").[458]  The Corus-BOA Master Agreement and the Corus-JP Master Agreement are referenced collectively in this Complaint as the Corus Master Agreements.

---

[457] The Corus-BOA Master Agreement is attached as Exhibit 30 and incorporated into this Complaint by reference.

[458] The Corus-JP Master Agreement is attached as Exhibit 31 and incorporated into this Complaint by reference.

312.    In the Corus Master Agreements, the parties represented that the execution, delivery, and performance of the Corus Master Agreements did not violate or conflict with any law applicable to them.[459]  The Corus Master Agreements further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, and complete in every material respect."[460]  The Corus Master Agreements require that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Corus Master Agreements or any Credit Support Document to which it is a party.[461]

313.    The Corus Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[462]  The Corus Master Agreements provide that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Corus Master Agreements.[463]

314.    The Corus Master Agreements state that all transactions between Corus and Bank of America, N.A. or JPMorgan Chase Bank, N.A. are entered into in reliance on the fact that the Corus Master Agreements and all confirmations form a single agreement between the parties.[464] A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

---

[459] Corus Master Agreements ¶ 3(a)(iii).

[460] *Id.* ¶ 3(d).

[461] *Id.* ¶ 4(c).

[462] *Id.* ¶ 5(a)(iv).

[463] *Id.* ¶ 11.

[464] *Id.* ¶ 1(c).

315.     During the relevant period, Corus entered into pay-fixed swaps governed by the Corus Master Agreements.

316.     Bank of America, N.A. and JPMorgan Chase Bank, N.A. knowingly breached and defaulted on the Corus Master Agreements through their fraudulent and collusive conduct, their failure to disclose fraudulent and collusive conduct, and their underpayments to Corus tied to the artificially suppressed USD bbaLIBOR™.

317.     As a result of Bank of America, N.A.'s and JPMorgan Chase Bank, N.A.'s breach of the Corus Master Agreements, Corus and the FDIC as Receiver for Corus have suffered damages under the Corus Master Agreements.

**COUNT IV:  BREACH OF CONTRACTS WITH INDYMAC**
**(BANK OF AMERICA, N.A., MERRILL LYNCH CAPITAL SERVICES, INC.,**
**BARCLAYS, CITIBANK, N.A., CITIGROUP FINANCIAL PRODUCTS, INC.,**
**CREDIT SUISSE INTERNATIONAL, DEUTSCHE BANK,**
**J.P. MORGAN BANK DUBLIN PLC, JPMORGAN CHASE BANK, N.A.,**
**J.P. MORGAN MARKETS LTD., RBC, RBS, AND UBS)**

318.     The FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

319.     On May 15, 2000, as amended on April 2, 2003 and June 10, 2005, IndyMac entered into an ISDA Master Agreement with Defendant Bank of America, N.A., under which IndyMac entered into pay-fixed swaps with Bank of America, N.A.  On March 16, 2000 and January 23, 2001, IndyMac entered into ISDA Master Agreements with Fleet National Bank, predecessor-in-interest to Defendant Bank of America, N.A., under which IndyMac entered into pay-fixed swaps with Bank of America, N.A.  The Master Agreements between IndyMac and

Bank of America, N.A. are referenced collectively in this Complaint as the "IndyMac-BOA Master Agreements".[465]

320.    On July 3, 2000, IndyMac entered into an ISDA Master Agreement with Defendant Merrill Lynch Capital Services, Inc., under which IndyMac entered into pay-fixed swaps with Merrill Lynch Capital Services, Inc. ("IndyMac-ML Master Agreement").[466]

321.    On April 26, 2005, IndyMac entered into an ISDA Master Agreement with Defendant Barclays Bank plc, under which IndyMac entered into pay-fixed swaps with Barclays ("IndyMac-Barclays Master Agreement").[467]

322.    On October 30, 2001, IndyMac entered into an ISDA Master Agreement with Defendant Citibank, N.A., under which IndyMac entered into pay-fixed swaps with Citibank, N.A. ("IndyMac-Citibank Master Agreement").[468]

323.    On March 15, 2005, IndyMac entered into an ISDA Master Agreement with Defendant Citigroup Financial Products, Inc., under which IndyMac entered into pay-fixed swaps with Citigroup Financial Products, Inc. ("IndyMac-CFP Master Agreement").[469]

324.    On February 16, 2001, IndyMac entered into an ISDA Master Agreement with Credit Suisse First Boston International, predecessor-in-interest to Credit Suisse International,

---

[465] The IndyMac-BOA Master Agreements are attached as Exhibits 32-34 and incorporated into this Complaint by reference.

[466] The IndyMac-ML Master Agreement, as amended on October 7, 2005, is attached as Exhibit 35 and incorporated into this Complaint by reference.

[467] The IndyMac-Barclays Master Agreement is attached as Exhibit 36 and incorporated into this Complaint by reference.

[468] The IndyMac-Citibank Master Agreement, as amended on March 28, 2003, is attached as Exhibit 37 and incorporated into this Complaint by reference.

[469] The IndyMac-CFP Master Agreement is attached as Exhibit 38 and incorporated into this Complaint by reference.

under which IndyMac entered into pay-fixed swaps with Defendant Credit Suisse International ("IndyMac-Credit Suisse Master Agreement").[470]

325.    On May 18, 2007, IndyMac entered into an ISDA Master Agreement with Defendant Deutsche Bank, under which IndyMac entered into pay-fixed swaps with Deutsche Bank ("IndyMac-Deutsche Master Agreement").[471]

326.    On September 5, 2002, IndyMac entered into an ISDA Master Agreement with Defendant J.P. Morgan Bank Dublin plc (f.k.a. Bear Stearns Bank plc), under which IndyMac entered into pay-fixed swaps with J.P. Morgan Bank Dublin plc ("IndyMac-Bear Bank Master Agreement").[472]

327.    On January 29, 2004, IndyMac entered into an ISDA Master Agreement with Defendant JPMorgan Chase Bank, N.A., under which IndyMac entered into pay-fixed swaps with JPMorgan Chase Bank, N.A. ("IndyMac-JP Master Agreement").[473]

328.    On March 7, 2006, IndyMac entered into an ISDA Master Agreement with Defendant J.P. Morgan Markets Ltd. (f.k.a. Bear Stearns International Ltd.), under which IndyMac entered into pay-fixed swaps with J.P. Morgan Markets Ltd. ("IndyMac-Bear Int'l Master Agreement").[474]

---

[470] The IndyMac-Credit Suisse Master Agreement is attached as Exhibit 39 and incorporated into this Complaint by reference.

[471] The IndyMac-Deutsche Master Agreement is attached as Exhibit 40 and incorporated into this Complaint by reference.

[472] The IndyMac-Bear Bank Master Agreement is attached as Exhibit 41 and incorporated into this Complaint by reference.

[473] The IndyMac-JP Master Agreement, as amended on March 14, 2008, is attached as Exhibit 42 and incorporated into this Complaint by reference.

[474] The IndyMac-Bear Int'l Master Agreement is attached as Exhibit 43 and incorporated into this Complaint by reference.

329.    On July 14, 2004, IndyMac entered into an ISDA Master Agreement with Defendant Royal Bank of Canada, under which IndyMac entered into pay-fixed swaps with RBC ("IndyMac-RBC Master Agreement").[475]

330.    On November 18, 2005, IndyMac entered into an ISDA Master Agreement with Defendant RBS, under which IndyMac entered into pay-fixed swaps with RBS ("IndyMac-RBS Master Agreement").[476]

331.    On June 2, 2004, IndyMac entered into two ISDA Master Agreements with Defendant UBS AG, under which IndyMac entered into pay-fixed swaps with UBS ("IndyMac-UBS Master Agreements").[477]  The Master Agreements involving IndyMac are referenced collectively in this Complaint as the IndyMac Master Agreements and the Counterparties to the IndyMac Master Agreements are referenced collectively in this Complaint as the IndyMac Contracting Defendants.

332.    In the IndyMac Master Agreements, the parties represented that the execution, delivery, and performance of the IndyMac Master Agreements did not violate or conflict with any law applicable to them.[478]  The IndyMac Master Agreements further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, and complete in every material respect."[479]  The IndyMac Master Agreements require that the parties comply in all material respects with all applicable laws and orders to which a

---

[475] The IndyMac-RBC Master Agreement is attached as Exhibit 44 and incorporated into this Complaint by reference.

[476] The IndyMac-RBS Master Agreement, as amended on December 7, 2007, is attached as Exhibit 45 and incorporated into this Complaint by reference.

[477] The IndyMac-UBS Master Agreements are attached as Exhibits 46 and 47 and incorporated into this Complaint by reference.

[478] IndyMac Master Agreements ¶ 3(a)(iii).

[479] *Id.* ¶ 3(d).

party may be subject if failure so to comply would materially impair its ability to perform its obligations under the IndyMac Master Agreements or any Credit Support Document to which it is a party.[480]

333.    The IndyMac Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[481]  The IndyMac Master Agreements provide that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the IndyMac Master Agreements.[482]

334.    The IndyMac Master Agreements state that all transactions between IndyMac and the IndyMac Contracting Defendants are entered into in reliance on the fact that the IndyMac Master Agreements and all confirmations form a single agreement between the parties.[483]  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

335.    During the relevant period, IndyMac entered into pay-fixed swaps governed by the IndyMac Master Agreements.

336.    The IndyMac Contracting Defendants knowingly breached and defaulted on the IndyMac Master Agreements through their fraudulent and collusive conduct, their failure to disclose fraudulent and collusive conduct, their intentional misrepresentation and manipulation

---

[480] *Id.* ¶ 4(c).

[481] *Id.* ¶ 5(a)(iv).

[482] *Id.* ¶ 11.

[483] *Id.* ¶ 1(c).

of USD bbaLIBOR™, and their underpayments to IndyMac tied to the artificially suppressed

USD bbaLIBOR™.

337.    As a result of the IndyMac Contracting Defendants' breach of the IndyMac

Master Agreements, IndyMac and the FDIC as Receiver for IndyMac have suffered damages

under the IndyMac Master Agreements.

## COUNT V:  BREACH OF CONTRACT WITH INTEGRA
### (CITIGROUP FINANCIAL PRODUCTS, INC.)

338.    The FDIC-R incorporates by reference the preceding paragraphs of this

Complaint.

339.    On February 4, 2003, Integra entered into an ISDA Master Agreement with

Defendant Citigroup Financial Products, Inc., under which Integra entered into pay-fixed swaps

with Citigroup Financial Products, Inc. ("Integra-CFP Master Agreement").[484]

340.    In the Integra-CFP Master Agreement, the parties each represented that the

execution, delivery, and performance of the Integra-CFP Master Agreement did not violate or

conflict with any law applicable to it.[485]  The Integra-CFP Master Agreement further states that

"[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other

party [is] true, accurate and complete in every material respect."[486]  The Integra-CFP Master

Agreement requires that the parties comply in all material respects with all applicable laws and

orders to which a party may be subject if failure so to comply would materially impair its ability

---

[484] The Integra-CFP Master Agreement, as amended on September 20, 2006, is attached as Exhibit 48 and
incorporated into this Complaint by reference.

[485] Integra-CFP Master Agreement ¶ 3(a)(iii).

[486] Id. ¶ 3(d).

to perform its obligations under the Integra-CFP Master Agreement or any Credit Support Document to which it is a party.[487]

341.    The Integra-CFP Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[488]  The Integra-CFP Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Integra-CFP Master Agreement.[489]

342.    The Integra-CFP Master Agreement states that all transactions between Integra and Citigroup Financial Products are entered into in reliance on the fact that the Integra-CFP Master Agreement and all confirmations form a single agreement between the parties.[490]  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

343.    During the relevant period, Integra entered into pay-fixed swaps governed by the Integra-CFP Master Agreement.

344.    Citigroup Financial Products knowingly breached and defaulted on the Integra-CFP Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, and its underpayments to Integra tied to the artificially suppressed USD bbaLIBOR™.

---

[487] *Id.* ¶ 4(c).

[488] *Id.* ¶ 5(a)(iv).

[489] *Id.* ¶ 11.

[490] *Id.* ¶ 1(c).

345.     As a result of the Citigroup Financial Products's breach of the Integra-CFP Master Agreement, Integra and the FDIC as Receiver for Integra have suffered damages under the Integra-CFP Master Agreement.

## COUNT VI:  BREACH OF CONTRACT WITH SILVERTON
### (CITIGROUP FINANCIAL PRODUCTS, INC.)

346.     The FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

347.     On May 8, 2008, Silverton entered into an ISDA Master Agreement with Defendant Citigroup Financial Products, Inc., under which Silverton entered into pay-fixed swaps with Citigroup Financial Products ("Silverton-CFP Master Agreement.").[491]

348.     In the Silverton-CFP Master Agreement, the parties each represented that the execution, delivery, and performance of the Silverton-CFP Master Agreement did not violate or conflict with any law applicable to it.[492]  The Silverton-CFP Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."[493]  The Silverton-CFP Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Agreement or any Credit Support Document to which it is a party.[494]

---

[491] The Silverton-CFP Master Agreement is attached as Exhibit 49 and incorporated into this Complaint by reference.

[492] Silverton-CFP Master Agreement ¶ 3(a)(iii).

[493] *Id.* ¶ 3(d).

[494] *Id.* ¶ 4(c).

349.    The Silverton-CFP Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[495]  The Silverton-CFP Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Silverton-CFP Master Agreement.[496]

350.    The Silverton-CFP Master Agreement states that all transactions between Silverton and Citigroup Financial Products are entered into in reliance on the fact that the Silverton-CFP Master Agreement and all confirmations form a single agreement between the parties.[497]  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

351.    During the relevant period, Silverton entered into pay-fixed swaps governed by the Silverton-CFP Master Agreement.

352.    Citigroup Financial Products breached and defaulted on the Silverton-CFP Master Agreement through its fraudulent and collusive conduct, its failure to disclose the fraudulent and collusive conduct, and its underpayments to Silverton tied to the artificially suppressed USD bbaLIBOR™.

353.    As a result of the Citigroup Financial Products's breach of the Silverton-Citigroup Master Agreement, Silverton and the FDIC as Receiver for Silverton have suffered damages under the Silverton-Citigroup Master Agreement.

---

[495] *Id.* ¶ 5(a)(iv).

[496] *Id.* ¶ 11.

[497] *Id.* ¶ 1(c).

## COUNT VII:  BREACH OF CONTRACT WITH SUPERIOR
### (CREDIT SUISSE INTERNATIONAL)

354.   The FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

355.   On June 25, 2002, Superior entered into an ISDA Master Agreement with Credit Suisse First Boston International, predecessor-in-interest to Defendant Credit Suisse International, under which Superior entered into pay-fixed swaps with Credit Suisse International ("Superior-Credit Suisse Master Agreement").[498]

356.   In the Superior-Credit Suisse Master Agreement, the parties represented that the execution, delivery, and performance of the Superior-Credit Suisse Master Agreement did not violate or conflict with any law applicable to it.[499]  The Superior-Credit Suisse Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."[500] The Superior-Credit Suisse Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Superior-Credit Suisse Master Agreement or any Credit Support Document to which it is a party.[501]

357.   The Superior-Credit Suisse Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any

---

[498] The Superior-Credit Suisse Master Agreement is attached as Exhibit 50 and incorporated into this Complaint by reference.

[499] Superior-Credit Suisse Master Agreement ¶ 3(a)(iii).

[500] *Id.* ¶ 3(d).

[501] *Id.* ¶ 4(c).

material respect when made or repeated.[502]  The Superior-Credit Suisse Master Agreement

provides that a defaulting party will, on demand, indemnify and hold harmless the other party for

and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other

party by reason of the enforcement and protection of its rights under the Superior-Credit Suisse

Master Agreement.[503]

358.    The Superior-Credit Suisse Master Agreement states that all transactions between

Superior and Credit Suisse International are entered into in reliance on the fact that the

Superior-Credit Suisse Master Agreement and all confirmations form a single agreement

between the parties.[504]  A "confirmation" is defined in the first paragraph as the documents and

other confirming evidence exchanged between the parties for each transaction.

359.    During the relevant period, Superior entered into pay-fixed swaps governed by the

Superior-Credit Suisse Master Agreement.

360.    Credit Suisse International breached and defaulted on the Superior-Credit Suisse

Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent

and collusive conduct, and its underpayments to Superior tied to the artificially suppressed USD

bbaLIBOR™.

361.    As a result of the Credit Suisse International's breach of the Superior-Credit

Suisse Master Agreements, Superior and the FDIC as Receiver for Superior have suffered

damages under the Superior-Credit Suisse Master Agreement.

---

[502] *Id.* ¶ 5(a)(iv).

[503] *Id.* ¶ 11.

[504] *Id.* ¶ 1(c).

## COUNT VIII:  BREACH OF CONTRACTS WITH UCB
**(BANK OF AMERICA, N.A., MERRILL LYNCH INTERNATIONAL BANK LTD.,
MERRILL LYNCH & CO., BARCLAYS, CITIBANK, N.A., THE HONGKONG AND
SHANGHAI BANKING CORP. LTD., JPMORGAN CHASE BANK, N.A., AND UBS)**

362.    The FDIC-R incorporates by reference the preceding paragraphs of this

Complaint.

363.    On February 9, 2005, UCB entered into an ISDA Master Agreement with

Defendant Bank of America, N.A., under which UCB entered into pay-fixed swaps with Bank of

America, N.A. ("UCB-BOA Master Agreement").[505]

364.    On May 19, 2004, UCB entered into an ISDA Master Agreement with Defendant

Merrill Lynch International Bank Ltd. and Merrill Lynch & Co., under which UCB entered into

pay-fixed swaps with Merrill Lynch International Bank Ltd. and Merrill Lynch & Co. ("UCB-

ML Master Agreement").[506]

365.    On May 19, 2009, UCB entered into an ISDA Master Agreement with Defendant

Barclays Bank plc, under which UCB entered into pay-fixed swaps with Barclays ("UCB-

Barclays Master Agreement").[507]

366.    On February 3, 2004, UCB entered into an ISDA Master Agreement with

Defendant Citibank, N.A., under which UCB entered into pay-fixed swaps with Citibank, N.A.

("UCB-Citibank Master Agreement").[508]

---

[505] The UCB-BOA Master Agreement, as amended on October 28, 2008, is attached as Exhibit 51 and incorporated into this Complaint by reference.

[506] The UCB-ML Master Agreement is attached as Exhibit 52 and incorporated into this Complaint by reference.

[507] The UCB-Barclays Master Agreement is attached as Exhibit 53 and incorporated into this Complaint by reference.

[508] The UCB-Citibank Master Agreement is attached as Exhibit 54 and incorporated into this Complaint by reference.

367.    On January 28, 2005, UCB entered into an ISDA Master Agreement with Defendant The Hongkong and Shanghai Banking Corporation Ltd. under which UCB entered into pay-fixed swaps with The Hongkong and Shanghai Banking Corporation Ltd. ("UCB-HSBC Master Agreement").[509]

368.    On March 24, 2004, UCB entered into an ISDA Master Agreement with Defendant JPMorgan Chase Bank, N.A., under which UCB entered into pay-fixed swaps with JPMorgan Chase Bank, N.A. ("UCB-JP Master Agreement").[510]

369.    On February 12, 2004, UCB entered into an ISDA Master Agreement with Defendant UBS AG, under which UCB entered into pay-fixed swaps with UBS ("UCB-UBS Master Agreement").[511]   The Master Agreements involving UCB are referenced collectively in this Complaint as the UCB Master Agreements and the Counterparties to the UCB Master Agreements are referenced collectively in this Complaint as the UCB Contracting Defendants.

370.    In the UCB Master Agreements, the parties represented that the execution, delivery, and performance of the UCB Master Agreements did not violate or conflict with any law applicable to them.[512]   The UCB Master Agreements further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, and complete in every material respect."[513]   The UCB Master Agreements require that the parties comply in all material respects with all applicable laws and orders to which a party may be

---

[509] The UCB-HSBC Master Agreement is attached as Exhibit 55 and incorporated into this Complaint by reference.

[510] The UCB-JP Master Agreement is attached as Exhibit 56 and incorporated into this Complaint by reference.

[511] The UCB-UBS Master Agreement is attached as Exhibit 57 and incorporated into this Complaint by reference.

[512] UCB Master Agreements ¶ 3(a)(iii).

[513] Id. ¶ 3(d).

subject if failure so to comply would materially impair its ability to perform its obligations under the UCB Master Agreements or any Credit Support Document to which it is a party.[514]

371.    The UCB Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[515]  The UCB Master Agreements provide that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the UCB Master Agreements.[516]

372.    The UCB Master Agreements state that all transactions between UCB and the UCB Contracting Defendants are entered into in reliance on the fact that the UCB Master Agreements and all confirmations form a single agreement between the parties.[517]  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

373.    During the relevant period, UCB entered into pay-fixed swaps governed by the UCB Master Agreements.

374.    The UCB Contracting Defendants breached and defaulted on the UCB Master Agreements through their fraudulent and collusive conduct, their failure to disclose fraudulent and collusive conduct, their intentional misrepresentation and manipulation of USD bbaLIBOR™, and their underpayments to UCB tied to the artificially suppressed USD bbaLIBOR™.

---

[514] *Id.* ¶ 4(c).

[515] *Id.* ¶ 5(a)(iv).

[516] *Id.* ¶ 11.

[517] *Id.* ¶ 1(c).

375.    As a result of the UCB Contracting Defendants' breach of the UCB Master

Agreements, UCB and the FDIC as Receiver for UCB have suffered damages under the UCB

Master Agreements.

### COUNT IX:  BREACH OF CONTRACTS WITH WAMU
**(BANK OF AMERICA, N.A., MERRILL LYNCH CAPITAL SERVICES, INC.,
MERRILL LYNCH INTERNATIONAL, BARCLAYS,
CITIBANK, N.A., CREDIT SUISSE INTERNATIONAL,
HSBC BANK USA, N.A., BEAR STEARNS CAPITAL MARKETS, INC.,
JPMORGAN CHASE BANK, N.A., RBC, UBS, AND PORTIGON)**

376.    The FDIC-R incorporates by reference the preceding paragraphs of this

Complaint.

377.    On March 3, 1998 and April 23, 1998, WaMu entered into ISDA Master

Agreements with Bank of America National Trust & Savings Association,

predecessor-in-interest to Defendant Bank of America, N.A., under which WaMu entered into

pay-fixed swaps with Bank of America, N.A. ("WaMu-BOA Master Agreements").[518]

378.    On June 1, 1989, WaMu entered into an ISDA Master Agreement with Defendant

Merrill Lynch Capital Services, Inc., under which WaMu entered into pay-fixed swaps with

Merrill Lynch Capital Services, Inc. ("WaMu-ML Cap. Master Agreement").[519]

379.    On October 31, 2001, WaMu entered into an ISDA Master Agreement with

Defendant Merrill Lynch International, under which WaMu entered into pay-fixed swaps with

Merrill Lynch International ("WaMu-ML Int'l Master Agreement").[520]

---

[518] The WaMu-BOA Master Agreements are attached as Exhibits 58 and 59 and incorporated into this Complaint by reference.

[519] The WaMu-ML Cap. Master Agreement is attached as Exhibit 60 and incorporated into this Complaint by reference.

[520] The WaMu-ML Int'l Master Agreement is attached as Exhibit 61 and incorporated into this Complaint by reference.

380.     On January 10, 2002, WaMu entered into an ISDA Master Agreement with

Defendant Barclays Bank plc, under which WaMu entered into pay-fixed swaps with Barclays

("WaMu-Barclays Master Agreements").[521]

381.     On July 28, 1995, American Savings Bank, F.A., predecessor-in-interest to

WaMu, entered into an ISDA Master Agreement with Defendant Citibank, N.A., under which

WaMu entered into pay-fixed swaps with Citibank, N.A. ("WaMu-Citibank Master

Agreement").[522]

382.     On March 26, 1998, WaMu entered into an ISDA Master Agreement with Credit

Suisse Financial Products, predecessor-in-interest to Defendant Credit Suisse International,

under which WaMu entered into pay-fixed swaps with Credit Suisse International ("WaMu-

Credit Suisse Master Agreement").[523]

383.     On April 11, 2002, WaMu entered into an ISDA Master Agreement with

Defendant HSBC Bank USA, N.A., under which WaMu entered into pay-fixed swaps with

HSBC Bank USA, N.A. ("WaMu-HSBC Master Agreement").[524]

384.     On December 19, 1997 and May 21, 1998, WaMu entered into ISDA Master

Agreements with Defendant Bear Stearns Capital Markets, Inc., under which WaMu entered into

pay-fixed swaps with Bear Stearns Capital Markets, Inc. ("WaMu-Bear Master Agreements").[525]

---

[521] The WaMu-Barclays Master Agreement is attached as Exhibit 62 and incorporated into this Complaint by reference.

[522] The WaMu-Citibank Master Agreement is attached as Exhibit 63 and incorporated into this Complaint by reference.

[523] The WaMu-Credit Suisse Master Agreement is attached as Exhibit 64 and incorporated into this Complaint by reference.

[524] The WaMu-HSBC Master Agreement is attached as Exhibit 65 and incorporated into this Complaint by reference.

[525] The WaMu-Bear Master Agreements are attached as Exhibits 66 and 67 and incorporated into this Complaint by reference.

385.     On February 23, 1996, WaMu entered into an ISDA Master Agreement with The Chase Manhattan Bank, predecessor-in-interest to Defendant JPMorgan Chase Bank, N.A., under which WaMu entered into pay-fixed swaps with JPMorgan Chase Bank, N.A. ("WaMu-Chase Master Agreement").[526]

386.     On February 2, 1998, WaMu entered into an ISDA Master Agreement with Morgan Guaranty Trust Co. of New York, predecessor-in-interest to Defendant JPMorgan Chase Bank, N.A. under which WaMu entered into pay-fixed swaps with JPMorgan Chase Bank, N.A. ("WaMu-Morgan Master Agreement.").[527]

387.     On November 21, 2002, WaMu entered into an ISDA Master Agreement with Bank One, N.A., predecessor-in-interest to Defendant JPMorgan Chase Bank, N.A. under which WaMu entered into pay-fixed swaps with JPMorgan Chase Bank, N.A. ("WaMu-Bank1 Master Agreement.").[528]

388.     On February 2, 1998, Homeside Lending, Inc., predecessor-in-interest to WaMu entered into an ISDA Master Agreement with Defendant, under which WaMu entered into pay-fixed swaps with RBC ("WaMu-RBC Master Agreement.").[529]

389.     On June 17, 1998, WaMu entered into an ISDA Master Agreement with Defendant UBS AG, under which WaMu entered into pay-fixed swaps with UBS ("WaMu-UBS Master Agreement").[530]

---

[526] The WaMu-Chase Master Agreement is attached as Exhibit 68 and incorporated into this Complaint by reference.

[527] The WaMu-Morgan Master Agreement is attached as Exhibit 69 and incorporated into this Complaint by reference.

[528] The WaMu-Bank1 Master Agreement is attached as Exhibit 70 and incorporated into this Complaint by reference.

[529] The WaMu-RBC Master Agreement is attached as Exhibit 71 and incorporated into this Complaint by reference.

[530] The WaMu-UBS Master Agreement is attached as Exhibit 72 and incorporated into this Complaint by reference.

390.     On June 24, 1998, WaMu entered into an ISDA Master Agreement with WestLB, predecessor-in-interest to Defendant Portigon AG, under which WaMu entered into pay-fixed swaps with Portigon ("WaMu-Portigon Master Agreement").[531]  The Master Agreements involving WaMu are referenced collectively in this Complaint as the WaMu Master Agreements and the Counterparties to the WaMu Master Agreements are referenced collectively in this Complaint as the WaMu Contracting Defendants.

391.     In the WaMu Master Agreements, the parties represented that the execution, delivery, and performance of the WaMu Master Agreements did not violate or conflict with any law applicable to then.[532]  The WaMu Master Agreements further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, and complete in every material respect."[533]  The WaMu Master Agreements require that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the WaMu Master Agreements or any Credit Support Document to which it is a party.[534]

392.     The WaMu Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[535]  The WaMu Master Agreements provide that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable

---

[531] The WaMu-Portigon Master Agreement is attached as Exhibit 73 and incorporated into this Complaint by reference.

[532] WaMu Master Agreements ¶ 3(a)(iii).

[533] Id. ¶ 3(d).

[534] Id. ¶ 4(c).

[535] Id. ¶ 5(a)(iv).

out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the WaMu Master Agreements.[536]

393.   The WaMu Master Agreements state that all transactions between WaMu and the WaMu Contracting Defendants are entered into in reliance on the fact that the WaMu Master Agreements and all confirmations form a single agreement between the parties.[537]  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

394.   During the relevant period, WaMu entered into pay-fixed swaps governed by the WaMu Master Agreements.

395.   The WaMu Contracting Defendants breached and defaulted on the WaMu Master Agreements through their fraudulent and collusive conduct, their failure to disclose fraudulent and collusive conduct, their intentional misrepresentation and manipulation of USD bbaLIBOR™, and their underpayments to WaMu tied to the artificially suppressed USD bbaLIBOR™.

396.   As a result of the WaMu Contracting Defendants' breach of the WaMu Master Agreements, WaMu and the FDIC as Receiver for WaMu have suffered damages under the WaMu Master Agreements.

### COUNT X:  BREACH OF CONTRACTS WITH WESTERNBANK
#### (MERRILL LYNCH CAPITAL SERVICES, INC., CITIBANK, N.A., CITIGROUP, INC., CREDIT SUISSE INTERNATIONAL, JPMORGAN CHASE BANK, N.A.)

397.   The FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

---

[536] *Id.* ¶ 11.

[537] *Id.* ¶ 1(c).

398.     On May 19, 2004, Westernbank entered into an ISDA Master Agreement with Defendant Merrill Lynch Capital Services, Inc., under which Westernbank entered into pay-fixed swaps with Merrill Lynch Capital Services, Inc. ("Westernbank-ML Master Agreement").[538]

399.     On February 25, 1993, Western Federal Savings Bank, predecessor-in-interest to Westernbank entered into an ISDA Master Agreement with Defendant Citibank, N.A., under which Westernbank entered into pay-fixed swaps with Citibank, N.A. ("Westernbank-Citibank Master Agreement").[539]

400.     On December 2, 1996, Westernbank entered into an ISDA Master Agreement with Smith Barney Capital Services, Inc., a joint venture between Defendant Citigroup and Morgan Stanley, under which Westernbank entered into pay-fixed swaps with Citigroup ("Westernbank-SB Master Agreement").[540]  The Westernbank-SB Master Agreement was guaranteed by Citigroup on April 4, 2006.

401.     On October 9, 2001, Westernbank entered into an ISDA Master Agreement with Credit Suisse First Boston International, predecessor-in-interest to Defendant Credit Suisse International, under which Westernbank entered into pay-fixed swaps with Credit Suisse International ("Westernbank-Credit Suisse Master Agreement").[541]

402.     On February 2, 1996, Westernbank, entered into an ISDA Master Agreement with The Chase Manhattan Bank, predecessor-in-interest to Defendant JPMorgan Chase Bank, N.A.

---

[538] The Westernbank-ML Master Agreement is attached as Exhibit 74 and incorporated into this Complaint by reference.

[539] The Westernbank-Citibank Master Agreement is attached as Exhibit 75 and incorporated into this Complaint by reference.

[540] The Westernbank-SB Master Agreement, and Citigroup Guarantee, is attached as Exhibit 76 and incorporated into this Complaint by reference.

[541] The Westernbank-Credit Suisse Master Agreement is attached as Exhibit 77 and incorporated into this Complaint by reference.

under which Westernbank entered into pay-fixed swaps with JPMorgan Chase Bank, N.A. ("Westernbank-Chase Master Agreement.").[542]  The Master Agreements involving Westernbank are referenced collectively in this Complaint as the Westernbank Master Agreements and the Counterparties to the Westernbank Master Agreements are referenced collectively in this Complaint as the Westernbank Contracting Defendants.

403.    In the Westernbank Master Agreements, the parties represented that the execution, delivery, and performance of the Westernbank Master Agreements did not violate or conflict with any law applicable to them.[543]  The Westernbank Master Agreements further state that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, and complete in every material respect."[544]  The Westernbank Master Agreements require that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Westernbank Master Agreements or any Credit Support Document to which it is a party.[545]

404.    The Westernbank Master Agreements provide that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.[546]  The Westernbank Master Agreements provide that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all

---

[542] The Westernbank-Chase Master Agreement is attached as Exhibit 78 and incorporated into this Complaint by reference.

[543] Westernbank Master Agreements ¶ 3(a)(iii).

[544] *Id.* ¶ 3(d).

[545] *Id.* ¶ 4(c).

[546] *Id.* ¶ 5(a)(iv).

reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Westernbank Master Agreements.[547]

405.    The Westernbank Master Agreements state that all transactions between Westernbank and the Westernbank Contracting Defendants are entered into in reliance on the fact that the Westernbank Master Agreements and all confirmations form a single agreement between the parties.[548]  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

406.    During the relevant period, Westernbank entered into pay-fixed swaps governed by the Westernbank Master Agreements.

407.    The Westernbank Contracting Defendants breached and defaulted on the Westernbank Master Agreements through their fraudulent and collusive conduct, their failure to disclose fraudulent and collusive conduct, their intentional misrepresentation and manipulation of USD bbaLIBOR™, and their underpayments to Westernbank tied to the artificially suppressed USD bbaLIBOR™.

408.    As a result of the Westernbank Contracting Defendants' breach of the Westernbank Master Agreements, Westernbank and the FDIC as Receiver for Westernbank has suffered damages under the Westernbank Master Agreements.

### COUNT XI:  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (CONTRACTING DEFENDANTS)

409.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint.

---

[547] *Id.* ¶ 11.

[548] *Id.* ¶ 1(c).

410.    On March 26, 2004, Doral Bank entered into an ISDA Master Agreement with Credit Suisse First Boston International, predecessor-in-interest to Defendant Credit Suisse International, under which Doral entered into pay-fixed swaps with Credit Suisse International ("Doral-Credit Suisse Master Agreement").[549]  On February 21, 2008, Doral Bank entered into an ISDA Master Agreement with Defendant Citibank, N.A., under which Doral entered into pay-fixed swaps with Citibank, N.A. ("Doral-Citibank Master Agreement").[550]

411.    As alleged above, certain Defendants (collectively the "Contracting Defendants")[551] entered into contracts with certain Closed Banks (collectively the "Contracting Closed Banks")[552] for bbaLIBOR™-based financial products.  These contracts are referenced collectively in this Complaint as the Master Agreements.

412.    Within each Master Agreement there is an implied covenant of good faith and fair dealing, whereby each Contracting Defendant had a duty to act in good faith and not engage in any conduct that would destroy or injure its Contracting Closed Bank counterparty's rights to the benefits of their contracts.

413.    During the relevant period, the Contracting Closed Banks entered into pay-fixed swaps governed by the Master Agreements.

---

[549] Doral-Credit Suisse Master Agreement is attached as Exhibit 79 and incorporated into this Complaint by reference.

[550] Doral-Citibank Master Agreement is attached as Exhibit 80 and incorporated into this Complaint by reference.

[551] The Contracting Defendants include at least:  Bank of America, N.A.; Merrill Lynch & Co.; Merrill Lynch International, Merrill Lynch International Bank Ltd.; Merrill Lynch Capital Services, Inc.; Barclays Bank plc; Citigroup, Inc.; Citibank, N.A.; Citigroup Financial Products, Inc.; Credit Suisse International; Deutsche Bank; The Hongkong and Shanghai Bank Corp. Ltd.; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; J.P. Morgan Bank Dublin plc; J.P. Morgan Markets Ltd.; Bear Stearns Capital Markets, Inc.; the Royal Bank of Canada; the Royal Bank of Scotland plc; UBS AG; and Portigon.

[552] The Contracting Closed Banks include at least:  Amcore; AmTrust; Corus; Doral; IndyMac; Integra; Silverton; Superior; UCB; WaMu; and Westernbank.

414.    Contracting Defendants violated the implied covenant of good faith and fair dealing through their fraudulent and collusive conduct, their failure to disclose fraudulent and collusive conduct, their intentional misrepresentation and manipulations of USD bbaLIBOR™, and their underpayments to the Contracting Closed Banks tied to the artificially suppressed USD bbaLIBOR™.

415.    These actions, which were intended to—and did—impair the Contracting Closed Banks' rights to the benefits of their contracts, increased Contracting Defendants' revenues related to bbaLIBOR™-based financial products, and lowered interest-rate payments to the Contracting Closed Banks.

416.    As a result of Contracting Defendants' breach of the implied covenant of good faith and fair dealing, the Contracting Closed Banks and the FDIC-R have suffered damages under the Master Agreements.

## COUNT XII:  UNJUST ENRICHMENT/RESTITUTION
### (CONTRACTING DEFENDANTS)

417.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint.

418.    The Contracting Defendants entered into contracts with the Contracting Closed Banks for bbaLIBOR™-based financial products.

419.    The Contracting Defendants engaged in wrongful acts and omissions, as described above, whereby the Contracting Defendants interfered with the Closed Bank's protected interests and were unjustly enriched at the expense of and to the detriment of the Contracting Closed Banks and have interfered with the Contracting Closed Banks' protected interests.

420.    As described throughout this Complaint, the Contracting Defendants knowingly acted in an unfair, unconscionable, and oppressive manner towards the Contracting Closed Banks and acted in conscious disregard for the Contracting Closed Banks' rights by manipulating bbaLIBOR™ and making numerous misrepresentations and/or omissions regarding bbaLIBOR™'s accuracy.

421.    Through their wrongful conduct, the Contracting Defendants have knowingly received and retained wrongful financial and other benefits at the Contracting Closed Banks' expense and have received windfall profits.

422.    As a direct and proximate result of the Contracting Defendants' wrongful and inequitable conduct, as set forth above, the Contracting Defendants have been unjustly enriched and the Contracting Closed Banks have suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.  The Contracting Defendants' retention of funds under these circumstances constitutes unjust enrichment as the Contracting Defendants have no right to the benefits that were obtained through their wrongful conduct.

423.    The financial benefits that the Contracting Defendants derived from their wrongful manipulation of bbaLIBOR™ belong to the Contracting Closed Banks and the FDIC-R.  The Closed Banks and the FDIC-R may have no adequate remedy at law for the Contracting Defendants' misappropriated gains.  The Court should compel the Contracting Defendants to disgorge to and the FDIC-R all wrongful or inequitable proceeds that the Contracting Defendants received.

## COUNT XIII: FRAUD
### (ALL DEFENDANTS)

424.    The FDIC-R incorporates by reference the preceding paragraphs in this

Complaint.

425.    Defendants owed a duty to the Closed Banks to honestly and accurately report

USD bbaLIBOR™ and not to intentionally mislead the Closed Banks and others by secretly and

collectively manipulating USD bbaLIBOR™ for Defendants' gain and to the detriment of others

in the financial markets.  The Panel Bank Defendants' and the BBA's duty arises from

representations that they made, directly and/or through the BBA, that bbaLIBOR™ was a

reliable indicator of the state of the money markets, that it was a reliable barometer of risk, that it

reflected competitive rates in the London interbank lending market, that bbaLIBOR™

submissions were made in accord with BBA published rules, and other such public

representations.  The Contracting Defendants also had a separate and additional duty of good

faith and fair dealing that arose from the contractual relationships they entered into with the

Contracting Closed Banks.  The Closed Banks reasonably relied on Defendants' fraudulent

misrepresentations and conduct because, among other things, Defendants held USD

bbaLIBOR™ out as a trustworthy, reliable benchmark and Defendants' fraud could have been

known only to them.

### Fraudulent USD bbaLIBOR™ Submissions
#### (Panel Bank Defendants and BBA)

426.    As described above, beginning in August 2007 and continuing through at least

mid-2011, each Panel Bank Defendant falsely represented on a daily basis the following:

- Its USD bbaLIBOR™ submissions were consistent with the published definition
  of bbaLIBOR™.

- It based its USD bbaLIBOR™ submissions on its honest perception of its cost of funds in the London interbank market without reference to rates submitted by other Panel Bank Defendants.

- Its USD bbaLIBOR™ submissions represented the actual competitive rates at which it honestly believed another bank would offer it funds in the London interbank market.

427.     The Panel Bank Defendants made these representations knowing that they were false, or with reckless disregard for their truth.

428.     These representations were material because they formed the basis for USD bbaLIBOR™ published by and through the BBA and affected the price the Closed Banks paid for bbaLIBOR™-based financial products.  In addition, each Panel Bank Defendant's published submission constituted a representation of the degree of its creditworthiness and liquidity.  When a Panel Bank Defendant with high credit risk and liquidity problems submitted bbaLIBOR™ rates that were artificially low in relation to other Panel Bank Defendants, that Panel Bank Defendant's submission was material because it led market participants to believe that the Panel Bank Defendant had the same credit standing as the other Panel Bank Defendants.  Had market participants and purchasers of bbaLIBOR™-based financial products known the true credit risk and liquidity issues facing those Panel Bank Defendants, some market participants and prospective purchasers would have declined to do business with them or would have demanded more favorable terms.

429.     The Panel Bank Defendants recognized the importance of USD bbaLIBOR™ and falsely and publicly held it out as a trustworthy benchmark.  In doing so, the Panel Bank Defendants intended for the Closed Banks and others to rely on their false representations of material fact.  The Closed Banks reasonably relied on these false representations of material fact.

430.     As a result of the Closed Banks' reasonable reliance on these false representations of material fact, the Closed Banks and the FDIC-R have suffered damages in the form of, among

other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate

payments from Defendants and others from bbaLIBOR™-based financial products.

### Fraudulent Representations Regarding USD bbaLIBOR™
#### (Panel Bank Defendants and BBA)

431.    As described above, beginning in August 2007 and continuing through at least

mid-2011, the Panel Bank Defendants and the BBA falsely represented on a daily basis that USD

bbaLIBOR™ rates electronically communicated by, and through, the BBA were based on honest

submissions by the Panel Bank Defendants of competitively set London interbank lending rates

that were consistent with the published definition of bbaLIBOR™.

432.    The Panel Bank Defendants and the BBA made these misrepresentations knowing

that they were false, or with reckless disregard for their truth.  These misrepresentations were

material because they (a) formed the basis for pricing bbaLIBOR™-based financial products and

(b) helped to preserve bbaLIBOR™ status as the dominant benchmark for competitive interbank

lending rates.  The Panel Bank Defendants and the BBA recognized the importance of USD

bbaLIBOR™ and falsely and publicly held it out as a trustworthy benchmark.  In doing so, the

Panel Bank Defendants and the BBA intended for the Closed Banks and others to rely on their

false representations of material fact.

433.    The Closed Banks reasonably relied on these false representations of material fact

in deciding whether to enter into transactions indexed to USD bbaLIBOR™ and whether to

continue holding bbaLIBOR™-based financial products.  The Closed Banks specifically relied

on Defendants' false representations in calculating the expected future cash flows from financial

products with interest rates based on USD bbaLIBOR™.

434.    As a result of the Closed Banks' reasonable reliance on these false representations

of material fact, the Closed Banks and the FDIC-R suffered damages in the form of, among other

things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

### The BBA's Fraud

435.    As described in this Complaint, beginning at least by mid-2008, the BBA falsely represented to the Closed Banks and others that it actively and independently monitored the Panel Bank Defendants' USD bbaLIBOR™ submissions to ensure that the submissions were consistent with the published definition of bbaLIBOR™.  From 2007 through at least 2011, the BBA represented that bbaLIBOR™ was a "transparent" benchmark and that bbaLIBOR™ provided a "reliable indicator" of the state of the money markets and risk in the global economy.

436.    In April 2008, the BBA falsely represented that it (a) was closely watching USD bbaLIBOR™ submissions, (b) would expel any Panel Bank that made deliberately inaccurate bbaLIBOR™ submissions, (c) would fast-track an "intensive review" of its bbaLIBOR™ process, and (d) did not believe that Panel Bank Defendants had submitted false rates.

437.    In June 2008, the BBA falsely represented that (a) the Panel Bank Defendants' USD bbaLIBOR™ submissions were honest and accurate and (b) it was incorporating a tight scrutiny mechanism that would require any contribution discrepancies to be reviewed and justified.

438.    On August 5, 2008, the BBA falsely represented that rates submitted by the Panel Bank Defendants were "truly reflective of their perceived borrowing costs" and that bbaLIBOR™ was a "fundamentally robust and accurate benchmark."[553]

439.    The BBA made these misrepresentations knowing that they were false, or with reckless disregard for their truth.  These misrepresentations were material because the BBA held

---

[553] BBA, Libor Consultation Feedback Statement, *supra* note 292.

itself out as an independent entity that would exercise vigilant oversight of bbaLIBOR™ to ensure that bbaLIBOR™ submissions by individual Panel Bank Defendants would be honest and consistent with the published definition of bbaLIBOR™.  Had market participants known that USD bbaLIBOR™ was set by collusion, and not by competitive market forces, market participants would have turned to other, more accurate, benchmarks to incorporate into their financial contracts.

440.    The BBA intended for the Closed Banks and others to rely on these false representations of material fact.  The Closed Banks reasonably relied on these false representations in deciding whether to enter into transactions tied to USD bbaLIBOR™ and whether to continue holding bbaLIBOR™-based financial products.

441.    As a result of the Closed Banks' reasonable reliance on these false representations of material fact, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from financial instruments held by the Closed Banks.

### Contracting Defendants' Fraud

442.    As discussed above, the Contracting Closed Banks entered into contracts with the Contracting Defendants for bbaLIBOR™-based financial products.  By virtue of these contractual relationships, the Contracting Defendants owed a duty of good faith and fair dealing to the Contracting Closed Banks.

443.    The Contracting Defendants breached that duty by knowingly providing the Contracting Closed Banks information regarding settling positions based on false submissions used to calculate USD bbaLIBOR™.  The Contracting Defendants thereby affirmatively misrepresented that USD bbaLIBOR™ accurately captured the competitive market forces that influence London interbank lending rates.  Further, the Contracting Defendants failed to disclose

the fraud and collusion relating to USD bbaLIBOR™. The Contracting Defendants made these representations and omissions either knowing the representations were false or with reckless disregard for their truth, and knowing that the omissions were material. The Contracting Defendants made these misrepresentations and omissions during negotiations for each pay-fixed swap and each time that payments were made and/or exchanged with the Contracting Closed Banks under the pay-fixed swaps in order to induce the Contracting Closed Banks to enter into these transactions. The Contracting Closed Banks would not have entered into the pay-fixed swaps at the same prices if the Contracting Closed Banks had known the Contracting Defendants intended to substitute collusion for competition in the setting of USD bbaLIBOR™.

444.    The Contracting Closed Banks reasonably relied on the Contracting Defendants' misrepresentations and nondisclosures in deciding whether to enter into financial transactions incorporating USD bbaLIBOR™ and, if so, on what terms, and whether to continue holding bbaLIBOR™-based financial products.

445.    As a result of the Contracting Closed Banks' reasonable reliance on these Defendants' fraudulent misrepresentations and material omissions, the Contracting Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

## COUNT XIV: AIDING AND ABETTING FRAUD
### (ALL DEFENDANTS)

446.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint.

447.    As explained above, the Defendants committed acts of fraud through their manipulation of bbaLIBOR™ and their misrepresentations regarding bbaLIBOR™, upon which the Closed Banks reasonably relied.

448.    Each Defendant had actual knowledge of the fraudulent acts of the other Defendants.

449.    Each Defendant aided and abetted the fraud committed by the other Defendants by providing substantial assistance and/or participating in the fraudulent acts committed by the other Defendants, as explained in the paragraphs above.

450.    As a result of Defendants' aiding and abetting, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

## COUNT XV:  CIVIL CONSPIRACY TO COMMIT FRAUD
### (ALL DEFENDANTS)

451.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint.

452.    As explained above, Defendants committed acts of fraud through their manipulation of bbaLIBOR™ and their misrepresentations and/or omissions regarding bbaLIBOR™, upon which the Closed Banks reasonably relied.

453.    Defendants formed a conspiracy or agreement to commit fraud by manipulating bbaLIBOR™ and submitting false USD bbaLIBOR™ rates that were inconsistent with the public definition of bbaLIBOR™, below their actual borrowing costs, and within a narrow range among the Panel Bank Defendants, as well as by engaging in a course of material misrepresentations and/or omissions to conceal the fraudulent acts.

454.    As explained throughout this Complaint, Defendants conspired together to commit fraud by manipulating bbaLIBOR™ through false and fraudulent bbaLIBOR™ submissions, as well as engaging in a course of material misrepresentations and/or omissions to conceal the fraudulent acts.

455.    As explained above, Defendants intentionally and knowingly committed acts in furtherance of this conspiracy by manipulating bbaLIBOR™ and making false and fraudulent bbaLIBOR™ submissions, as well as making repeated misrepresentations and omitting material facts regarding bbaLIBOR™'s accuracy.

456.    As a result of Defendants' conduct, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

## COUNT XVI:  NEGLIGENT MISREPRESENTATION
### (ALL DEFENDANTS)

457.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint.

458.    As discussed above, the Contracting Closed Banks entered into contracts with the Contracting Defendants for bbaLIBOR™-based financial products.  By virtue of these contractual relationships, the Contracting Closed Banks had a special relationship with the Contracting Defendants and the Contracting Defendants owed a duty of good faith and fair dealing to the Contracting Closed Banks.  As a result of this special relationship, the Contracting Defendants had a duty to impart correct information to the Contracting Closed Banks.

459.    The Panel Bank Defendants and the BBA also owed a duty to the Closed Banks to honestly and accurately report USD bbaLIBOR™ and not to intentionally mislead the Closed

Banks and others by secretly and collectively manipulating USD bbaLIBOR™ for the Panel

Bank Defendants' gain and to the detriment of others in the financial markets.  Defendants' duty

arises from representations that they made, directly and/or through the BBA, that bbaLIBOR™

was "a reliable indicator of the state of the money markets," that it was a "reliable barometer of

risk," that it reflected competitive rates in the London interbank lending market, and other public

representations regarding the nature and reliability of bbaLIBOR™.

### Misrepresentations in USD bbaLIBOR™ Submissions
#### (Panel Bank Defendants)

460.    As described above, beginning in August 2007 and continuing through at least

mid-2011, each Panel Bank Defendant falsely represented on a daily basis the following:

- Its USD bbaLIBOR™ submissions were consistent with the published definition of bbaLIBOR™;

- It based its USD bbaLIBOR™ submissions on its honest perception of its cost of funds in the London interbank market without reference to rates submitted by other Panel Bank Defendants; and

- Its USD bbaLIBOR™ submissions represented the actual competitive rates at which it honestly believed another bank would offer it funds in the London interbank market.

461.    The Panel Bank Defendants made these representations, at a minimum,

negligently and without reasonable justification.

462.    These representations were material because they formed the basis for USD

bbaLIBOR™ published by and through the BBA and affected the price of bbaLIBOR™-based

financial products.  In addition, a Panel Bank Defendant's published submission constituted a

representation of the degree of its creditworthiness and liquidity.  When a Panel Bank Defendant

with high credit risk and liquidity problems submitted bbaLIBOR™ rates that were artificially

low in relation to other Panel Bank Defendants, that Panel Bank Defendant's submission was

material because it led market participants to believe that the Panel Bank Defendant had the

same credit standing as the other Panel Bank Defendants.  Had market participants and purchasers of bbaLIBOR™-based financial products known the true credit risk and liquidity issues facing those Panel Bank Defendants, they would have declined to do business with them or demanded more favorable terms.

463.    The Panel Bank Defendants intended for the Closed Banks and others to rely on these false representations of material fact.  The Closed Banks reasonably relied on these false representations of material fact in deciding whether to do business with a particular Panel Bank Defendant.

464.    As a result of the Closed Banks' reasonable reliance on these false representations of material fact, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

### Misrepresentations Regarding USD bbaLIBOR™
### (Panel Bank Defendants and BBA)

465.    As described above, beginning in August 2007 and continuing through at least mid-2011, the Panel Bank Defendants and the BBA falsely represented on a daily basis that USD bbaLIBOR™ rates electronically communicated by, and through, the BBA were based on honest submissions by the Panel Bank Defendants of competitively set London interbank lending rates that were consistent with the published definition of bbaLIBOR™.

466.    The Panel Bank Defendants and the BBA made these misrepresentations, at a minimum, negligently and without reasonable care.  These misrepresentations were material because they (a) formed the basis for pricing bbaLIBOR™-based financial products and (b) helped to sustain bbaLIBOR™ as the dominant benchmark for competitive interbank lending

rates.  The Panel Bank Defendants and the BBA intended for the Closed Banks and others to rely on these false representations of material fact.

467.    The Closed Banks reasonably relied on these false representations of material fact in deciding whether to enter into transactions indexed to USD bbaLIBOR™ and whether to continue holding bbaLIBOR™-based financial products.  The Closed Banks specifically relied on Defendants' false representations in calculating the expected future cash flows from USD bbaLIBOR™ and consequently, the prices the Closed Banks were willing to pay for pay-fixed swaps.

468.    As a result of the Closed Banks' reasonable reliance on these false misrepresentations of material fact, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

**The BBA's Misrepresentations**

469.    As described in this Complaint, beginning in mid-2008, the BBA falsely represented to the Closed Banks and others that it actively and independently monitored the Panel Bank Defendants' USD bbaLIBOR™ submissions to ensure that they were consistent with the published definition of bbaLIBOR™.  From 2007 through at least mid-2011, the BBA represented that bbaLIBOR™ was a "transparent" benchmark and that bbaLIBOR™ provided a "reliable indicator" of the state of the money markets and risk in the global economy.

470.    In April 2008, the BBA falsely represented that it (a) was closely watching USD bbaLIBOR™ submissions, (b) would expel any Panel Bank that made deliberately inaccurate bbaLIBOR™ submissions, (c) would fast-track an "intensive review" of its bbaLIBOR™ process, and (d) did not believe that Panel Bank Defendant had submitted false rates.

471.     In June 2008, the BBA falsely represented that (a) the Panel Bank Defendants' USD bbaLIBOR™ submissions were honest and accurate, and (b) it was incorporating a tight scrutiny mechanism that would require any contribution discrepancies to be reviewed and justified.

472.     On August 5, 2008, the BBA falsely represented that rates submitted by Panel Banks were "truly reflective of their perceived borrowing costs" and that bbaLIBOR™ was a "fundamentally robust and accurate benchmark."[554]

473.     The BBA made these misrepresentations, at a minimum, negligently and without reasonable care.  These misrepresentations were material because the BBA held itself out as an independent entity that would exercise vigilant oversight of bbaLIBOR™ to ensure that bbaLIBOR™ submissions by individual Panel Bank Defendants would be honest and consistent with the published definition of bbaLIBOR™.  Had market participants known that USD bbaLIBOR™ was set by collusion, and not competitive market forces, market participants would have turned to other, more accurate, benchmarks to incorporate into their financial contracts.

474.     The BBA intended for the Closed Banks and others to rely on these false representations of material fact.  The Closed Banks reasonably relied on these false representations in deciding whether to enter into transactions tied to USD bbaLIBOR™ and whether to continue holding bbaLIBOR™-based financial products.

475.     As a result of the Closed Banks' reasonable reliance on these false representations, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

---

[554] BBA, Libor Consultation Feedback Statement, *supra* note 292.

## Contracting Defendants' Misrepresentations

476.    As discussed above, the Contracting Closed Banks entered into contracts with the Contracting Defendants for bbaLIBOR™-based financial products.  By virtue of these contractual relationships, the Contracting Defendants owed a duty of good faith and fair dealing to the Contracting Closed Banks.

477.    The Contracting Defendants breached that duty by affirmatively misrepresenting their credit risk and liquidity through fraudulent and collusive USD bbaLIBOR™ submissions.  In addition, the Contracting Defendants affirmatively misrepresented that USD bbaLIBOR™ accurately captured the competitive market forces that influence London interbank lending rates.  Further, the Contracting Defendants failed to disclose the fraud and collusion relating to USD bbaLIBOR™.  The Contracting Defendants made these false representations and omitted those material facts, at a minimum, negligently and without reasonable care.  The Contracting Defendants made these misrepresentations and omitted those material facts during negotiations for each pay-fixed swap and each time that payments were made and/or exchanged with the Contracting Closed Banks under the pay-fixed swaps in order to induce the Contracting Closed Banks to enter into these transactions.  The Contracting Closed Banks would not have entered into the pay-fixed swaps at the same prices if the Contracting Closed Banks had known the Contracting Defendants intended to substitute collusion for competition with respect to USD bbaLIBOR™.

478.    The Contracting Closed Banks reasonably relied on the Contracting Defendants' misrepresentations and nondisclosures in deciding whether to enter into financial transactions incorporating USD bbaLIBOR™ and, if so, on what terms, and whether to continue holding bbaLIBOR™-based financial products.

479.     As a result of the Contracting Closed Banks' reasonable reliance on these Defendants' fraudulent misrepresentations and material omissions, the Contracting Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

## COUNT XVII:  TORTIOUS INTERFERENCE WITH CONTRACT
### (PANEL BANK DEFENDANTS AND BBA)

480.     The FDIC-R incorporates by reference the preceding paragraphs in this Complaint.

481.     The Closed Banks entered into pay-fixed swaps and other financial contracts tied to USD bbaLIBOR™ with the Contracting Defendants and counterparties other than Defendants.

482.     Each Panel Bank Defendant and the BBA knew that USD bbaLIBOR™ was incorporated into ISDA Master Agreements and other financial instruments.

483.     The Panel Bank Defendants and the BBA intentionally and fraudulently held USD bbaLIBOR™ out to the world, including the Closed Banks, as a trustworthy and reliable benchmark.

484.     Each Panel Bank Defendant and the BBA knew, or should have known, that the Closed Banks had entered into financial instruments with one or more of the other Panel Bank Defendants, as well as counterparties other than Defendants, that incorporated USD bbaLIBOR™.  In fact, as detailed above, certain Panel Bank Defendants were counterparties to similar contracts with the Closed Banks.

485.     As described above, the Panel Bank Defendants and the BBA intentionally and improperly interfered with these contracts and agreements, including by their collusive manipulation of USD bbaLIBOR™ and fraudulent misrepresentations and/or material omissions

- 173 -

about bbaLIBOR™'s accuracy. The Panel Bank Defendants' and BBA's tortious acts caused

those contracts to be breached, and the Closed Banks to receive reduced payments from those

contracts and/or the contracts to decrease in value.

486. As a result of the Panel Bank Defendants' and the BBA's intentional interference

with the Closed Banks' contracts and agreements, the Closed Banks and the FDIC-R suffered

damages in the form of, among other things, receiving lower interest-rate payments from the

Contracting Defendants and others.

**COUNT XVIII: AIDING AND ABETTING**
**<u>TORTIOUS INTERFERENCE WITH CONTRACT</u>**
**(PANEL BANK DEFENDANTS AND BBA)**

487. The FDIC-R incorporates by reference the preceding paragraphs in this

Complaint.

488. As explained above, the Panel Bank Defendants and the BBA tortiously interfered

with the Closed Banks' contracts and agreements with the Contracting Defendants and

counterparties other than the Contracting Defendants.

489. Each Panel Bank Defendant and the BBA had actual knowledge of the acts of

tortious interference committed by the other Panel Bank Defendants' and the BBA.

490. Each Panel Bank Defendant and the BBA aided and abetted the acts of tortious

interference committed by the other Panel Bank Defendants and the BBA. They did so by

providing substantial assistance and/or participating in the tortious acts committed by the other

Panel Bank Defendants and the BBA, including through their collusive manipulation of USD

bbaLIBOR™ and fraudulent misrepresentations and/or material omissions about bbaLIBOR™'s

accuracy. The Panel Bank Defendants' and the BBA's acts of aiding and abetting caused those

contracts to be breached and the Closed Banks to receive reduced payments from those contracts

and/or a decrease in value.

491.    As a result of the Panel Bank Defendants' and the BBA's aiding and abetting, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from the Contracting Defendants and others from bbaLIBOR™-based financial products.

### COUNT XIX:  CIVIL CONSPIRACY TO COMMIT TORTIOUS INTERFERENCE WITH CONTRACT (PANEL BANK DEFENDANTS AND BBA)

492.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint.

493.    As explained above, the Panel Bank Defendants and the BBA tortiously interfered with the Closed Banks' contracts with the Contracting Defendants and counterparties other than Defendants.

494.    As explained throughout this Complaint, the Panel Bank Defendants and the BBA conspired together to tortiously interfere with the Closed Banks' contracts by manipulating bbaLIBOR™ through false and fraudulent bbaLIBOR™ submissions, as well as engaging in a course of material misrepresentations and/or material omissions to conceal their tortious acts.

495.    As explained above, the Panel Bank Defendants and the BBA intentionally and knowingly committed tortious acts in furtherance of this conspiracy by manipulating bbaLIBOR™ and making false and fraudulent bbaLIBOR™ submissions, as well as by making repeated misrepresentations and repeatedly omitting material facts regarding bbaLIBOR™'s accuracy.

496.    As a result of the Panel Bank Defendants' and the BBA's misconduct, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from the Contracting Defendants and others from bbaLIBOR™-based financial products.

**COUNT XX: TORTIOUS INTERFERENCE**
**WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(PANEL BANK DEFENDANTS AND BBA)**

497. The FDIC-R incorporates by reference the preceding paragraphs in this Complaint.

498. The Closed Banks had valid business expectancies in that the Closed Banks were engaged in interest-rate swap contracts and other bbaLIBOR™-based financial instruments with certain Defendants and counterparties other than Defendants. The Closed Banks' contractual relationships at that time expressly incorporated USD bbaLIBOR™ and provided that the Closed Banks would receive payments based on the level of USD bbaLIBOR™.

499. The Panel Bank Defendants and the BBA knew that USD bbaLIBOR™ was incorporated into ISDA Master Agreements and other financial instruments.

500. The Panel Bank Defendants and the BBA knew of the Closed Banks' contractual relationships and business expectancies and understood that USD bbaLIBOR™, as the "world's most important number," was incorporated into many contracts similar to the ones to which the Closed Banks were parties. In fact, certain Defendants were counterparties to similar contracts with the Closed Banks. The Panel Bank Defendants and the BBA further knew, or should have known, that the Closed Banks expected payments from these contracts based on the level of USD bbaLIBOR™.

501. The Panel Bank Defendants and the BBA intentionally interfered with the Closed Banks' business expectancies by means of improper, fraudulent, wrongful methods, as described throughout this Complaint, and caused the Closed Banks to receive reduced payments from these contracts and/or a decrease in their value compared to what the Closed Banks would have realized, absent the Panel Bank Defendants' and the BBA's conduct.

502.    As a result of the Panel Bank Defendants' and the BBA's intentional interference with the Closed Banks' business expectancies, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, receiving lower interest-rate payments from the Contracting Defendants and others, and paying artificially high prices for financial products tied to USD bbaLIBOR™.

### COUNT XXI:  AIDING AND ABETTING TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (PANEL BANK DEFENDANTS AND BBA)

503.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint.

504.    As explained above, the Panel Bank Defendants and the BBA tortiously interfered with the Closed Banks' valid business expectancies with certain Defendants and counterparties other than the Defendants.

505.    The Panel Bank Defendants and the BBA had actual knowledge of the acts of tortious interference of the other Panel Bank Defendants and the BBA.

506.    Each Panel Bank Defendant and the BBA, through improper and fraudulent means, aided and abetted the tortious interference committed by the other Panel Bank Defendants and the BBA.  They did so by providing substantial assistance and/or participating in the tortious acts committed by the other Panel Bank Defendants and the BBA, including through their collusive manipulation of USD bbaLIBOR™ and fraudulent misrepresentations and/or material omissions about bbaLIBOR™'s accuracy.  The Panel Bank Defendants' and the BBA's acts of aiding and abetting caused the Closed Banks to receive reduced payments from their contracts and/or a decrease in their value compared to what the Closed Banks would have realized, absent the Panel Bank Defendants' and the BBA's conduct.

507.    As a result of the Panel Bank Defendants' and the BBA's aiding and abetting, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, paying artificially high prices for bbaLIBOR™-based financial products and receiving lower interest-rate payments from the Contracting Defendants and others from bbaLIBOR™-based financial products.

**COUNT XXII:  CIVIL CONSPIRACY TO COMMIT TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (PANEL BANK DEFENDANTS AND BBA)**

508.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint.

509.    As explained above, the Panel Bank Defendants and the BBA tortiously interfered with the Closed Banks' valid business expectancies with certain Defendants and counterparties other than Defendants.

510.    As explained throughout this Complaint, the Panel Bank Defendants and the BBA conspired together to tortiously interfere with the Closed Banks' valid business expectancies by manipulating bbaLIBOR™ through false and fraudulent bbaLIBOR™ submissions, as well as by engaging in a course of material misrepresentations and/or material omissions to conceal their tortious acts.

511.    As explained above, the Panel Bank Defendants and the BBA intentionally and knowingly committed acts in furtherance of this conspiracy by manipulating bbaLIBOR™ and making false and fraudulent bbaLIBOR™ submissions, as well as by making repeated misrepresentations and repeatedly omitting material facts regarding bbaLIBOR™'s accuracy.

512.    As a result of the Panel Bank Defendants' and the BBA's conduct, the Closed Banks and the FDIC-R suffered damages in the form of, among other things, paying artificially

high prices for bbaLIBOR™-based financial products and receiving lower interest-rate payments

from the Contracting Defendants and others from bbaLIBOR™-based financial products.

## COUNT XXIII:  VIOLATIONS OF SHERMAN ACT SECTION 1
### (ALL DEFENDANTS)

513.    The FDIC-R incorporates by reference the preceding paragraphs of this

Complaint.

### Agreement

514.    From in or about August 2007 and lasting through at least mid-2011, the

Defendants participated in a combination, conspiracy, and/or agreement that involved multiple

horizontal and vertical levels.  In this case, the Complaint alleges a set of agreements among the

Defendants that restricted competition in various markets.  As shown above, the unlawful

agreements consisted of the following:

- The Panel Bank Defendants agreed to (a) disregard the bbaLIBOR™ published
  rules to coordinate the interest rates that they submitted to the BBA for
  calculation, (b) keep those coordinated submissions below the rates at which they
  would be offered funds in the London interbank lending market for USD, and
  (c) keep those coordinated submissions within a narrow range.

- The Defendants agreed to falsely hold USD bbaLIBOR™ out as a reliable
  interest-rate benchmark calculated according to its published methodology and
  conceal the fact that the Panel Bank Defendants had agreed to disregard the
  published methodology for USD bbaLIBOR™.

- The Defendants agreed to conceal the extent to which conditions in the London
  interbank loan market had deteriorated.

- The Panel Bank Defendants and the BBA agreed to publicly, and falsely, maintain
  that USD bbaLIBOR™ would be protected by a strict governance protocol, that it
  would be overseen by an "independent" committee of active market participants,
  and that the BBA would ensure compliance with bbaLIBOR™'s published rules.

515.    The Defendants had a conscious commitment to common objectives, namely

insulating bbaLIBOR™ from the forces of competition so that the Defendants could collectively

control the product standard in the market for USD interest-rate benchmarks.  Through control of

bbaLIBOR™, the Bank Defendants could manipulate it for their personal gain and systematically suppress it to unfairly profit from USD bbaLIBOR™-based financial transactions. Certain Bank Defendants also had a common interest in manipulating bbaLIBOR™ to protect their respective credit ratings.

516.    As set forth above, the Defendants had strong motives to conspire.  Because of the way that USD bbaLIBOR™ was calculated based upon the Panel Bank Defendants' bbaLIBOR™ submissions, a single Panel Bank acting unilaterally had little ability to affect bbaLIBOR™.  But colluding gave the Panel Bank Defendants the power to affect the USD bbaLIBOR™ fixing published by and through the BBA.  In addition, the unlawful scheme required collective action to avoid detection.  If any Panel Bank Defendant deviated from the unlawful agreements on a sustained basis or revealed that Defendants had agreed to disobey the bbaLIBOR™ rules, the scheme would have been exposed and bbaLIBOR™'s integrity and reliability would have been fundamentally undermined.  Disclosure of the unlawful agreements would also have exposed bbaLIBOR™ to the forces of competition from other interest-rate indices, imperiling bbaLIBOR™'s position as the market standard for interest-rate benchmarks, and triggering government investigations and lawsuits.  In fact, these are precisely the consequences that followed Barclays's disclosure of systematic suppression in 2012.

517.    There is abundant evidence that the conduct of the Defendants was the product of agreement and not independent action.  Five Panel Bank Defendants (UBS, Barclays, Lloyds, Citibank, and Société Générale) have already admitted systematically submitting artificially suppressed USD bbaLIBOR™ rates to the BBA.  Without the Defendants' conspiracy, the USD bbaLIBOR™ submissions from these four Panel Bank Defendants would have been noticeably lower than the other Panel Bank Defendants.  They were not.  USD bbaLIBOR™ submissions

were closely grouped together throughout the conspiracy period, which could not have occurred without explicit coordination.

518.   For example, Figure 6 below plots the submissions for three-month USD bbaLIBOR™ during a two-month period in 2008 for the four Panel Bank Defendants that have admitted to systematic suppression (Barclays, UBS, Lloyds, and Citibank) and the submissions of Panel Bank Defendants Bank of America, N.A., Credit Suisse, and JP Morgan, N.A.  The chart shows that the latter three banks submitted USD bbaLIBOR™ rates that were within ***or below*** the range of the admittedly suppressed rates.  The submissions of other Panel Bank Defendants show the same trend.  This pattern of coordinated submissions cannot be credibly explained in the absence of a conspiracy.

**Figure 6:  Comparison of bbaLIBOR™ submissions**



519.    While very little evidence contained in the internal documents maintained by the

Defendants has been disclosed to date, the evidence that has been revealed confirms the

existence of the unlawful agreements:

- A Rabobank bbaLIBOR™ submitter told federal investigators in 2014 that
  Rabobank was "low-balling" its USD bbaLIBOR™ submissions at a time when it
  was attempting to "hoard" cash by borrowing when available for longer terms
  regardless of cost and even though interest rates were going higher and higher.[555]
  Rabobank bbaLIBOR™ submitters asked a Rabobank executive whether
  Rabobank should start submitting bbaLIBOR™s at the much higher rates that
  were available in the market.  The executive responded that "doing so was a
  stupid idea and shouldn't be done," specifically related to USD.  In fact,

---

[555] Defense Ex. 608C, *supra* note 34, at 17.

Rabobank was paying much higher rates for longer-term USD borrowings than it reported in its bbaLIBOR™ submissions.

- In an electronic chat between a Bank of Scotland plc USD bbaLIBOR™ submitter and an employee of "another financial institution" (unidentified), the Bank of Scotland plc submitter stated, "youll [sic]like this ive [sic] been pressured by senior management to bring my rates down into line with everyone else."[556]

- In one message dated August 19, 2007, a former trader for RBS, Tan Chi Min, wrote in an electronic discussion with traders at other banks, including Deutsche Bank's Mark Wong: "It's just amazing how Libor fixing can make you that much money or lose if opposite.  It's a cartel now in London."[557]

- In October 2007, a Barclays employee noted internally that an unidentified Panel Bank had submitted a bbaLIBOR™ rate that was lower than the rate it actually paid.[558]

- On December 4, 2007, a Barclays bbaLIBOR™ submitter sent an internal email stating that the Panel Bank Defendants, including Barclays, were submitting false and dishonest submissions.[559]

- On April 11, 2008, a Barclays employee told an employee of the NY Fed that he was aware of Panel Bank Defendants putting in USD bbaLIBOR™ submissions that were lower than what they were actually paying and that "the ones that need the cash most put in the lowest, lowest rates."[560]  The Barclays employee noted "if we can't borrow money at that rate, then no one else could really. . . .  I mean we, you-you know we speak to everyone that everyone else does so, um, yeah, it's a quite, quite an uncomfortable feeling and I don't know if at some stage LIBORs will correct themselves."[561]

- On October 24, 2008, a Barclays employee privately reported to the NY Fed that USD bbaLIBOR™ rates were "absolute rubbish," citing submissions by WestLB and Deutsche Bank as being too low.[562]  The employee told the NY Fed that he

---

[556] Lloyds CFTC Order, *supra* note 60, at 15.

[557] Andrea Tan, Gavin Finch & Liam Vaughan, *RBS Instant Messages Show Libor Rates Skewed for Traders*, Bloomberg (Sept. 26, 2012), http://www.bloomberg.com/news/2012-09-25/rbs-instant-messages-show-libor-rates-skewed-for-traders.html.

[558] Email to Jason Miu (Oct. 3, 2007, 07:34), attached as Exhibit 81 and incorporated into this Complaint by reference.

[559] Barclays SOF, *supra* note 162, ¶ 45.

[560] *Apr. 11 Barclays and N.Y. Fed Tr.*, *supra* note 237, at 7.

[561] *Id.* at 16.

[562] *Oct. 24 Barclays and N.Y. Fed Tr.*, *supra* note 315, at 000098, 000100.

was aware of banks that were making bbaLIBOR™ submissions that were below what they actually paid in comparable transactions.[563]

- In an internal email, a Barclays employee noted that Lloyds's USD bbaLIBOR™ submission was artificially low.[564]

520.    In addition, Panel Bank Defendant RBS has admitted that its employees participated in agreements to submit bbaLIBOR™ submissions that were inconsistent with the published definitions.  Although RBS did not admit systematic suppression, the head of its money markets trading and the person responsible for USD bbaLIBOR™ submissions reportedly told a subordinate that Panel Bank Defendants were setting bbaLIBOR™ "to where it suits their book" and that "LIBOR is what you say it is."[565]  This communication occurred in August 2007, within days of the admitted directives issued by Barclays and UBS executives.

521.    Because the BBA's instructions prohibited Panel Banks from basing their USD bbaLIBOR™ submissions on submissions by other Panel Banks, the Panel Bank Defendants cannot claim that their conduct was merely the result of conscious parallelism without admitting that they secretly and fraudulently deviated from bbaLIBOR™'s published methodology.  The Panel Bank Defendants' pretextual explanations for their artificially low USD bbaLIBOR™ submissions further confirm the existence of the unlawful agreements.

522.    Moreover, the Panel Bank Defendants acted against their legitimate independent self-interest in several regards.  First, absent agreement with other Panel Bank Defendants, any Panel Bank Defendant that unilaterally chose to deviate from the published bbaLIBOR™ rules would have exposed itself to civil and criminal sanctions that would have undermined the Panel

---

[563] *Id.* at 000100.

[564] Email to Pat Leising (Aug. 28, 2007, 11:27), attached as Exhibit 82 and incorporated into this Complaint by reference.

[565] Vaughan & Finch, *Secret Libor Transcripts Expose Trader Rate-Manipulation*, *supra* note 185.

Bank Defendant's reputation in the United States.  According to the bbaLIBOR™ rules, banks that deviated from the rules would be removed from the bbaLIBOR™ panel.[566]  Removal from the bbaLIBOR™ panel would have harmed the bank's perceived integrity, exposed it to investigation by government regulators, and led to civil action by counterparties.  Removal also could have proven catastrophic if the market interpreted the bank's fraud as a desperate attempt to protect its reputation in the United States and hide its financial condition.

523.    Second, Panel Bank Defendants that were more creditworthy than their supposed rivals on the USD bbaLIBOR™ panel acted against their independent economic self-interest by submitting USD bbaLIBOR™ rates that were not significantly lower than their less creditworthy "competitor" banks on the USD bbaLIBOR™ panel and tolerating false submissions that created the appearance that all of the Panel Banks presented the same perceived credit risk.  A bank's creditworthiness is an important part of a bank's ability to obtain wholesale funding at competitive prices. In the absence of collusion, the more creditworthy Bank Defendants would be expected to have used their stronger credit standing as a competitive advantage to obtain lower costs of funds than their rivals and to use those lower costs to compete on price in downstream markets for interest-rate derivatives, floating-rate retail loans, and other financial products.  Similarly, it was in the independent economic self-interest of the more creditworthy Bank Defendants to publicly expose and/or report to the authorities the artificially low bbaLIBOR™ rates submitted by their supposed rivals.

524.    Third, the BBA and Panel Banks' *collective* incentive to maintain the prestige and dominance USD bbaLIBOR™ as a benchmark and as contributing banks often eclipsed

---

[566] BBA Libor, LIBOR Governance and Scrutiny, *supra* note 140, § 1.13.

unilateral incentives to submit lower and lower rates. ███████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████ █ █████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████ Panel membership carried inherent value.

Persistent suppression thus had to be coordinated to preserve the perception and reputation of the

benchmark, the BBA, and the USD bbaLIBOR™ panel as a whole.

525.    The Panel Bank Defendants had ample opportunity to conspire through, among

other things, BBA and FX & MM Committee meetings, numerous interbank communications,

electronic chats, and telephone calls.  Even the minimal evidence publicly disclosed to date in

connection with government regulatory actions, some of which is set forth above, reveals a

sustained pattern of illicit and anticompetitive communications among the Panel Bank

Defendants.

526.    The economic evidence also supports the existence of the unlawful agreements in

that the USD bbaLIBOR™s relationship to the Eurodollar Bid Rate fundamentally changed

during the alleged conspiracy period.  During the conspiracy, the Panel Bank Defendants and the

BBA offered a number of explanations for that change, but the disclosures following Barclays's

June 2012 admission of unlawful conduct confirm that the agreements alleged above caused that

fundamental change.



**Restraint of Trade**

527.    The purpose and effect of the unlawful agreements was to maintain market

dominance for USD interest-rate benchmarks during the conspiracy period and limit competition

in the markets for interest-rate benchmarks, interest-rate derivatives, floating-rate loans, floating-

rate MBS, and wholesale funding.  The Panel Bank Defendants and the BBA achieved this

objective by colluding to create the false impression that USD bbaLIBOR™ was suited for its

intended purpose and that the London interbank loan market was a reliable source of data for the

Panel Bank Defendants' cost of unsecured funds.  Only the Panel Bank Defendants and the BBA

knew whether the Panel Bank Defendants were following the bbaLIBOR™ methodology, the

extent to which the opaque London interbank loan market was active, and whether the Panel

Bank Defendants were submitting rates consistent with the actual interest rates available in the

London interbank loan market. The Panel Bank Defendants' and the BBA's conspiracy harmed

competition in numerous markets.

528.    The Panel Bank Defendants and the BBA foreclosed competition by alternative

interest-rate benchmarks and shielded bbaLIBOR™'s dominant position as the market standard

from the forces of competition.  Taking advantage of their large, if not dominant, market

positions (and pursuant to the unlawful agreements), the Bank Defendants continued to

incorporate bbaLIBOR™ into USD interest-rate derivatives, floating-rate loans, and floating-rate

MBS, even though the Defendants knew that bbaLIBOR™ was not what they held it out to be.

This conduct was intended to, and did, insulate bbaLIBOR™ from the forces of competition, and

that foreclosure allowed the Defendants to maintain bbaLIBOR™ as the market standard without

even attempting to innovate its rules or improve its governance mechanism.  In short, the

Defendants maintained USD bbaLIBOR™ as the standard in the market for USD interest-rate

benchmarks and the leading reference interest-rate benchmark in markets for USD interest-rate

derivatives, floating-rate loans and floating-rate MBS not by competing on the merits, but by entering into secret agreements to exclude competition.

529.    The unlawful agreements had especially pernicious effects because the market for USD interest-rate benchmarks was characterized by network effects.  These network effects were driven by the widespread use of bbaLIBOR™ throughout the interconnected USD interest-rate derivative, floating-rate loan and floating-rate MBS markets, in which the Bank Defendants were major players.  The Bank Defendants were among the dominant sellers of OTC USD interest-rate derivatives, which gave them additional market power as the most important users of USD interest-rate benchmarks. Thus, the Bank Defendants' agreements as dealers in the OTC interest-rate derivatives market necessarily diminished competition in the related floating-rate loan market and in the upstream market for interest-rate benchmarks.

530.    The Defendants knew and intended that the unlawful agreements would affect the prices and returns on financial products tied to USD bbaLIBOR™.  By agreeing to systematically and secretly suppress bbaLIBOR™ into the future, the Defendants harmed the competitive process.

531.    As explained in the Wheatley Report, an interest-rate benchmark serves two important purposes.[570]  First, it functions as the reference interest rate incorporated into financial contracts as a payment (and price) term.  Thus, suppression of the benchmark will cause economic loss to companies that hold interest-rate derivatives, loans, or floating-rate MBS. Second, the benchmark functions as a discount rate used in negotiations to price products that incorporate the benchmark.  As explained above, an interest-rate swap is determined by applying the rules of the interest-rate benchmark to the notional value over the duration of the proposed

---

[570] Wheatley Final Report, *supra* note 84, at 45.

swap to determine the net present value of those payments which, in turn, determines the fixed rate that the counterparty will pay. Thus, the price of an interest-rate swap is set by the net present value of the interest-rate benchmark. The net present value calculation is expressly premised on the reliability, predictability, and integrity of the interest-rate benchmark.

532. By providing a benchmark supposedly tied to competitively determined interbank lending rates, bbaLIBOR™ purported to serve the price-discovery purpose in markets for interest-rate derivatives, floating-rate loans, and floating-rate MBS. By foreclosing competition in the market for USD interest-rate benchmarks, the Defendants harmed the competitive process by which parties discovered the price of interest-rate derivatives, loans, and floating-rate MBS.[571] As one District Court observed, "[f]raud and deceit are not legitimate market forces. Fundamentally, markets are information processing systems. The market price is only as 'real' as the data that inform the process of price discovery. By the same token, the market price is 'artificial' when the market is misinformed."[572]

533. By artificially suppressing USD bbaLIBOR™, the Panel Bank Defendants caused purchasers of products that incorporated bbaLIBOR™ as an interest-rate benchmark to overpay for those products. Had purchasers known the true manner in which the Panel Bank Defendants and the BBA calculated, and intended to continue to calculate, USD bbaLIBOR™, purchasers would have chosen not to enter into the transaction at all or requested an alternative interest-rate benchmark. Had the Defendants not prevented purchasers from making an informed choice to

---

[571] For example, assume a monopolist offers a product for $30 when its internal cost to produce and sell the product is just $10. Absent competition, buyers will not know that $30 represents a three-fold increase over the seller's costs. Now, assume instead that there are multiple sellers of the same product, all with similar costs. Rather than lose a sale, the second seller will offer a price below $30, which should trigger a price reaction from the seller's rivals. Eventually, through the competitive process, buyers will "discover" that the market price for the product is just above $10. *See* Robert C. Marshall & Leslie M. Marx, *The Economics of Collusion—Cartels and Bidding Rings* 83-84 (2012).

[572] *United States v. Reliant Energy Servs., Inc.*, 420 F. Supp. 2d 1043, 1058 (N.D. Cal. 2006).

incorporate bbaLIBOR™ as the benchmark based on the actual rules that the Panel Bank
Defendants intended to apply, the true discounted value of the products would have been far less
than what purchasers paid.  Similarly, purchasers, including the Closed Banks, suffered
economic losses on financial products that incorporated USD bbaLIBOR™ as a price term.  As
explained above, market participants were not informed of the actual methodology that the Panel
Bank Defendants used to submit USD bbaLIBOR™ and therefore the unlawful agreements
prevented market participants from being able to make informed decisions whether to keep those
financial products and, if so, whether to demand changes to the benchmark methodology.
Through the unlawful agreements, the Bank Defendants artificially increased the profit margins
that they earned in certain financial transactions tied to USD bbaLIBOR™ to the Closed Banks'
economic detriment.

534.    Second, the Defendants also interfered with the ability of non-conspirator banks
to fairly compete against the Bank Defendants in the markets for interest-rate derivatives,
floating-rate loans, and floating-rate MBS.  Non-conspirator banks were unaware of the alleged
fraud and collusion and therefore priced interest-rate derivatives, loans, and floating-rate MBS
based on the reasonable expectation that USD bbaLIBOR™ would be determined according to
the published rules.  As a result of their conspiracy, the Bank Defendants could slightly undercut
prices offered by non-conspirators knowing that even the undercut price would provide a profit
due to the Bank Defendants' unlawful agreements.

535.    Third, each artificially suppressed bbaLIBOR™ submission by an individual
Panel Bank Defendant enhanced that Panel Bank Defendant's reputation in the United States and
public perception of its credit risk and liquidity.[573]  In the absence of collusion, banks with

---

[573] Abrantes-Metz et al., *supra* note 415, at 138.

superior credit and liquidity profiles would have used their reputation in the United States as a competitive advantage and banks with lower reputations in the United States would have been forced to compete on the merits by providing better prices, improving efficiency, and shedding risk.  Numerous Panel Bank Defendants, in fact, have admitted that individual bbaLIBOR™ submissions contained market information that affected or tended to affect prices of financial contracts and products that incorporated the interest-rate benchmark.[574]

536.    Fourth, the Panel Bank Defendants and the BBA stifled innovation and limited demand for alternative (competing) benchmarks.  Through their agreement to submit rates that appeared to be fair and honest reflections of interbank lending, the Panel Bank Defendants and the BBA maintained the façade that market forces determined bbaLIBOR™ and that a more reliable benchmark was unnecessary.  But for the collusion, the Panel Bank Defendants would have been forced to compete on the merits by showing that bbaLIBOR™ served its intended purpose as a proxy for competition or by incorporating other floating interest-rate benchmarks into financial products they sold.  One benchmark provider recently acknowledged that "the existing LIBOR framework [has] failed to keep pace with market needs as they have developed over the past two decades."[575]  Another provider recently wrote that enforcement of existing laws prohibiting fraud and price-fixing was the key to avoiding scandals like bbaLIBOR™.[576]

537.    Finally, the Defendants interfered with the supply/demand balance for wholesale funding.  The Bank Defendants treated bbaLIBOR™ submissions as an upper limit on interest rates they would offer for other unsecured funding products.  Lloyds has admitted that its

---

[574] *See, e.g.*, UBS SOF, *supra* note 76, ¶ 97.

[575] Rate Validation Servs., *Regulation of Benchmarks and Indices:  RVS Response to the EU Consultation Document*, at 10 (Nov. 15, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/individual-others/rate-valuations-services_en.pdf.

[576] Russell Resp., *supra* note 93, at 12-13.

executives instructed employees not to bid for cash at rates that were out of line with their bbaLIBOR™ submissions.  In a competitive environment, market forces determine interest rates and efficiently allocate money.

538.    The antitrust charges filed against subsidiaries of Panel Bank Defendants UBS and RBS confirm that agreements to manipulate bbaLIBOR™ constitute *per se* restraints of trade that harmed competition in the markets for USD interest-rate benchmarks, interest-rate derivatives, floating-rate loans, and floating-rate MBS in violation of Sherman Act Section 1. *Per se* treatment of the conspiracy is appropriate because the unlawful agreements were specifically related to price and quality.  Where, as here, a plaintiff alleges a *per se* violation of the Sherman Act, no allegations with respect to relevant product market, geographic market, or market power are required.  To the extent allegations may otherwise be necessary, the markets and harm to competition caused by the unlawful agreements are addressed below.

### Antitrust Injury and Damages

539.    During the conspiracy period, the Closed Banks purchased and owned interest-rate derivatives, including pay-fixed, receive-floating interest-rate swaps, that incorporated USD bbaLIBOR™ as a price term.  In addition, the Closed Banks purchased and held floating-rate MBS that incorporated USD bbaLIBOR™ as the interest-rate benchmark[577] and made loans that were formulated, based on or incorporated USD bbaLIBOR™ as a price term.  In the absence of the unlawful agreements, competitive market forces would have created overwhelming incentives for the Panel Bank Defendants and the BBA to calculate and publish USD bbaLIBOR™ in compliance with its published rules and to ensure that the London interbank

---

[577] Attached as an Addendum to this Complaint is a representative sample of the "no-action" clauses contained in the pooling and servicing agreements pursuant to which the MBS were issued.

market used to calculate USD bbaLIBOR™ was sufficient to measure the Panel Bank Defendants' cost of funds.  In addition, the unlawful agreements injected false information into financial markets that depended on interest-rate benchmarks for accurate information regarding the Panel Bank Defendants' costs of funds.

540.    As a result, in some circumstances the Closed Banks paid artificially high prices for financial instruments tied to USD bbaLIBOR™.  Conversely, as a result of the collusion and anticompetitive effects, the Closed Banks received less in interest-rate payments from these financial instruments tied to USD bbaLIBOR™.  These damages flow directly from the unlawful agreements' interference with competitive market forces.

541.    In the absence of collusion, the Bank Defendants could not have achieved the supracompetitive prices that they were able to charge (and increased profit margins that they were able to earn) in transactions for certain financial instruments tied to USD bbaLIBOR™.

## Rule of Reason

542.    Alternatively, analyzed under either a "quick look" or full rule-of-reason framework, the unlawful agreements unreasonably restrained trade in the markets for USD interest-rate benchmarks, OTC USD interest-rate derivatives, USD floating-rate retail loans, and floating-rate MBS.  The unlawful agreements arose from "competitor collaborations" as that term is used in the U.S. Guidelines for Collaborations Among Competitors[578] because the Bank Defendants were purported competitors in each of the defined markets as well as in the market for unsecured short-term wholesale funding.

---

[578] U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Guidelines for Collaborations Among Competitors, Apr. 2000, *available at* http://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf.

543.   As noted above, absent collusion, each Panel Bank Defendant would have individually competed to submit the lowest USD rates to the BBA consistent with the published bbaLIBOR™ methodology and prevented any other Panel Bank Defendant from submitting artificially low rates to the BBA.

544.   Even if the bbaLIBOR™ data gathering process, in fact, was intended to be a cooperative one, that does not mean that the actual submission process was intended to be collaborative and not competitive.  Even for collaborative ventures, agreements are evaluated based on their effects on competition in relevant markets.[579]  As detailed below, the unlawful agreements harmed the competitive processes in several markets and in several ways.

A.   **Relevant Market:  USD Short-Term Interest-Rate Benchmarks**

<u>Market Definition</u>

545.   During the relevant period, there were no reasonable substitutes for USD short-term interest-rate benchmarks.  Interest-rate derivatives and floating-rate loans require an interest-rate benchmark.  The market for USD short-term interest-rate benchmarks was global.

546.   The Defendants had substantial power in the market for short-term interest-rate benchmarks.  bbaLIBOR™ was by far the dominant short-term interest-rate benchmark and the phenomenon of network effects protected the Defendants' market power.  Panel Bank Defendants served on the supposedly independent FX & MM Committee responsible for overseeing and implementing bbaLIBOR™ during the conspiracy period.  The Bank Defendants were in the very small minority of financial institutions that could provide upstream information on the unsecured costs of funds for the largest commercial banks in the world.  The Bank Defendants were also among the dominant sellers of OTC USD interest-rate derivatives, which

---

[579] *Id.* at 3-4, 24-25.

gave them additional market power as the most important downstream users of USD short-term interest-rate benchmarks.

547.    In addition, Bank Defendants were significant providers of USD floating-rate retail loans and floating-rate MBS, which increased their power in the market for USD short-term interest-rate benchmarks.  The phenomenon of network effects further increased the Defendants' market power because end users will prefer to purchase interest-rate derivatives that incorporate the same short-term interest-rate benchmark that is incorporated into floating-rate loans and MBS that they held.

## Harm to Competition

548.    The unlawful agreements harmed competition in the market for USD interest-rate benchmarks by limiting choice, deterring innovation, artificially increasing barriers to entry, injecting false information in the market, limiting transparency, and increasing prices. Defendants created the false impression that USD bbaLIBOR™ was suited for its intended purpose, that users could reliably predict USD bbaLIBOR™ (the price) over the term of interest-rate derivatives, floating-rate loans, and floating-rate MBS, and that it was carefully monitored by an "independent" overseer.

549.    One of the reasons that the Defendants entered into the unlawful agreements was to foreclose competition by alternative benchmarks and thereby insulate themselves from the forces of competition.  The Bank Defendants benefited from maintaining control of the market standard interest-rate benchmark, USD bbaLIBOR™, because it allowed them to profit on transactions involving interest-rate derivatives, floating-rate loans, and floating-rate MBS.  In addition, the BBA generated revenues through the licensing of USD bbaLIBOR™ and the Bank Defendants indirectly benefited from those licensing fees as BBA members.

550.     As shown above, had the Defendants publicly disclosed their agreement to disregard the published USD bbaLIBOR™ methodology and governance mechanisms, market participants would have sought out, or developed, alternative benchmarks that would better serve the purpose of USD short-term interest-rate benchmarks, or at the very least negotiated lower prices that better reflected the additional uncertainty that would have been created by the Panel Bank Defendants' and the BBA's self-serving rules.  In the absence of the agreement to secretly revise the USD bbaLIBOR™ methodology and governance, the Defendants would have been forced to compete on the merits to protect the status of USD bbaLIBOR™ as the dominant USD short-term interest-rate benchmark.

551.     Real-world insights into the way competition would have encouraged innovation, integrity, and reliability can be gained from market developments following the conspiracy's end.  Soon after Barclays admitted its participation in the bbaLIBOR™ manipulation, the BBA voluntarily sought to reassure users that USD Panel Banks would adhere to the published methodology in the future.[580]  The BBA stated that its top priority was to ensure the provision of a reliable benchmark which had the confidence and support of users.[581]

552.     In addition, the FSA sponsored a wide-ranging report overseen by its then Managing Director, Martin Wheatley, that eventually recommended numerous improvements to "get back to what this reference rate is supposed to do."[582]  The Wheatley Report reforms

---

[580] Press Release, BBA, Libor Statement—Thursday 28 June (June 28, 2012), *available at* http://www.mondovisione.com/media-and-resources/news/british-bankers-association-libor-statement-thursday-28-june/.

[581] BBA, British Bankers' Association Statement Regarding the Treasury Committee's Preliminary Findings On Libor, *supra* note 168.

[582] Martin Wheatley, Managing Director, FSA, & CEO Designate, FCA at the Wheatley Review of LIBOR, Pushing the Reset Button on LIBOR (Sept. 28, 2012), *available at* http://www.fsa.gov.uk/library/communication/speeches/2012/0928-mw.shtml.

included stripping the BBA of its administrative role due to unresolvable conflicts of interest, imposing mechanisms to corroborate USD bbaLIBOR™ submissions with actual trade data, expanding the number of Panel Banks, reducing the number of currencies, and delaying publication of individual Panel Bank submissions by three months.

553.    In 2013, IOSCO drafted and published its Principles for Financial Benchmarks that outlined best practices for all indices, including bbaLIBOR™.[583]  Market participants advocated for a broader set of interest-rate benchmarks that could be adapted to a range of applications.  The news service Bloomberg, for example, demanded more alternatives to bbaLIBOR™.[584]  CFTC Chairman Gary Gensler advocated for the abolishment of bbaLIBOR™.[585]

554.    The BBA, in fact, implemented a number of the reforms recommended in the Wheatley Report.  In February 2014, the BBA handed control of USD bbaLIBOR™ over to a private benchmark provider, the ICE.  In response to competitive threats, ICE has since implemented additional screens to prevent manipulation, imposed additional measures to boost bbaLIBOR™'s reliability, and has vowed to continue to improve bbaLIBOR™.

555.    As shown, the unlawful agreements harmed competition in the market for short-term interest-rate benchmarks by deterring innovation, eroding product quality, limiting product choice, injecting false information into the market, limiting transparency, and increasing price.

---

[583] IOSCO Principles, *supra* note 98.

[584] Darrell Duffie & Jeremy Stein, *Libor Needs More Competition*, Bloomberg View (July 22, 2014), http://www.bloombergview.com/articles/2014-07-22/libor-needs-more-competition.

[585] Gary Gensler, Chairman, U.S. C.F.T.C., Remarks of Chairman Gary Gensler on Libor Before the Global Financial Markets Association's Future of Global Benchmarks Conference (Feb. 28, 2013), *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opagensler-133.

556.     In addition, the Defendants' agreement to conceal deterioration in the unsecured interbank loan market limited the ability of market participants to determine whether the interbank loan market was a trustworthy source of data.  In the absence of collusion, the Defendants would have had an incentive to apprise users of this issue and clearly identify contingency measures to respond to it.[586]

557.     The unlawful agreements did not provide any pro-competitive benefits.

## Antitrust Injury

558.     The reduction of competition in the market for USD interest-rate benchmarks was a direct and material cause of the Closed Banks' and the FDIC-R's injuries.  The injuries alleged by FDIC-R would not have occurred but for Defendants' antitrust violations.  In a competitive market for interest-rate benchmarks, USD bbaLIBOR™ would have been calculated according to its published rules and not subject to manipulation and systematic suppression.  In the absence of the unlawful agreements, the competitive process would have created overwhelming incentives for Defendants to reliably apply the published USD bbaLIBOR™ methodology and the Closed Banks would have received the consideration for which it bargained.

559.     In addition, but for the collusion, the Defendants would have disclosed the extent of deterioration in the unsecured interbank loan market and identified methods to improve the reliability of the underlying data.  Virtually all of the recent proposals for improvement of interest-rate benchmarks would broaden the range of data to include actual transactions in unsecured wholesale funding markets.

---

[586] *See* IOSCO Consultation Report, *supra* note 94, at 20-21 (benchmark providers should clearly disclose changes to the methodology so that users can determine whether it remains a suitable reference); IOSCO Principles, *supra* note 98, at 22-23 (benchmark providers should publish methodology in sufficient detail to allow users to understand how it is derived and its appropriateness as a reference for financial instruments).

560.     In their capacities as lenders, the Closed Banks were consumers of USD short-term interest-rate benchmarks, including USD bbaLIBOR™, and therefore suffered direct injury because they were forced to participate in a non-competitive and non-transparent market for interest-rate benchmarks.

561.     In addition, the Closed Banks were consumers of interest-rate derivatives that incorporated bbaLIBOR™ as a payment term for the Closed Banks, and received lower payments from derivatives, loans, and floating-rate MBS where payments were determined by or formulated based on USD bbaLIBOR™.

B.     **Relevant Market:  OTC USD Interest-Rate Derivatives**

<u>Market Definition</u>

562.     OTC USD interest-rate derivatives include interest-rate swaps and similar instruments used by market participants to hedge exposure to interest rates.[587]  During the conspiracy period, USD bbaLIBOR™ was the dominant interest-rate benchmark used in OTC USD interest-rate derivatives.

563.     The OTC interest-rate derivatives market differed from futures markets in a number of important respects.  Whereas futures and futures options were standardized agreements that traded on organized exchanges, the OTC market was an informal bilateral market consisting of broker-dealers that traded price information and negotiated transactions over electronic communications networks.  Although a great deal of contract standardization existed in the OTC market, dealers active in this market custom-tailored agreements to meet the specific needs of their customers. And unlike futures markets, where futures exchange

---

[587] Anatoli Kuprianov, *Chapter 16:  Over-the-Counter Interest Rate Derivatives*, *in* Fed. Reserve Bank of Richmond, Instruments of the Money Market 238, 238-39 (1998), *available at* https://www.richmondfed.org/ publications/research/special_reports/instruments_of_the_money_market/pdf/chapter_16.pdf.

clearinghouses guarantee contract performance through a system of margin requirements combined with the daily settlement of gains or losses, counterparties to OTC derivative agreements must bear some default or credit risk.[588]  The unlawful agreements made the OTC USD interest-rate derivatives market even more opaque during the conspiracy period.

564.    OTC USD interest-rate derivatives are traded in a global market.  A small set of dealers—comprised primarily of Bank Defendants—dominated the market for OTC USD interest-rate derivatives during the conspiracy period.  According to a July 2010 ISDA market survey, the largest 14 dealers held 82% of interest-rate derivatives by notional amount.[589]  Of these fourteen dealers, ten are USD bbaLIBOR™ Panel Bank Defendants (or their parent holding companies):  Defendants Bank of America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, HSBC, JPMorgan, RBS, Société Générale, and UBS.[590]  Similarly, the top five U.S. bank holding companies—Bank of America, Citigroup, JPMorgan, Morgan Stanley, and Goldman Sachs—accounted for more than 95% of all OTC swaps and derivatives transactions in the United States.[591]

565.    There were no reasonable alternatives to OTC USD interest-rate derivatives.

<u>Harm to Competition</u>

566.    Competition in the OTC USD interest-rate derivatives market depends on a reliable and predictable interest-rate benchmark.  As noted above, OTC dealers quote prices for interest-rate swaps in two parts: (1) an interest-rate benchmark and (2) a fixed interest rate.  The fixed rate is calculated to provide the net present value today of the expected cash flows from the

---

[588] *Id.*

[589] Mengle, *supra* note 108, at 1.

[590] *Id.* at 2.

[591] *Id.* at 1.

quoted benchmark over the life of the swap.  The potential purchaser of a pay-fixed, receive-floating derivative calculates the expected cash flows by applying the published rules of the quoted benchmark to the predicted market conditions over the length of the swap to determine the price it will pay for that swap.

567.    The unlawful agreements harmed competition in the market for OTC USD interest-rate derivatives by undermining price transparency and excluding alternative benchmarks from being used to price OTC USD interest-rate derivatives.  In a competitive market, bbaLIBOR™ would have been a reliable benchmark or it would have been replaced by an alternative benchmark that better served its intended purposes.

568.    The unlawful agreements did not provide any pro-competitive benefits in this market.

Antitrust Injury

569.    The Closed Banks' and the FDIC-R's injuries arose from the harm to competition alleged above.  In a competitive environment, Defendants could not have sustained their conspiracy and USD bbaLIBOR™ would have been calculated according to its published methodology and therefore would have been consistently higher throughout the conspiracy period.  These injuries flow directly from the substitution of collusion for competition in the market for OTC USD interest-rate derivatives.

C.    **Relevant Market:  USD Floating-Rate Retail Loans**

Market Definition

570.    USD floating-rate retail loans are loans made by banks, including the Bank Defendants, for mortgages and other consumer uses.  Retail loans were of longer duration than the loans available in the wholesale funding markets.  There are markets for USD floating-rate

retail loans worldwide. [592] During the conspiracy period, the Bank Defendants made billions of

dollars' worth of USD floating-rate retail loans, which Bank Defendants packaged into MBS for

sale to investors.  For example, in 2010, more than half of all mortgages in the United States

were originated by three banks:  Wells Fargo, Bank of America, and JPMorgan.[593]  During the

conspiracy period, these three banks and Citigroup were consistently among the top five

mortgage originators.[594]  They were also, by far, the four largest commercial banks in the United

States.[595]  In 2010, these four banks held $3.6 trillion in deposits at the end of the fourth quarter,

whereas the next 46 institutions in the top 50 collectively held $2.68 trillion in deposits.

571.    There were no reasonable substitutes for USD floating-rate retail loans.

Participants in the market for floating-rate loans seek to transfer risk of higher future interest

rates from the lender to the borrower for a price.

Harm to Competition

572.    The unlawful agreements harmed competition in the market for USD floating-rate

retail loans by limiting competition for the key interest-rate benchmark and by injecting false

information that obscured the price-discovery process.  The Bank Defendants were among the

largest lenders and, as a result of their conspiracy, foreclosed competition for interest-rate

benchmarks.  Also as a result of the conspiracy, lenders other than the Bank Defendants were

unaware that bbaLIBOR™ no longer served its intended purpose and therefore non-defendant

lenders had no incentive to demand alternative interest-rate benchmarks.  The unlawful

---

[592] Wholesale loans are also referred to as "trades," with "buy" corresponding to borrow and "sell" corresponding to lend.

[593] Press Release, Mortgage Daily, 3 Biggest Lenders Close Over Half of U.S. Mortgages (Feb. 15, 2011), http://www mortgagedaily.com/PressRelease021511.asp.

[594] *Id.*

[595] *See, e.g.*, Aarti Kanjani, *Top 50 U.S. Banks and Thrifts by Assets*, SNL Fin. (Mar. 21, 2011), http://www.snl.com/InteractiveX/article.aspx?CDID=A-12500123-14138&KPLT=2.

agreements therefore restricted choice, deterred innovation, artificially increased barriers to entry, limited transparency, and increased prices.

573.    The unlawful agreements did not provide any pro-competitive benefits in this market.

Antitrust Injury

574.    The Closed Banks' and the FDIC-R's injuries arose from this harm to competition.  In a competitive environment, the Defendants could not have sustained their conspiracy and USD bbaLIBOR™ would have been calculated according to its published methodology.  As a result of the reduction of competition in the market for interest-rate benchmarks, the Closed Banks lacked adequate alternatives to USD bbaLIBOR™ and were deceived into believing that USD bbaLIBOR™ sufficiently served its intended purpose.  As a direct result of the competitive harms caused by the Bank Defendants' conduct, payments to the Closed Banks on floating-rate loans that incorporated USD bbaLIBOR™ were lower than they would have been in the absence of the conspiracy.

D.    **Relevant Market:  USD Floating-Rate MBS**

Market Definition

575.    The market for USD floating-rate MBS was a global one.  During the conspiracy period, the Bank Defendants were among the largest issuers and underwriters of USD floating-rate MBS.  For example, in 2009 Bank of America was the leading underwriter of U.S. mortgaged-backed securities with 17.5 percent of the total market.  Other Bank Defendants in the top 10 included Barclays, Credit Suisse, JPMorgan, Citibank, RBS, and Deutsche Bank.[596]

---

[596] Adam Quinones, *Bank of America Top MBS Underwriter in 2009.  What is an MBS Underwriter?*, Mortgage News Daily (Jan. 4, 2010), http://www.mortgagenewsdaily.com/01042010_bank_of_america_mbs_uw.asp.

576.     There were no reasonable substitutes for USD floating-rate MBS.

### Harm to Competition

577.     The unlawful agreements harmed competition in the market for USD floating-rate MBS by limiting competition for the key interest-rate benchmark and by injecting false information that obscured the price-discovery process.  The Bank Defendants were among the largest issuers and underwriters of USD floating-rate MBS and, as a result of their conspiracy, were uninterested in promoting competition for interest-rate benchmarks.  As a result of the conspiracy, purchasers of USD floating-rate MBS paid artificially high prices for products and received lower quality.  The unlawful agreements also limited choice, deterred innovation, artificially increased barriers to entry, injected false information into the market, and limited transparency.

578.     The unlawful agreements did not provide any pro-competitive benefits in this market.

### Antitrust Injury

579.     The harms to competition in the market for USD floating-rate retail loans were a material contributing factor to the Closed Banks and the FDIC-R's injuries because the Closed Banks purchased significant amounts of USD floating-rate MBS from the Panel Bank Defendants and others.  In a competitive environment, USD bbaLIBOR™ would have been calculated according to its published methodology and the Closed Banks and the FDIC-R would not have suffered their alleged injuries because the payments that the Closed Banks received from floating-rate MBS were less than they would have been in the absence of the conspiracy.

## COUNT XXIV: VIOLATIONS OF THE DONNELLY ACT
### (ALL DEFENDANTS)

580.    The FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

581.    As explained in detail above, the Defendants unlawfully interfered with competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in violation of N.Y. Gen. Bus. Law § 340.

582.    As a result of the Defendants' fraudulent and collusive conduct, the Closed Banks and the FDIC-R have suffered damages from the artificial suppression of bbaLIBOR™ in the form of, among other things, paying artificially high prices for bbaLIBOR™-based financial instruments and receiving artificially low interest payments on bbaLIBOR™-based financial products. These damages flow directly from the unlawful agreements' interference with competition and the free exercise of any activity in the conduct of any business, trade or commerce.

583.    In the absence of collusion, the Bank Defendants could not have achieved the supracompetitive prices that they were able to charge (and increased profit margins that they were able to earn) in transactions for certain bbaLIBOR™-based financial instruments.

## PRAYER FOR RELIEF

WHEREFORE, FDIC as Receiver for the Closed Banks requests the Court to:

a.    Enter judgment for the FDIC-R awarding full damages for all economic, monetary, actual, consequential, and compensatory damages that the Closed Banks suffered as a result of Defendants' wrongful and/or inequitable conduct.

b.    Award punitive damages to the extent allowable by law.

c.   Award treble damages for violations of the Sherman Act and/or Donnelly Act.

d.   Award attorneys' fees and costs of suit.

e.   Award pre- and post-judgment interest to the extent allowable by law.

f.   Grant such other further relief as allowed by law.

## **JURY DEMAND**

The FDIC-R demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated:  April 16, 2019                              Respectfully submitted,

ZELLE LLP

By:   */s/ James R. Martin*
       James R. Martin
       Jennifer D. Hackett
       Woody N. Peterson
       Miriam R. Vishio
       Nicholas S. Cheolas
       Allison M. Vissichelli
       1775 Pennsylvania Avenue, NW
       Suite 375
       Washington, DC  20006
       Tel:  202-899-4100
       Fax:  612-336-9100
       Email:   jmartin@zelle.com
                   jhackett@zelle.com
                   wpeterson@zelle.com
                   mvishio@zelle.com
                   ncheolas@zelle.com
                   avissichelli@zelle.com

       *Attorneys for the FDIC-R*